**No. 2015-1945**

IN THE

# UNITED STATES COURT OF APPEALS
FOR THE FEDERAL CIRCUIT

**WI-FI ONE, LLC,**

*Appellant,*

**v.**

**BROADCOM CORPORATION,**

*Appellee.*

*Appeal from the United States Patent and Trademark Office,
Patent Trial and Appeal Board in Case No. IPR2013-00602*

## OPENING BRIEF OF APPELLANT
## WI-FI ONE, LLC

G. Donald Puckett
Steven Joseph Udick
SKIERMONT PUCKETT LLP
2200 Ross Ave.
Suite 4800W
Dallas, TX 75201
(214) 978-6600

Douglas A. Cawley
MCKOOL SMITH, P.C.
300 Crescent Court
Suite 1500
Dallas, TX 75201
(214) 978-4972

Peter J. Ayers
LEE & HAYES PLLC
11501 Alterra Parkway
Suite 450
Austin, TX 78758
(512) 605-0252

*Attorneys for Appellant Wi-Fi One, LLC*

## CERTIFICATE OF INTEREST

Counsel for the Appellant, Wi-Fi One, LLC, certifies the following:

1.      The full name of every party or amicus represented by me is:

**Wi-Fi One, LLC**

2.      The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:

**Wi-Fi One, LLC**

3.      All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:

**Wi-Fi One, LLC is 100% owned by Optis Wi-Fi Holdings, LLC.**

4.      The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this Court are:

**LEE & HAYES, PLLC**
Peter Ayers
J. Christopher Lynch
John Shumaker

**SKIERMONT PUCKETT LLP**
G. Donald Puckett
Steven Joseph Udick
Sarah E. Spires

**MCKOOL SMITH, P.C.**
Douglas A. Cawley

Dated:  October 26, 2015          Respectfully submitted,


/s/ Donald Puckett
G. Donald Puckett
Steven Joseph Udick
SKIERMONT PUCKETT LLP
2200 Ross Avenue, Suite 4800W
Dallas, Texas 75201
(214) 978-6600 (telephone)
(214) 978-6601 (facsimile)
Donald.Puckett@skiermontpuckett.com
Steve.Udick@skiermontpuckett.com

Douglas A. Cawley
MCKOOL SMITH, P.C.
300 Crescent Court, Suite 1500
Dallas, TX 75201
(214) 978-4972 (telephone)
(214) 978-4044 (facsimile)
dcawley@mckoolsmith.com

Peter J. Ayers
LEE & HAYES PLLC
11501 Alterra Parkway, Suite 450
Austin, TX 78758
(512) 605-0252 (telephone)
(512) 605-0252 (facsimile)
peter@leehayes.com

*Attorneys for Appellant,*
*Wi-Fi One, LLC*

**TABLE OF CONTENTS**

CERTIFICATE OF INTEREST ..................................................................................i

TABLE OF CONTENTS........................................................................................ iii

TABLE OF AUTHORITIES ..................................................................................vi

STATEMENT OF RELATED CASES ...................................................................xi

I.     STATEMENT OF JURISDICTION ..........................................................1

II.    STATEMENT OF THE ISSUES ...............................................................2

III.   STATEMENT OF THE CASE ..................................................................4

IV.    STATEMENT OF FACTS .........................................................................5

      A.    Procedural History.........................................................................5

      B.    The Indemnity Agreements and the Relationship Between
             Broadcom and the District Court Defendants .......................................6

      C.    The '568 Patent and the IPR Decision .................................................9

V.     SUMMARY OF THE ARGUMENT .........................................................15

VI.    ARGUMENT...............................................................................................17

      A.    The Board's Final Written Decision should be reversed or
             vacated in light of 35 U.S.C. §315(b). .................................................17

           1.    Standard of Review – Section 314(d) does not preclude
                   all appellate review of the Board's §315(b)
                   determinations. ......................................................................17

                a.    There is a strong presumption against
                        unreviewability of agency actions. The agency
                        bears a heavy burden to overcome this
                        presumption. ...............................................................18

b.      Section 314(d) does not evidence a clear intent to preclude judicial review of the §315(b) time-bar. ..........20

c.      The Federal Circuit retains jurisdiction to review the Board's violation of a clear statutory directive. The jurisdictional versus nonjurisdictional distinction is irrelevant. .................................................24

d.      In the alternative, this Court can review the §315(b) issue for critical legal errors or serious procedural violations; or else treat this appeal as a petition for writ of mandamus. ......................................27

2.      The Board's Final Written Decision must be reversed or vacated because its resolution of the §315(b) issue was both substantively and procedurally flawed. ...........................28

a.      The Board applied a fundamentally flawed legal standard that was too rigid and narrow, and that undermines the basic purpose of the "real party in interest or privy" language in §315(b)............................28

b.      The Board turned a blind eye to the most relevant facts, such as the known indemnity agreements.............32

c.      The Board did not adequately set forth its reasons and supporting evidence, and its findings are not supported by substantial evidence. ................................35

3.      The Board's §315(b) determination should be reversed or vacated by appellate review or by mandamus. ........................38

B.      The Board's unpatentability determinations are erroneous and should be reversed. ........................................................................41

1.      Standard of Review................................................................41

2.      The Board erroneously determined that the '568 Patent is invalid as anticipated...............................................................42

iv

a.  The Board erred in construing the phrase "service type identifier." ...........................................................42

b.  The Board erred in concluding that Morley anticipated the challenged claims of the '568 Patent. .......................................................................49

    i.  Overview of Morley ............................................49

    ii.  The Board applied an incorrect construction of "service type identifier" to Morley. .................52

    iii.  Morley does not identify a "service type." ..........55

    iv.  Morley does not identify payload information. ........................................................56

c.  The Board erred in concluding that Adams renders obvious the challenged claims of the '568 Patent. .........60

    i.  Overview of Adams .............................................60

    ii.  The Board applied an incorrect construction of "service type identifier." .................................62

    iii.  Adams does not identify a type of payload information. ........................................................64

CONCLUSION ...........................................................................67

ADDENDUM

    A. Final Written Decision 35 U.S.C. § 318(a) and 37 C.F.R. § 42.73 ..........A001

    B. Decision on Request for Rehearing 37 C.F.R. § 42.71(d) .......................A0301

    C. U.S. Patent No. US 6,466,568 B1 .........................................................A0036

CERTIFICATE OF SERVICE

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

**Cases**

*Abbott Labs., Inc. v. Gardner*,
  387 U.S. 136 (1967).................................................................18

*Achates Reference Publ'g, Inc. v. Apple, Inc.*,
  2015 U.S. App. LEXIS 17183 (Fed. Cir. Sept. 30, 2015)..................... passim

*Aruze Gaming Macau, Ltd. v. MGT Gaming, Inc.*,
  IPR2014-01288, Paper No. 13 (PTAB Feb. 20, 2015)..................................30

*Atar S.r.l. v. United States*,
  730 F.3d 1320 (Fed. Cir. 2013) .....................................................35

*Atchison v. Wichita Board of Trade*,
  412 U.S. 800 (1973).................................................................36

*Austin Road Co. v. Occupational Safety and Health Review Comm'n*,
  683 F.2d 905 (5th Cir. 1982) ........................................................36

*Bowen v. Michigan Academy of Family Physicians*,
  476 U.S. 667 (1986)..................................................................19

*Brisco v. Bell*,
  432 U.S. 404 (1977)..................................................................22

*City of Arlington v. FCC*,
  133 S.Ct. 1863 (2013)......................................................... passim

*Consol. Edison Co. v. N.L.R.B.,*
  305 U.S. 197 (1938)..................................................................42

*Daiichi Sankyo Co., Ltd. v. Lee*,
  791 F.3d 1373 (Fed. Cir. 2015) ....................................... 32, 35, 39

vi

*Director, Office of Workers' Compensation Programs*,
    826 F.2d 1319 (3d Cir. 1987) ............................................................35

Ericsson, et al. v. D-Link Systems, Inc.
    No. 10-cv-0473 (E.D. Tex.)............................................................ xii

*Ericsson, Inc. v. D-Link Systems, Inc.*,
    773 F.3d 1201 (Fed. Cir. 2014) ......................................................5, 6

*Ericsson, Inc. v. D-Link Systems, Inc.*,
    Fed. Cir. Nos. 2013-1625, -1631, -1632, -1633; 773 F.3d 1201
    (Fed. Cir. 2014)............................................................................ xii

*GTNX, Inc. v. Inttra, Inc.*,
    789 F.3d 1309 (Fed. Cir. 2015) ........................................................28

*In re Cuozzo Speed Tech's*,
    793 F.3d 1268 (Fed. Cir. 2015) .................................................. 28, 42

*In re Dominion Dealer Sols., LLC*,
    749 F.3d 1379 (Fed. Cir. 2014) ........................................................40

*In re Telefonaktiebolaget LM Ericcson*,
    564 Fed. App. 585 (Fed Cir. 2014) ............................................... xi, 9

*Intel Corp. v. U.S. Int'l Trade Comm'n*,
    946 F.2d 821 (Fed. Cir. 1991) .........................................................33

*Ismailov v. Reno*,
    263 F.3d 851 (8th Cir. 2001) ...........................................................22

*Japanese Found. for Cancer Research v. Lee*,
    773 F.3d 1300 (Fed. Cir. 2014) .................................................. 38, 39

*Leedom v. Kyne*,
    358 U.S. 184 (1958).................................................................. 19, 27

*Lindahl v. OPM*,
    470 U.S. 768 (1984).................................................................. 23, 27

*Mach Mining, LLC v. EEOC*,
    135 S.Ct. 1645 (2015)................................................................ passim

*McDougal-Saddler v. Herman*,
    184 F.3d 207 (3d Cir. 1999) ....................................................22

*Microsoft Corp. v. Proxyconn, Inc.*,
    789 F.3d 1292 (Fed. Cir. 2015) .................................... 41, 43, 46

*National Coalition to Save Our Mall v. Norton*,
    269 F.3d 1092 ...........................................................................22

*NMB Sing. Ltd. v. United States*,
    557 F.3d 1316 (Fed. Cir. 2009) ...............................................36

*Pregis Corp. v. Kappos*,
    700 F.3d 1348 (Fed. Cir. 2012) ...............................................20

*Reflectix, Inc. v. Promethean Insulation Tech. LLC*,
    IPR2015-00039, Paper No. 18 (PTAB Apr. 24, 2015) ..............31

*Reilly v. Office of Personnel Mgmt.*,
    571 F.3d 1372 (Fed. Cir. 2009) ......................................... passim

*SKF USA, Inc. v. United States*,
    630 F.3d 1365 (Fed. Cir. 2011) ...............................................35

*Teva Pharms. U.S.A., Inc. v. Sandoz, Inc.*,
    135 S. Ct. 831 (2015)................................................................41

*Versata Dev. Grp., Inc. v. SAP Am., Inc.*,
    793 F.3d 1306 (Fed. Cir. 2015) ......................................... passim

*Zoll Lifecore Corp. v. Philips Elecs. N. Am. Corp.*,
    IPR 2013-00609, Paper No. (PTAB Mar. 20, 2014)............. 31, 37

viii

**Statutes**

5 U.S.C. § 556 ...............................................................................................35

5 U.S.C. § 556(d) ..........................................................................................34

5 U.S.C. § 556(e) ..........................................................................................34

5 U.S.C. § 702 ...............................................................................................18

5 U.S.C. § 704 ...............................................................................................22

5 U.S.C. § 706 ...............................................................................................18

5 U.S.C. § 8347 .............................................................................................23

5 U.S.C. § 8347(c) .........................................................................................23

28 U.S.C. § 1295(a) .........................................................................................1

35 U.S.C. § 141(c) ...........................................................................................1

35 U.S.C. § 142 ................................................................................................1

35 U.S.C. § 314 ................................................................................................1

35 U.S.C. § 314(d) ................................................................................. passim

35 U.S.C. § 315(b) ................................................................................. passim

35 U.S.C. § 318(a) ..................................................................................... 1, 22

35 U.S.C. § 319 .......................................................................................... 1, 22

35 U.S.C. § 324(e) .................................................................................. 19, 20

**Other Authorities**

154 Cong. Rec. S9989 (daily ed. Sept. 27, 2008)........................................30

**Rules**

Fed. Cir. R. 47.5(a) ......................................................................... xi

Fed. Cir. R. 47.5(b) ......................................................................... xi

**Regulations**

37 C.F.R. § 41.108 ...............................................................................1

37 C.F.R. § 42.20(c).............................................................................36

37 C.F.R. § 42.51(b)(2).........................................................................32

37 C.F.R. § 42.73 .................................................................................1

37 C.F.R. § 90.3 ..................................................................................1

Trial Practice Guide,
    77 Fed. Reg. 48,756 (Aug. 14, 2012) ..................................... 29, 30

## STATEMENT OF RELATED CASES

In accordance with Federal Circuit Rule 47.5(a) and (b), appellant states:

1.    The following petition for writ of mandamus was previously before this Court, arising from the same *inter partes* review proceeding that is now at issue in this appeal:

- *In re Telefonaktiebolaget LM Ericcson*, Nos. 2014–127, –128, and –129 (decided on May 5, 2014).  The panel was composed of Judges Lourie, Dyk and Reyna (with Judge Lourie authoring the opinion).  This opinion was designated non-precedential and is reported as 564 Fed. Appx. 585 (Fed. Cir. 2014).

2.    The following pending cases are companions to this appeal in that they arise from *inter partes* review proceedings involving the same parties; involve final written decisions that were entered on or about the same day; and involve common issues of law and fact related to the issues arising under 35 U.S.C. §315(b) (but also involve distinct issues of law and fact pertaining to the different patents involved):

- *Wi-Fi One, LLC v. Broadcom Corporation*, Fed. Cir. No. 2015-1944.

- *Wi-Fi One, LLC v. Broadcom Corporation*, Fed. Cir. No. 2015-1946.

3.    The following district court case may be directly affected by the outcome of this appeal:

- *Ericsson, Inc., Telefonaktiebolaget LM Ericsson, and Wi-Fi One, LLC v. D-Link Systems, Inc., Netgear, Inc., Acer, Inc., Acer America Corporation, Gateway, Inc., Dell, Inc., Toshiba America Information Systems, Inc., Toshiba Corporation, Intel Corporation, and Belkin International, Inc.*, No. 10-cv-0473, in the United States District Court for the Eastern District of Texas.

- An appeal was previously taken and decided from that case. The appeal was styled *Ericsson, Inc. v. D-Link Systems, Inc.*, Fed. Cir. Nos. 2013-1625, -1631, -1632, -1633; 773 F.3d 1201 (Fed. Cir. 2014).  This appeal was decided on December 4, 2014.  The panel was composed of Judges O'Malley, Taranto, and Hughes (Judge O'Malley filed the opinion and Judge Taranto filed an opinion dissenting in part).

## I.    STATEMENT OF JURISDICTION

The Patent Trial and Appeal Board (the "Board") asserted jurisdiction over this case under 35 U.S.C. §314 and instituted the case for trial pursuant to 37 C.F.R. §42.108. (A131.)  The Board then issued its Final Written Decision pursuant to 35 U.S.C. §318(a) and 37 C.F.R. §42.73 on March 6, 2015. (A1–35.) Wi-Fi One then filed a Request for Rehearing of the Final Written Decision, (A283–300), which was denied by the Board on June 1, 2015. (A301–10.)

Patent Owner Wi-Fi One, LLC timely filed a Notice of Appeal on July 13, 2015, pursuant to 35 U.S.C. §142 and 37 C.F.R. §90.3. (A311–17.) The Notice of Appeal was received and docketed by this Court on August 25, 2015. The Court has jurisdiction over this appeal pursuant to 28 U.S.C. §1295(a) and 35 U.S.C. §§141(c) and 319.

## II.    STATEMENT OF THE ISSUES

1.    Where certain litigation defendants are time-barred from filing a petition for *inter partes* review under 35 U.S.C. §315(b), and the Patent Owner has presented evidence of an indemnity relationship and other coordination between Broadcom and some of the time-barred litigation defendants:

    (a)    Did the PTAB err in applying a legal standard under §315(b) under which it is irrelevant if the litigation defendants had the right to control, or were actually controlling, Broadcom's IPR activities?

    (b)    Did the PTAB err in refusing to allow Patent Owner any discovery on the §315(b) issue, and in refusing to consider evidence known to be relevant to the §315(b) issue, such as the known indemnity agreements?

    (c)    Did the PTAB err by failing to provide a clear statement of the reasons and evidence supporting its implied finding that the §315(b) time-bar does not apply?

    (d)    Are the PTAB's errors related to the §315(b) issue reviewable by this Court in light of 35 U.S.C. §314(d)?

2.    Whether claims 1–6 of the '568 Patent are patentable over Morley?

(a)   Did the Board err in finding claims 1–6 of the '568 Patent anticipated by Morley where the Board erred in construing the term "service type identifier"?

(b)   Did the Board err in finding claims 1–6 of the '568 Patent anticipated by Morley where no substantial evidence supports its finding that Morley discloses a message having a service type identifier?

3.   Whether claims 1–6 of the '568 Patent are patentable in view of Adams?

(a)   Did the Board err in finding claims 1–6 of the '568 Patent rendered obvious by Adams where the Board erred in construing the term "service type identifier"?

(b)   Did the Board err in finding claims 1–6 of the '568 Patent rendered obvious by Adams where no substantial evidence supports its finding that Adams discloses a message having a service type identifier?

### III.   STATEMENT OF THE CASE

This is an appeal from an *inter partes* review ("IPR") decision by the Patent Trial and Appeal Board ("PTAB" or the "Board") finding all challenged claims of U.S. Patent No. 6,466,568 (the '568 Patent) to be unpatentable. (A1–35.)  The PTAB issued its final written decision on March 6, 2015. (*Id.*) Appellant timely filed a request for rehearing of the final written decision, which the PTAB denied on June 1, 2015. (A283–300; A301–10.) Appellant then filed its notice of appeal to this Court. (A311–17.)

During the pendency of the IPR below, patent owner Telefonaktiebolaget LM Ericsson ("Ericsson") transferred ownership of the '568 Patent to new patent owner Wi-Fi One, LLC ("Wi-Fi One"), and Wi-Fi One was substituted as the patent owner in the IPR. Throughout this brief, references to "Patent Owner" or "Appellant" are intended to refer alternatively to either Ericsson or Wi-Fi One, whichever owned the patent at the relevant time being discussed.

4

## IV.    STATEMENT OF FACTS

### A.    Procedural History

The '568 Patent previously was before the Federal Circuit in *Ericsson, Inc. v. D-Link Systems, Inc.*, 773 F.3d 1201 (Fed. Cir. 2014). In that case, the Federal Circuit affirmed a jury verdict and district court judgment finding that the '568 Patent[1] had been infringed; but the Court remanded the case for a new trial on damages. *See id.* at 1236-37.  The district court litigation against D-Link and seven other defendants was filed by Ericsson (as the then-owner of the '568 Patent) on September 24, 2010 (the "District Court Litigation"). It is undisputed that each of the defendants (the "District Court Defendants") would themselves have been subject to the one-year time-bar of 35 U.S.C. §315(b) if they had filed the IPR petition because they had been sued for patent infringement of the '568 Patent more than one year prior to the filing of the IPR petition. (A100.)

IPR Petitioner and Appellee Broadcom Corporation ("Broadcom") was not named as a defendant in the District Court Litigation and has never itself been sued

---

[1] The case also involved two other Ericsson patents that had been asserted in the same case: U.S. Patent Nos. 6,772,215 and 6,424,625. Each of these patents has also been found to be unpatentable by the PTAB in separate IPR proceedings, and each of these patents is the subject of a co-pending appeal to this Court. *See* Federal Circuit Appeal Nos. 15-1944 and 15-1946.

for infringing the '568 Patent. But on September 20, 2013—shortly after the district court entered its final judgment —Broadcom filed the petition for IPR below, challenging claims 1-6 (the "challenged claims") of the '568 Patent. (A336.)  The PTAB granted the IPR petition on March 10, 2014. (A130–31.)

While Broadcom and Ericsson were litigating the IPR in the PTAB, the parties to the District Court Litigation proceeded with the Federal Circuit appeal which ultimately resulted in a remand of the case to district court for a retrial on damages. *See D-Link,*773 F.3d at 1236-37. Before the new trial on damages was held, however, the PTAB in the IPR below entered its final written decision finding all challenged claims of the '568 Patent to be unpatentable. (A1–35.)

**B.    The Indemnity Agreements and the Relationship Between Broadcom and the District Court Defendants**

Although Broadcom itself has never been sued for infringement of the '568 Patent, it is undisputed that there is a significant relationship between Broadcom and at least some of the District Court Defendants with respect to the infringement claims asserted by Patent Owner in that case. The relationship between Broadcom and the District Court Defendants is relevant to whether the IPR petition below was time-barred under 35 U.S.C. §315(b).

In its motion for additional discovery and also in its Patent Owner Response, Patent Owner presented strong evidence that Broadcom has been closely

coordinating with some of the District Court Defendants in opposing the '568

Patent. (A57–59 (sealed), A68–70 (redacted); A160–72 (sealed), A215–27

(redacted).) Indeed, the close ties between Broadcom and its customer-defendants

were well summarized by the Board in its motion denying the requested discovery.

(A104–13.) The factual nature of this evidence is largely undisputed.

For example, Broadcom acknowledged in the IPR petition that certain

Broadcom products, such as the "BCM4313" and "BCM4321" chips, form the

basis for some of the '568 Patent infringement allegations made by Patent Owner

in the District Court Litigation. (A334.) It also is undisputed that there are at least

two indemnity agreements between Broadcom and certain District Court

Defendants that cover the '568 Patent infringement allegations in district court.

(A1985 (district court order noting the existence of at least two indemnity

agreements and indemnity-related email); A107 (Board order noting the existence

of indemnity agreements).) The specific terms of the indemnity relationships are

not known, however, because the indemnity agreements have not been made a part

of the record, despite the diligent efforts of Patent Owner. It also is undisputed that

for many years Broadcom has been working in coordination with at least some of

the District Court Defendants with respect to the defense of the infringement

allegations in the District Court Litigation. (A57–59 (sealed), A68–70 (redacted);

A104–13.) And it is undisputed that Broadcom took other affirmative steps to collaterally attack the asserted patents on behalf of its customers—the District Court Defendants. (A58, A62 (sealed); A69, 73 (redacted).)

Presumably, the indemnity agreement itself would shed more light on the nature of the relationship between Broadcom and its customers who are District Court Defendants – particularly regarding the parties' respective rights to control litigation or IPR decisions. The indemnity agreement was produced to Patent Owner's counsel subject to a protective order in the District Court Litigation, but the terms of the district court protective order precluded the agreement from being offered as an exhibit in the IPR below. (A1985–88.)

Patent Owner has made every effort to have the indemnity agreement included in the IPR record. Patent Owner first moved the district court to modify the protective order to allow the known indemnity agreements to be introduced in the IPR, but this request was denied. (A1985–88.) The district court judge held that "granting Ericsson relief from the protective order would undermine the negotiations which produced the Protective Order." (A1987.) Patent Owner then filed a motion for additional discovery in the IPR below seeking, *inter alia*, production of the indemnity agreements. (A56–66 (sealed); A67–77 (redacted).) The motion for additional discovery was opposed by Broadcom, and all requested

discovery (including production of the known indemnity agreements) was denied

by the Board. (A78–87 (redacted brief ); A88–97 (unredacted brief); A98–114

(order).) Patent Owner moved for rehearing of this decision, but the request for

rehearing also was denied. (A115–23; A124–29.) Patent Owner then pursued a writ

of mandamus to compel the PTAB to order all or part of the requested discovery,

but the Federal Circuit declined to issue mandamus relief. *See In re*

*Telefonaktiebolaget LM Ericsson*, 564 Fed. Appx. 585 (Fed. Cir. 2014).

Thus, the Board below did not have the benefit of the known indemnity

agreements (or any of the other discovery requested by Wi-Fi One) when it

overruled Patent Owner's contention that the petition is time-barred under 35

U.S.C. §315(b), and implicitly held that none of the District Court Defendants is a

"real party in interest or privy" of Broadcom.

## C.    The '568 Patent and the IPR Decision

The '568 Patent resulted from Ericsson's work on the North American Time

Division Multiple Access (NA-TDMA) standards in the mid-90s.  As a result of

that work, the inventors realized that the traffic demands on existing

telecommunications infrastructure were growing at a rapid rate, while that

infrastructure needed to remain the same.  (A45 at 2:56–63.)   In particular, the

inventors recognized that "[i]n addition to voice information being transmitted on

the traffic channels, various other types of data can and will be transmitted thereon." (A45 at 2:17–20.)   Such types of information included video, facsimile, packet data, video, and/or hybrid voice, data and video.  (A45 at 2:17–37.)

One of the challenges with accommodating all of these different information types on the same communication channel is that each type could have "different optimal transmission characteristics." (A45 at 2:28–30.)  In the case of an internet transmission, for example, "a greater bandwidth in the downlink (i.e., from the internet to the remote station)" may be required "than in the uplink, since many users spend a significant portion of their connection time downloading information from the internet than uploading thereto." (A45 at 2:30–36.)  Likewise, voice and data might require different "degrees of error protection" such as "channel coding" because of the potential availability of "retransmission procedures" for one and not the other. (A45 at 2:42–50.)   "Other transmission characteristics, for example, the ability to tolerate delay in the reception of information, may also vary between services." (A45 at 2:50–52.)   The objective of the '568 Patent was to provide a mechanism that would allow for the optimal transmission of these various data types using the existing infrastructure "so that equipment used by the existing customer base will not become obsolete."   (A45 at 2:56–63.)  This was a laudable goal for a company that sold such telecommunications equipment.

10

To achieve this goal, the inventors created a new data field called a "service type identifier" in an existing communication channel to identify both the type of data being transmitted (e.g., voice or data) and the corresponding transmission characteristics of that particular data type (e.g., channel coding or interleaving). (A36 at Abstract, A46 at 3:9–22, A49 at 9:29–32.)  In the preferred embodiment, a fast out-of-band channel ("FOC") is used to provide information relating to the type and characteristics of a particular payload.  "In this embodiment, the FOC can provide information regarding the type of service which the associated payload is currently supporting, the channel coding and/or interleaving associated therewith." (A49 at 9:29–32.)  This information "is used by the receiving equipment to aid in processing the information conveyed in the payload, e.g., by knowing the channel coding rate."  (A46 at 3:16–19.)

Fig. 6 of the '568 Patent illustrates one approach for implementing a service type identifier in a FOC field:

## FIG. 6

| SLOT 1 | SYNC | SACCH | DATA | CDVCC | DATA | CDL |
| SLOT 2 | SYNC | FOC | DATA | FOC | DATA | FOC |
| SLOT 3 | SYNC | FOC | DATA | FOC | DATA | FOC |

11

(A40 at Fig. 6.) In this figure, three different downlink time slots are shown. (A46 at 3:59–60, A47 at 6:47–48.) Here, the FOC field can be populated with "information regarding the type of service which the associated payload is currently supporting, the channel coding and/or interleaving associated therewith." (A49 at 9:29–32.) The information is encoded in the "service type identifier" field. (A49 at 9:27–29.) In each case, the FOC service type identifier field provides transmission characteristics for communication of the information between the base and mobile stations. (A2012–13 at ¶ 17.) In some cases, information regarding the type of service necessarily correlates to transmission characteristics. (A2012–13 at ¶ 17.) In other words, identifying the type of data necessarily identifies the data's transmission characteristics. As mentioned above, channel coding and interleaving are examples of transmission characteristics. (A2012–13 at ¶ 17.) The '568 Patent therefore uses the service type identifier to identify transmission characteristics. (A2012–13 at ¶ 17.)

Different types of information can be efficiently communicated by exploiting the communication characteristics of the service type. However, if a receiver is unable to determine the service type(s) of the payload(s) of each data packet, the receiver would not know how to efficiently process the data streams. (A2013 at ¶ 18.) Efficient communication of various types of data may involve

12

different channel coding, different interleaving, or error correction. (A45 at 2:28–50; A49 at 9:27–32.) And different data types may have different tolerances for delay. (A45 at 2:50–55.) The '586 Patent teaches a service type identifier for identifying the type of information communication and, in some cases, the type of data in the payload so that different types of information can be efficiently communicated. (A2013 at ¶ 18.)

The '568 Patent recognized that advancement and evolution of radio communication systems may require new types of information with different transmission characteristics to be exchanged. Rather than attempt to predict all these future changes, the '568 Patent proposes using a service type identifier to describe, among others, the transmission characteristics of a data payload. (A45 at 2:56–2:63.) The transmission characteristics can thereafter be easily changed to accommodate a variety of different services. (*Id.*) For example, the time-sensitive nature of voice information requires a high degree of error coding so that the voice packets are received error-free in the correct order. On the other hand, fax transmission is more tolerant of error so a fax service typically would require a much lower error protection than voice information. (A45 at 2:44–50.) To alert a receiver to these differences in transmission characteristics, each packet could contain a service type identifier which informs the receiver to use, for example,

13

voice error protection or fax error protection when processing that packet. (A45 at 2:56–63.)

Independent claim 1 of the '568 Patent is reproduced below:

1. A communication station comprising:

a processor for arranging information for transmission including providing at least one first field in which payload information is disposed and providing at least one second field, separate from said first field, which includes a service type identifier which identifies a type of payload information provided in said at least one first field; and

a transmitter for transmitting information received from said processor including said at least one first field and said at least one second field.

In the IPR below, Broadcom successfully convinced the Board that this claim and a number of others were anticipated by the Morley reference and rendered obvious by the Adams reference. (A33.) As discussed below, the Board's decision is not supported by substantial evidence.

## V.   SUMMARY OF THE ARGUMENT

The Board's final written decision below must be reversed or vacated because the Board erred in two fundamental respects.

First, the Board's resolution of the time-bar issue under 35 U.S.C. §315(b) was fundamentally flawed. The Board applied an incorrect legal standard for determining whether one or more District Court Defendants is a "real party in interest or privy" of Broadcom. Under the Board's erroneous standard, it is irrelevant even if the District Court Defendants directly controlled Broadcom's conduct in the IPR below. Moreover, the Board purposefully refused to consider relevant evidence, such as the known indemnity agreements. Additionally, the Board's orders fail to articulate reasons or evidence in favor of its implied determination that §315(b) does not apply in this case. All credible evidence in the record indicates that the petition below was time-barred, and the Board's actions in this case violate the statutory directive of §315(b).

The recent *Achates* case notwithstanding, the Federal Circuit may review the §315(b) issue on appeal. The *Achates* court did not consider the most recent Supreme Court authorities rejecting a jurisdictional/nonjurisdictional distinction and instructing federal courts to treat all statutory directives to administrative agencies as impacting the agency's authority. Nor did *Achates* properly consider

15

the strong presumption against unreviewability and previous Federal Circuit cases preserving some scope of judicial review, even considering much stronger statutory language restricting reviewability of an agency action. In the alternative, the court should treat this appeal as a petition for mandamus in order to correct the Board's errors in its §315(b) determination.

Second, the Board's unpatentability determinations are premised on several reversible errors. The Board's construction of the phrase "service type identifier" is unduly broad because it ignores that a "service type identifier" must identify both the type of payload and transmission characteristics of the service. The Board further erred by applying its erroneous construction of a "service type identifier" to the Morley and Adams references. Morley does not invalidate the claims of the '568 patent because Morley does not identify transmission characteristics, nor does Morley identify any service type or payload information. Similarly, Adams also fails to identify any service type or type of payload information.

16

## VI.    ARGUMENT

**A.    The Board's Final Written Decision should be reversed or vacated in light of 35 U.S.C. §315(b).**

### 1.    Standard of Review – Section 314(d) does not preclude all appellate review of the Board's §315(b) determinations.

In *Achates Reference Publ'g, Inc. v. Apple, Inc.*, 2015 U.S. App. LEXIS 17183 (Fed. Cir. Sept. 30, 2015), the Federal Circuit recently held that the PTAB's 35 U.S.C. §315(b) determination in that case was not reviewable on appeal in light of 35 U.S.C. §314(d).[2] *See id.* at *16.  Patent Owner respectfully contends that *Achates* was either wrongly decided, or else cannot be applied so strictly or so broadly as to preclude all judicial review of the Board's §315(b) determinations in every case.

In light of the Supreme Court and Federal Circuit authority discussed below (and not considered in *Achates*), the proper reading of §314(d) is that it precludes interlocutory appeal of the Board's decision on whether to institute a case for trial, but that it has little if any effect on the ***reviewability***, on appeal of a final written decision, of issues related to the Board's compliance with statutory directives such as the time-bar of §315(b). At a *minimum* this Court retains jurisdiction to review

---

[2] At the time Patent Owner files this brief, the deadlines have not passed for Achates to request a panel rehearing, *en banc* rehearing, or file a petition for *certiorari* to the U.S. Supreme Court.

17

the PTAB's §315(b) determinations to set aside agency actions that result from critical legal errors and/or from substantial deviations from a party's important procedural rights. *See, e.g. Reilly v. Office of Personnel Mgmt.*, 571 F.3d 1372, 1376-79 (Fed. Cir. 2009).

> **a.    There is a strong presumption against unreviewability of agency actions. The agency bears a heavy burden to overcome this presumption.**

Congress endorsed a strong presumption in favor of judicial review of agency actions when it passed the Administrative Procedures Act (the "APA"). *See Abbott Labs., Inc. v. Gardner*, 387 U.S. 136, 140 (1967); *see also* 5 U.S.C. §702 ("A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action, ***is entitled to judicial review thereof***.")[3]. Under the APA, Courts "***shall decide*** all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning and applicability of the terms of an agency action." 5 U.S.C. §706. Section 706 further provides a laundry list of the review standards courts are instructed to apply in reviewing agency actions. *Id.*

Even when Congress has enacted a statutory limitation to judicial review of an agency action, the federal courts possess an inherent ("nonstatutory") power to

---

[3] Throughout this brief, all emphasis in quotations is added, unless otherwise noted.

invalidate agency actions that are "*ultra vires,*" when the agency violates a clear statutory mandate. *See Leedom v. Kyne*, 358 U.S. 184, 190-91 (1958); *see also Achates*, 2015 U.S. App. LEXIS 17183 at \*16-17 (discussing *Leedom*).

Just last term, the Supreme Court reaffirmed this very strong presumption against unreviewability. *See Mach Mining, LLC v. EEOC*, 135 S.Ct. 1645, 1651 (2015). "Congress rarely intends to prevent courts from enforcing directives to federal agencies. For that reason, this Court applies a 'strong presumption' favoring judicial review of administrative action." *Id.*; *see also Bowen v. Michigan Academy of Family Physicians*, 476 U.S. 667, 670-72, 672 n.3 (1986) (discussing the historical roots of the presumption against unreviewability and collecting Supreme Court authority).

Citing *Mach Mining*, the Federal Circuit recently recognized and reaffirmed "the strong presumption that Congress intends judicial review of administrative action . . . ." *Versata Dev. Grp., Inc. v. SAP Am., Inc.*, 793 F.3d 1306, 1320 (Fed. Cir. 2015). In *Versata*, the court considered limitations on appealability contained in 35 U.S.C. §324(e), which applies to "post-grant reviews" and "covered business method reviews," but which is textually identical to §314(d).[4] The *Versata* court

---

[4] In its decision applying §324(e), the Federal Circuit looked to previous cases interpreting and applying §314(d). *See Versata*, 793 F.3d at 1316-17.

19

noted that the presumption of reviewability is controlling when there is any doubt about congressional intent to completely preclude judicial review, and held that notwithstanding the language of §324(e) the Federal Circuit retains jurisdiction to review whether a particular patent qualifies for covered business method review. *See Versata*, 793 F.3d at 1319-21.

While the presumption against unreviewability can be rebutted by the agency when the text or structure of the statute indicates that Congress intended the agency to police itself, "***the agency bears a 'heavy burden'*** in attempting to show that Congress 'prohibited all judicial review' of the agency's compliance with a legislative mandate." *Mach Mining*, 135 S.Ct. at 1651 (emphasis added).

### b.    Section 314(d) does not evidence a clear intent to preclude judicial review of the §315(b) time-bar.

"To determine whether a particular statute precludes judicial review, we look to its express language, the structure of the statutory scheme, its legislative history and purpose, and the nature of the administrative action involved." *Pregis Corp. v. Kappos*, 700 F.3d 1348, 1357-58 (Fed. Cir. 2012).

The America Invents Act, which created the new *inter partes* review ("IPR") proceeding, contains a limitation on the appealability of the Director's institution decisions. Section 314(d) states: "The determination by the Director whether to institute an inter partes review under this section shall be ***final and***

20

*nonappealable*." 35 U.S.C. §314(d). In *Achates*, the court relied upon §314(d) to conclude that the PTAB's §315(b) determinations at the institution stage are not only immune from interlocutory appeal, but also that they are not *reviewable* on an appeal of a final written decision. *See Achates*, 2015 U.S. App. LEXIS 17183 at *16. Unlike the present case, in *Achates* the PTAB had initially made a §315(b) determination in its institution decision that was revisited in its final written decision.[5]

The language of §314(d) and the structure of the Act, however, do not provide clear evidence that Congress intended the USPTO to police itself with respect to all statutory mandates related to the IPR institution decisions, including the time-bar of §315(b). By its plain text, the statute does not state that the Director's institution decision is not "reviewable." Instead, it merely states that the institution decision is "final and nonappealable." The plain text is most reasonably read as no more than a prohibition on interlocutory appeals, given the interlocutory

---

[5] In this case, the Board did not make any determination regarding §315(b) in its institution decision. (A130–51.) The Patent Owner first fully briefed its §315(b) arguments in the Patent Owner Response. (A160–72 (sealed); A215–27 (redacted).) The Board never meaningfully addressed these arguments. Even in its Final Written Decision, the Board merely incorporated by reference its reasons for denying Patent Owner's request for discovery, rather than making a reasoned determination of the §315(b) issue. (A7–8.)

21

nature of the Board's institution decision. *See Versata,* 793 F.3d at 1319 n.8 (noting that, under the APA, an agency initiation of a proceeding is considered interlocutory).

Congress expressly provided full appellate rights from the PTAB's final written decision. *See* 35 U.S.C. §319 ("A party dissatisfied with the final written decision of the Patent Trial and Appeal Board under section 318(a) may appeal the decision pursuant to sections 141 through 144."). Moreover, the APA specifies that nonappealable interlocutory agency rulings are ordinarily reviewable on appeal of the agency's final decision. *See* 5 U.S.C. §704 ("A preliminary, procedural, or intermediate agency action or ruling not directly reviewable is subject to review on the review of the final agency action.").

In cases involving other statutory schemes, where courts have found complete unreviewability of an agency action, the relevant statute clearly and expressly preclude *judicial review* by courts. *See, e.g., Brisco v. Bell*, 432 U.S. 404 (1977) (holding that provision of Voting Rights Act precluded all judicial review where statute stated that certain determinations "shall not be reviewable in any court"); *Ismailov v. Reno*, 263 F.3d 851, 854-55 (8th Cir. 2001) (similar); *National Coalition to Save Our Mall v. Norton*, 269 F.3d 1092, 1094-95 (D.C. Cir. 2001) (similar); *McDougal-Saddler v. Herman*, 184 F.3d 207, 211-14 (3d Cir. 1999)

22

(similar); *see also Lindahl v. OPM*, 470 U.S. 768, 780-81 (1984) ("[W]hen Congress intends to bar judicial review altogether, it typically employs language far more unambiguous and comprehensive . . . .").

In *Reilly*, for example, the Federal Circuit considered statutory language from the Civil Service Retirement Act which provided that certain agency decisions "are final and conclusive and ***are not subject to review***." *See Reilly*, 571 F.3d at 1376-77 (discussing 5 U.S.C. §8347(c)). The *Reilly* court nonetheless held that this "seemingly unequivocal language" did not overcome the strong presumption against unreviewability. *Id.* Instead, the court held that this statutory language still permits judicial review of the agency's decision for "critical legal errors" or whether the agency made a "substantial departure from important procedural rights." *See id.* at 1377; *see also Lindahl*, 470 U.S. at 791 ("The Federal Circuit erred in concluding that §8347, as amended, altogether bars judicial review of MSPB decisions in retirement disability cases.").

The statutory language of §314(d), limiting appealability but not reviewability, is a much weaker restriction on judicial review than the language considered in *Reilly* and *Lindahl*. If the courts in *Reilly* and *Lindahl* permitted some scope of judicial review for critical or serious legal errors and procedural

violations, then *at a minimum* the same judicial review should be available under

§314(d).

> **c.** **The Federal Circuit retains jurisdiction to review the Board's violation of a clear statutory directive. The jurisdictional versus nonjurisdictional distinction is irrelevant.**

The *Achates* court justified its holding, and distinguished *Versata*, on the

grounds that §315(b) is nonjurisdictional, as opposed to the jurisdictional issue

presented in *Versata*. *See Achates*, 2015 U.S. App. LEXIS 17183 at *13-15. But

recently, the Supreme Court completely rejected this distinction as being both

contrived and irrelevant. *See City of Arlington v. FCC*, 133 S.Ct. 1863, 1868-71

(2013). Under the Supreme Court's recent jurisprudence, ***all*** statutory directives

from Congress serve to constrain the power and authority of administrative

agencies.

The Supreme Court's rejection of the jurisdictional / nonjurisdictional

distinction could not have been more unequivocal:

> No matter how it is framed, the question a court faces when confronted with an agency's interpretation of a statute it administers is always, simply, *whether the agency has stayed within the bounds of its authority*. . . . Both their power to act and how they are to act is authoritatively prescribed by Congress, so that when they act improperly, no less than when they act beyond their jurisdiction, what they do is ultra vires. Because the question – whether framed as an incorrect application of agency authority or an assertion of authority not conferred – is always whether the agency has gone beyond what

Congress permitted it to do, ***there is no principled basis for carving out some arbitrary subset of such claims as "jurisdictional."***

*Id.* at 1868-69. "The reality, laid bare, is that there is *no difference*, insofar as the validity of agency action is concerned, between an agency's exceeding the scope of its authority (its 'jurisdiction') and its exceeding authorized application of authority it unquestionably has." *Id.* at 1870 (emphasis in original). The Supreme Court strongly discouraged judges from ever attempting to sort out jurisdictional versus nonjurisdictional administrative statutes:

> In sum, judges should not waste their time in the mental acrobatics needed to decide whether an agency's interpretation of a statutory provision is "jurisdictional" or "nonjurisdictional." Once those labels are sheared away, it becomes clear that the question in every case is, simply, whether the statutory text forecloses the agency's assertion of authority, or it does not. . . . The federal judge as haruspex, sifting the entrails of vast statutory schemes to divine whether a particular agency interpretation qualifies as "jurisdictional" is not engaged in reasoned decisionmaking.

*Id.* at 1870-71.

Even more recently in *Mach Mining*, when the Supreme Court considered whether a similar statutory limit on appeal precluded all judicial review of the EEOC's compliance with a statute requiring conciliation, the Court did not attempt to determine if the relevant statute was jurisdictional or nonjurisdictional. Instead, the Court merely treated the relevant statute as a "congressional directive." *See Mach Mining*, 135 S.Ct. at 1651-53.

25

For these same reasons, the jurisdictional / nonjurisdictional distinction cannot reconcile the Court's holdings in *Versata* and *Achates.* The *Achates* court framed the issue by stating that §315(b)'s time bar is not jurisdictional as it does not affect the PTAB's authority ***to invalidate a particular patent*** because a different party who is not time barred could file a proper petition. *Achates*, 2015 U.S. App. LEXIS 17183 at *13. But the issue could just as easily be reframed to shift the focus away from the Board's authority over a particular patent, and instead focus on the Board's delegated authority to act on a particular ***IPR petition***. *See City of Arlington*, 133 S.Ct. at 1870 ("The [jurisdiction] label is an empty distraction because every new application of a broad statutory term can be rephrased as a questionable extension of the agency's jurisdiction.")

Under §315(b), Congress prohibited the PTAB from exercising its authority to institute a petition that is time-barred. When the PTAB improperly institutes a time-barred petition it violates this congressional directive and exceeds its authority—end of story. *See City of Arlington*, 133 S.Ct. at 1874 ("The fox-in-the-henhouse syndrome is to be avoided . . . by taking seriously, and applying rigorously in all cases, statutory limits on agencies' authority.").

26

The *Achates* decision did not cite *City of Arlington*, and it did not attempt to justify the significance it placed on the jurisdictional / nonjurisdictional distinction. Nor does the *Achates* decision cite *Reilly, Lindahl* or *Mach Mining*. Appellant respectfully contends that the *Achates* decision did not properly consider the most relevant legal authorities, and that it was wrongly decided.

The language of §314(d) notwithstanding, this Court should retain jurisdiction, on appeal of the Board's final written decisions, to review the Board's compliance with clear congressional directives such as the time-bar of §315(b). *See Leedom*, 358 U.S. at 190-91; *see also Mach Mining*, 135 S.Ct. at 1651-53; *City of Arlington*, 133 S.Ct. at 1874-75. Such a holding would be in accord with *Versata*, which held that the PTAB's rulings regarding compliance with a congressional directive (§18 in that case) are reviewable on appeal from a final written decision. *See Versata*, 793 F.3d at 1320-21.

> **d.    In the alternative, this Court can review the §315(b) issue for critical legal errors or serious procedural violations; or else treat this appeal as a petition for writ of mandamus.**

If the Court is inclined to adopt a standard of review that is less than full appellate review, Appellant urges this Court to at least adopt a rule allowing for the Court to review the PTAB's §315(b) determinations to ensure, at a minimum, that the PTAB has not committed a critical legal error or made a substantial departure

27

from important procedural rights. This holding would be consistent with *Reilly*, 571 F.3d at 1377.

Finally, if the Court determines that the PTAB's §315(b) determination is not subject to review on appeal, Appellant asks the Court to treat this appeal as a petition for writ of mandamus. *See, e.g.*, *In re Cuozzo Speed Tech's*, 793 F.3d 1268, 1274 (Fed. Cir. 2015) ("[M]andamus may be available to challenge the PTO's decision to grant a petition to institute IPR after the Board's final decision in situations where the PTO has clearly and indisputably exceeded its authority."); *GTNX, Inc. v. Inttra, Inc.*, 789 F.3d 1309, 1312 (Fed. Cir. 2015) ("[W]e may treat the appeal as, in the alternative, a request for mandamus relief under §1651.").

> **2.      The Board's Final Written Decision must be reversed or vacated because its resolution of the §315(b) issue was both substantively and procedurally flawed.**
>
> **a.      The Board applied a fundamentally flawed legal standard that was too rigid and narrow, and that undermines the basic purpose of the "real party in interest or privy" language in §315(b).**

The Board committed a critical and serious legal error because it applied the wrong legal standard in making its §315(b) determination. Specifically, in deciding whether one or more District Court Defendants is a "real party in interest or privy of the petitioner," the Board imposed a hard and absolute requirement that Broadcom must have had the right to control the District Court Litigation in order

to find that a District Court Defendant was a real party in interest or privy. Under the Board's legal standard, it is *irrelevant* if a District Court Defendant has an absolute right to control Broadcom's conduct of the IPR (and even if it has been exercising actual control all along, such that Broadcom is a mere shill). This rigid legal standard defies logic, and it is contrary to both the text and purpose of the "real party in interest or privy" language of §315(b).

Section 315(b) states:

> **Patent Owner's Action.** – An inter partes review may not be instituted if the petition requesting the proceeding is filed more than 1 year after the date on which the *petitioner, real party in interest, or privy of the petitioner* is served with a complaint alleging infringement of the patent. . . .

35 U.S.C. §315(b).

The plain text of the statute makes clear that the "real party in interest, or privy of the petitioner" language in § 315(b) is intended to prevent litigation defendants from subverting the statutory time-bar by having their agents or cohorts file an IPR petition that they themselves are time-barred from filing. The USPTO's Patent Trial Guide confirms this purpose behind the "real party in interest, or privy" language. *See* Trial Practice Guide, 77 Fed. Reg. 48,756 at 48,759 (Aug. 14, 2012) (One of the "core functions" of the real-parties-in-interest or privies language is to "protect patent owners from harassment via successive petitions *by*

29

*the same or related parties* . . . .”). Thus, to accomplish the statutory purpose, the legal standard for “real party in interest or privy of the petitioner” must be broad enough to allow the PTAB to determine whether one or more District Court Defendants have attempted to circumvent the §315(b) time-bar by having Broadcom file the IPR petition for them and/or at their direction or control.

The legislative history and official public comments of the USPTO demonstrate that the applicable legal standard must be flexible and multi-faceted so that individual cases can be judged on their unique circumstances. *See* 154 Cong. Rec. S9989 (daily ed. Sept. 27, 2008) (statement of Sen. Kyl) (discussing the breadth of “privy” as explained by recent case law developments); *see also* Trial Practice Guide, 77 Fed. Reg. at 48759-60.

The Board has applied a broad and flexible legal standard —looking both at whether a petitioner controls related district court litigation and also whether the district court litigants control the IPR—in practically every recent §315(b) case. *See, e.g.*, *Aruze Gaming Macau, Ltd. v. MGT Gaming, Inc.*, IPR2014-01288, Paper No. 13 at 10-12 (PTAB Feb. 20, 2015) (discussing how “litigation through a proxy” satisfies the real party in interest standard); *Reflectix, Inc. v. Promethean Insulation Tech. LLC*, IPR2015-00039, Paper No. 18 at 9-10 (PTAB Apr. 24, 2015) (collecting cases in which the PTAB has found a non-party to be a real party

30

in interest due to the nonparty's control or connection with the IPR proceeding); *Zoll Lifecore Corp. v. Philips Elecs. N. Am. Corp.*, IPR 2013-00609, Paper No. 15 at 10-13 (PTAB Mar. 20, 2014) (same).

In this case, however, the Board inexplicably applied a narrow and rigid legal standard that focused exclusively on whether Broadcom has a right to control the District Court Litigation.  The Board made it abundantly clear that it viewed the District Court Defendants' right to control this IPR to be of no importance whatsoever. (A104 ("To show privity requires a showing that Broadcom would be bound by the outcome of the Texas litigation. To be bound, in normal situations, Broadcom *must have had control over the Texas Litigation*."); A108 ("The totality of the evidence fails to amount to more than a 'mere possibility' that Broadcom *controlled, or could have controlled, the Texas litigation*."); A109–10 ("[T]he IPR filings fail to show control over the Texas Litigation. The evidence does not amount to more than speculation that any of Broadcom's activity constitutes evidence of collusion with the D-Link defendants in the Texas Litigation *in a manner that would bind Broadcom to the outcome thereof.*"); A112 ("The evidence and arguments fail to show that the sought-after discovery would have more than a mere possibility of producing useful privity information, i.e., *that Broadcom controlled or could have controlled the Texas Litigation*.");

31

*see also* (A7–8 (Final Written Decision); A303–05 (order denying request for rehearing)).)

The Board's erroneous legal standard undermines both the plain text and purpose of §315(b), allowing a time-barred district court litigant to easily circumvent the statutory time-bar by simply employing an agent or shill to file an otherwise time-barred petition. This is a nonsensical result, and it substantially undermines the very purpose of the "real party in interest or privy of the petitioner" language from §315(b).

Because the Board applied the wrong legal standard to its §315(b) determination, its decision must be reversed. *See Daiichi Sankyo Co., Ltd. v. Lee*, 791 F.3d 1373, 1379 (Fed. Cir. 2015) ("An agency abuses its discretion when its decision is based on an erroneous interpretation of the law.").

> **b.    The Board turned a blind eye to the most relevant facts, such as the known indemnity agreements.**

Relying upon 37 C.F.R. §42.51(b)(2), Patent Owner moved for "additional discovery" of evidence that would show the level of coordination and control between Broadcom and the District Court Defendants. (A56–66 (sealed); A67–77 (redacted); A1567–74.) Patent Owner presented strong evidence that Broadcom and one or more of the District Court Defendants were closely coordinating their opposition to the '568 Patent, either in the District Court Litigation, in the IPR

32

below, or in both. (A57–59, A62 (sealed); A68–70, A73 (redacted).) The Board, however, denied Patent Owner any discovery on the issue. (A98–114; A124–29.) The Board even refused to compel Broadcom to produce the known indemnity agreements, which are almost certainly the most relevant evidence related to coordination and control between Broadcom and its customers who are District Court Defendants.

Whatever discretion may be afforded the Board's discovery rulings, that discretion was abused in this case. Patent Owner's point of error, however, is more than just a complaint that the Board misapplied the standards for deciding a discovery motion. The Board's error here is more fundamental. The requested discovery goes to the heart of whether the IPR petition was time-barred when it was filed, and thus goes to whether the Board itself has complied with the statutory directive under §315(b). To arrive at the factually correct ruling, the Board by necessity must look at the known indemnity agreements. *See, e.g.*, *Intel Corp. v. U.S. Int'l Trade Comm'n*, 946 F.2d 821, 839 (Fed. Cir. 1991) (noting that the existence of an indemnity agreement alone, in many cases, has been sufficient for a finding of privity).

The Board's order denying the requested discovery gives no coherent explanation as to why the Board views the indemnity agreement (and other

33

requested discovery) as being irrelevant. The Board's order focuses on what it alleges to be deficiencies in Patent Owner's proof. (A104–13.) But, as discussed in the previous section, the Board's order is premised upon a fundamentally incorrect legal standard. The Board's reasoning also is circular because it finds fault with Patent Owner's proof regarding control, and uses the alleged lack of proof as a reason to deny Patent Owner access to the proof regarding control. For example, the Board found that Broadcom's filing of the IPR petition is not relevant to the privity issue because Patent Owner "does not show how IPR filings and other filings were pursuant to indemnity agreements . . . ." (A109–10.) But how could Patent Owner make that showing without having access to the indemnity agreement itself, or other requested discovery?

The Board's denial of discovery and refusal to consider the known indemnity agreements violated important procedural protections of the APA. The Board has an obligation to consider all relevant evidence on the issue. *See* 5 U.S.C. §556(d) ("A sanction may not be imposed or rule or order issued ***except on consideration of the whole record*** . . . ."). The Board's complete denial of discovery to Patent Owner, given the strong evidence submitted in support of the motion for additional discovery, violated Petitioner's right to present contrary evidence under the APA. *See* 5 U.S.C. §556(e) ("When an agency decision rests on

34

official notice of a material fact not appearing in the evidence in the record, a party is entitled, on timely request, to an opportunity to show to the contrary.").

"Although §556 does not command that agencies admit all relevant evidence, courts have often reversed agencies for excluding 'facts and circumstances relevant to its inquiry which upon due consideration may be persuasive weight in the exercise of its discretion." *Director, Office of Workers' Compensation Programs*, 826 F.2d 1319, 1331 (3d Cir. 1987) (collecting cases); *see also Daiichi*, 791 F.3d at 1379 (agency action is arbitrary where it "fails to examine the relevant data"); *SKF USA, Inc. v. United States*, 630 F.3d 1365, 1373 n.3 (Fed. Cir. 2011) (agency action is arbitrary where it "entirely failed to consider an important aspect of the problem").

> **c.    The Board did not adequately set forth its reasons and supporting evidence, and its findings are not supported by substantial evidence.**

An agency has an obligation to provide a reasoned explanation for its actions. *See, e.g.*, *Atar S.r.l. v. United States*, 730 F.3d 1320, 1325 (Fed. Cir. 2013) ("To review the reasonableness of agency action, courts look for a reasoned analysis or explanation of an agency's decisions as a way to determine whether a particular decision is arbitrary, capricious, or an abuse of discretion.") The agency's decision must set forth facts establishing its own authority to act, and its

compliance with statutory directives regarding the proper exercise of its delegated authority. *See, e.g.*, *Austin Road Co. v. Occupational Safety and Health Review Comm'n*, 683 F.2d 905, 908 (5th Cir. 1982). Moreover, where (as here) the agency's actions substantially deviate from its actions in other similar cases, the agency has an obligation to provide a clearly articulated statement of reasons and evidence justifying the departure. *See, e.g.*, *Atchison v. Wichita Board of Trade*, 412 U.S. 800, 808-09 (1973); *NMB Sing. Ltd. v. United States*, 557 F.3d 1316, 1331 (Fed. Cir. 2009).

In this case, the Board never expressly decided the §315(b) issue. Instead, it denied Patent Owner discovery on the issue, and then adopted the same reasoning by reference in its final written decision. (A7–8.) The Board's orders were entirely based on Patent Owner's alleged failure of proof, and the orders make no attempt to set forth reasons that §315(b) does not apply.[6] Significantly, the Board never set forth ***even one fact*** supporting its implied conclusion that no District Court Defendant is a "real party in interest or privy."

---

[6] It is unclear which party bears the burden of proof to show whether the time-bar applies under 35 U.S.C. §315(b), and the Federal Circuit did not address this issue in *Achates*. Under the PTAB's rules, a party requesting relief has the burden of proof to show it is entitled to the relief requested. *See* 37 C.F.R. §42.20(c). Arguably, this would place the burden of proof on a petitioner to show that its petition is not time-barred.

36

Contrary to the Board's conclusion, all of the credible evidence in the record supports the opposite conclusion – even without considering the specific terms of the known indemnity agreement.  Patent Owner made a strong evidentiary showing that Broadcom and at least some of its customers who are Texas Defendants have been in cahoots in defending against the '568 Patent both in the Texas Litigation and in this IPR, as previously discussed.

Significantly, Broadcom had an opportunity to present evidence that the District Court Defendants are not coordinating or controlling aspects of this IPR – but Broadcom chose to present no evidence on this point at all. Tellingly, Broadcom's proof was carefully worded to focus narrowly and exclusively on Broadcom's ties to the District Court Litigation, and to avoid any mention of the District Court Defendants' role in directing or controlling this IPR. (A82 (redacted); A92 (sealed); A1297–99 (sealed).) In other similar cases, the Board has placed weight on a petitioner's failure to provide evidence of the non-party's lack of participation in or control over the IPR.  *See, e.g., Zoll*, IPR2013-00609, Paper No. 15 at 11-12.

Patent Owner's evidence, even if circumstantial to some degree regarding the District Court Defendants' control of this IPR, should be sufficient to carry the day *in the absence of any articulated evidence to the contrary.* This is particularly

37

true where the most relevant evidence (such as the known indemnity agreements) is within the possession and control of Broadcom, yet Broadcom chose not to put that evidence in the record and instead has taken every available step to keep the most relevant evidence out of the record.

Because the Board did not articulate facts showing that it acted within its statutory authority as prescribed by 35 U.S.C. §315(b), and because its implied findings are not supported by substantial evidence, the final written decision should be reversed or vacated. *See Japanese Found. for Cancer Research v. Lee*, 773 F.3d 1300, 1304 (Fed. Cir. 2014) ("[A]n agency acts arbitrarily or capriciously . . . if it fails to examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made.").

### 3.    The Board's §315(b) determination should be reversed or vacated by appellate review or by mandamus.

The *Achates* decision notwithstanding, the foregoing errors are reviewable by this Court in this appeal of the final written decision for several reasons. First, the Board's action was *ultra vires* because it failed to set forth facts and reasons demonstrating its compliance with the statutory directive of §315(b). Under the rule established in *Versata*, §314(d) does not preclude the Board from reviewing the Board's determinations that relate to the Board's compliance with statutory

38

directives. The *City of Arlington* case makes clear that all statutory requirements for an agency relate to the agency's authority, and there is no meaningful distinction between jurisdictional versus nonjurisdictional statutory mandates. *See City of Arlington,* 133 S.Ct. at 1868-71; *see also Mach Mining*, 135 S.Ct. at 1651; *Leedom*, 358 U.S. at 190-91.

Second, the Board's actions were arbitrary and capricious because it applied the wrong legal standard, failed to articulate a reasoned explanation for its implied determination that §315(b) is not applicable, and its factual findings are not supported by substantial evidence. *See Daiichi*, 791 F.3d at 1379; *Japanese Found.*, 773 F.3d at 1304.

Third, at a minimum, the Court retains jurisdiction to review the decision below for critical legal errors and substantial procedural errors. *See, e.g.*, *Reilly*, 571 F.3d at 1378-79. In this case, the Board's errors amount to both. It is a critical legal error because the erroneous legal standard applied by the Board undermines the plain text and purpose of the "real parties in interest or privies" language in the statute, and would allow time-barred litigants to easily circumvent §315(b). Moreover, the Board's actions amounted to a substantial departure from important procedural rights protected by the Administrative Procedures Act, as previously discussed.

39

In the alternative, the Court should grant mandamus relief. To be entitled to mandamus, a party must show: (1) a clear an indisputable right to relief; (2) that the party lacks an adequate alternative means to obtain the relief; and (3) that the court should exercise its discretion to issue the writ of mandamus. *See In re Dominion Dealer Sols., LLC*, 749 F.3d 1379, 1381 (Fed. Cir. 2014).

First, Patent Owner has shown a clear and indisputable right to relief because the Board's §315(b) determination was so fundamentally flawed. The language and requirements of §315(b) are clear and unambiguous. Moreover, the Board's combination of errors make this a particularly compelling case for mandamus. The Board applied a fundamentally flawed legal test that undermines the clear intent of the statute; precluded patent owner from putting highly relevant evidence in the record; purposefully refused to consider the known indemnity agreements and other highly relevant evidence; and failed to articulate a reasoned basis for its actions. This satisfies the first requirement of mandamus.

Second, if the Court holds that the §315(b) issue is not reviewable by appeal, then Patent Owner lacks any alternative means for obtaining relief to correct the Board's errors, and mandamus relief is the Patent Owner's only available avenue for addressing the errors below.

40

Third, the Court should exercise its discretion to issue the writ. Failure to do so would allow the Board in this case to undermine the clear intent of a congressional mandate under §315(b), and would provide an easy path for time-barred parties to circumvent the rule. Patent Owner is unaware of any countervailing equitable considerations that should preclude the Court from issuing mandamus relief.

For the foregoing reasons, the Board's Final Written Decision should be reversed or vacated in light of the critical legal and procedural errors made by the Board in connection with its determination under 35 U.S.C. §315(b).

**B.    The Board's unpatentability determinations are erroneous and should be reversed.**

### 1.    Standard of Review

With respect to the Board's patentability determinations, the Court "review[s] the Board's conclusions of law de novo and its findings of fact for substantial evidence." *Microsoft Corp. v. Proxyconn, Inc.*, 789 F.3d 1292, 1297 (Fed. Cir. 2015). The Board's claim constructions are reviewed *de novo*, whereas the underlying factual findings as to extrinsic evidence are reviewed for substantial evidence. *Teva Pharms. U.S.A., Inc. v. Sandoz, Inc.*, 135 S. Ct. 831, 841–42 (2015). Substantial evidence is "such relevant evidence as a reasonable mind

41

might accept as adequate to support a conclusion." *Consol. Edison Co. v. N.L.R.B.,* 305 U.S. 197, 229 (1938).

In an *inter partes* review, the claims of an unexpired patent are construed under the broadest reasonable interpretation (BRI) in light of the intrinsic evidence. *See In re Cuozzo*, 793 F.3d at 1279. Applying this standard, the Court should vacate the Board's interpretation of the "type identifier field" term of claim 1 because this term, contrary to the Board's construction, must identify the type of message from a number of different message types.

### 2. The Board erroneously determined that the '568 Patent is invalid as anticipated.

#### a. The Board erred in construing the phrase "service type identifier."

Of the challenged claims, claim 1 is independent. Claim 1 is reproduced below:

1. A communication station comprising:

a processor for arranging information for transmission including providing at least one first field in which payload information is disposed and providing at least one second field, separate from said first field, which includes *a service type identifier*

42

*which identifies a type of payload information* provided in said at least one first field; and

a transmitter for transmitting information received from said processor including said at least one first field and said at least one second field.

(A51 at cl. 1.)

The Board construed the phrase "service type identifier which identifies a type of payload information" as "an identifier that identifies the type of information conveyed in the payload, including but not limited to video, voice, data, and multimedia." (A12.) This construction, however, does not represent the broadest reasonable construction of this term and impermissibly broadens this term to a mere identifier. In particular, the Board's construction ignores the phrase "service type"; the proper construction of this term is "an identifier that identifies a transmission characteristic of the service and identifies type of payload information." Because the Board's construction is not supported by any reasonable interpretation of the intrinsic evidence, its construction is erroneous. *See Proxyconn*, 789 F.3d at 1298 ("A construction that is 'unreasonably broad' and which does not 'reasonably reflect the plain language and disclosure' will not pass muster." (citations omitted)).

43

The phrase "service type" is central to the recited claims. The notion of a "service" in the '568 Patent is more than just the type of data in a payload. Instead, the service type includes both data type and transmission characteristics. (A45 at 2:28–30; A2016 at ¶ 24.) The "service type identifier," therefore, must be able to identify both traits, not just the type of data. The claimed systems and methods can be applied to "multimedia communications where the type of payload may vary rapidly, e.g., on a slot-by-slot basis, or even within each slot." (A46 at 3:20–22.) Merely knowing the type of data conveyed in a payload in such a system is insufficient for a receiver to properly process the received data. (A2016 at ¶ 24.) The '568 Patent "provide[s] techniques for transmitting information between remote stations and the system in radiocommunication networks that provide sufficient flexibility for the anticipated variety of information communication services . . . while also providing sufficient compatibility with existing technology so that equipment used by the existing consumer base will not become obsolete." (A45 at 2:56–63.) The Board, however, ignored this aspect of the "service type identifier"—namely information about transmission characteristics—taught in the '568 Patent.

The '568 Patent makes clear that the invention was designed for systems where many service types may be used in the transmission of many different types

of payloads. (A45 at 2:56–60.) The patent recognized that many more types of payloads and service types for use in transmitting those payloads were possible in addition to those discussed in the patents. (A45 at 2:26–28 ("video or hybrid voice, data, and video to support Internet connections[] will likely be supported in the future").) To accommodate different services, the '568 Patent provides a "service type identifier" identifying different "services" (*i.e.*, different types of "information communication") that "will likely have different optimal transmission characteristics." (A45 at 2:29–2:31.) Indeed, each of the various example services disclosed in the '568 Patent (e.g., voice, video, fax, and Internet data) may require different amounts of bandwidth, error protection, and/or have a different ability to tolerate delay. (*Id.*) Patent Owner's proposed construction of "service type identifier" recognizes that this term identifies transmission characteristics to aid in processing different types of data as taught by the '568 Patent.

The Board erred when it characterized "services" as simply "various types of information being transmitted on traffic channels." (A138 (quotation marks omitted).) The patent clearly distinguishes between "information" and "services." Nowhere does the '568 Patent equate services as merely information being transmitted, as does the Board's construction. "Services" refer to the "various types of *information transmission*." (A45 at 2:28–29.) The type of information

45

transmission (including the characteristics of transmitting that information)—and not merely the information itself—is central to a "service." (A2018 at ¶ 28.) Ignoring the distinction between information and services—as did the Board—ignores a critical teaching of the '568 Patent. Consequently, the Board's construction fails to comport with the teachings of the '568 Patent and thus does not provide the broadest reasonable construction of this term. *See Proxyconn,* 789 F.3d at 1298.

In reaching its decision, the Board misread two excerpts of the specification of the '568 Patent. (A11 (discussing 3:11–19 (A46) and 9:28–32 (A49)).) In the first passage, the service type identifier is characterized as information (transmission characteristics) that allows a receiver to properly interpret the received data:

> The FOC may provide information relating to the same connection as the payload or data field in that time slot, e.g., a service type identifier which informs the mobile or base station of the type of information (e.g., voice, video or data) being conveyed in the payload. This information can be used by the receiving equipment to aid in processing the information conveyed in the payload, e.g., by knowing the channel coding rate.

46

(A46 at 3:11–19.)  Here, the '568 Patent describes an embodiment of the "service type identifier" that provides information (1) to inform the receiver as to the "type of information (e.g., voice, video or data) being conveyed in the payload" (A46 at 3:14–16) and (2) to provide transmission characteristics (such as the channel coding rate) to aid in the processing of the information (A46 at 3:16–19.)  By "describing the 'service type identifier' as identifying only 'the type of information,'" the Board ignores the transmission characteristics aspect of a "service type identifier" that is taught by the '568 Patent.  (A11.)

In the second passage, the '568 Patent further confirms the service type identifier provides information about transmission characteristics.  "[T]he FOC fields may also serve the purpose of service type identifier . . . [by providing] information regarding the type of service which the associated payload is currently supporting, the channel coding and/or interleaving associated therewith."  (A49 at 9:28–32.)  The Board summarily dismisses this teaching by concluding that "[t]he use of 'and/'or' makes clear that a 'service type identifier' may provide *only* information regarding the type of service, and need not necessarily also provide information about channel code, which Patent Owner recognizes as transmission characteristics."  (A11 (emphasis in original).)  But the Board does so by assuming that the type of service is limited to only identification of payload information.

47

Such an assumption is contrary to the teaching in the '568 Patent, and belies the broadest reasonable interpretation of this term in light of the specification.

Indeed, channel coding and interleaving associated therewith are each a form of transmission characteristics. (A45 at 2:44–55 (channel coding), A49 at 9:29–32 (interleaving).) And information about the "type of service" necessarily implicates transmission characteristics. (A45 at 2:28–30 ("These various types of information communication (also referred to herein as different services) will likely have different optimal transmission characteristics.").) Accordingly, the '568 Patent teaches that a "service type identifier" provides information about transmission characteristics.

The Board ignored the '568 Patent's teaching that ties "service type identifier" to "transmission characteristics." The Board's construction redrafts the claimed "service type identifier" to "a payload type identifier" or just "an identifier," and is improper and unsupportable. Instead, the broadest reasonable interpretation in light of the specification for "a service type identifier which identifies a type of payload information provided in said at least one first field" consistent with the totality of the written description is "an identifier that identifies a transmission characteristic of the service and identifies the type of payload information."

>    **b.    The Board erred in concluding that Morley anticipated the challenged claims of the '568 Patent.**

>        **i.    Overview of Morley**

Morley is directed toward "transmitting and receiving a composite signal on a single communications channel." (A575 at 1:3–5.)  Morley discloses a system for handling a composite voice and data signal, allowing remote users to communicate with each other across a telephone network via an analog telephone modem.  (A575 at 1:7–10, A576 at 4:42–45.)  The Morley system is depicted in Fig. 2 below (A568).



Users of Morley communicate with each other using telephone handsets 16 and exchange visual data from graphics tablet 12.  (A576 at 3:11–15.)  Voice coder/decoder 24 digitizes voice signals into outgoing voice frames.  (A576 at

3:44–49.)  Via a multiplexer, a voice frame is combined with any available data from the tablet to "form mux frames including both voice and image data."  (A576 at 4:38–41.)  The multiplex frame is then converted into an analog signal by modem 26 and sent to the other user through the telephone connection.  (A576 at 4:42–44.)

The purpose of Morley is to ensure synchronization of the combined voice frame, thereby eliminating transmission errors caused by clock errors.  (A2021–22 at ¶ 35.)  Morley "provide[s] a multiplexer enabling voice frames, or other framed data, to be transmitted without degradation due to timing errors whilst maintaining efficient use of bandwidth."  (A575 at 1:52–55.)  Morley recognized that using separate clocks for voice and data information during transmission introduces errors that may propagate and produce a loss of synchronization.  (A575 at 1:28–34; A2021–22 at ¶ 35.)  To address this issue, Morley embedded a signal in the header for use as a clock for both the transmitted voice frame and data.  (A577 at 5:39–44, A 578 at 7:34–35; A2021–22 at ¶ 35.)

The header of the mux frame serves two purposes. First, the header identifies the "frame type."  The receiver sorts received information to the appropriate voice or data hardware based on the frame type: "the header of a received frame is checked and status, voice and non voice fields are written to the

50

voice and data buffers 70 and 72 as appropriate." (A579 at 10:19–22.) Second, the receiver compares the header value to one of the 16 unique header values shown in the table below for error determination purposes (A578 at 7:34–35 ("Synchronisation between two multiplexers is achieved and maintained by searching for the mux frame headers.")):

| Header Type | Frame Type | Header Value |
|---|---|---|
| 0 | Sync | 0 × 19b3 |
| 1 | Extend | 0 × 007f |
| 2 | Voice Only | 0 × 4ce6 |
| 3 | Not Defined | 0 × 0000 |
| 4 | Data 0 | 0 × 34e9 |
| 5 | Data 0* | 0 × 3366 |
| 6 | Voice + Data 0 | 0 × 2ad5 |
| 7 | Voice + Data 0* | 0 × 1e3c |
| 8 | Data 1 | 0 × 4b69 |
| 9 | Data 1* | 0 × 52da |
| 10 | Voice + Data 1 | 0 × 552a |
| 11 | Voice + Data 1* | 0 × 61c3 |
| 12 | Data 2 | 0 × 664c |
| 13 | Data 2* | 0 × 7870 |
| 14 | Voice + Data 2 | 0 × 078f |
| 15 | Voice + Data 2* | 0 × 4b16 |

(A578 at 7:1–17.) The formats of some example header types are shown in Figs. 5a–g (A571):

51



If the header value matches one of these predetermined header values, the

receiver knows the frame should contain no errors. On the other hand, if the

header does not match a predetermined header value, the receiver checks the frame

for errors, which if present, causes the transmitter and receiver to resynchronize.

(A578 at 7:64–8:10.)

### ii. The Board applied an incorrect construction of "service type identifier" to Morley.

The Board applied its incorrect construction of "service type identifier" to

Morley. The Board determined the header field in Morley is a "service type

identifier" because the header identifies the type of payload information. (A15.)

The Board noted that its "construction requires only that it 'identifies the type of

information conveyed in the payload,'" and further that it "decline[d] to adopt

Patent Owner's construction of 'service type identifier.'" (A17–18.) Because the

Board's conclusion is premised on an erroneous claim construction, its invalidity conclusion is also erroneous.

Morley does not invalidate the challenged claims under the proper construction of "service type identifier." The header in Morley does not identify any transmission characteristics of the composite mux frame, as required by the proper construction of "service type identifier." The header provides synchronization information, not transmission characteristics: "Synchronization between two multiplexers is achieved and maintained by searching for the mux frame headers." (A578 at 7:34–35.) The header values do not allow devices in the system to account for different transmission characteristics of different service types, let alone identify any transmission characteristics of the information conveyed in the payload.

Indeed, the transmission characteristics of the voice frame and data cannot be part of the header value. To the extent that they exist, the transmission characteristics are separately embedded into the voice frames and data by the codec and processor, respectively. "Error correction may be added to the data channels by the multiplexer." (A577 at 5:15–16.) Specifically, the "multiplexer may perform error correction on data channels, thus ensuring error free data to the protocol and application layers." (A578 at 8:34–36.) Moreover, the voice codec

53

may provide error correction information to the receiver.  (A578 at 8:24–28

("Some voice coders incorporate forward error correction (FEC) and some send a

checksum. Both schemes increase the bandwidth required by the voice channel, the

additional information is used for error correction/detection at the voice

decoder.").)  Because the error correction is added to the data channels, any error

correction is not part of the header of the multiplex frame disclosed in Morley.

The multiplexer and the voice coder, not the header, add error correction to

the voice frames and data.  (A577 at 5:15–16, A578 at 8:22–33.)  Thus, a single

header type could relate to the same type of voice frame or data with entirely

different error correction characteristics.  Merely adding error correction to the

voice frames or data before creating a composite mux frame does not create a new

service.  (A2026–27 at ¶44.)  Because one header type can refer to different types

of data, each having a unique error correction procedure, the header type cannot be

a service type.  (A2026–27 at ¶44.)  In reality, one service type exists in Morley,

and that service is the communication of composite voice and data information.

(A2026–27 at ¶44.)  Accordingly, the header value does not provide transmission

characteristics to the receiver for proper decoding of the received information.  The

Board committed legal error by basing its invalidity finding on an incorrect

construction, and consequently, this Court should reverse the Board's finding.

54

### iii.    Morley does not identify a "service type."

The header in Morley is not a "service type identifier" because Morley communicates only one type of frame—a composite frame of voice and data—using sixteen different header types.   Morley is concerned with a system that combines "at least two types of data and send[s] a composite signal over a single physical channel." (A575 at 1:57–59.)  The multiplex frame in Morley can include voice only, data only, or a combination of a voice frame and data.  (A577 at 5:52–53, 6:33–53, A578 at 7:1–17.)  But just because a mux frame may take one of various forms does not deem the communication of each type of mux frame a separate service.  Separate voice and data services for the mux frame require that the voice frame and data *each* be independently communicated, rather than communicated as a single composite unit.  (A2024–25 at ¶40.)  In other words, the '568 Patent requires a separate service type identifier for each service, rather than redundant service type identifiers for one service.  (A2024–25 at ¶40.)  Morley, however, treats each mux frame as a composite unit, rather than as an independent communication of each type of information in the composite frame.  (A2025 at ¶41.)

Although a mux frame consists of a voice frame (if any) and a data frame (if any), communication of the mux frame is not optimized for separate

55

communication of the voice and data. Rather, a received mux frame is deconstructed into its constituent parts (voice, if any, and data, if any) after transmission. (A2025 at ¶41.) Because Morley describes only one type of information communication, it cannot disclose a service type identifier: an "identifier" is meaningless in the context of communicating only one type of information. (A2025 at ¶41.) That Morley discloses sixteen different headers relating to one service shows that header in Morley does not identify the type of service, and is not a service type identifier.

The Board's analysis ignores any aspect of "service" when determining whether Morley discloses this claim limitation. In its view, "Claim 1 does not require a plurality of types of information communication." But to get to that conclusion, the Board applied an "identifier" rather than a "service type identifier" to Morley. This is so because the necessity of a service type identifier is obviated by limiting the system to only one service. In this case, the receiver need not know what service the payload is currently supporting because it expects a multiplex frame.

### iv. Morley does not identify payload information.

Even assuming that Board's construction of "service type identifier" is correct, the Board further erred in concluding that the Morley header identifies a

type of payload information.  (A18.)  The header does not identify a type of

payload information. The structure of mux frames is optimized "according to 'long

term' requirements of the application and protocol layers." (A577 at 5:60–62.) The

organization of the frames is determined by the transmitter and reflected in the

header.  The header is merely a shorthand notation for the optimal structure or

framework of a multiplex frame.  (A2027 at ¶45.)  Morley discloses 13 types of

composite frames that transport data:

- 1 composite frame that includes voice frames (Header Type 1)

- 6 composite frames that each include data from each of the three different data channels (Data 0, Data 1, Data 2) and zero-padded versions of these data channels (Data 0*, Data 1*, Data 2*)

- 6 composite frames that each include a voice frame combined one of the data channels (which may be zero-padded)

(A578 at 7:1-25.)

Morley is premised on transporting data using pre-determined mux frame

types, depending on the data that is currently available for transport. Rather than

identifying (1) the type of information conveyed in the payload, and (2) the service

type for the information conveyed in the payload, as in the '568 Patent, Morley

57

transmits the data using only one service type, and selects the frame format (using the header) to transport the available data.  (A2028 at ¶47.)

The header in Morley defines the format (or structure) of the information transmitted, rather than identifying the payload data itself. A composite mux frame can include a voice frame and varying amount of data; therefore Morley provides a header for use with a demultiplexer to select and route the received voice and data information to the appropriate processor (codec or system processor).  (A2028–29 at ¶48.)  The header value merely specifies which portions of the payload data are to be sent to the voice buffers and which portions are sent to the data buffers. "Received data is demultiplexed into voice and data components according to the synchronization information."  (A577 at 5:11–13.)  At the receiver, "[t]he analog signal received is converted back into frames of digital data by the modem 26a and sent to the mux 22a where they are demultiplexed into frames of voice data and a stream of data."  (A576 at 4:45–48.)

Morley would have no need for a demultiplexer had the header provided a service type identifier which identifies the type of information conveyed in the payload.  (A2028–29 at ¶48.)  But since it did not, the codec and the mux in the receiver need be aware of the transmission characteristics of the data. (A2028–29 at ¶48.)  And such transmission characteristics are hard-wired in the receiver.

58

Even assuming that changing the mux frame format relates to transmission characteristics (which it does not), Morley teaches away from transmission characteristics. Any change in format in Morley is related only to header type 0, and header type zero does not identify any "information conveyed in the payload." (A578 at 8:18–40.)

Because the header identifies only the structure of the mux frame for proper decoding, the header of Morley and Morley as a whole fail to disclose, teach or suggest "a service type identifier which identifies a type of payload information provided in said at least one first field" as recited by claim 1.  Accordingly, Morley does not anticipate claim 1 of the '568 Patent.

The Board based its contrary findings on knowing that the Morley header "identifies the frame type as voice only, data only, or some combination."  (A18.) The Board determined that "[b]y identifying the frame type, the header necessarily identifies the type of payload information in the frame." (A18.)  But such a finding ignores the teachings of Morley.  Morley discloses 16 different frame types so the receiver knows how to unpack the mux frame into its constituent voice and data components.   Rather than maintaining the frame format and loading the payload fields with different data types as does the '568 patent, Morley uses 16 unique frame formats and a header to identify the format and provide synchronization

information. What is critical in Morley is the knowledge of the frame type for proper processing, whereas the '568 Patent is focused on using the same frame type along with a service type identifier to identify the transmission characteristics and the type of information in the payload. Because the Board's finding that Morley anticipates the challenge claims is not supported by substantial evidence, this Court should reverse that decision.

### c.     The Board erred in concluding that Adams renders obvious the challenged claims of the '568 Patent.

#### i.     Overview of Adams

Adams relates to a satellite television receiver system that uses video and audio data streams in conjunction with associated data streams for "content programmer control of display and selection functions for a video system." (A791 at 1:9–11.) Adams discloses a "video system that employs packetized digital data streams to provide a video stream, an audio stream and a command and control associated data stream." (A791 at 2:53–56.) The system relies on devices that receive a data stream having separate audio, video, and data packets. Adams is not concerned with efficiently using bandwidth of the wireless media. (A2030 at ¶52.) Rather, Adams is directed toward programmer control of a television screen based on transmitted satellite television data consisting of labeled video, audio, and associated data packets. (A2030 at ¶52.)

60

The Adams system includes separate subsystems for processing each of three different types of information by checking an ID tag in the header of a received packet to determine the proper routing for the packet. In particular, the ID tag may contain one of a video identifier (VIDEO_ID), an audio identifier (AUDIO_ID), or a data identifier (DATA_ID) as shown below to cause the receiver to route the packet to the video, audio, and data subsystems, respectively (A787):



*Figure 5*

The system processes the incoming data using a data selector to route the incoming data to the appropriate data queue.  (A2031–32 at ¶54.)  The system does not process the incoming data based on transmission characteristics.  (A2031–32 at ¶54.)  Rather, it merely diverts the incoming packets to an appropriate processor based on the label of each packet as shown in Fig. 3 below (A785):

61



*Figure 3*

The data selector 76 decodes the header of each incoming packet to determine whether to transfer the incoming packet into either the video queue 70, the audio queue 72, or the associated data queue 74." (A793 at 6:23–26; A2032 at ¶55.)

### ii. The Board applied an incorrect construction of "service type identifier."

The Board rejected Patent Owner's proposed construction of "service type identifier," and applied its erroneous construction of "service type identifier" to Adams. (A25 ("As a result, Patent Owner's arguments regarding transmission characteristics are unpersuasive.").) Because the Board based its findings on an incorrect claim construction, the Board's invalidity finding as to Adams must be reversed. Furthermore, Adams does not disclose transmission characteristics so Adams cannot invalidate the challenged claims under the proper construction of "service type identifier."

Adams is silent as to a relationship, if any, between transmission characteristics and the alleged data types. Other than disclosing that the "incoming packetized digital data streams received by the satellite receiver 14 conform to the motion picture engineering group (MPEG) video transport standard (A792 at 4:7–9), Adams does not address whether the incoming packets are otherwise compressed or processed. A person of ordinary skill in the art would understand that the voice and audio packets in Adams could be compressed using the MPEG standard, but would not glean any information regarding transmission characteristics of the services. (A2033 at ¶57.) Accordingly, Adams discloses only one type of encoded information, namely the MPEG encoding. As such, Adams does not teach or disclose "service type identifier" because always relying on MPEG encoding negates the need for a "service type identifier."

The disclosed ID tags are not service type identifiers. As discussed above, there is only one type of information communication—the transmission of separate and individual audio, voice, and data packets "to provide flexible content programming control in an interactive video system." (A791 at 2:19–20.) Because each type of information is associated with only one type of data packet, Adams does not teach or disclose a service type identifier for each packet. Instead, each packet includes only one type of data. The receiver need only interpret a label

63

identifying the type of received packet to properly process the packet. (A2033–34 at ¶58.) Adams discloses nothing more than sorting data packets based on a label field, which is distinct from a service type identifier. (*Id.*)

Further, Adams does not disclose the use of a data slot that can, depending on the service, store or carry various types of information to thereby save bandwidth. Adams discloses an invariant data structure, namely packets that are always one of three types: video, audio, or associated data, for efficiently receiving and processing discrete audio, video, and other types of data. (A2034 at ¶59.) As a result, the ID tag does not allow devices in the system to account for different transmission characteristics of different service types, and therefore cannot be a "service type identifier." (*Id.*) This Court should vacate the Board's conclusion that Adams discloses a "service type identifier" because that conclusion is not supported by substantial evidence.

### iii. Adams does not identify a type of payload information.

The Board concluded that the ID tag of Adams shown in Fig. 5 discloses, teaches or suggests the claimed "service type identifier" because the ID tag can be used to indicate which of a video, audio, or data is included in the packet. (A25–26.) The Board is wrong. Labeling a packet is distinct from identifying a service or even transmission characteristics of a service. Labeling a packet in Adams as

64

audio, voice, or associated data packets confirms that those data packets are merely transmitted separately, but processed together.

Even assuming that the ID tags of Adams are "service type identifiers" under the Board's construction of this term, those identifiers, nonetheless do not identify the type of information conveyed in the payload. Instead, the receiver in Adams merely transfers the incoming packet to an appropriate queue based on the ID tag. (A2034–35 at ¶60.) "The data selector 76 decodes the header of each incoming packet to determine whether to transfer the incoming packet into either the video queue 70, the audio queue 72 or the associated data queue 74." (A793 at 6:23–26.) Merely classifying received data packets as a video, audio, or associated data packet says nothing about the transmission characteristics of the received data packet. (A2034–35 at ¶60.) As such, the ID tags of Adams and Adams as a whole fail to disclose, teach or suggest "a service type identifier which identifies a type of payload information provided in said at least one first field" as recited by claim 1. The Board acknowledges that Adams classifies, rather than identifies a type of payload information. (A25 ("To the extent that Patent Owner is arguing that Adams's ID tag does not 'identif[y] a type of payload information' because it '[m]erely classif[ies] received data packets as a video, audio, or associated data packet,' that argument is not persuasive because it is distinction without a

65

difference.)".)  The Board reasoned that "[t]he receiver could not transfer the incoming packet to the appropriate queue—i.e., the video queue, audio queue, or data queue—if Adams's ID tag did not 'identif[y] a type of payload information' as video, audio, or data."  (A26.)

The Board's conclusion is not supported by any evidence, let alone substantial evidence.  Dr. Akl's testimony is unrebutted on this point.  Directing packets to the appropriate queue based on a label is an example of classifying the packets, not identifying the payload information in the packet.  For example, the audio packet will always be routed to the audio queue, even if video data is stored in an audio packet.  The Board's contrary conclusion is unsupported by substantial evidence and should be reversed.

## CONCLUSION

For the foregoing reasons, the Board's Final Written Decision should be either reversed or vacated.

Dated:  October 26, 2015                    Respectfully submitted,


*/s/ Donald Puckett*
G. Donald Puckett
Steven Joseph Udick
SKIERMONT PUCKETT LLP
2200 Ross Avenue, Suite 4800W
Dallas, Texas 75201
(214) 978-6600 (telephone)
(214) 978-6601 (facsimile)
Donald.Puckett@skiermontpuckett.com
Steve.Udick@skiermontpuckett.com

Douglas A. Cawley
MCKOOL SMITH, P.C.
300 Crescent Court, Suite 1500
Dallas, TX 75201
(214) 978-4972 (telephone)
(214) 978-4044 (facsimile)
dcawley@mckoolsmith.com

Peter J. Ayers
LEE & HAYES PLLC
11501 Alterra Parkway, Suite 450
Austin, TX 78758
(512) 605-0252 (telephone)
(512) 605-0269 (facsimile)
peter@leehayes.com

Attorneys for Appellant,
Wi-Fi One, LLC

67

# ADDENDUM

## ADDENDUM TABLE OF CONTENTS

A.    Final Written Decision 35 U.S.C. § 318(a) and 37 C.F.R. § 42.73..........A001

B.    Decision on Request for Rehearing 37 C.F.R. § 42.71(d).....................A0301

C.    U.S. Patent No. US 6,466,568 B1 .......................................................A0036

Trials@uspto.gov
571-272-7822

Paper 66
Entered: March 6, 2015

UNITED STATES PATENT AND TRADEMARK OFFICE

————————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

————————

BROADCOM CORPORATION,
Petitioner,

v.

WI-FI ONE, LLC,
Patent Owner.

————————

Case IPR2013-00601
Patent 6,772,215 B1

————————

Before KARL D. EASTHOM, KALYAN K. DESHPANDE, and
MATTHEW R. CLEMENTS, *Administrative Patent Judges*.

CLEMENTS, *Administrative Patent Judge*.

FINAL WRITTEN DECISION
*35 U.S.C. § 318(a) and 37 C.F.R. § 42.73*

**A0001**

IPR2013-00601
Patent 6,772,215 B1

## I.    INTRODUCTION

Broadcom Corporation ("Petitioner") filed a Petition requesting *inter partes* review of claims 1, 2, 4, 6, 8, 15, 22, 25, 26, 29, 32, 34, 45, 46, 49, 52, and 54 (the "challenged claims") of U.S. Patent No. 6,772,215 B1 (Ex. 1001, "the '215 patent").  Paper 3 ("Pet.").  Telefonaktiebolaget L. M. Ericsson[1] ("Patent Owner") filed an election to waive its Preliminary Response.  Paper 22.  On March 10, 2014, we instituted an *inter partes* review of all challenged claims on certain grounds of unpatentability alleged in the Petition.  Paper 29 ("Dec. to Inst.").

After institution of trial, Patent Owner filed a Patent Owner Response (Paper 40, "PO Resp.") to which Petitioner filed a Reply (Paper 49, "Pet. Reply").  Patent Owner filed a Motion to Exclude (Paper 53), which Petitioner opposed (Paper 58).  Patent Owner filed a Reply to Petitioner's Opposition to its Motion to Exclude.  Paper 59.  Oral hearing was held on December 8, 2014.[2]

The Board has jurisdiction under 35 U.S.C. § 6(c).  This Final Written Decision is issued pursuant to 35 U.S.C. § 318(a) and 37 C.F.R. § 42.73.

Petitioner has shown, by a preponderance of the evidence, that claims 1, 2, 4, 6, 8, 15, 22, 25, 26, 29, 32, 34, 45, 46, 49, 52, and 54 of the '215 patent are unpatentable.  Patent Owner's Motion to Exclude is denied.

---

[1] On July 11, 2014, Patent Owner filed an Updated Mandatory Notice indicating that the '215 patent had been assigned to Wi-Fi One, LLC, and that Wi-Fi One, LLC and PanOptis Patent Management, LLC were now the real parties-in-interest.  Paper 43.

[2] A transcript of the oral hearing is included in the record as Paper 65.

IPR2013-00601
Patent 6,772,215 B1

## A.  Related Proceedings

Petitioner and Patent Owner indicate that the '215 patent is involved in a case captioned *Ericsson Inc. v. D-LINK Corp.,* Civil Action No. 6:10-cv-473 (E.D. Tex.) ("D-Link Lawsuit"), and in an investigation at the U.S. International Trade Commission captioned *In the Matter of Certain Electronic Devices, Including Wireless Communication Devices, Tablet Computers, Media Players and Televisions, and Components Thereof*, ITC Inv. No. 337-TA-862.  Pet. 1–2; Paper 6, 1.  Patent Owner also identifies an appeal at the Federal Circuit captioned *Ericsson Inc. v. D-LINK Corp.*, Case Nos. 2013-1625, -1631, -1632, and -1633.  Paper 6, 1.  Petitioner also filed two petitions for *inter partes* review of related patents:  IPR2013-00602 (U.S. Patent No. 6,466,568) and IPR2013-00636 (U.S. Patent No. 6,424,625).

## B.  The '215 Patent

The '215 patent relates to the telecommunications field and, in particular, to a method for minimizing feedback responses in Automatic Repeat Request (ARQ) protocols.  Ex. 1001, 1:14–17.  When data is conveyed between nodes in a network, certain algorithms are used to recover from the transmission of erroneous data and the loss of data between the nodes.  *Id.* at 1:20–23.  An algorithm commonly used is referred to as an ARQ protocol.  *Id.* at 1:23–25.  Each node, or peer entity, in a network includes a receiver and a sender.  *Id.* at 1:26–29.  The units of data conveyed between peer entities commonly are referred to as Protocol Data Units ("PDUs").  *Id.* at 1:29–30.  The basic function of an ARQ protocol is to allow the receiver to request that the sender retransmit PDUs that were lost

3

**A0003**

IPR2013-00601
Patent 6,772,215 B1

during transmission or contained errors. *Id.* at 1:33–37. The receiver can inform the sender about which PDUs were received correctly and/or can inform the sender about which PDUs were *not* received correctly. *Id.* at 1:38–41. When the sender receives this information, it retransmits the "lost" PDUs. *Id.* at 1:41–42. Several ARQ protocols, such as Stop-and-Wait ARQ, Go-back-N ARQ, and Selective-Repeat ARQ, existed at the time that the '215 patent was filed and were well known. *Id.* at 2:17–21.

Figure 1 of the '215 patent is reproduced below.



Figure 1 illustrates the use of ARQ protocols. *Id.* at 2:22–23. A sequence of transmitted Data-PDUs ("D-PDUs") and Status-PDUs ("S-PDUs") is shown. *Id.* at 2:28–29. A D-PDU includes user data, a sequence number ("SN"), and possibly piggybacked error control information. *Id.* at 2:29–31. The sequence number ("SN") is associated with each D-PDU to identify that

4

**A0004**

IPR2013-00601
Patent 6,772,215 B1

specific D-PDU. *Id.* at 2:32–34. An S-PDU includes status information but no user information. *Id.* at 2:31–32.

According to the '626 patent, two main methods were used in the prior art for coding the SNs within S-PDUs: (1) a list of SNs to be retransmitted; and (2) a bitmap to represent the SNs to be retransmitted. *Id.* at 2:48–52. As such, known S-PDUs included a format identifier that could be used by a receiver to distinguish between the different PDU formats.

Figures 2 and 3 of the '215 patent are reproduced below:

FIG. 2
PRIOR ART

| PDU_format=S-PDU |
| Length=5 |
| SN=3 |
| SN=4 |
| SN=5 |
| SN=9 |
| SN=16 |

FIG.3
PRIOR ART

| PDU_format=S-PDU |
| SSN=2 |
| BITMAP=0100001111111000 |

Figure 2 shows an S-PDU that uses the list method to code SNs. *Id.* at 2:60–62. Figure 3 shows an S-PDU that uses the bitmap method to code SNs. *Id.* at 3:18–19. According to the '215 patent, a significant problem with existing ARQ protocols is that fixed length messages are used, which leads to a waste of bandwidth because unnecessary overhead information is transmitted. *Id.* at 3:46–50; *see also id.* at Table 1, 4:1–13. According to the '215 patent, a significant need existed for a method that can be used to minimize the size of S-PDUs in an ARQ protocol or, if it is not possible to fit all SNs into a single S-PDU, to maximize the number of SNs in an S-PDU with limited size. *Id.* at 4:33–38.

5

**A0005**

IPR2013-00601
Patent 6,772,215 B1

To address these issues, the '215 patent discloses a method whereby different mechanisms for indicating erroneous D-PDUs can be combined in a single S-PDU. *Id.* at 4:43–48. Each message includes three fields: type information, length information, and a value. *Id.* at 5:60–66. In a first embodiment of the invention, a bitmap message can be constructed using a number of methods to represent the length of the bitmap (i.e., the LENGTH field). *Id.* at 6:19–48. Likewise, a list message can list only erroneous SNs or can combine the prior art list method with the list of only erroneous SNs. *Id.* at 6:58 –7:51. In accordance with a second embodiment of the invention, a number of different message types can be combined to create an S-PDU. *Id.* at 7:52–54. Figure 8, reproduced below, illustrates how an S-PDU can be constructed in accordance with this embodiment:

| |
|---|
| Type=BITMAP' |
| FSN |
| LENGTH |
| Bitmap |
| Type=LIST' |
| LENGTH |
| $SN_1$ |
| $L_1$ |
| … |
| $SN_{LENGTH}$ |
| $L_{LENGTH}$ |
| Type=BITMAP' |
| LENGTH |
| bitmap |
| Type=NO_MORE |

FIG. 8

As shown in Figure 8, the resulting S-PDU includes two BITMAP' messages and one LIST' message. *Id.* at 8:43–44. For comparison with the prior art techniques, Table 3 is reproduced below.

6

IPR2013-00601
Patent 6,772,215 B1

TABLE 3

| | Size of S-PDU (bits) | | |
|---|---|---|---|
| | State-of-the-art solutions | | Combination |
| | LIST | BITMAP | solution |
| 1 | 42 | 141 | 38 |
| 2 | 114 | 141 | 74 |
| 3 | 138 | 141 | 78 |
| 4 | 282 | 141 | 121 |
| 5 | 114 | 141 | 53 |

Table 3 shows the sizes of S-PDUs constructed in accordance with the prior art list and bitmap methods, and also with the combination method described in accordance with the second embodiment. *Id.* at 9:27–30. As illustrated by Table 3, the size of S-PDUs resulting from the combination method described in the '215 patent is significantly smaller than that of the S-PDUs resulting from the prior art methods. *Id.* at 9:32–35.

*C. Illustrative Claim*

Of the challenged claims, claims 1, 15, 25, and 45 are independent. Claim 1 is reproduced below:

1.    A method for minimizing feedback responses in an ARQ protocol, comprising the steps of:

sending a plurality of first data units over a communication link;

receiving said plurality of first data units; and

responsive to the receiving step, constructing a message field for a second data unit, said message field including a type identifier field and at least one of a sequence number field, a length field, and a content field.

7

**A0007**

IPR2013-00601
Patent 6,772,215 B1

### D. The Instituted Ground of Unpatentability

We instituted *inter partes* review of claims 1, 2, 4, 6, 8, 15, 22, 25, 26, 29, 32, 34, 45, 46, 49, 52, and 54 under 35 U.S.C. § 102 as anticipated by Seo (US 6,581,176, issued June 17, 2003) (Ex. 1002).

## II.    ANALYSIS

### A.  35 U.S.C. § 315(b)

Patent Owner argues that "Petitioner is subject to the 35 U.S.C. § 315(b) bar as a privy to the D-Link Defendants, and because the D-Link Defendants are real parties-in-interest to this action, despite Petitioner's failure to designate them as such under 35 U.S.C. § 312(a)(2)."  PO Resp. 8. According to Patent Owner, Petitioner is in privity with defendants named in the D-Link Lawsuit (*Ericsson Inc. v. D-Link Corp.*, 6:10-cv-473) because, *inter alia*, "[Petitioner] has an indemnity relationship with Dell and Toshiba."  *Id.* at 8–12.  Patent Owner also argues that the defendants named in the D-Link Lawsuit (the "D-Link Defendants") are real parties-in-interest to this proceeding because Petitioner has a "substantive legal relationship with at least Dell and Toshiba," Petitioner used the same prior art references as the D-Link Defendants, and the Petition was filed after the D-Link Defendants abandoned their invalidity case regarding the '215 patent in the D-Link Lawsuit.  *Id.* at 12–14.

Petitioner counters that "[Patent] Owner has raised this identical argument twice, and failed each time," and that "[t]his third attempt relies on *exactly the same arguments [Patent] Owner made to this Board and the Federal Circuit* and should be rejected for the same reasons."  Pet. Reply 1. Petitioner continues that, "[Patent] Owner offers no new reason whatsoever

8

**A0008**

IPR2013-00601
Patent 6,772,215 B1

for this Board to reverse its prior decision that [Patent] Owner's proferred 'evidence' and legal authorities fail to amount to anything more than 'speculation' or 'a mere possibility' that [Petitioner] is in privity with the D-Link Defendants or that the D-Link Defendants are real parties-in-interest." *Id.* We find Petitioner's arguments persuasive.

Patent Owner's arguments and evidence are not different substantively from the arguments and evidence presented in its Motion for Additional Discovery (Paper 14). The arguments and evidence are unpersuasive for same reasons explained in our Decision on Patent Owner's Motion for Additional Discovery (Paper 23), which we adopt and incorporate by reference.

### B.  Claim Construction

In an *inter partes* review, claim terms in an unexpired patent are interpreted according to their broadest reasonable construction in light of the specification of the patent in which they appear. 37 C.F.R. § 42.100(b); *see also In re Cuozzo Speed Technologies, LLC*, No. 2014-1301, 2015 WL 448667, at *5–*8 (Fed. Cir. Feb. 4, 2015) ("Congress implicitly adopted the broadest reasonable interpretation standard in enacting the AIA," and "the standard was properly adopted by PTO regulation"). Under the broadest reasonable interpretation standard, claim terms are given their ordinary and customary meaning as would be understood by one of ordinary skill in the art in the context of the entire disclosure. *In re Translogic Tech., Inc.*, 504 F.3d 1249, 1257 (Fed. Cir. 2007). An inventor may rebut that presumption by providing a definition of the term in the specification with reasonable clarity, deliberateness, and precision. *In re Paulsen*, 30 F.3d 1475, 1480

9

**A0009**

IPR2013-00601
Patent 6,772,215 B1

(Fed. Cir. 1994).  In the absence of such a definition, limitations are not to be read from the specification into the claims.  *In re Van Geuns*, 988 F.2d 1181, 1184 (Fed. Cir. 1993).

1.  *"responsive to the receiving step, constructing a message field for a second data unit, said message field including a type identifier field"*

Petitioner proposes that this phrase be construed as "responsive to the receiving step, generating a message field including a field that identifies the message type of the feedback response message from a number of different message types."  Pet. 5.  Petitioner states that this construction was proposed by Patent Owner and adopted by the Court in the D-Link Lawsuit.  Pet. 8 (citing Ex. 1005, 9).  Petitioner does not dispute this construction.  Pet. 8. The proposed construction replaces "constructing" with "generating," and replaces "type identifier field" with "a field that identifies the message type of the feedback response message from a number of different message types."  Although this construction has been adopted in the D-Link Lawsuit, we are not persuaded that it is the broadest reasonable interpretation of this limitation.

For example, the antecedent basis for "*the* feedback response message" in the proposed construction is the "feedback responses" of the preamble.  "In general, a preamble limits the invention if it recites essential structure or steps, or if it is 'necessary to give life, meaning, and vitality' to the claim."  *Catalina Marketing Int'l, Inc. v. Coolsavings.com, Inc.*, 289 F.3d 801, 808 (Fed. Cir. 2002) (quoting *Pitney Bowes, Inc. v. Hewlett-Packard Co.*, 182 F.3d 1298, 1305 (Fed. Cir. 1999)).  "Conversely, a preamble is not limiting 'where a patentee defines a structurally complete invention in the claim body and uses the preamble only to state a purpose or

10

**A0010**

IPR2013-00601
Patent 6,772,215 B1

intended use for the invention.'" *Id.* (quoting *Rowe v. Dror*, 112 F.3d 473, 478 (Fed. Cir. 1997)).

If we were to adopt Petitioner's proposed construction, it would introduce a dependency upon the preamble, thereby causing the preamble to limit the invention.[3]  Accordingly, in the Decision to Institute, we explained that we were not persuaded that Petitioner's proposed construction would be the broadest reasonable interpretation of the claim because no term of the claim, as drafted, has its antecedent basis in the preamble.  Dec. to Inst. 10.

Patent Owner argues that we provided, in the Decision to Institute, "no case law for [the] proposition that introducing a dependency upon the preamble would cause the preamble to limit the invention," and that this proposition "appears to be focused on antecedent basis issue."  PO Resp. 26.  As we explained in the Decision to Institute, Patent Owner's proposed construction uses the phrase "the feedback response," the antecedent basis for which is the "feedback response" of the preamble.  Dec. to Inst. 10.  We decline to construe claim 1 in a way that the preamble becomes "necessary to give life, meaning, and vitality" to the claim.  *Id.*  Moreover, the plain language of claim 1 requires the "type identifier field" be included in a "message field for *a second data unit*" (emphasis added).  It does not require that that "message field" be for a "feedback response."  By requiring the recited "type identifier field" to "identif[y] a message type of *a feedback response message,*" Patent Owner's proposed construction implicitly limits

---

[3] This result would be contrary to Petitioner's proposed construction of the preambles as non-limiting.  Pet. 7, 8.

11

A0011

IPR2013-00601
Patent 6,772,215 B1

the recited "second data unit" to a feedback response message.  Patent Owner provides no support for such a construction.

The '215 patent does not define explicitly the term "type identifier field," but does uses it several times to describe a field in an S-PDU that indicates whether that S-PDU includes a list or a bitmap.  Ex. 1001, 6:20, 8:2, 8:16; *see also id.* at 7:58–61, 8:8–10, 8:55–57 (describing a "type identifier").  For example, Table 2 depicts a column labeled "Type Identifier," that includes NO_MORE, LIST', BITMAP', and ACK.  *Id.* at 9:1–9.  Accordingly, in the Decision to Institute, we construed "type identifier field" as "a field of a message that identifies the type of that message."

Patent Owner argues that our construction is overly broad because it "would cover a mere S-PDU as in the prior art . . . [b]ut the specification distinguishes 'the present invention' from the prior art S-PDU."  PO Resp. 26 (citing Ex. 1001, 4:38–40, 4:43–63).  Patent Owner does not elaborate.  Petitioner counters that "[Patent] Owner concedes invalidity under the Board's construction based on the admitted prior art," and that "invalidity of the claims in light of the prior art is not grounds for rejecting this Board's well-reasoned claim construction."  Pet. Reply 4.

We are not persuaded by Patent Owner's arguments.  Patent Owner's proposed construction differs from ours in that it limits the message to "a feedback message" and states explicitly what is only implicit in our construction—i.e., "from a number of different message types."  It is not evident which of those two additional limitations Patent Owner contends distinguish the prior art S-PDU.  Indeed, the '215 patent describes the prior

12

**A0012**

IPR2013-00601
Patent 6,772,215 B1

art S-PDU as a "feedback response" (*See, e.g.,* Ex. 1001, 2:38–45) and describes how it may have a number of different message types (*See, e.g., id.* at 2:63–3:45, Figs. 2, 3). In any event, the '215 patent distinguishes "the present invention"—not the "type identifier field"—from the prior art. Even assuming that the patentee intended to draft the claims, as a whole, to distinguish a prior art S-PDU, Patent Owner identifies insufficient support in the claims or Specification for its proposed construction of the term "type identifier field."

Finally, in the Decision to Institute, we alternatively construed "type identifier field" as "any type of data." Dec. to Inst. 11–12. Patent Owner argues that "[b]ecause the type identifier field is not instructional or otherwise written material, the 'printed matter' doctrine does not apply." PO Resp. 27. According to Patent Owner, "the type identifier field in the challenged claims is not printed matter, and further, it defines functional characteristics of the claimed method and system." *Id.* at 31. We are persuaded that the recited "type identifier field" is not non-functional descriptive material.

Accordingly, we maintain our construction of "type identifier field" as "a field of a message that identifies the type of that message."

13

**A0013**

IPR2013-00601
Patent 6,772,215 B1

> 2. *"means for receiving said plurality of first data units, and constructing one to several message fields for a second data unit, said one to several message fields including a type identifier field and at least one of a sequence number field, a length field, a content field, a plurality of erroneous sequence number fields, and a plurality of erroneous sequence number length fields, each of said plurality of erroneous sequence number fields associated with a respective one of said plurality of erroneous sequence number length fields"*

Independent claim 45 recites a "means for receiving . . . ." Petitioner contends that this term is a means-plus-function element invoking 35 U.S.C. § 112, paragraph 6[4]. We agree because (1) the limitation uses the phrase "means for"; (2) the term "means for" is modified by functional language; and (3) the term "means for" is not modified by any structure recited in the claim to perform the claimed function. In the Decision to Institute, we determined that the function of the "means for receiving . . ." is

> *receiving* said plurality of first data units, *and constructing* one to several message fields for a second data unit, said one to several message fields including a type identifier field and at least one of a sequence number field, a length field, a content field, a plurality of erroneous sequence number fields, and a plurality of erroneous sequence number length fields, each of said plurality of erroneous sequence number fields associated with a respective one of said plurality of erroneous sequence number length field.

Dec. to Inst. 12–15. We also construed the structure for performing the recited function to be the sender and receiver of a peer entity. *Id*. Neither party disputes our initial construction of this term, and Patent Owner agrees

---

[4] Section 4(c) of the AIA re-designated 35 U.S.C. § 112, ¶ 6, as 35 U.S.C. § 112(f). Pub. L. No. 112-29, 125 Stat. 284, 296–07 (2011). Because the '215 patent has a filing date before September 16, 2012 (effective date), we will refer to the pre-AIA version of 35 U.S.C. § 112, in this decision.

14

**A0014**

IPR2013-00601
Patent 6,772,215 B1

with our determination of the corresponding structure (PO Resp. 31).  We maintain our construction.

3. *"for minimizing feedback responses in an ARQ protocol"* (Preambles)

The preamble of each independent claim recites "for minimizing feedback responses in an ARQ protocol."  In the Decision to Institute, we determined that the preambles do not limit the claims.  Dec. to Inst. 15.  Neither party disputes our initial construction of this term, and Patent Owner agrees with it (PO Resp. 32[5]).  We maintain our construction.

4. *"means for sending a plurality of first data units over said communication link to said second peer entity"*

Independent claim 45 recites a "means for sending . . . ."  Petitioner contends that this term is a means-plus-function element invoking 35 U.S.C. § 112, paragraph 6.  We agree because (1) the limitation uses the phrase "means for"; (2) the term "means for" is modified by functional language; and (3) the term "means for" is not modified by any structure recited in the claim to perform the claimed function.  In the Decision to Institute, we determined that the function of the "means for sending a plurality of first data units over said communication link to said second peer entity" is "sending a plurality of first data units over said communication link to said second peer entity."  Dec. to Inst. 15–17.  We also construed the structure for performing the recited function to be the sender of a peer entity.  *Id.*

---

[5] Patent Owner's Response appears to have swapped headings IV.B.3 and IV.B.4 inadvertently, such that this claim term is argued under the heading "for minimizing feedback responses in an ARQ protocol," and that term is argued under the heading "means for sending."

15

**A0015**

IPR2013-00601
Patent 6,772,215 B1

Neither party disputes our initial construction of this term, and Patent Owner agrees with our determination of the corresponding structure (PO Resp. 31–32[6]). We maintain our constructions.

### C. The Challenged Claims – Anticipated by Seo

Petitioner argues that claims 1, 2, 4, 6, 8, 15, 22, 25, 26, 29, 32, 34, 45, 46, 49, 52, and 54 are unpatentable under 35 U.S.C. § 102(b) as anticipated by Seo. Pet. 21–45. In support of this ground of unpatentability, Petitioner provides detailed explanations as to how each claim limitation is disclosed by Seo, and relies upon the Declaration of Dr. Bims (Ex. 1004). *Id.* (citing Ex. 1004 ¶¶ 31–70).

Patent Owner counters that claim 1 is not anticipated by Seo because (1) Seo's NAK_TYPE does not "identif[y] the message type of a feedback response message from a number of different message types," as the parties' proposed construction of "type identifier field" requires, because Seo discloses only a single message type; and (2) Seo's NAK_TYPE field is not included in a "message field," as required by each of the challenged claims. PO Resp. 37–40. Patent Owner also argues that Seo does not disclose a length field, as required by independent claim 15. *Id.* at 40–41.

Upon consideration of the parties' contentions and supporting evidence, we determine that Petitioner has demonstrated, by a preponderance of the evidence, that claims 1, 2, 4, 6, 8, 15, 22, 25, 26, 29, 32, 34, 45, 46, 49, 52, and 54 are anticipated by Seo.

---

[6] *See* n.5 above.

16

**A0016**

IPR2013-00601
Patent 6,772,215 B1

*Seo (Exhibit 1002)*

Seo describes a method for transmitting control frames and user data frames in a mobile radio communications system.  Ex. 1002, 1:10–12.  Specifically, Seo discusses a modification of the Radio Link Protocol ("RLP") specified in international standard IS-707 for a Code Division Multiple Access ("CDMA") mobile radio communication system.  *Id.* at 1:14–19, 5:28–30.  According to the RLP retransmission procedure, a Negative Acknowledgement ("NAK") RLP control frame for a particular user data frame can be transmitted more than once at the same time to ensure reliability and, in response to receiving each NAK, the missing user data frame will be retransmitted.  According to the invention of Seo, rather than transmitting each NAK corresponding to each missed user data frame, a single NAK corresponding to *all* missed user data frames is transmitted to the sender.  *Id.* at 5:31–36.

Figure 4 of Seo is reproduced below:

| FIELD | LENGTH (BITS) |
|---|---|
| SEQ | 8 |
| CTL | 4 |
| RE_NUM | 2 |
| NAK_TYPE | 2 |
| NAK_SEQ | 4 |
| L_SEQ_HI | 4 |
| | |
| FIRST | 12 |
| LAST | 12 |
| FCS | 16 |
| PADDING | VARIABLE |
| | |
| NAK_Map_Count | 2 |
| NAK_Map | |
| NAK_Map_SEQ | 12 |
| NAK_Map | 8 |

*FIG. 4*

17

**A0017**

IPR2013-00601
Patent 6,772,215 B1

Figure 4 shows the structure of a RLP NAK control frame according to the invention of Seo. *Id.* at 5:42–43. The NAK control frame of Seo includes a field NAK_TYPE with a length of 2 bits to indicate a NAK type. *Id.* at 5:53–54.

If the value of NAK_TYPE is "00," the receiver is requesting retransmission of a range of missed user data frames (*Id.* at 5:54–57), and the fields FIRST, LAST, FCS, and padding exist (*Id.* at 6:18–19). FIRST is the 12-bit sequence number of the first data frame for which retransmission is requested. *Id.* at 5:63–65. LAST is the 12-bit sequence number of the last data frame for which retransmission is requested. *Id.* at 5:65–67. SEQ, with a length of 8 bits, is a data frame sequence number. *Id.* at 5:57–58.

If the value of NAK_TYPE is "01," the receiver is requesting retransmission of missed user data frames using a bitmap, and the field NAK_MAP_COUNT exists. *Id.* at 6:8–21. If the value of the field NAK_MAP_COUNT+1 exists, then the fields NAK_MAP_SEQ and NAK_MAP exist. *Id.* at 6:21–22. NAK_MAP_SEQ is the 12-bit sequence number of the first data frame in the NAK Map for which retransmission is requested. *Id.* at 6:8–11. NAK_MAP is an 8-bit bitmap identifying the missing user data frames for which retransmission is requested, wherein the most significant bit corresponds to the user data frame identified by NAK_MAP_SEQ+1. *Id.* at 6:11–15.

*Analysis*

In light of the arguments and evidence, Petitioner has demonstrated, by a preponderance of the evidence, that the challenged claims are unpatentable as anticipated by Seo.

18

**A0018**

IPR2013-00601
Patent 6,772,215 B1

For example, independent claim 1 recites "sending a plurality of first data units over a communication link." Seo discloses a "transmitting station" that sends user data frames to a "receiving station" over a "radio section between a receiving station and the transmitting station." Ex. 1002, 5: 28–41; *see also id.* at 8:24–27 ("transferring user data frames of a radio link protocol (RLP) from a transmitting station to a receiving station"), Fig. 6 ("Transmitting Station A"). The user data frames transport user traffic data. *Id.* at 1:21–22.

Claim 1 also recites "receiving said plurality of first data units." Seo discloses a "receiving station" that receives user data frames from the "transmitting station." *Id.* at 1:21–22, 5:28–41, 8:24–27, Fig. 6 ("Receiving Station B").

Finally, claim 1 recites "responsive to the receiving step, constructing a message field for a second data unit, said message field including a type identifier field and at least one of a sequence number field, a length field, and a content field." Seo discloses an "RLP NAK" message that includes a field NAK_TYPE that identifies whether the message identifies a range of sequence numbers or uses a bitmap. If the value of NAK_TYPE is "00," the RLP NAK message includes two fields—FIRST and LAST—with "the 12-bit sequence number of the first data frame for which a retransmission is required," and "the 12-bit number of the last data frame for which a retransmission is required," respectively. Ex. 1002, 5:54–57, 5:63–67, 6:17–18. If the value of NAK_TYPE is "01," the RLP NAK message includes a field NAK_MAP_SEQ with "the 12-bit sequence number of the first data frame in this NAK Map for which [] retransmission is requested." *Id.* at

19

**A0019**

IPR2013-00601
Patent 6,772,215 B1

6:9–11.  On this record, we are persuaded that Seo's RLP NAK message includes a type identifier field (NAK_TYPE), and a sequence number field (FIRST, LAST, or NAK_MAP_SEQ).  We are persuaded that Seo discloses this limitation whether "type identifier field" is construed to mean "a field of a message that identifies the type of that message," or, in the alternative, to mean any type of data.

Claim 2 recites "wherein said message field comprises a bitmap message."  Claim 6 recites similarly "wherein said content field comprises a bitmap."  Seo discloses that, if the value of NAK_TYPE is "01," the RLP NAK message includes a field NAK_MAP "with a length of 8 bits [that] is a bit-map identifying the missing user data frames for which a retransmission is requested."  *Id.* at 6:11–13.  On this record, we are persuaded that Seo discloses claims 2 and 6.

Claim 4 recites "wherein said sequence number field includes any sequence number from said plurality of first data units."  Claim 8 recites similarly "wherein said second data unit comprises information about missing or erroneous said first data units."  As discussed above, the RLP NAK message includes fields with sequence numbers for which *re*transmission is requested—i.e., the sequence number of a data unit previously sent by the transmitting station but not missed by the receiving station.  *See, e.g., Id.* at 2:46–51 ("That is, the receiving station requests the transmitting station to retransmit the *missed* user data frames hereto.") (emphasis added).  On this record, we are persuaded that Seo discloses claims 4 and 8.

20

**A0020**

IPR2013-00601
Patent 6,772,215 B1

Petitioner also argues that claims 15, 22, 25, 26, 29, 32, 34, 45, 46, 49, 52, and 54 are disclosed by Seo.  Pet. 23–33, 38–41.  We are persuaded that the evidence of record supports Petitioner's contentions.

Patent Owner presents several arguments as to how Petitioner has failed to provide an adequate reason to modify the references to reach the claimed invention and why Seo does not teach all of the limitations of the claims.  PO Resp. 32–42.  Petitioner responds to these arguments.  Pet. Reply 1–15.  We address each argument in turn below.

*Whether Seo discloses "a number of different message types"*

Patent Owner argues that, "the NAK_TYPE field in Seo does not 'identif[y] the message type of a feedback response message from a number of different message types' because Seo merely discloses a single message type."  PO Resp. 37.  According to Patent Owner, "Seo's NAK frame has a constant size and format, containing both a bitmap and a list, regardless of NAK_TYPE," and "the NAK frame . . . always contains the same fields whose content varies with the contents of the NAK_TYPE field."  *Id.* at 38. Patent Owner continues that "Seo's NAK_TYPE field merely indicates which fields within the message field will contain zero values and which fields will contain non-zero values."  *Id*.  According to Patent Owner, "Figure 4 represents a single control frame that includes fields for both a list of first and last sequence numbers and bitmaps," and that the "only change is that certain fields contain non-zero values, depending on the value of the NAK_TYPE."  *Id.* at 39.

Petitioner counters that "Seo never limits the NAK message to a fixed length," and that "[e]ven if all the NAK messages in Seo had the same fixed

21

**A0021**

IPR2013-00601
Patent 6,772,215 B1

length, it would not prove that the NAK messages all have the same fields" because the length of a message does not necessarily determine its type. Pet. Reply 6. According to Petitioner, "Seo does not require that all fields shown in Figure 4 be used with all types of NAKs." *Id.* Petitioner continues that, "Seo describes how different fields 'exist' in different types of NAKs, as indicated by the value of NAK_TYPE." *Id.* at 6–7. We find Petitioner's arguments to be persuasive.

As an initial matter, Patent Owner's argument is based upon its proposed construction of "type identifier field," which we declined to adopt for the reasons above. In any event, we are not persuaded that Seo discloses only a single message type, as Patent Owner contends. Seo discloses explicitly that some fields in the RLP NAK control frame depicted in Figure 4 exist only if NAK_TYPE is "00," whereas other fields exist only if NAK_TYPE is "01." Ex. 1002, 6:18–22 ("[i]f a value of the field NAK_TYPE is '00', the fields FIRST, LAST, FCS, padding, exist. If a value of the 20 field NAK_TYPE is '01', the field NAK_MAP COUNT exi[st]. If a value of the field NAK_MAP COUNT+1 exists, there exist the fields NAK_MAP SEQ and NAK_MAP."); *see also id.* at claim 11. Patent Owner argues that Seo uses to the term "exist" to mean "contain non-zero values," and that those fields of Figure 4 which are not said to "exist" contain only zero values (PO Resp. 38–39), but cites nothing in Seo to support its interpretation. The only evidence Patent Owner offers is the testimony of its expert, Dr. Robert Akl, who merely repeats the language of the Patent Owner Response. Ex. 2020 ¶ 51.

22

**A0022**

IPR2013-00601
Patent 6,772,215 B1

In contrast, Petitioner's expert, Dr. Bims, testifies that Seo uses the common sense meaning of "exist," and testifies that "it would make sense to include unnecessary fields in a NAK message, such as FIRST and LAST fields in a NAK message of the bitmap NAK_TYPE, or bitmap fields in a First/Last type of NAK." Ex. 1013 ¶¶ 4–6. In this regard, we credit the testimony of Dr. Bims. We conclude that Seo discloses an RLP NAK control frame that includes certain fields only when NAK_TYPE is "00" and includes other fields only when NAK_TYPE is "01." Accordingly, we are not persuaded by Patent Owner's argument that NAK_TYPE is not a "type identifier field" because it does not identify the type of a message from a number of different message types.

*Whether NAK_TYPE is included in a "message field"*

Patent Owner argues that, "NAK_TYPE is not part of the message, but rather part of the S-PDU header." PO Resp. 39. According to Patent Owner, "'the type identifier field' must be part of the 'said message field'" and distinguishes "fields that were included in the header of the PDU such as the PDU_format field shown in the admitted prior art." *Id.* at 39–40. Patent Owner argues that certain benefits of the invention are achieved because "the claimed 'type identifier field' [is] in the message body as opposed to the fixed length header." *Id.* at 40.

Petitioner counters that "neither the claims nor the specification of the '215 patent make a distinction between providing information in a 'header' versus in a 'payload' or in any other portion of a message." Pet. Reply 10. Petitioner continues that, "The '215 patent refers to its Figures 4-7 as 'messages' without differentiating any parts of those messages, such as those

23

**A0023**

IPR2013-00601
Patent 6,772,215 B1

fields that include control information (type) and those fields that contain data content." *Id.* at 11 (citing Ex. 1013 ¶ 10). Moreover, according to Petitioner, "[t]he amendment did not add any requirement that a type identifier field be in a particular portion of the message (header, payload, or elsewhere);" instead, "the type identifier field was *always* part of the 'message field' – the amendment just made clear that the type identifier field was a necessary element, and not just one of several optional fields within the message field." *Id.* at 12. We find Petitioner's arguments to be persuasive.

Patent Owner relies entirely on the testimony of its expert, Dr. Akl, to support its construction of "message" as excluding headers. PO Resp. 39–40 (citing Ex. 2020 ¶¶ 52, 53). However, neither the claims nor the Specification of the '215 patent distinguish a header from the recited "message." Indeed, the term "header" is not even used in the '215 patent. Moreover, Dr. Bims testifies that "the type field in Figures 4-7 of the '215 patent contain bits that tell a receiver how to process the substance of the data that follows, and therefore, would be considered part of a header as opposed to a "payload." Ex. 1013 ¶ 10. We, therefore, see no basis to construe the term "message" to exclude a header. Accordingly, we are not persuaded that Seo's NAK_TYPE is not included in a "message field."

*Dependent claim 15*

Patent Owner argues that claim 15 requires that each message field must include a "length field" because it requires

> at least one of (i) '*a length field*', (ii) 'a plurality of erroneous sequence number-fields . . . each of said plurality of erroneous sequence number fields associated with a respective one of said

24

**A0024**

IPR2013-00601
Patent 6,772,215 B1

plurality of erroneous sequence number *length fields*,' and (iii) 'a plurality of erroneous sequence number *length fields*.'

PO Resp. 41.  In other words, Patent Owner contends that the "each of" clause at the end of claim 15 should be read in conjunction with "a plurality of erroneous sequence number-fields," recited earlier in the claim.  *Id*. According to Patent Owner, "Seo does not disclose a length field" because "[n]either the FIRST/LAST nor the BITMAP section of the NAK Control frame teaches or discloses a length field.  *Id*.

Petitioner counters that the "each of" clause should be read in conjunction with the "plurality of erroneous sequence number length fields," that immediately precedes it in the claim.  Pet. Reply 14.  According to Petitioner, "[Patent] Owner's argument gives no meaning to the phrase "at least one of."  *Id*.  We find Petitioner's arguments to be persuasive.

The "each of" clause references both "said plurality of erroneous sequence number fields" and "said plurality of erroneous sequence number length fields."  Nothing about the clause itself suggests that it should be read in conjunction with the "plurality of erroneous sequence number-fields, as opposed to with the "plurality of erroneous sequence number length fields." When a claim recites, "at least one of A, B, and C, each of said B associated with said C," the intuitive interpretation is to read the "each of" clause as part of C.  Patent Owner points to nothing in the Specification of the '215 patent that supports its counter-intuitive interpretation.  Accordingly, we are not persuaded that claim 15 requires a "length field" and, therefore, are not persuaded that Seo fails to disclose claim 15.

25

**A0025**

IPR2013-00601
Patent 6,772,215 B1

*Dependent claims*

Patent Owner argues that dependent claims 2, 4, 6, 8, 22, 26, 29, 32, 34, 46, 49, 42, and 54 are not anticipated by Seo because they depend from an independent claim that is not anticipated. PO Resp. 41–42. We are not persuaded by Patent Owner's arguments regarding the independent claims for the reasons discussed above.

*Conclusion*

We are persuaded that Petitioner has demonstrated, by a preponderance of the evidence, that claims 1, 2, 4, 6, 8, 15, 22, 25, 26, 29, 32, 34, 45, 46, 49, 52, and 54 are unpatentable as anticipated by Seo.

*D. Patent Owner's Motion to Exclude*

Patent Owner's Motion to Exclude seeks to exclude (1) Exhibit 1010, entitled "TIA/EIA Interim Standard; Data Service Options for Wideband Spread Spectrum Systems," TIA/EIA/IS-707-A (Revision of TIA/EIA/IS-707); and (2) paragraph 7 of the Reply Declaration of Dr. Bims (Ex. 1013). Paper 53, 2–4. As movant, Patent Owner has the burden of proof to establish that it is entitled to the requested relief. *See* 37 C.F.R. § 42.20(c). For the reasons stated below, Patent Owner's Motion to Exclude is *dismissed as moot*.

Patent Owner argues that Exhibit 1010 should be excluded because (1) it is irrelevant under Rule 403 because it is dated 4–8 months after Seo and is not, therefore, contemporaneous evidence of how a person of ordinary skill in the art would have interpreted Seo; (2) Petitioner has not shown why the exhibit could not have been included in the Petition; (3) it does not respond to any argument raised by Patent Owner in its response; (4) it is not

26

IPR2013-00601
Patent 6,772,215 B1

relevant to any issue in the case (Fed. R. Evid. 401, 403); (5) it has not been authenticated, and no evidence links it to the version of IS-707.2 referenced in Seo (Fed. R. Evid. 901); and (6) it is inadmissible hearsay because Broadcom is attempting to prove the truth of the matter asserted, including its alleged publication date (Fed. R. Evid. 801, 802).  Paper 53, 2–3 (citing *Hilgraeve, Inc. v. Symantec Corp.*, 271 F. Supp. 2d 964, 974–75 (E.D. Mich. 2003)).  Patent Owner argues that paragraph 7 of Dr. Bims' Declaration should be excluded because it "[f]or the same reasons above as to Exhibit 1010." *Id.* at 4.

Because we have not relied upon Exhibit 1010, the motion is *dismissed* as moot as to Exhibit 1010 and paragraph 7 of Exhibit 1013.

## III.  CONCLUSION

Petitioner has shown, by a preponderance of the evidence, that claims 1, 2, 4, 6, 8, 15, 22, 25, 26, 29, 32, 34, 45, 46, 49, 52, and 54 of the '215 patent are unpatentable.

## IV.  ORDER

Accordingly, it is

ORDERED that pursuant claims 1, 2, 4, 6, 8, 15, 22, 25, 26, 29, 32, 34, 45, 46, 49, 52, and 54 of the '215 patent are held unpatentable;

FURTHER ORDERED that Patent Owner's Motion to Exclude is *dismissed as moot*; and

FURTHER ORDERED that, because this is a Final Written Decision, the parties to the proceeding seeking judicial review of the decision must comply with the notice and service requirements of 37 C.F.R. § 90.2.

27

**A0027**

IPR2013-00601
Patent 6,772,215 B1

For PETITIONER:

Dominic E. Massa
Michael A. Diner
Zachary Piccolomini
WILMER CUTLER PICKERING HALE AND DORR LLP
dominic.massa@wilmerhale.com
michael.diener@wilmerhale.com
zachary.piccolomini@wilmerhale.com

For PATENT OWNER:

Peter J. Ayers
J. Christopher Lynch
LEE & HAYES PLLC
peter@leehayes.com
chris@leehayes.com
EricssonIPR2013-00601@leehayes.com
EricssonIPR2013-00602@leehayes.com

28

**A0028**

Trials@uspto.gov                                          Paper 71
571-272-7822                                    Entered: June 1, 2015

UNITED STATES PATENT AND TRADEMARK OFFICE
_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD
_____

BROADCOM CORPORATION,
Petitioner,

v.

WI-FI ONE, LLC,
Patent Owner.

IPR2013-00601 (Patent 6,772,215 B1)
IPR2013-00602 (Patent 6,466,568 B1)
IPR2013-00636 (Patent 6,424,625 B1)[1]

Before KARL D. EASTHOM, KALYAN K. DESHPANDE, and
MATTHEW R. CLEMENTS, *Administrative Patent Judges*.

CLEMENTS, *Administrative Patent Judge*.

DECISION
Request for Rehearing
*37 C.F.R. § 42.71(d)*

---

[1] We exercise our discretion to issue one Order to be filed in each case. The parties are not authorized to use this style heading for any subsequent papers.

IPR2013-00601 (Patent 6,772,215 B1)
IPR2013-00602 (Patent 6,466,568 B1)
IPR2013-00636 (Patent 6,424,625 B1)

## I.    SUMMARY

Patent Owner, Wi-Fi One, LLC,[2] requests rehearing of the Final Written Decisions (IPR2013-00601, Paper 66, "601 Dec."; IPR2013-00602, Paper 60, "602 Dec."; IPR2013-00636, Paper 60, "636 Dec.").  Paper 70 ("Req.").[3]  Patent Owner seeks rehearing on the grounds that:

1. The Board misapprehended the purpose of the "real party in interest or privy" language in 35 U.S.C. § 315(b), and misapprehended the correct legal standard for determining whether a non-party is a "real party in interest or privy of petitioner" under § 315(b); and

2. The Board misapprehended the entirety of the factual record and overlooked evidence supporting Patent Owner's contention that certain district court defendants are real parties in interest and/or privies of Petitioner in this proceeding.

Req. 2.  Patent Owner also argues that our Final Written Decisions raise administrative law issues.  *Id.* at 4, 13–15.

The Requests for Rehearing are *denied*.

---

[2] On July 11, 2014, Patent Owner filed an Updated Mandatory Notice in IPR2013-00601 indicating that the patent-at-issue had been assigned to Wi-Fi One, LLC, and that Wi-Fi One, LLC and PanOptis Patent Management, LLC are now the real parties-in-interest.  Paper 43.  The same paper was filed in IPR2013-00602 (Paper 40) and IPR2013-00636 (Paper 38).

[3] Patent Owner filed a Request for Rehearing in each of IPR2013-00601 (Paper 70), IPR2013-00602 (Paper 64), and IPR2013-00636 (Paper 64).  All three requests put forward substantively the same arguments and, thus, we address them together with reference to the Request in IPR2013-00601.  Citations are to IPR2013-00601, unless otherwise noted.

**A0271**

IPR2013-00601 (Patent 6,772,215 B1)
IPR2013-00602 (Patent 6,466,568 B1)
IPR2013-00636 (Patent 6,424,625 B1)

## II.    DISCUSSION

The applicable standard for a request for rehearing is set forth in 37 C.F.R. § 42.71(d), which provides in relevant part:

> A party dissatisfied with a decision may file a request for rehearing, without prior authorization from the Board. The burden of showing a decision should be modified lies with the party challenging the decision. The request must specifically identify all matters the party believes the Board misapprehended or overlooked, and the place where each matter was previously addressed in a motion, opposition, or a reply.

### A.  35 U.S.C. § 315(b)

Patent Owner argues that the Board misapprehended the purpose of the "real party in interest, or privy" language of § 315(b). Req. 4. Specifically, Patent Owner argues that "the legislative purpose of [35 U.S.C. § 315(b)] is to ensure IPR Petitions are not used as a litigation tactic for purposes of delay" (*id*. at 4), and that "[t]he plain text of the statute makes clear that . . . § 315(b) is intended to prevent litigation defendants from subverting the statutory time-bar by having their agents or cohorts file an IPR petition that they themselves are barred from filing" (*id.* at 5). Patent Owner also argues that the legal standard for determining whether a third party is a "real party in interest, or privy of petition" under § 315(b) "is purposefully broad and flexible so that the Board can determine, on a case-by-case basis and in light of all relevant facts, whether particular parties are attempting to circumvent the § 315(b) time-bar." Req. 7.

Patent Owner has not argued in its Patent Owner Response the legislative purpose of § 315(b). We could not have misapprehended or overlooked arguments not before us. Moreover, Patent Owner identifies

3

**A0272**

IPR2013-00601 (Patent 6,772,215 B1)
IPR2013-00602 (Patent 6,466,568 B1)
IPR2013-00636 (Patent 6,424,625 B1)

nothing in our Decision that it contends mischaracterizes the legislative purpose of § 315(b). We are not persuaded, therefore, that we have overlooked or misapprehended the legislative purpose of § 315(b).

Patent Owner also argues that we misapprehended the legal test that should be applied to determine whether a non-party is a "real party in interest, or privy" for purposes of § 315(b). Req. 6. Specifically, Patent Owner contends that "the Board applied a narrow and rigid standard that is erroneous as a matter of law" (*id.* at 7) because it "requires — as an absolute and necessary condition — that Broadcom controlled or could have exercised control over one or more of the District Court Defendants in relation to the District Court Litigation" (*id.*) without "also considering, *inter alia*, the non-party's control over the IPR" (*id.* at 8). According to Patent Owner, "the issue under § 315(b) is whether the District Court Defendants have attempted to circumvent the one-year statutory time-bar." Req. 9.

Although our Decision on Patent Owner's Motion for Additional Discovery (Paper 23) focuses primarily on Broadcom's ("Petitioner") exercise of control, or opportunity to exercise control over the prior District Court lawsuit (Req. 8), that is because that was the focus of Patent Owner's Motion for Additional Discovery. *See, e.g.,* Paper 14, 6 ("Here, evidence will prove that Broadcom has had the opportunity to control and maintains a substantive legal relationship with the D-Link Defendants sufficient to bind Broadcom to the District Court's judgment.").

That decision, however, did not characterize the legal standard, for all cases, as being limited strictly to a petitioner's control, or opportunity to control, a non-party in previous litigation. To the contrary, it addressed

4

**A0273**

IPR2013-00601 (Patent 6,772,215 B1)
IPR2013-00602 (Patent 6,466,568 B1)
IPR2013-00636 (Patent 6,424,625 B1)

control, or opportunity to control, by a non-party generally as one of a number of factors:

> Whether parties are in privity, for instance, depends on whether the relationship between a party and its alleged privy is "sufficiently close such that both should be bound by the trial outcome and related estoppels." [*Office Patent Trial Practice Guide*, 77 Fed. Reg. 48,756, 48,759 (Aug. 14, 2012]. Depending on the circumstances, a number of factors may be relevant to the analysis, including whether the non-party "exercised or could have exercised control over a party's participation in a proceeding," and whether the non-party is responsible for funding and directing the proceeding. *Id*. at 48,759-60.

Paper 23, 7.

That decision also addresses Patent Owner's theory that the indemnity agreements imply that the District Court Defendants are real parties in interest in these *inter partes* reviews ("IPRs"). *See id*. at 12–13. Patent Owner relied on substantively the same arguments and evidence in its Patent Owner Response as in its Motion for Additional Discovery, and our Final Written Decision, thus, applied essentially the same analysis. 601 Dec. 8–9. Accordingly, we are not persuaded that we misapprehended the proper legal standard for establishing privity or real party in interest.

### B. District Court Defendants

Patent Owner argues that we misapprehended and overlooked evidence establishing that certain District Court defendants are real parties in interest and/or are in privity with Petitioner for purposes of this proceeding. Req. 10–13. Specifically, Patent Owner argues that it has made "a strong circumstantial showing that Petitioner and at least some of their District Court Defendant customers are in cahoots" because "there are indemnity

**A0274**

IPR2013-00601 (Patent 6,772,215 B1)
IPR2013-00602 (Patent 6,466,568 B1)
IPR2013-00636 (Patent 6,424,625 B1)

agreements," they "share a common economic and legal interest," and "[Petitioner] has been coordinating with the District Court Defendants for many years." *Id.* at 11–12. According to Patent Owner, "the Board erred when it decided the § 315(b) issue without reviewing the known indemnity agreements." *Id.* at 12.

Patent Owner's arguments are not persuasive. The evidence cited by Patent Owner were Paper 3, and Exhibits 2005 and 2015–2018. PO Resp. 8–14. Exhibit 2018 is a final judgment of infringement in the co-pending district court litigation that sheds no light on whether Broadcom controlled, or could have controlled, the district court defendants, or vice-versa. All of the other evidence was considered in our Decision on Patent Owner's Motion for Additional Discovery. For example, we considered, and rejected, Patent Owner's argument that an indemnity relationship is sufficient to establish privity:

> Contrary to Ericsson's assertion that "[t]he weight of authority strongly supports that an indemnity agreement . . . establish[es] privity," Mot. 6, *Bros. Inc, TRW, Dentspl[]y* and other cases noted *supra* illustrate that more is required. Control of the litigation, or some sort of representation, constitutes a "crucial" factor. *Dentsply*, 42 F.Supp.2d at 398.

Paper 23, 9. As we indicated in our Final Written Decision, Patent Owner's Response relied on substantively the same arguments and evidence as its Motion for Additional Discovery, and we were not persuaded for the same reasons as explained in our decision on that motion. 601 Dec. 8–9. Accordingly, we are not persuaded that we misapprehended or overlooked the evidence relied upon by Patent Owner. To the extent Patent Owner is arguing that we should have granted its Motion for Additional Discovery

6

**A0275**

IPR2013-00601 (Patent 6,772,215 B1)
IPR2013-00602 (Patent 6,466,568 B1)
IPR2013-00636 (Patent 6,424,625 B1)

directed to the indemnity agreements, the argument is untimely because our decision denying that discovery was issued well over a year before our Final Written Decision, Patent Owner requested rehearing (Paper 27) and we denied that request (Paper 28). *See* 37 C.F.R. § 42.71(d)(1).

In these proceedings, Patent Owner does not set forth a persuasive argument, supported by evidence, that the District Court Defendants funded, controlled, or could have controlled these proceedings, or that Petitioner's indemnity agreements even mention IPRs, let alone would show funding, control, or ability to control IPRs, or would have obligated Broadcom to file specific, if any, IPRs. *See* Req. 12. Instead, Patent Owner generally asserts that "Broadcom's duty to indemnify triggered the successive attack on [it]s patents," without specifying, based on cited precedent supporting the theory, how even a generic trigger for some unspecified future action, even if it existed, elevates the District Court Defendants to real parties in interest in the IPRs. *See* PO Resp. 13.

Patent Owner also argues that Petitioner failed to provide evidence of the non-party's lack of participation in, or control over, this proceeding, and that the Declaration of David Djavaherian (Ex. 1007) submitted by Petitioner in its Opposition to Patent Owner's Motion for Additional Discovery is carefully worded to obscure the true nature of the relationship between Petitioner and the District Court defendants. Req. 11, 12. Patent Owner did not make these arguments in the Patent Owner Response. We, therefore, could not have misapprehended or overlooked them.

7

**A0276**

IPR2013-00601 (Patent 6,772,215 B1)
IPR2013-00602 (Patent 6,466,568 B1)
IPR2013-00636 (Patent 6,424,625 B1)

### C. Administrative Law Issues

Patent Owner argues that "the Board's Final Written Decision and other actions in this IPR are *ultra vires*, undertaken without statutory authority." Req. 13. Specifically, Patent Owner argues the following:

> The Board's refusal to consider a reasonably full evidentiary record in connection with the § 315(b) issue; its denial of all discovery on the issue; and its refusal to consider the terms of the known indemnity agreement and other known facts all violate the Board's duties under the APA. *See Olenhouse v. Commodity Credit Corp.*, 42 F.3d 1560, 1581 (10th Cir. 1994); *Intel Corp. v. U.S. Int'l Trade* [*Comm'n*], 946 F.2d 821, 836-39 (Fed. Cir. 1991).

*Id.* at 14. Patent Owner also argues that (1) our actions are inconsistent with public statements made during the rulemaking process and, therefore, violate the Administrative Procedure Act ("APA"); (2) our Decision is contrary to 37 C.F.R. § 42.3(b) and our failure to follow our rules is contrary to the APA; and (3) our Decision does not establish that we have jurisdiction to hear this petition in light of 35 U.S.C. § 315(b), contrary to the APA. *Id.* at 15.

Patent Owner's arguments are predicated on its contention that we lack jurisdiction under § 315(b) because the defendants in the co-pending district court litigation are real parties-in-interest who were served with a complaint alleging infringement more than one year before the filing of the Petitions in these proceedings. As discussed above, we are not persuaded that we erred in determining that those defendants are not real parties in interest. As a result, we are not persuaded that the Petitions were time-barred under § 315(b), and we are, therefore, not persuaded that our Final Written Decisions are *ultra vires* actions that exceed our statutory authority.

8

**A0277**

IPR2013-00601 (Patent 6,772,215 B1)
IPR2013-00602 (Patent 6,466,568 B1)
IPR2013-00636 (Patent 6,424,625 B1)

### III.   Conclusion

For the foregoing reasons, Patent Owner has not shown that our Final Written Decision in IPR2013-00601 should be modified.  For the same reasons, Patent Owner also has failed to show that our Final Written Decisions in IPR2013-00602 and IPR2013-00636 should be modified.

### ORDER

Accordingly, it is:

ORDERED that Patent Owner's Requests for Rehearing are *denied*.

**A0278**

IPR2013-00601 (Patent 6,772,215 B1)
IPR2013-00602 (Patent 6,466,568 B1)
IPR2013-00636 (Patent 6,424,625 B1)

For PETITIONER:

Dominic E. Massa
Michael A. Diner
Zachary Piccolomini
WILMER CUTLER PICKERING HALE AND DORR LLP
Dominic.massa@wilmerhale.com
michael.diener@wilmerhale.com
Zachary.piccolomini@wilmerhale.com

For PATENT OWNER:

Peter J. Ayers
J. Christopher Lynch
Sarah Spires
LEE & HAYES PLLC
peter@leehayes.com
chris@leehayes.com
Sarah.spires@skiermontpuckett.com

10

**A0279**

US006772215B1

(12) **United States Patent**
Rathonyi et al.

(10) **Patent No.:     US 6,772,215 B1**
(45) **Date of Patent:         Aug. 3, 2004**

(54) **METHOD FOR MINIMIZING FEEDBACK RESPONSES IN ARQ PROTOCOLS**

(75) Inventors: **Bela Rathonyi**, Malmö (SE); **Joachim Sachs**, Aachen (DE); **Michael Meyer**, Aachen (DE); **Per Beming**, Stockholm (SE); **Mathias Johansson**, Sollentuna (SE); **Christiaan Roobol**, Hässelby (SE); **Erik Schön**, Tokyo (JP); **Kazuhiko Inoue**, Tokyo (JP)

(73) Assignee: **Telefonaktiebolaget LM Ericsson (publ)**, Stockholm (SE)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **09/537,146**

(22) Filed: **Mar. 29, 2000**

**Related U.S. Application Data**

(60) Provisional application No. 60/128,517, filed on Apr. 9, 1999.

(51) **Int. Cl.$^7$** ............................................... **G06F 15/16**
(52) **U.S. Cl.** ...................................... **709/230**; 370/229
(58) **Field of Search** ......................... 709/230; 370/229, 370/232, 394, 395.1, 349

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 4,439,859 A | | 3/1984 | Donnan ........................ 371/32 |
| 5,477,550 A | * | 12/1995 | Crisler et al. ................ 714/748 |
| 5,566,170 A | * | 10/1996 | Bakke et al. ................ 370/392 |
| 5,673,252 A | * | 9/1997 | Johnson et al. ............. 370/449 |
| 5,752,078 A | * | 5/1998 | Delp et al. ..................... 710/7 |
| 5,754,754 A | | 5/1998 | Dudley et al. ......... 395/182.16 |

| | | | | |
|---|---|---|---|---|
| 5,799,012 A | * | 8/1998 | Ayerst et al. ................ 370/336 |
| 5,968,197 A | * | 10/1999 | Doiron ........................ 714/748 |
| 5,991,299 A | * | 11/1999 | Radogna et al. ............ 370/392 |
| 6,034,963 A | * | 3/2000 | Minami et al. ............. 370/401 |
| 6,069,886 A | * | 5/2000 | Ayerst et al. ............. 370/336 |
| 6,317,430 B1 | * | 11/2001 | Knisely et al. ............. 370/394 |
| 6,359,877 B1 | * | 3/2002 | Rathonyi et al. ........... 370/349 |
| 6,473,399 B1 | * | 10/2002 | Johansson et al. .......... 370/229 |
| 6,542,490 B1 | * | 4/2003 | Ahmadvand et al. ....... 370/338 |

FOREIGN PATENT DOCUMENTS

EP          0 768806 A2      4/1997

OTHER PUBLICATIONS

Throughput analysis of some ARQ protocols in the presence of feedback errors by Cam et al.; IEEE; vol. 45 No. 1, Jan. 1997.*

Richard Cam and Cyril Leung; *Throughput Analysis of Some ARQ Protocols in the Presence of Feedback Errors;* IEEE Transactions on Communications; Jan. 1997; vol. 45, No. 1; pp. 35–44.

ISR, PCT/SE/ 00/00677, Completed Aug. 23, 2000.

* cited by examiner

*Primary Examiner*—Frantz B. Jean

(57)          **ABSTRACT**

A method for minimizing feedback responses in an ARQ protocol is disclosed, whereby different mechanisms can be used to indicate erroneous D-PDUs and construct S-PDUs. The S-PDUs are constructed so as to optimize performance in accordance with certain criteria. One such criterion used is to minimize the size of the S-PDUs. A second such criterion used is to maximize the number of SNs included in an S-PDU of limited size.

**64 Claims, 3 Drawing Sheets**

| |
|---|
| type=LIST |
| LENGTH=0 |
| LENGTH=4 |
| $SN_1$=1 |
| $SN_2$=25 |
| $SN_3$=50 |
| $SN_4$=95 |

A0029



FIG.1
PRIOR ART

FIG. 2
PRIOR ART

| PDU_format=S-PDU |
| --- |
| Length=5 |
| SN=3 |
| SN=4 |
| SN=5 |
| SN=9 |
| SN=16 |

FIG.3
PRIOR ART

| PDU_format=S-PDU |
| --- |
| SSN=2 |
| BITMAP=0100001111111000 |

FIG. 5

| type=LIST |
| --- |
| LENGTH=0 |
| LENGTH=4 |
| $SN_1$=1 |
| $SN_2$=25 |
| $SN_3$=50 |
| $SN_4$=95 |

FIG. 6

| Type=LIST' |
| --- |
| LENGTH |
| $SN_1$ |
| $L_1$ |
| $SN_2$ |
| $L_2$ |
| ... |
| $SN_{LENGTH}$ |
| $L_{LENGTH}$ |

FIG.4

| Type=BITMAP' |
| --- |
| FSN |
| LENGTH |
| Bitmap |

A0030

| type=ACK |
| --- |
| SN |

FIG. 7

| Type=BITMAP' |
| --- |
| FSN |
| LENGTH |
| Bitmap |
| Type=LIST' |
| LENGTH |
| SN₁ |
| L₁ |
| ... |
| SN_LENGTH |
| L_LENGTH |
| Type=BITMAP' |
| LENGTH |
| bitmap |
| Type=NO_MORE |

FIG. 8

| Field | Field Value | | Field size |
| --- | --- | --- | --- |
| | Decimal | Bits | |
| LIST' | N/A' | 01 | 2 |
| LENGTH | 1 | 00001 | 5 |
| SN₁ | 51 | 000000110011 | 12 |
| L₁ | 27 | 11011 | 5 |
| ACK | N/A | 11 | 2 |
| SN | 101 | 000001100101 | 12 |

FIG. 9

| Field | Field Value | | Field size |
| --- | --- | --- | --- |
| | Decimal | Bits | |
| LIST' | N/A | 01 | 2 |
| LENGTH | 0 | 00000 | 5 |
| LENGTH | 4 | 00100 | 5 |
| SN₁ | 1 | 000000000001 | 12 |
| SN₂ | 25 | 000000011001 | 12 |
| SN₃ | 50 | 000001100100 | 12 |
| SN₄ | 95 | 000001011111 | 12 |
| ACK | N/A | 11 | 2 |
| SN | 101 | 000001100101 | 12 |

FIG.10

| Field | Field Value | | Field size |
| --- | --- | --- | --- |
| | decimal | Bits | |
| BITMAP' | N/A | 10 | 2 |
| LENGTH | 2 | 00010 | 5 |
| FSN | 27 | 000000011011 | 12 |
| Bitmap | 28-43 | 0001111011101011 | 16 |
| LIST' | N/A | 01 | 2 |
| LENGTH | 2 | 00010 | 5 |
| SN₁ | 91 | 000001011011 | 12 |
| L₁ | 3 | 00011 | 5 |
| SN₁² | 101 | 000001100101 | 12 |
| L₂ | 0 | 00000 | 5 |
| NO_MORE | N/A | 00 | 2 |

FIG. 11

| Field | Field Value | | Field size |
|---|---|---|---|
| | *decimal* | *Bits* | |
| BITMAP' | N/A | 10 | 2 |
| LENGTH | 11 | 01011 | 5 |
| FSN | 3 | 000000000011 | 12 |
| Bitmap | 4-10 | 1110111 | 88 |
| | 11-20 | 0111101111 | |
| | 21-30 | 1111111111 | |
| | 31-40 | 1101111111 | |
| | 41-50 | 1111011111 | |
| | 51-60 | 1111011111 | |
| | 61-70 | 1111101111 | |
| | 71-80 | 1111111011 | |
| | 81-90 | 1011111111 | |
| | 91 | 0 | |
| ACK | N/A | 11 | 2 |
| SN | 101 | 000001100101 | 12 |

## FIG. 12

| Field | Field Value | | Field size |
|---|---|---|---|
| | *decimal* | *Bits* | |
| LIST' | N/A | 01 | 2 |
| LENGTH | 1 | 00001 | 5 |
| SN₁ | 10 | 000000001010 | 12 |
| L₁ | 20 | 10100 | 5 |
| BITMAP' | N/A | 10 | 2 |
| LENGTH | 1 | 00001 | 5 |
| Bitmap | 31-38 | 01011011 | 8 |
| ACK | N/A | 11 | 2 |
| SN | 101 | 000001100101 | 12 |

## FIG. 13

US 6,772,215 B1

# METHOD FOR MINIMIZING FEEDBACK RESPONSES IN ARQ PROTOCOLS

## CROSS-REFERENCES TO RELATED APPLICATIONS

This Application for Patent claims the benefit of priority from, and hereby incorporates by reference the entire disclosure of, co-pending U.S. Provisional Application for patent Ser. No. 60/128,517, filed Apr. 9, 1999.

## BACKGROUND OF THE INVENTION

1. Technical Field of the Invention

The present invention relates in general to the telecommunications field and, in particular, to a method for minimizing feedback responses in Automatic Repeat Request (ARQ) protocols, such as, for example, selective-repeat ARQ protocols.

2. Description of Related Art

When data is conveyed between nodes in a telecommunication network, certain algorithms are used to recover from the transmission of erroneous data and the loss of data on the transmission links between the nodes. An algorithm commonly used to recover from the transmission of erroneous data is referred to as an ARQ protocol.

The existing ARQ protocols (i.e., algorithms) include two peer entities that communicate with each other over transmission links. Each such entity includes a receiver and a sender. The units of data conveyed between the peer entities are commonly referred to as Protocol Data Units (PDUs). The ARQ protocols include certain rules for sending and receiving PDUs, as well as rules for the structure of the PDUs. As such, the name "Automatic Repeat Request" indicates the basic function of the protocol: the receiver requests the sender to retransmit those PDUs that were lost or contained errors during transmission.

The receiver can inform the sender about which PDUs were correctly received (i.e., receiver acknowledges correctly-received PDUs) and/or which PDUs were incorrectly received. When the sender receives this information, it retransmits the "lost" PDUs. In other words, an ARQ protocol is a set of rules that allow the use of efficient retransmission mechanisms between a sending side and receiving side in a communication system. These rules specify, for example, how and in what form the PDUs are to be constructed so that the receiving side can interpret the conveyed PDUs correctly and respond to them accordingly.

Three main types of information elements (PDUs) can be transferred between two ARQ peer entities: user data; error recovery control data; and common control data. These three types of PDUs can be found in all of the existing ARQ protocols. A user data PDU contains at least user data and a sequence number. An error recovery control data PDU contains various control information needed for error recovery and control functions such as positive and negative acknowledgments. A common control data PDU contains common control data.

In the known High Level Data Link Control (HDLC) protocol, which forms the basis for many existing ARQ protocols, the three types of PDUs are called, respectively, information frames (I-frames), supervisory frames (S-frames), and unnumbered frames (U-frames). Examples of HDLC-derived ARQ protocols are the Radio Link Protocol (RLP) used in the Global System for Mobile Communications (GSM), the Radio Link Control (RLC) and Logical Link Control (LLC) protocols used in the General Packet Radio Service (GPRS), the Infrared Link Access Protocol (IrLAP) used in IrDA systems, and the LAP-B protocol used in X.25 systems. Notably, PDUs that include user data and at least a sequence number are denoted herein as Data-PDUs (D-PDUs), and PDUs that include control data needed for error control/recovery are denoted herein as Status-PDUs (S-PDUs).

In most communication systems, user data information is conveyed in both directions between the peer entities. A common feature included in an ARQ protocol is the possibility of including error control information in the user data PDUs. This capability is known as "piggybacking". For example, an acknowledgment is included in all I-frames (i.e., D-PDUs) of HDLC-derived protocols. The acknowledgment informs the peer entity about the sequence number of the last (in-sequence) correctly received PDU.

The most common existing ARQ protocols implement one or more mechanisms to recover from errors on a transmission link, such as a Stop-and-Wait ARQ, Go-back-N ARQ, and Selective-Repeat ARQ. The use of these mechanisms and ARQs in general is well known.

FIG. 1 is a sequence diagram that illustrates the use of ARQ protocols. As shown, two ARQ peer entities 10, 12 are communicating with each other. The arrows in FIG. 1 indicate the transmission of PDUs between the two entities, and the content of each PDU is described directly above the respective arrow. Referring to FIG. 1, a sequence of transmitted D-PDUs and S-PDUs is shown. A D-PDU includes user data, a sequence number (SN), and possibly piggybacked error control information. An S-PDU includes status information but no user information. A sequence number (SN=x) is associated with a D-PDU to identify that specific D-PDU. An acknowledgment (ACK=x) is used to acknowledge any PDU with a SN<x. A negative acknowledgment (NAK=x) is used to acknowledge that a PDU (with an SN=x) has not been correctly received.

Two types of error control feedback responses are shown in FIG. 1. For one of the feedback responses (e.g., S-PDU, ACK=2) 14, the second ARQ peer entity 12 has acknowledged that it has received the PDUs with the SN=0 and SN=1. For the second type of feedback response (e.g., S-PDU, NAK=3) 16, the second peer entity 12 has indicated that the PDU with the SN=3 was corrupted and should be retransmitted by the first peer entity 10.

As discussed above, the S-PDUs are special PDUs which are transmitted between peer entities. An S-PDU includes information about the SNs of corrupted PDUS. Two main methods are currently used for coding the SNs within S-PDUs. One such method is to use a list of SNs to be retransmitted. The second method is to use a bitmap to represent the SNs to be retransmitted. As such, apart from representing SNs, an S-PDU also includes a format identifier which can be used by a receiver to distinguish between the different PDU formats (i.e., D-PDUs and S-PDUs).

The list method used for coding SNs includes the SNs of the erroneous PDUs in the S-PDU. If the length of the list is not predefined and thereby known, this length information is indicated in the S-PDU. For example, a length field can be included in the S-PDU. FIG. 2 shows such an S-PDU, which can be created by a receiver using a list method for coding SNs.

Referring to FIG. 2, a receiver can create an S-PDU with the contents shown, if the sender has transmitted a sequence of D-PDUs with SNs=0–15, and the PDUs with SNs=3, 5, 6, 7 and 8 have failed (not been correctly received). For example, the first two elements in the list (after the length

A0033

US 6,772,215 B1

3      4

field) indicate that the D-PDU with SN=3 was erroneous. The third and fourth elements in the list indicate that the D-PDUs with SNs=5–8 were erroneous. The final element is included to acknowledge the remaining PDUs (SNs up to 15).

The size of the S-PDU depends on the number of bits used to represent the PDU format identifier field, the length field and the SN field. As such, the size of an S-PDU can be calculated by the expression:

$$DU.SIZE_{LIST}=size(pdu.format.field)+size(length.field)+ \\ no.listelements*size(seq.no.field). \qquad (1)$$

For example, this list method is used in the SSCOP protocol, wherein two S-PDU formats exist and are denoted by the term "STAT" for a variable list length, and "USTAT" for a list with a limited number of elements (e.g., 2 elements).

FIG. 3 shows an S-PDU which can be created by a receiver using a bitmap method for coding SNs. When a bitmap is used to indicate SNs, the receiver creates the S-PDU from the SN of the last in-sequence correctly received D-PDU and a bitmap. This SN is referred to as a Start SN (SSN). Consequently, this S-PDU implicitly acknowledges all D-PDUs received up to the value of the SSN. Each location in the bitmap is used to address a specific S-PDU relative to the SSN. Typically, the size of the bitmap is fixed to the size of the ARQ receiver window and does not have to be explicitly indicated. If the bitmap is not fixed, the length has to be indicated.

The bitmap shown in FIG. 3 shows an S-PDU created from the example described above with respect to FIG. 2, and a window size of 16. As such, each location in the bitmap can have one of the two values, 0 or 1: A "1" means that SN=(SSN+bit_position) has been correctly received; and a "0" value means that SN=(SSN+bit_position) has not been correctly received. Of course, the meaning of the "0" and "1" values can be interchanged. The size of an S-PDU when using such a bitmap can be derived from the following expression:

$$PDU.SIZE_{BITMAP}=size(pdu.format.field)+size(SSN.field)+size(bit- \\ map.field). \qquad (2)$$

Both the RLC and LLC protocols in the GPRS system use such an expression and convey bitmaps between peer entities for error control purposes.

A significant problem with existing ARQ protocols is that they are static in construction (e.g., fixed length messages are used). In certain situations, this approach leads to a waste of bandwidth resources, because a great deal of overhead information is transmitted unnecessarily. For example, such situations can occur in systems having a large number of D-PDUs being transmitted between two ARQ peer entities, and these D-PDUs have to be acknowledged and selectively requested for retransmission. For some error control situations, the existing solutions introduce a significant amount of unnecessary overhead. The following example illustrates such a situation.

In the Wideband-Code Division Multiple Access (WCDMA) system currently being standardized for the so-called 3rd Generation Cellular Communication System, one ARQ protocol used is an RLC protocol. The,SN set includes the values 0–4095, which means that each SN is coded with 12 bits. An assumption can be made that for high data rates, a relatively large set of SNs will have to be addressed in some S-PDUs. Also, assume that the status of 100 D-PDUs (SN=1–100) needs to be communicated between the RLC peer entities in an S-PDU.

Table 1 below shows the number of bits needed to code an S-PDU using the list and bitmap methods described above. Different error circumstances are provided to highlight the large difference in the number of bits required for the two methods. Assume that the following element sizes are used: bitmap=128 bits; length=5 bits; and one PDU format identifier=1 bit (for distinguishing between a D-PDU and an S-PDU). As such, the different S-PDU sizes shown in Table 1 are calculated in accordance with Equations (1) and (2) above, respectively.

As illustrated by rows 2–5 in Table 1, both of the existing solutions have problems with efficiently building small S-PDUs for error circumstances shown. The length of the LIST does not depend so much on the number of erroneous D-PDUs, but rather on the distribution of the errors within the window used. This fact becomes evident by comparing rows 1 and 2 in Table 1.

TABLE 1

| Erroneous D-PDUs | # | Size of S-PDU (bits) | |
|---|---|---|---|
| (SN) | SN | LIST | BITMAP |
| 51–77 | 27 | 42 | 141 |
| 1, 25, 50, 95 | 4 | 114 | 141 |
| 27–30, 35, 39, 41, 91–93 | 10 | 138 | 141 |
| 3, 7, 11, 16, 33, 45, 55, 66, 78, 82, 91 | 11 | 282 | 141 |
| 10–29, 31, 33, 36 | 23 | 114 | 141 |

A general statement of the problem to be solved is to determine how to efficiently represent (encode) in a message the status of an arbitrary amount and distribution of n numbers from a set of m numbers. As such, a significant need exists for a method that can be used to minimize the size of S-PDUs in an ARQ protocol Also, a significant need exists for a method that can be used to maximize the number of SNs in an S-PDU with limited size, if it is not possible to fit all potential SNs into a single S-PDU. As described in detail below, the present invention successfully resolves the above-described problems and other related problems.

## SUMMARY OF THE INVENTION

In accordance with an embodiment of the present invention, a method for minimizing feedback responses in an ARQ protocol is provided, whereby different mechanisms can be used to indicate erroneous D-PDUs and construct S-PDUs. In particular, these different mechanisms can be combined in a single S-PDU. The S-PDUs are constructed so as to optimize system performance in accordance with certain criteria. One such criterion used is to minimize the size of the S-PDUs. A second such criterion used is to maximize the number of SNs included in an S-PDU of limited size.

An important technical advantage of the present invention is that radio interface bandwidth resources can be saved.

Another important technical advantage of the present invention is that protocol overhead can be minimized.

Still another important technical advantage of the present invention is that system capacity can be increased.

Yet another important technical advantage of the present invention is that the number of feedback responses in a selective-repeat ARQ protocol can be minimized.

## BRIEF DESCRIPTION OF THE DRAWINGS

A more complete understanding of the method and apparatus of the present invention may be had by reference to the

US 6,772,215 B1

**5**

following detailed description when taken in conjunction with the accompanying drawings wherein:

FIG. **1** is a sequence diagram that illustrates the use of ARQ protocols;

FIG. **2** is a diagram that shows an S-PDU which can be created by a receiver using an existing list method for coding SNs;

FIG. **3** is a diagram that shows an S-PDU which can be created by a receiver using an existing bitmap method for coding SNs;

FIG. **4** is a bitmap message for use in an S-PDU, constructed in accordance with a first embodiment of the present invention;

FIG. **5** is a diagram of a message with the fields and contents of the LIST S-PDU for row 2 in Table 1, constructed in accordance with the first embodiment of the present invention;

FIG. **6** is a diagram of the fields of a LIST' message in an S-PDU, constructed in accordance with the first embodiment of the present invention;

FIG. **7** is a diagram that shows the contents of an "ACK" message constructed in accordance with the second embodiment of the present invention;

FIG. **8** is a diagram that illustrates how an S-PDU can be constructed in accordance with the combination method of the second embodiment;

FIG. **9** is a diagram that shows the contents of row 1 of Table 1 in a combination S-PDU, constructed in accordance with the second embodiment of the present invention;

FIG. **10** is a diagram that shows the contents of row 2 of Table 1 in a combination S-PDU, constructed in accordance with the second embodiment of the present invention;

FIG. **11** is a. diagram that shows the contents of row 3 of Table 1 in a combination S-PDU, constructed in accordance with the second embodiment of the present invention;

FIG. **12** is a diagram that shows the contents of row 4 of Table 1 in a combination S-PDU, constructed in accordance with the second embodiment of the present invention; and

FIG. **13** is a diagram that shows the contents of row 5 of Table 1 in a combination S-PDU, constructed in accordance with the second embodiment of the present invention.

DETAILED DESCRIPTION OF THE DRAWINGS

The embodiments of the present invention and their advantages are best understood by referring to FIGS. **1–13** of the drawings, like numerals being used for like and corresponding parts of the various drawings.

Essentially, in accordance with a first embodiment of the present invention, a method for minimizing feedback responses in an ARQ protocol is provided, whereby different mechanisms can be used to indicate erroneous D-PDUs and construct S-PDUs. The S-PDUs are constructed so as to optimize performance in accordance with certain criteria. One such criterion used is to minimize the size of the S-PDUs. A second such criterion used is to maximize the number of SNs included in an S-PDU of limited size.

Specifically, hereinafter, the basic components being described are messages. For this embodiment, such a message can be described by using a Type, Length, Value (TLV) syntax. In other words, each message includes three fields. One field includes type information, the second field includes length information, and the third field includes a value. The size of the type field is preferably non-zero, while the sizes of the other two fields can be zero.

**6**

Notably, as mentioned earlier, all existing bitmap solutions include information about the sequence number (herein called the SSN) of the last received in-sequence D-PDU in a constructed S-PDU. The SSN indicates that no errors exist prior to that sequence number. In other words, the SSN is used to acknowledge all D-PDUs having SNs up to that of the SSN.

For this exemplary embodiment, a basic message to be used for minimizing feedback responses in an ARQ protocol can be constructed as follows. Using a BITMAP method for this embodiment, the SN included in a constructed S-PDU indicates the SN of any (not necessarily the first) erroneous D-PDU from the set of SNs. The status of the subsequent SNs are indicated in the bitmap. Although the SN of the first erroneous D-PDU is used in this exemplary embodiment, it should be understood that any D-PDU (from the SN set) can be used in the bitmap method instead. In that case, the bitmap also has to include the status (0 or 1) of the SN included in the constructed S-PDU. As such, a "BITMAP" message can be created with a type identifier field, a first SN (FSN) field, a bitmap length field, and a bitmap field. FIG. **4** illustrates a bitmap message with such fields for use in an S-PDU, in accordance with the first embodiment of the present invention.

Referring to the bitmap message shown in FIG. **4**, a number of methods can be used to represent the length of the bitmap (LENGTH field). For one method, a predefined number of bits can be used to represent the size of the bitmap in a basic data unit. Such a data unit can have any granularity and include, for example, one or more bits, bytes, words, etc. For example, if a byte is used as the basic data unit, the value, x, in the LENGTH field means that 8*x SNs are covered by the bitmap. This resulting value also represents the size of the bitmap in bits.

For a second method used to represent the length of the bitmap, a different SN can be used to indicate the last SN covered by the bitmap. The size of the LENGTH field is then equal to the size of the FSN field. As such, the size of the bitmap can be calculated by subtracting the FSN value from the LENGTH value.

A third method that can be used for representing the length of the bitmap is to fix the size of the bitmap so that no LENGTH field is required in the S-PDU. Alternatively, the size of the LENGTH field can be set to zero. Also, the size of the FSN field can also be set to zero if the SN that the bitmap covers is signalled remotely. Such a method is described in more detail below.

Notably, a conventional data compression method can be used to compress the information in the bitmap field. As such, both normal and compressed bitmaps can be included in one S-PDU. In this case, the value of the type field for the compressed bitmap would be different than that for a normal bitmap.

As mentioned earlier, a significant drawback of the existing LIST methods is that two SNs are required for each error group. An error group comprises a single error or several consecutive errors of D-PDUs. In order to resolve such a problem using a LIST method in accordance with this exemplary embodiment, only erroneous SNs are listed. In other words, a new LIST type can be defined wherein only single errors are listed. Consequently, the size of a resulting S-PDU can be significantly reduced for certain error situations, in comparison with the existing LIST solutions.

Another method that can be used to reduce the size of S-PDUs, in accordance with this embodiment, is to combine an existing LIST method (2 SNs per error group) with the

US 6,772,215 B1

7

above-described single error SN LIST method to create the list message. For example, the existing LIST method can be improved significantly by introducing the following rules for creating the LENGTH field value:

(1) A zero value means that a single error SN LIST method is applied. A second (new) length field is included directly after the original LENGTH field to indicate the number of single erroneous SNs that follow directly after the second field. All list elements represent single erroneous SNs, and no acknowledgment is provided while using this list method.

(2) An odd value implies that the last list element is an acknowledgment.

(3) An even value (excluding zero) implies that the last element is not an acknowledgment. Consequently, following the above-described rules in accordance with this embodiment, the (LIST) S-PDU for row 2 in Table 1 now contains the fields and contents shown in FIG. 5. As such, if the field sizes shown in row 2 of the example illustrated by Table 1 were to be used with respect to the embodiment illustrated by FIG. 5, then the total size of the S-PDU would be 59 bits. Consequently, in accordance with the present invention, the number of bits needed for the resulting S-PDU is significantly smaller than the number of bits (114) needed for the existing LIST solution.

FIG. 6 is a diagram that illustrates another method that can be used to reduce the size of an S-PDU using a LIST method. The method used in accordance with this embodiment is to include a field after each list element which determines the length of the error, instead of indicating the length of the error with an "ending" SN. In most systems, the size of the length field would then be substantially smaller than the size of the SN field. Furthermore, typically there is no need to represent very large consecutive, erroneous D-PDUs (i.e., a large error group) in an S-PDU.

Referring to FIG. 6, the fields of a new message (denoted as LIST') in an S-PDU are shown. The new length field introduced after each $SN_i$ is denoted $L_i$ for $1 \leqq I \leqq LENGTH$. Notably, a value of zero can be used for $L_i$ to further improve the functionality of the resulting LIST' message. As such, the following alternatives can be used:

(1) A zero value for $L_i$ means that $SN_i$ is an acknowledgment (i.e., Li is not pointing out an error).

(2) A zero value represents the end of the LIST' message. The first LENGTH field can be omitted if the interpretation of the last SN has been predefined. For example, the last SN can be restricted so as to always be an acknowledgment (e.g., as in the first alternative), or the length can be predefined (e.g., so as to point out a single error).

In accordance with a second embodiment of the present invention, a number of different message types can be combined to create an S-PDU. These message types can be added in any arbitrary order in the S-PDU, and there is no rule on the number of messages or the type of message that can be included in the S-PDU. For this exemplary embodiment, each such message includes a type identifier, and the length is either fixed or indicated by a length field for each specific message. The first type identifier preferably has a predefined position in the resulting S-PDU. The rest of the type identifiers can be located at arbitrary locations depending on the sizes of the included messages. For example, the messages, LIST', BITMAP' and ACK can be included in the S-PDU.

The number of such messages that can possibly be included in an S-PDU determines the size (bits) of the type

8

identifier field used in the S-PDU. For example, the size of such a type identifier field can be determined by the following expression:

$$\text{ize(type. field)} = \lfloor \log_2(\text{number of possible messages} + 1) \rfloor, \quad (3)$$

where the operator $\lfloor \ \rfloor$ rounds the argument off to the next highest integer value. The "+1" part of the argument is used so that a type identifier can be used to indicate that no other messages are included in an S-PDU. This special identifier is denoted herein as a "NO_MORE" message. As such, in accordance with Equation (3), the size of the type field is 2 bits for three different messages, because $\lfloor \log_2(4) \rfloor 2$.

The contents of an "ACK" message constructed in accordance with this embodiment are shown in FIG. 7. The ACK message shown includes a type identifier field and SN. This ACK message marks the end of an S-PDU, and all prior D-PDUs not indicated to be erroneous within this S-PDU are acknowledged by the SN. Consequently, when such an ACK message is included in an S-PDU, there is no need to include a NO_MORE message to terminate the combined S-PDU.

Assume that a LIST' message with an acknowledgment feature (i.e., a zero value for $L_i$ means that $SN_i$ is an acknowledgment) is used (with a LENGTH field). When a BITMAP' message is included directly after a LIST' message, the size of the FSN field is zero. As such, the first SN which is represented in the bitmap is $SN_{LENGTH} + L_{LENGTH}$. Furthermore, a zero in the LENGTH field of the LIST' message means that an additional LENGTH field is included, and the message is constructed as shown in FIG. 5 with no $L_{SNi}$ fields.

Another way to obtain the above-described LIST feature is to define a new type (denoted, for example, "LIST"). However, the size of the type field can be affected, which can result in a larger S-PDU. In any event, there is a trade-off (which is system dependent) to consider in selecting the exact rules to follow for the combination method described above.

FIG. 8 is a diagram that illustrates how an S-PDU can be constructed in accordance with the combination method described above. As shown, the resulting S-PDU includes two BITMAP' messages and one LIST' message. The second BITMAP' message does not include an FSN field (or, the size of the FSN field is zero). Consequently, the first element in the bitmap represents the SN having the value, $SN_{LENGTH} + L_{LENGTH}$.

In order to demonstrate the advantages of the above-described combination method, it can be applied to the example described above with respect to Table 1. As such, Table 2 shows different messages (along with their corresponding bit values) which can be combined in an S-PDU, in accordance with the second embodiment of the present invention. For this embodiment, each S-PDU starts with one of the type identifiers shown. Also, the sizes of the LENGTH and $L_{SNi}$ fields are fixed to 5 bits.

Consequently, these fields can each hold a value between $0–32(2^5)$ Notably, although the sizes of the fields are fixed, their sizes are not necessarily equal, as in this example (i.e., the size of the LENGTH field in the BITMAP' message can be different than the size of the LENGTH field in the LIST' message). The value of the LENGTH field in the BITMAP' message corresponds to the size of the bitmap in bytes (i.e., a maximum of 8*32=256 SNs can be addressed in a single S-PDU). All of the fields containing an SN value have a size of 12 bits (i.e., the FSN, SN and SSN fields).

US 6,772,215 B1

9

TABLE 2

| Type Identifier | Value |
|---|---|
| NO_MORE | 00 |
| LIST' | 01 |
| BITMAP' | 10 |
| ACK | 11 |

FIG. 9–13, respectively, are diagrams that show the contents of an S-PDU for each row shown in Table 1 for the above-described example. For this embodiment, the combination is selected so as to minimize the total size of the S-PDU.

As illustrated by the example described above with respect to Table 1, FIG. 9 shows the contents of row 1 in the resulting (combination) S-PDU, FIG. 10 shows the contents of row 2, and FIG. 11 shows the contents of row 3. Note that by including an ACK type instead of the list element $SN_i$ in FIG. 11, an additional 5 bits can be saved with respect to the total size of the S-PDU. FIG. 12 shows the contents of row 4 in the resulting S-PDU, and FIG. 13 shows the contents of row 5. As such, the contents of the entire coded S-PDU can be obtained by concatenating all values from the "bits" column. For example, the contents of row 1 of the S-PDU (FIG. 9) would appear as:

"010000100000011001111101111000001100101".

Table 3 shows the sizes of the S-PDUs constructed in accordance with the existing LIST and BITMAP methods, and also the combination method described above in accordance with the second embodiment. The sizes of the S-PDUs are calculated by adding the "Field size" columns in FIGS. 9–13. As illustrated by Table 3, the size of the S-PDU resulting from the combination method of the present invention is significantly smaller than the S-PDUs resulting from the existing solutions.

TABLE 3

| | Size of S-PDU (bits) | | |
|---|---|---|---|
| | State-of-the-art solutions | | Combination |
| | LIST | BITMAP | solution |
| 1 | 42 | 141 | 38 |
| 2 | 114 | 141 | 74 |
| 3 | 138 | 141 | 78 |
| 4 | 282 | 141 | 121 |
| 5 | 114 | 141 | 53 |

In many ARQ protocols, the size of the D-PDUs is predefined and can have limited set of different values. Padding can be used if the amount of user data provided to the sending ARQ entity is smaller than the size of the D-PDU. Padding is a technical whereby nonsensical data is used to fill up the remaining empty locations in the D-PDU. For example, if a D-PDU can be filled with 20 bytes of user data, and the sending ARQ entity has only 14 bytes of user data, the rest of the D-PDU can be filled or padded with 6 bytes of padding data. The length of the user data part is indicated in the D-PDU. The RLC protocol in the GPRS and W-CDMA systems use this type of padding function.

The combination method of the second embodiment can also be used efficiently with piggybacking. For example, an ARQ entity can piggyback status information after the end of the last user data byte, if enough space exists to fill the padding fields with a status message. A NO_MORE type

10

identifier is used whenever there is no status information to be included in a D-PDU which contains padding bytes. This piggybacking scheme advantageously reduces the number of packets being exchanged between two ARQ entities and, consequently, saves system capacity. The cost for such a piggybacking scheme is relatively low, because no field is reserved in the D-PDU for the piggybacking scheme, which is the case for existing ARQ protocols that use piggybacking.

Although embodiments of the method and apparatus of the present invention have been illustrated in the accompanying Drawings and described in the foregoing Detailed Description, it will be understood that the invention is not limited to the embodiments disclosed, but is capable of numerous rearrangements, modifications and substitutions without departing from the spirit of the invention as set forth and defined by the following claims.

What is claimed is:

1. A method for minimizing feedback responses in an ARQ protocol, comprising the steps of:

sending a plurality of first data units over a communication link;

receiving said plurality of first data units; and

responsive to the receiving step, constructing a message field for a second data unit, said message field including a type identifier field and at least one of a sequence number field, a length field, and a content field.

2. The method of claim 1, wherein said message field comprises a bitmap message.

3. The method of claim 1, wherein said sequence number field includes a sequence number indicating an erroneous first data unit from said plurality of first data units.

4. The method of claim 1, wherein said sequence number field includes any sequence number from said plurality of first data units.

5. The method of claim 1, wherein said length field comprises a length value for said content field.

6. The method of claim 1, wherein said content field comprises a bitmap.

7. The method of claim 1, wherein said plurality of first data units comprises a plurality of ARQ protocol units including user data.

8. The method of claim 1, wherein said second data unit comprises information about missing or erroneous said first data units.

9. The method of claim 1, wherein the size of said length field is zero and a predefined bitmap size is used.

10. The method of claim 1, wherein said length field indicates a final sequence number in a bitmap.

11. The method of claim 1, wherein said length field comprises a value of zero.

12. The method of claim 1, wherein a size of said sequence number field equals zero.

13. The method of claim 1, wherein at least one of said plurality of first data units is used to piggy-back said message field.

14. The method of claim 1, wherein said ARQ protocol comprises a selective-repeat ARQ protocol.

15. A method for minimizing feedback responses in an ARQ protocol, comprising the steps of:

sending a plurality of first data units over a communication link;

receiving said plurality of first data units; and

responsive to the receiving step, constructing a message field for a second data unit, said message field including a type identifier field and at least one of, a length field,

US 6,772,215 B1

11

a plurality of erroneous sequence number-fields, and a plurality of erroneous sequence number length fields, each of said plurality of erroneous sequence number fields associated with a respective one of said plurality of erroneous sequence number length fields.

16. The method of claim 15, wherein said message field comprises a list message.

17. The method of claim 15, wherein at least one value for said plurality of erroneous sequence number length fields comprises zero.

18. The method of claim 15, wherein said length field comprises a value of zero.

19. The method of claim 15, wherein said length field comprises an odd value indicating that the last SN is an acknowledgment.

20. The method of claim 15, wherein said length field comprises an even value indicating that the last SN is not an acknowledgment.

21. The method of claim 15, wherein said plurality of first data units comprises a plurality of ARQ protocol units including user data.

22. The method of claim 15, wherein said second data unit comprises information about missing or erroneous said first data units.

23. The method of claim 15, wherein at least one of said plurality of first data units is used to piggy-back said message field.

24. The method of claim 15, wherein said ARQ protocol comprises a selective-repeat ARQ protocol.

25. A method for minimizing feedback responses in an ARQ protocol, comprising the steps of:

sending a plurality of first data units over a communication link;

receiving said plurality of first data units; and

responsive to the receiving step, constructing between one to several message fields for a second data unit, said one to several message fields including a type identifier field and at least one of a sequence number field, a length field, a content field, a plurality of erroneous sequence number fields, and a plurality of erroneous sequence number length fields, each of said plurality of erroneous sequence number fields associated with a respective one of said plurality of erroneous sequence number length fields.

26. The method of claim 25, wherein said one to several message fields further comprise an acknowledgment message.

27. The method of claim 25, wherein the last of said one to several message fields includes an acknowledgment of all SNs not indicated erroneous by all other of said one to several message fields in said second data unit.

28. The method of claim 25, wherein said one to several message fields further comprise a no more message.

29. The method of claim 25, wherein said one to several message fields include a bitmap message.

30. The method of claim 25, wherein said sequence number field includes a sequence number indicating an erroneous first data unit from said plurality of first data units.

31. The method of claim 25, wherein said length field comprises a length value for said content field.

32. The method of claim 25, wherein said content field comprises a bitmap.

33. The method of claim 25, wherein said plurality of first data units comprises a plurality of ARQ protocol units including user data.

34. The method of claim 25, wherein said second data unit comprises information about missing or erroneous said first data units.

12

35. The method of claim 25, wherein the size of said length field is zero and a predefined bitmap size is used.

36. The method of claim 25, wherein said length field indicates a final sequence number in a bitmap.

37. The method of claim 25, wherein said length field comprises a value of zero.

38. The method of claim 25, wherein a size of said sequence number field equals zero.

39. The method of claim 25, wherein said one to several message fields include a list message.

40. The method of claim 25, wherein at least one value for said plurality of erroneous sequence number length fields comprises zero.

41. The method of claim 25, wherein said length field comprises an odd value indicating that the last SN is an acknowledgment.

42. The method of claim 25, wherein said length field comprises an even value indicating that the last SN is not an acknowledgment.

43. The method of claim 25, wherein said ARQ protocol comprises a selective-repeat ARQ protocol.

44. The method of claim 25, wherein at least one of said plurality of first data units is used to piggy-back said one to several message fields.

45. A system for minimizing feedback responses in an ARQ protocol, comprising:

a first peer entity;

a second peer entity; and

a communication link coupled between said first peer entity and said second peer entity for communicating data therebetween;

said first peer entity including means for sending a plurality of first data units over said communication link to said second peer entity;

said second peer entity including means for receiving said plurality of first data units, and constructing one to several message fields for a second data unit, said one to several message fields including a type identifier field and at least one of a sequence number field, a length field, a content field, a plurality of erroneous sequence number fields, and a plurality of erroneous sequence number length fields, each of said plurality of erroneous sequence number fields associated with a respective one of said plurality of erroneous sequence number length fields.

46. The system of claim 45, wherein said one to several message fields further comprise an acknowledgment message.

47. The system of claim 45, wherein the last of said one to several message fields includes an acknowledgment of all SNs not indicated erroneous by all other of said one to several message fields in said second data unit.

48. The system of claim 45, wherein said one to several message fields further comprise a no more message.

49. The system of claim 45, wherein said one to several message fields include a bitmap message.

50. The system of claim 45, wherein said sequence number field includes a sequence number indicating an erroneous first data unit from said plurality of first data units.

51. The system of claim 45, wherein said length field comprises a length value for said content field.

52. The system of claim 45, wherein said content field comprises a bitmap.

53. The system of claim 45, wherein said plurality of first data units comprises a plurality of ARQ protocol units including user data.

A0038

US 6,772,215 B1

13

**54**. The system of claim **45**, wherein said second data unit comprises information about missing or erroneous said first data units.

**55**. The system of claim **45**, wherein the size of said length field is zero and a predefined bitmap size is used.

**56**. The system of claim **45**, wherein said length field indicates a final sequence number in a bitmap.

**57**. The system of claim **45**, wherein said length field comprises a value of zero.

**58**. The system of claim **45**, wherein a size of said sequence number field equals zero.

**59**. The system of claim **45**, wherein said one to several message fields include a list message.

**60**. The system of claim **45**, wherein at least one value for said plurality of erroneous sequence number length fields comprises zero.

14

**61**. The system of claim **45**, wherein said length field comprises an odd value indicating that the last SN is an acknowledgment.

**62**. The system of claim **45**, wherein said length field comprises an even value indicating that the last SN is not an acknowledgment.

**63**. The system of claim **45**, wherein said ARQ protocol comprises a selective-repeat ARQ protocol.

**64**. The system of claim **45**, wherein at least one of said plurality of first data units is used to piggy-back said one to several message fields.

* * * * *

A0039

# United States Court of Appeals
## for the Federal Circuit
*Wi-Fi One, LLC v. Broadcom Corporation,* 2015-1945 (IPR2013-00602)

## CERTIFICATE OF SERVICE

I, Elissa Matias, being duly sworn according to law and being over the age of 18, upon my oath depose and say that:

Counsel Press was retained by SKIERMONT PUCKETT LLP, counsel for Appellant to print this document.  I am an employee of Counsel Press.

On **October 26, 2015** counsel has authorized me to electronically file the foregoing **BRIEF OF THE APPELLANT** with the Clerk of Court using the CM/ECF System, which will serve via e-mail notice of such filing to all counsel registered as CM/ECF users, including any of the following:

> Dominic E. Massa
> Kevin Goldman
> Zachary Piccolomini
> Katie Saxton
> Wilmer Cutler Pickering Hale and Dorr LLP
> 60 State Street
> Boston, MA 02109
> 617-526-6000
> dominic.massa@wilmerhale.com
> kevin.goldman@wilmerhale.com
> zachary.piccolomini@wilmerhale.com
> kate.saxton@wilmerhale.com

Paper copies will also be mailed to the above principal counsel at the time paper copies are sent to the Court.

Upon acceptance by the Court of the e-filed document, six paper copies will be filed with the Court within the time provided in the Court's rules.

October 26, 2015                                    /s/ Elissa Matias
                                                    Counsel Press

## CERTIFICATE OF COMPLIANCE

Pursuant to Rule 32(a)(7)(C) of the Federal Rules of Appellate Procedure, I hereby certify that I am an attorney of record on behalf of Appellants Wi-Fi One, LLC and that I personally used the "word count" feature of Microsoft Word 2010 to count the words in the foregoing Brief of Appellant Wi-Fi One, LLC identified in the Rule 32(a)(7)(B)(iii) and determined that the foregoing brief contains 13,996 words and is therefore in compliance with Rule 32(a)(7)(B)(i).

In addition, this brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in 14-point Times New Roman.

By:

*/s/ Donald Puckett*
G. Donald Puckett
SKIERMONT PUCKETT LLP
2200 Ross Avenue, Suite 4800W
Dallas, Texas 75201
(214) 978-6600 (telephone)
(214) 978-6601 (facsimile)
Donald.Puckett@skiermontpuckett.com