**No. 2015-1945**

IN THE

# UNITED STATES COURT OF APPEALS
FOR THE FEDERAL CIRCUIT

———————•———————

WI-FI ONE, LLC,

*Appellant,*

v.

BROADCOM CORPORATION,

*Appellee.*

*Appeal from the United States Patent and Trademark Office,*
*Patent Trial and Appeal Board in Case No. IPR2013-00602*

## NON-CONFIDENTIAL JOINT APPENDIX

G. Donald Puckett
NELSON BUMGARDNER PC
3131 West 7th Street, Suite 300
Fort Worth, Texas 76107
(817) 377-9111

Douglas A. Cawley
MCKOOL SMITH, P.C.
300 Crescent Court, Suite 1500
Dallas, TX 75201
(214) 978-4972

Peter J. Ayers
LEE & HAYES PLLC
11501 Alterra Parkway, Suite 450
Austin, TX 78758
(512) 605-0252

*Attorneys for Appellant*
*Wi-Fi One, LLC*

Dominic E. Massa
Katie M. Saxton
Kevin A. Goldman
Zachary P. Piccolomini
WILMER CUTLER PICKERING
HALE AND DORR LLP
60 State Street
Boston, MA 02109
(617) 526-6000

*Attorneys for Appellee*
*Broadcom Corporation*

# TABLE OF CONTENTS

| Document Title | Page Range |
|---|---|
| Final Written Decision (Paper No. 60) | A1–A35 |
| United States Patent No. 6,466,568 | A36–A51 |
| [SEALED] Motion for Additional Discovery (Paper No. 11) *Pages A0058 and A0062 contain confidential information.* | A56–A66 |
| [PUBLIC] Motion for Additional Discovery (Paper No. 13) | A67–A77 |
| [REDACTED] Petitioner's Opposition to Motion for Additional Discovery (Paper No. 16) | A78–A87 |
| [SEALED] Petitioner's Opposition to Motion for Additional Discovery (Paper No. 17) *Pages A0092 and A0093 contain confidential information.* | A88–A97 |
| Decision on Motion for Discovery (Paper No. 21) | A98–A114 |
| Patent Owner's Request for Rehearing (Paper No. 25) | A115–A123 |
| Decision on Request for Rehearing (Paper No. 26) | A124–A129 |
| Decision on Institution of Inter Partes Review (Paper No. 27) | A130–A151 |
| Excerpts from [SEALED] Patent Owner Response (Paper No. 36) *Page A0163 contains confidential information.* | A160–A172 |
| Excerpts from [REDACTED] Patent Owner Response (Paper No. 37) | A207, A215–A227, A234, A240 A250–A251 |
| Excerpts from Petitioner's Reply to Patent Owner Response (Paper No. 46) | A262, A265–A277 |
| Patent Owner's Request for Rehearing of Final Written Decision (Paper No. 64) | A283–A300 |
| Decision on Request for Rehearing (Paper No. 65) | A301–A310 |
| Notice of Appeal (Paper No. 66) | A311–A317 |
| Certified List, Case No. IPR2013-00602 | A327–A331 |

| Document Title | Page Range |
|---|---|
| Excerpts from Petition for Inter Partes Review of U.S. Patent 6,772,215 (Paper No. 2) | A334–A336, A338–A339 |
| Excerpts from Patent Owner's Motion to Amend (Paper No. 38) | A406–A407 |
| Excerpts from Petitioner's Opposition to Patent Owner's Motion to Amend (Paper No. 47) | A430, A437–A439 |
| Excerpts from Patent Owner's Reply re: Motion to Amend (Paper No. 49) | A451, A455–A456 |
| Excerpts from Record of Oral Hearing (Paper No. 59) (Note: this is the transcript) | A535 |
| Ex. 1002 - Morley, U.S. Patent No. 5,488,610, entitled "Communication System" ("Morley") | A566–A626 |
| Ex. 1006 - Adams et al., U.S. Patent No. 5,541,662, entitled "Content Programmer Control of Video and Data Display Using Associated Data" ("Adams") | A782–A797 |
| Excerpts Ex. 1009 - Declaration of Harry Bims, Ph.D. | A857–A858, A864–A871 A884–A892 |
| Excerpts from Ex. 1011- Case No. 6:10-CV-473, March 8, 2013 Claim Construction Order | A1201–A1202 |
| Excerpts from Ex. 1013 - U.S. Patent No. 6,466,568 Prosecution History, Office Action of July 23, 2001 | A1256–A1257 |
| Excerpts from Ex. 1014 - 568 Patent File History November 21 2001 Response 09-20-13 | A1263–A1264 |
| Excerpts from Ex. 1015 - U.S. Patent No. 6,466,568 Prosecution History, Office Action of Feb. 11, 2002 | A1270–A1273 |
| Excerpts from Ex. 1016 - 568 Patent File History May 2002 Response 09-20-13 | A1277–A1281 |
| Ex. 1018 - Declaration of David Djavaherian *Pages A1298-A1299 contain confidential information.* | A1297–A1299 |
| Excerpts from Ex. 1023 - Bims Reply Declaration | A1516–A1518 |
| Ex. 2001 - PO's Request for Production | A1567–A1574 |

| Document Title | Page Range |
|---|---|
| Excerpts from Ex. 2005 - Form 10-Q SEC Filing | A1775 |
| Ex. 2007 - Email Stream 06-04-2010 | A1809–A1811 |
| Ex. 2009 - EC Complaint<br>*Pages A1819-A1855 contain confidential information.* | A1819–A1855 |
| Ex. 2016 – Order Denying Ericsson's Motion for Relief from Protective Order and Expedited Briefing | A1985–A1988 |
| Ex. 2018 - Final Judgment Pursuant to FRCP 54(b) | A1998–A2000 |
| Excerpts from Ex. 2020 - Declaration of Robert Akl, D.Sc. in Support of Patent Owner's Response | A2002, A2012–A2013, A2016, A2018–A2019, A2021–A2022, A2024–2035 |

**Confidential Material Omitted**

The material omitted on pages A82, A92 and A1298-99 describes the commercial relationship between Broadcom and the Texas Defendants. The material omitted on pages A58, A62, A69, A73, A83, A93, A163, A218 and A1820-55 describes a non-public regulatory action.

iii

Trials@uspto.gov
571-272-7822

Paper 60
Entered:  March 6, 2015

UNITED STATES PATENT AND TRADEMARK OFFICE

_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD

_____

BROADCOM CORPORATION,
Petitioner,

v.

WI-FI ONE, LLC,
Patent Owner.

_____

Case IPR2013-00602
Patent 6,466,568 B1

_____

Before KARL D. EASTHOM, KALYAN K. DESHPANDE, and
MATTHEW R. CLEMENTS, *Administrative Patent Judges*.

CLEMENTS, *Administrative Patent Judge*.

FINAL WRITTEN DECISION
*35 U.S.C. § 318(a) and 37 C.F.R. § 42.73*

IPR2013-00602
Patent 6,466,568 B1

## I.    INTRODUCTION

Broadcom Corporation ("Petitioner") filed a Petition requesting *inter partes* review of claims 1–6 (the "challenged claims") of U.S. Patent No. 6,466,568 B1 (Ex. 1001, "the '568 patent").  Paper 2 ("Pet.").  Telefonaktiebolaget L. M. Ericsson[1] ("Patent Owner") filed an election to waive its Preliminary Response.  Paper 20.  On March 10, 2014, we instituted an *inter partes* review of all challenged claims on certain grounds of unpatentability alleged in the Petition.  Paper 27 ("Dec. to Inst.").

After institution of trial, Patent Owner filed a Patent Owner Response (Paper 36, "PO Resp.") and a Motion to Amend (Paper 38, "Mot. to Amend").  Petitioner filed a Reply (Paper 46, "Pet. Reply") and an Opposition to Patent Owner's Motion to Amend (Paper 47, "Opp. to Mot. to Amend").  Patent Owner then filed a Reply to Petitioner's Opposition to its Motion to Amend.  Paper 49 ("PO Reply).  Oral hearing was held on December 8, 2014.[2]

The Board has jurisdiction under 35 U.S.C. § 6(c).  This Final Written Decision is issued pursuant to 35 U.S.C. § 318(a) and 37 C.F.R. § 42.73.

Petitioner has shown, by a preponderance of the evidence, that claims 1–6 of the '568 patent are unpatentable.  Petitoner's Motion to Amend is denied.

---

[1] On July 11, 2014, Patent Owner filed an Updated Mandatory Notice indicating that the '568 patent had been assigned to Wi-Fi One, LLC, and that Wi-Fi One, LLC and PanOptis Patent Management, LLC were now the real parties-in-interest.  Paper 40.

[2] A transcript of the oral hearing is included in the record as Paper 59.

2

**A0002**

IPR2013-00602
Patent 6,466,568 B1

## A. *Related Proceedings*

Petitioner and Patent Owner indicate that the '568 patent is involved in a case captioned *Ericsson Inc.,. v. D-LINK Corp.,* Civil Action No. 6:10-cv-473 (E.D. Tex.) ("D-Link Lawsuit"). Pet. 1–2; Paper 6, 1. Patent Owner also identifies an appeal at the Federal Circuit captioned *Ericsson Inc., v. D-LINK Corp.,* Case Nos. 2013-1625, -1631, -1632, and -1633. Paper 6, 1. Petitioner also filed two petitions for *inter partes* review of related patents: IPR2013-00601 (U.S. Patent No. 6,772,215) and IPR2013-00636 (U.S. Patent No. 6,424,625).

## B. *The '568 patent*

The '568 patent relates generally to radio communications systems, such as cellular or satellite systems, that use digital traffic channels in a multiple access scheme, such as time division multiple access ("TDMA") or code division multiple access ("CDMA"). Ex. 1001, 1:13–17.

Figure 2 of the '568 patent is reproduced below.

### FIG. 2



Figure 2 depicts how, in a TDMA system, the consecutive time slots on a radio channel are organized in TDMA frames of, for example, six slots each so that a plurality of distinct channels can be supported by a single radio carrier frequency. *Id.* at 5:11–15. Each TDMA frame has a duration of 40 milliseconds and supports six half-rate logical channels, three full-rate

3

IPR2013-00602
Patent 6,466,568 B1

logical channels, or greater bandwidth channels as indicated in the table below:

| Number of Slots | Used Slots | Rate |
|---|---|---|
| 1 | 1 | half |
| 2 | 1, 4 | full |
| 4 | 1, 4, 2, 5 | double |
| 6 | 1, 4, 2, 5, 3, 6 | triple |

As shown in the table, a full-rate digital traffic channel ("DTC"), for example, uses two slots of each TDMA frame—i.e., the first and fourth, second and fifth, or third and sixth. *Id.* at 2:8–11.

A conventional downlink DTC slot format is defined as shown in Figure 3, reproduced below.



FIG. 3
PRIOR ART

As shown in Figure 3, a slot includes a SYNC field, SACCH field, two DATA fields used to transmit the "payload" of the slot, a CDVCC field, and a reserved bit CDL field. *Id.* at 5:31–47. Conventionally, this format is used for each time slot in a TDMA frame—i.e., all six time slots. *Id.* at 5:47–49. However, if a mobile station is using a triple rate downlink connection—i.e., it is reading the DATA fields of each of time slots 1, 2, and 3—some of the other fields provided in the conventional downlink time slot of Figure 3 need not be transmitted in each time slot. *Id.* at 6:66–7:4. For example, a mobile station need not receive SACCH at triple rate; that is, a mobile station may only need to receive one SACCH for every three time slots. *Id.* at 7:4–8.

4

**A0004**

IPR2013-00602
Patent 6,466,568 B1

Likewise, the CDVCC field need not be transmitted by the base station at triple rate. *Id.* at 7:10–17.

To address these issues, the '568 patent discloses an alternative slot format to accommodate the different communication services described above. *Id.* at 5:50–52.

Figure 6 is reproduced below.

## FIG. 6

| SLOT 1 | SYNC | SACCH | DATA | CDVCC | DATA | CDL |
|--------|------|-------|------|-------|------|-----|

| SLOT 2 | SYNC | FOC | DATA | FOC | DATA | FOC |
|--------|------|-----|------|-----|------|-----|

| SLOT 3 | SYNC | FOC | DATA | FOC | DATA | FOC |
|--------|------|-----|------|-----|------|-----|

As illustrated in Figure 6, in one embodiment of the invention, the fields that are conventionally used for SACCH and CDVCC information in slots 2 and 3 can be replaced by FOC information. *Id.* at Fig. 6, 7:8–10. Omitting these fields in time slots 2 and 3 (as well as 5 and 6) provides an opportunity to inform other mobile stations of information pertaining to their uplink connections. *Id.* at 7:21–25. For example, the FOC fields can be used to inform another mobile station that a previously transmitted packet was not properly received and should be retransmitted. *Id.* at 7:26–29.

According to another embodiment of the invention, the FOC may serve the purpose of a service type identifier by providing information relating to the same connection as the payload or data field in that time slot, such as a service type identifier that informs the mobile or base station of the type of information (e.g., voice, video, or data) being conveyed in the

5

**A0005**

IPR2013-00602
Patent 6,466,568 B1

payload. *Id.* at 3:11–16, 9:27–32. This information can be used by the receiving equipment to aid in processing the information conveyed in the payload. *Id.* at 3:16–19. For example, in a multimedia connection, the information being transferred may rapidly vary between voice, data, and video. *Id.* at 9:32–34. In such a case, the FOC can inform a mobile station of the type of information being transmitted so that the mobile station will know how to process the received information. *Id.* at 9:35–38.

### C. Illustrative Claim

Of the challenged claims, claim 1 is independent. Claim 1 is reproduced below:

> 1.    A communication station comprising:
>
> a processor for arranging information for transmission including providing at least one first field in which payload information is disposed and providing at least one second field, separate from said first field, which includes a service type identifier which identifies a type of payload information provided in said at least one first field; and
>
> a transmitter for transmitting information received from said processor including said at least one first field and said at least one second field.

### D. Prior Art Supporting the Instituted Grounds

The following prior art was asserted in the instituted grounds:

| | | | |
|---|---|---|---|
| Morley | US 5,488,610 | Jan. 30, 1996 | Ex. 1002 |
| Adams | US 5,541,662 | July 30, 1996 | Ex. 1006 |

6

**A0006**

IPR2013-00602
Patent 6,466,568 B1

### E. The Instituted Grounds of Unpatentability

The following table summarizes the challenges to patentability on which we instituted *inter partes* review:

| Reference | Basis | Claims challenged |
|-----------|-------|-------------------|
| Morley | § 102 | 1–6 |
| Adams | § 103 | 1–6 |

## II.   ANALYSIS

### A.  35 U.S.C. § 315(b)

Patent Owner argues that "Petitioner is subject to the 35 U.S.C. § 315(b) bar as a privy to the D-Link Defendants, and because the D-Link Defendants are real parties-in-interest to this action, despite Petitioner's failure to designate them as such under 35 U.S.C. § 312(a)(2)."  PO Resp. 8. According to Patent Owner, Petitioner is in privity with defendants named in the D-Link Lawsuit (*Ericsson Inc. v. D-Link Corp.*, 6:10-cv-473) because, *inter alia*, "[Petitioner] has an indemnity relationship with Dell and Toshiba."  *Id.* at 8–12.  Patent Owner also argues that the defendants named in the D-Link Lawsuit (the "D-Link Defendants") are real parties-in-interest to this proceeding because Petitioner has a "substantive legal relationship with at least Dell and Toshiba," Petitioner used the same prior art references as the D-Link Defendants, and the Petition was filed after the D-Link Defendants abandoned their invalidity case regarding the '568 patent in the D-Link Lawsuit.  *Id.* at 12–14.

Petitioner counters that "[Patent] Owner has raised this identical argument twice, and failed each time," and that "[t]his third attempt relies on exactly the same arguments [Patent] Owner made to this Board and the

7

**A0007**

IPR2013-00602
Patent 6,466,568 B1

Federal Circuit and should be rejected for the same reasons." Pet. Reply 1. Petitioner continues that, "[Patent] Owner offers no new reason whatsoever for this Board to reverse its prior decision that [Patent] Owner's proferred 'evidence' and legal authorities fail to amount to anything more than 'speculation' or 'a mere possibility' that [Petitioner] is in privity with the D-Link Defendants or that the D-Link Defendants are real parties-in-interest." *Id.* We find Petitioner's arguments persuasive.

Patent Owner's arguments and evidence are not different substantively from the arguments and evidence presented in its Motion for Additional Discovery (Paper 11). The arguments and evidence are unpersuasive for same reasons explained in our Decision on Patent Owner's Motion for Additional Discovery (Paper 21), which we adopt and incorporate by reference.

### B. Claim Construction

In an *inter partes* review, claim terms in an unexpired patent are interpreted according to their broadest reasonable construction in light of the specification of the patent in which they appear. 37 C.F.R. § 42.100(b); *see also In re Cuozzo Speed Technologies, LLC*, No. 2014-1301, 2015 WL 448667, at *5–*8 (Fed. Cir. Feb. 4, 2015) ("Congress implicitly adopted the broadest reasonable interpretation standard in enacting the AIA," and "the standard was properly adopted by PTO regulation."). Under the broadest reasonable interpretation standard, claim terms are given their ordinary and customary meaning as would be understood by one of ordinary skill in the art in the context of the entire disclosure. *In re Translogic Tech., Inc.*, 504 F.3d 1249, 1257 (Fed. Cir. 2007). An inventor may rebut that presumption

8

**A0008**

IPR2013-00602
Patent 6,466,568 B1

by providing a definition of the term in the specification with reasonable clarity, deliberateness, and precision. *In re Paulsen*, 30 F.3d 1475, 1480 (Fed. Cir. 1994). In the absence of such a definition, limitations are not to be read from the specification into the claims. *In re Van Geuns*, 988 F.2d 1181, 1184 (Fed. Cir. 1993).

Independent claim 1 recites "a service type identifier which identifies a type of payload information." Petitioner proposes that this phrase be construed as "an identifier that identifies the type of information conveyed in the payload. Examples of types of information include, but are not limited to, video, voice, data, and multimedia." Pet. 7–8. Petitioner argues that this construction is consistent with the broadest reasonable construction in light of the specification and is consistent with how the term "service" is used in the '568 patent. *Id.* Petitioner further argues that, during prosecution of the '568 patent, Patent Owner distinguished the recited "service type identifier" from a prior art identifier that identified "transmission characteristics." *Id.* at 8 (citing Ex. 1016, 5 (distinguishing the claimed service type identifier as "claiming the use of a field to identify the type of payload information *and not the type of channel coding*.") (emphasis added)). Thus, according to Petitioner, the recited "service type identifier" cannot encompass identifiers of "transmission characteristics" such as channel coding. *Id.*

The language of claim 1 requires that the "service type identifier" identify only "a type of payload information provided in said at least one first field." The '568 patent states the following:

> In addition to voice information being transmitted on the traffic channels, various other types of data can and will be transmitted thereon. For example, facsimile (fax) transmissions are commonly supported by radiocommunication systems. Similarly,

9

**A0009**

IPR2013-00602
Patent 6,466,568 B1

> packet data transmissions, which divide information streams into packets rather than providing dedicated (i.e., "connection-oriented") channels for each information stream, will be supported in radiocommunication systems. Other types of information transmission, e.g., video or hybrid voice, data and video to support internet connections, will likely be supported in the future.
>
> These various types of information communication (also referred to herein as different *"services"*) will likely have different optimal transmission characteristics.

Ex. 1001, 2:25–30 (emphasis added). Thus, the '568 patent uses the term "services" to refer to "various types of information communication" and lists explicitly "facsimile (fax) transmissions . . . , packet data transmissions, . . . [and o]ther types of information transmission, e.g., video or hybrid voice, data and video to support internet connections." *Id.* Accordingly, in the Decision to Institute, we construed "service type identifier" to mean an identifier that identifies the type of information conveyed in the payload, including but not limited to video, voice, data, and multimedia.

Patent Owner argues that our construction is "inconsistent with the intrinsic evidence as it gives no meaning to 'service type' and is therefore unreasonable." PO Resp. 21. Specifically, Patent Owner contends that our construction reads out the requirement that the service type identifier identify a "service type." *Id.* According to Patent Owner, the broadest reasonable construction of "service type identifier which identifies a type of payload information" is "an identifier that identifies a transmission characteristic of the service and the type of information conveyed in the payload." *Id.* at 21–23.

IPR2013-00602
Patent 6,466,568 B1

Petitioner counters that "the phrase 'of the service' lacks antecedent basis," and that "neither such occurrence [of the term 'service type identifier' in the Specification] supports [Patent] Owner's proposed construction. Pet. Reply 5.

We find Petitioner's arguments persuasive. Neither instance of "service type identifier" in the '568 patent suggests that a "service type identifier" must identify a transmission characteristic. The first instance describes the "service type identifier" as identifying only "the type of information." Ex. 1001, 3:11–19 ("a service type identifier which informs the mobile or base station of the type of information (e.g., voice, video or data) being conveyed in the payload."). The second instance describes how "the FOC fields may also serve the purpose of the service type identifier." *Id.* at 9:28–29. In this embodiment, "the FOC [i.e., service type identifier] can provide information regarding the type of service which the associated payload is currently supporting, the channel coding *and/or* interleaving associated therewith." *Id.* at 9:29–32 (emphasis added). The use of "and/or" makes clear that a "service type identifier" may provide *only* information regarding the type of service, and need not necessarily also provide information about channel coding, which Patent Owner recognizes as transmission characteristics (Tr. 50:3–6).

We are not persuaded by Patent Owner's argument that Petitioner's reliance on the district court's construction is misplaced (PO Resp. 24) because we did not rely on the district court's construction.

We also are not persuaded by Patent Owner's argument that "the Board erred when it characterized 'services' as 'various types of information

11

**A0011**

IPR2013-00602
Patent 6,466,568 B1

being transmitted on traffic channels'" because "services" refers to "various types of information *transmission.*" PO Resp. 24–25. Patent Owner identifies no support in the '568 patent for its contention that "types of information transmission" includes the characteristics of transmitting that information. Even assuming that the '568 patent defined "service type identifier" in a way that required it to identify transmission characteristics, Petitioner's expert explains how transmission characteristics can be inferred from the type of payload. Pet. Reply 9 (citing Ex. 1023 ¶ 4). We are, therefore, not persuaded that identification of transmission characteristics would necessarily require anything more than identifying the type of payload.

Accordingly, we maintain our construction of "service type identifier" as "an identifier that identifies the type of information conveyed in the payload, including but not limited to video, voice, data, and multimedia."

### C. The Challenged Claims – Anticipated by Morley

Petitioner argues that claims 1–6 are unpatentable under 35 U.S.C. § 102(b) as anticipated by Morley. Pet. 18–27. In support of this ground of unpatentability, Petitioner provides detailed explanations as to how each claim limitation is disclosed by Morley, and relies upon the Declaration of Dr. Harry Bims (Ex. 1009). *Id.* (citing Ex. 1009 ¶¶ 29–37).

Patent Owner counters that claim 1 is not anticipated because Morley does not disclose (1) a "service type identifier" as that term is construed by Patent Owner; or (2) any "identifier which identifies a type of payload information provided in said at least one first field," as recited in claim 1. PO Resp. 27–37.

12

**A0012**

IPR2013-00602
Patent 6,466,568 B1

Upon consideration of the parties' contentions and supporting evidence, we determine that Petitioner has demonstrated, by a preponderance of the evidence, that claims 1–6 are anticipated by Morley.

*Morley (Exhibit 1002)*

Morley describes a multiplexer for use in a system for transmitting more than one type of data, e.g., voice and data.  Ex. 1002, Abstract.

Figure 2 of Morley is reproduced below.



Figure 2 is a block diagram showing the main components of communication system 10 of Morley's invention.  *Id.* at 2:52–53, 2:66–67. Controller 18 comprises processor 19, storage means 20, multiplexer/demultiplexer 22, voice coder/decoder 24, and line interface 27. *Id.* at 3:1–9.  Communication system 10 can be used to share voice and visual data with another user of a similar system.  *Id.* at 3:10–11. Multiplexer 22 multiplexes the voice and data signals, adds synchronization information, and transmits the composite signal to the physical layer (e.g., a

13

**A0013**

IPR2013-00602
Patent 6,466,568 B1

high speed modem (V32bis) connected to the Public Switched Telephone Network (PSTN) or a GSM mobile network). *Id.* at 5:4–6, 5:39–41, 99:40–46. The composite signal is organized into frames each containing a header and one or more complete voice frames and/or other non-voice data. *Id.* at 5:41–44, 5:52–53. The content of each frame is determined by the applications and may change during the call. *Id.* at 5:55–56, 5:63–64.

Figures 5a to 5g, reproduced below, show the structures of some possible frames.



In Figures 5a to 5g, "H" is a header field that identifies the frame type, which is used to identify the contents of a frame. *Id.* at 6:22–25. Sixteen possible headers for supporting one voice channel and up to three data channels are shown in the table below:

14

**A0014**

IPR2013-00602
Patent 6,466,568 B1

| Header Type | Frame Type | Header Value |
| --- | --- | --- |
| 0 | Sync | 0 × 19b3 |
| 1 | Extend | 0 × 007f |
| 2 | Voice Only | 0 × 4ce6 |
| 3 | Not Defined | 0 × 0000 |
| 4 | Data 0 | 0 × 34c9 |
| 5 | Data 0* | 0 × 3366 |
| 6 | Voice + Data 0 | 0 × 2ad5 |
| 7 | Voice + Data 0* | 0 × 1e3c |
| 8 | Data 1 | 0 × 4b69 |
| 9 | Data 1* | 0 × 52da |
| 10 | Voice + Data 1 | 0 × 552a |
| 11 | Voice + Data 1* | 0 × 61c3 |
| 12 | Data 2 | 0 × 664c |
| 13 | Data 2* | 0 × 7870 |
| 14 | Voice + Data 2 | 0 × 078f |
| 15 | Voice + Data 2* | 0 × 4b16 |

*Analysis*

Independent claim 1 recites

a processor for arranging information for transmission including providing at least one first field in which payload information is disposed and providing at least one second field, separate from said first field, which includes a service type identifier which identifies a type of payload information provided in said at least one first field.

Petitioner relies upon Morley's disclosure of controller 18—e.g., a PC—comprising processor 19—e.g., an Intel 386 processor—and multiplexer 22—e.g., a GMM/Sync 2 CCP intelligent communications card and software. Pet. 20–21; *see also* Ex. 1002, 3:4–9, 3:33–41. Under the direction of processor 19, multiplexer 22 arranges voice and non-voice data for transmission in frames. Ex. 1002, 5:4–6, 5:39–44. A frame may contain at least a field V (voice) or D (non-voice data) in which payload information is disposed. *Id.* at Figs. 5a–5g, 6:4–55. A frame also contains a separate field, H (header), that identifies the frame type—i.e., the type of payload information—as voice only, data only, or voice and data. *Id.* at Figs. 5a–5g, 6:22–32, 7:1–17.

15

**A0015**

IPR2013-00602
Patent 6,466,568 B1

Claim 1 also recites "a transmitter for transmitting information received from said processor including said at least one first field and said at least one second field." Petitioner relies upon Morley's disclosure of high speed modem 26 for transmitting the frames arranged by multiplexer 22 over the PSTN or using GSM. Pet. 21; *see also* Ex. 1002, 3:3, 3:58–59, 4:42–44, 99:40–45.

Claim 5 recites "wherein said communication station is a base station." Claim 6 recites similarly "wherein said communication station is a mobile station." Petitioner relies upon Morley's disclosure of implementing the claimed invention using GSM. Pet. 23 (citing Ex. 1002, 99:40–45). In addition, Petitioner argues that a "base station" and a "mobile station" are inherent in GSM (Pet. 23–24), and Dr. Bims testifies as follows:

> It is inherent that GSM radio communications systems include base stations, and it is also known that base stations can receive data from mobile stations and retransmit data to other mobile stations. It is also inherent that GSM radio communications systems include mobile stations. Base stations and mobile stations in a GSM cellular system, or in other cellular systems, each have a processor for processing data to be sent, and a transmitter for sending data. That processor sends data that has been arranged in frames defined by the GSM protocol. (*See, e.g.*, Mouly and Pautet, GSM, Ex. 1008, pp. 89–99).

Ex. 1009 ¶ 36. We are persuaded by the reasoning in the above-quoted analysis of Dr. Bims.

Petitioner also argues that claims 2–4 are disclosed by Morley. Pet. 22–23.

We are persuaded that Petitioner's citations support Petitioner's contentions. Patent Owner presents several arguments as to why Morley

16

**A0016**

IPR2013-00602
Patent 6,466,568 B1

does not teach all of the limitations of the claims. PO Resp. 27–37. Petitioner responds to these arguments. Pet. Reply 6–11. We address each argument in turn below.

### *Whether Morley discloses a "service type identifier"*

Patent Owner argues that the header of Morley's mux frame is not a "service type identifier" because Morley does not disclose separate services. PO Resp. 32. According to Patent Owner, "separate voice and data services for the mux frame require that the voice frame and data *each* be independently communicated, rather than communicated as a single composite unit." *Id.* (citing Ex. 2020 ¶ 40). Patent Owner acknowledges that Morley's mux frame may contain voice only, data only, or a combination, but argues that a "the mux frame is not optimized for separate communication of the voice and the data." *Id.* at 32–33. Patent Owner concludes that "[b]ecause M[o]rley describes only one type of information communication, it cannot disclose a service type identifier." *Id.* at 33.

We are not persuaded by Patent Owner's argument because it is not commensurate with the language of claim 1. Claim 1 does not require a plurality of types of information communication. Patent Owner attempts to import these limitations into the term "service type identifier," but the language of claim 1 requires only that the "service type identifier" identify a type of payload information, and our construction requires only that it "identifies the type of information conveyed in the payload." Patent Owner concedes that Morley's header identifies the type of information in the payload—i.e., voice only, data only, or a combination. Accordingly, we are

17

**A0017**

IPR2013-00602
Patent 6,466,568 B1

not persuaded that Morley's header does not disclose the claimed "service type identifier."

Patent Owner also argues that Morley does not construe a "service type identifier," as Patent Owner construes that term. PO Resp. 33–35. We decline to adopt Patent Owner's construction of "service type identifier" for the reasons discussed above. As a result, Patent Owner's argument is unpersuasive.

Lastly, Patent Owner argues that Morley's header does not "identif[y] a type of payload information," as recited in claim 1, because it "defines the format (or structure) of the information transmitted, rather than ident[ies] the payload data itself." PO Resp. 35–37. Morley's header identifies the frame type as voice only, data only, or some combination. Pet. 19–20 (citing Ex. 1002, Figs. 5a-g, 6:22–32, 7:1–17. The receiver uses this information to identify the type of payload information in the frame and write it to the appropriate buffer. Pet. 20 (citing Ex. 1002, 10:19–22). By identifying the frame type, the header necessarily identifies the type of payload information in the frame. Accordingly, we are not persuaded that Morley's header does not "identif[y] the type of payload information."

### *Dependent claims*

Patent Owner argues that dependent claims 2–6 are not anticipated by Morley for the same reasons as independent claim 1. PO Resp. 37. We are not persuaded by Patent Owner's arguments regarding independent claim 1 for the reasons discussed above.

18

**A0018**

IPR2013-00602
Patent 6,466,568 B1

*Conclusion*

We are persuaded that Petitioner has demonstrated, by a preponderance of the evidence, that claims 1–6 are unpatentable as anticipated by Morley.

### D. The Challenged Claims – Obvious over Adams

Petitioner argues that claims 1–6 are unpatentable under 35 U.S.C. § 103(a) as obvious over Adams. Pet. 45–54. In support of this ground of unpatentability, Petitioner provides detailed explanations as to how each claim limitation is taught or suggested by Adams, and relies upon the Declaration of Dr. Bims (Ex. 1009). *Id.* (citing Ex. 1009 ¶¶ 71–79).

Patent Owner argues that (1) Adams's ID tag is not a "service type identifier" because it does not convey transmission characteristics; (2) Adams's ID tag does not "identif[y] a type of payload information provided in said at least one first field," as recited in claim 1; and (3) Adams does not teach or suggest a "base station" or "mobile station," as recited in claims 5 and 6, respectively. PO Resp. 40–46.

Upon consideration of the parties' contentions and supporting evidence, we determine that Petitioner has demonstrated, by a preponderance of the evidence, that claims 1–6 are obvious over Adams.

*Adams (Exhibit 1006)*

Adams describes an interactive video system that processes a video data stream and an associated data stream corresponding to the video data stream. Ex. 1006, Abstract. The interactive video system includes satellite receiver 14, cable television ("CATV") receiver 16, or television broadcast receiver 18. *Id.* at Fig. 1, 4:2–4. Satellite receiver 14 enables reception of

19

**A0019**

IPR2013-00602
Patent 6,466,568 B1

packetized digital data streams over a satellite link. *Id.* at 4:5–6. The packetized digital data streams received by satellite receiver 14 include video data packets, audio data packets, and associated data packets. *Id.* at 4:9–12.

Figure 5 is reproduced below.



*Figure 5*

Figure 5 illustrates a packetized digital data stream, including video packet 80, audio packet 82, and associated data packet 84. *Id.* at 7:9–14. Video packet 80, audio packet 82, and associated data packet 84 each comprise a packet header and payload. *Id.* at 7:15–17. Video packet 80 includes (1) a video payload that provides digital video data; and (2) a header with a video identifier (VIDEO_ID) that identifies the packet as carrying video data. *Id.* at 7:22–26. Audio packet 82 includes (1) an audio payload; and (2) a header with an audio identifier (AUDIO_ID) that identifies the packet as carrying audio data. *Id.* at 7:27–31. Associated packet 84 includes (1) an associated data payload; and (2) a header with an associated data identifier (DATA_ID) that identifies the packet as carrying associated data. *Id.* at 7:32–37.

*Analysis*

Independent claim 1 recites

20

**A0020**

IPR2013-00602
Patent 6,466,568 B1

> a processor for arranging information for transmission
> including providing at least one first field in which payload
> information is disposed and providing at least one second field,
> separate from said first field, which includes a service type
> identifier which identifies a type of payload information
> provided in said at least one first field.

Petitioner relies upon Adams's teaching of digital video packets that include
a first field with payload information—i.e., video payload, audio payload, or
associated data payload—and a second field, separate from the first field,
with a service type identifier—i.e., VIDEO_ID, AUDIO_ID, or
DATA_ID—that identifies the type of payload information provided in the
first field. Pet. 47–48 (citing Ex. 1006, 7:9–37).

Petitioner acknowledges that Adams teaches explicitly only a
receiver. Pet. 47. Petitioner argues that Adams teaches implicitly "a
communication station with a processor for formatting the audio and video
data, and a transmitter for transmitting a packetized digital data stream to the
device shown in Adams." *Id.* (citing Ex. 1006, Figs. 1, 5, 2:54–65, 3:33–36,
3:65–4:6, 4:9–14, 4:25–34, 6:7–26; Ex. 1009 ¶ 72). Dr. Bims testifies as
follows:

> Adams discloses receiving "at least one first field" in which
> payload information is disposed because in Adams each packet
> that is received includes an audio payload, a video payload, or a
> data payload. An object of the invention in Adams is to enable
> a content programmer to create a video display screen from a
> programming studio. (*Id.* at 2:21–23.) Because Adams
> discloses implementing a content programmer, it is obvious (if
> not inherent) that the communication station sending to Adams
> include a processor for arranging information for transmission.
> Adams also discloses receiving "at least one second field,
> separate from the first field" that identifies a type of payload
> information because Adams discloses that each video packet

21

**A0021**

IPR2013-00602
Patent 6,466,568 B1

includes a packet header that includes an identifier that identifies whether audio, video, or data is carried in the packet payload. (*Id*. at Figures 3, 5, and 6, 6:7–58, 7:8–37). One of ordinary skill in the art would have understood the Adams reference to teach a transmitter for transmitting said at least one first field and said at least one second field on said radio channel.

Ex. 1009 ¶ 72. We are persuaded by the reasoning in the above-quoted analysis of Dr. Bims.

Claim 1 also recites "a transmitter for transmitting information received from said processor including said at least one first field and said at least one second field." As with the limitation above, Petitioner acknowledges that Adams teaches explicitly only a receiver, and argues that Adams teaches implicitly the recited "transmitter." Pet. 47 (citing Ex. 1009 ¶ 71). Dr. Bims testifies as follows:

The subject matter of claim 1 would have been obvious in view of Adams. Adams is focused on a receiver, while the claims are to a transmitting device. However, one of ordinary skill in the art would have understood that the Adams reference implicitly teaches a communication station for transmitting packetized digital data streams, including the three types of payload, in Adams. Therefore it would have been obvious to provide a transmitter for sending the type of data that Adams receives.

Ex. 1009 ¶ 71. We are persuaded by the reasoning in the above-quoted analysis of Dr. Bims.

Claim 5 recites "wherein said communication station is a base station." Petitioner relies upon Adams's teaching of transmission of packetized digital data streams over a satellite link. Pet. 49–50 (citing Ex. 1006, Fig. 1, 4:2–14). Petitioner argues that "[i]t is well-known in the

22

**A0022**

IPR2013-00602
Patent 6,466,568 B1

art that such satellite communication devices include base stations." Pet. 50 (citing Ex. 1009 ¶ 76). Dr. Bims testifies as follows:

> Dependent claim 5 recites that the communication station is a base station. Adams discloses transmission of packetized digital data streams over a satellite link, and thus the transmitter would typically be a base station. (*Id*. at Figure 1, 3:65–5:22). It is well-known in the art that such satellite communications devices include base stations. Adams also discloses communication of an analog or digital video signal over a coaxial transmission line. Transmission over a coaxial transmission line is typically by a head-end, or base station. Further, I believe it would have been obvious to provide Adams over almost any wireless system. Adams does not require any particular type of system, and thus could use systems like cellular systems with base stations. This would be the use of a known technique (of providing payloads and identifiers) applied to a known type of device (base station) to yield the predictable result of allowing the base station to send content and identify the packets that make up the content.

Ex. 1009 ¶ 76. We are persuaded by the reasoning in the above-quoted analysis of Dr. Bims.

Claim 6 recites "wherein said communication station is a mobile station." Petitioner relies upon Adams's teaching of computer system 10 for receiving packetized digital data streams. Pet. 50–51 (citing Ex. 1006, 4:9–12); *see also* Ex. 1006, Fig. 1, 3:65–4:1, 4:12–15. Petitioner argues that it was known for computer systems to *send* video, audio, and data, and that such computer systems could be mobile, such as with laptop computers. Pet. 50–51 (citing Ex. 1009 ¶ 77). Dr. Bims testifies as follows:

> Dependent claim 6 recites that the station is a mobile station. It would have been obvious to provide a protocol for sending voice, video, and data to a mobile station, as a mobile station (e.g., like the laptop in Menand) could create multiple types of

23

**A0023**

IPR2013-00602
Patent 6,466,568 B1

> content to be sent, and therefore it would have been obvious to
> provide the ability to identify what type of data was included in
> a packet to allow the packet to be processed appropriately. This
> would be the use of a known technique (of providing payloads
> and identifiers) applied to a known type of device (mobile) to
> yield the predictable result of allowing the mobile to send
> content and identify the packets that make up the content.

Ex. 1009 ¶ 77. We are persuaded by the reasoning in the above-quoted
analysis of Dr. Bims.

Petitioner also argues that claims 2–4 are taught or suggested by
Adams. Pet. 48–49.

We are persuaded that Petitioner's citations support Petitioner's
contentions.

Patent Owner presents several arguments as to why Adams does not
teach all of the limitations of the claims. PO Resp. 37–46. Petitioner
responds to these arguments. Pet. Reply 12–15. We address each argument
in turn below.

*Whether Adams teaches a "service type identifier"*

Patent Owner argues that Adams's ID tag is not a "service type
identifier" because it is merely a label from which "[n]o transmission
characteristics can be gleaned." PO Resp. 40–41. According to Patent
Owner, "Adams is essentially silent as to the transmission characteristics,"
such as, for example, "whether the incoming packets are otherwise
compressed or processed." *Id.* at 41. Patent Owner contends that "Adams
discloses only one type of encoded information, namely the MPEG
encoding," which "negates the need for a 'service type identifier.'" *Id.*
Because "Adams discloses an invariant data structure," in Patent Owner's

24

**A0024**

IPR2013-00602
Patent 6,466,568 B1

view, "the ID tag does not allow devices in the system to account for different transmission characteristics of different service types, and therefore cannot be a 'service type identifier.'" *Id.* at 42. Petitioner counters that "[Patent] Owner admits that Adams classifies packets as containing video, audio, or data," and "[t]herefore . . . cannot distinguish the claimed service type identifier from the identifiers discloses in Adams under the Board's construction." Pet. Reply 12. We find Petitioner's argument persuasive.

We decline to adopt Patent Owner's construction of "service type identifier" for the reasons discussed above. As a result, Patent Owner's arguments regarding transmission characteristics are unpersuasive.

Patent Owner also argues that Adams's ID tag does not "identif[y] a type of payload information provided in said at least one first field," as recited in claim 1, because "the receiver in Adams merely transfers the incoming packet to an appropriate queue based on the ID tag," and "[m]erely classifying received data packets as a video, audio, or associated data packet says nothing about the transmission characteristics of the received data packet." PO Resp. 42–43. To the extent that Patent Owner is arguing that Adams's ID tag fails to identify transmission characteristics, that argument is not persuasive because it is not commensurate with the claim language, which requires only "identif[y] a type of payload information in said at least one first field." To the extent that Patent Owner is arguing that Adams's ID tag does not "identif[y] a type of payload information" because it "[m]erely classif[ies] received data packets as a video, audio, or associated data packet," that argument is not persuasive because it is distinction without a difference. Patent Owner concedes that the receiver in Adams uses the ID

25

**A0025**

IPR2013-00602
Patent 6,466,568 B1

tag to transfer the incoming packet to an appropriate queue.  The receiver could not transfer the incoming packet to the appropriate queue—i.e., the video queue, audio queue, or data queue—if Adams's ID tag did not "identif[y] a type of payload information" as video, audio, or data.

### *Whether a transmitter would have been obvious*

Patent Owner argues that it would not have been obvious to provide a transmitter for sending the type of data that Adams receives because "the satellite receivers in Adams only receive data" and "have no transmitter functionality," and "Adams does not disclose how data is transmitted."  PO Resp. 43–44.  According to Patent Owner, "the satellite broadcasting station may simply retransmit the audio, video, and/or associated data," and "its transmitter may not transmit the information recited by the claims."  *Id.* at 44.  Patent Owner continues that, "[w]ithout knowing the transmission characteristics of the video, audio, and associated data frames, one cannot show that the limitations of the '568 Patent are met by Adams."  *Id.* Petitioner counters that "it would have been obvious to provide a transmitter to send data in the format Adams uses to receive data, and this would need to be generated by some processor along with a transmitter."  Pet. Reply 13–14 (citing Ex. 1023 ¶ 9).  We find Petitioner's arguments to be persuasive. A person of ordinary skill in the art at the time would have understood that Adams's receiver would not receive data in the format taught were it not first transmitted by a transmitter in that format.

### *Dependent claims 2–6*

Patent Owner argues that dependent claims 2–6 are not anticipated by Adams for the same reasons as independent claim 1.  PO Resp. 37.  We are

**A0026**

IPR2013-00602
Patent 6,466,568 B1

not persuaded by Patent Owner's arguments regarding independent claim 1 for the reasons discussed above.

With respect to claim 5, Patent Owner argues that "[o]ne of ordinary skill in the art would understand that satellite communication devices contain earth stations, not base stations." PO Resp. 44–45. Dr. Akl testifies about three differences that preclude equating an Earth station to a base station. Ex. 2020 ¶ 64. Dr. Bims testifies that "[i]t is well-known in the art that such satellite communications devices include base stations." Ex. 1009 ¶ 76. Neither expert cites to any evidence in support of their opinions. As Patent Owner points out, however, the '568 patent states that the "invention relates generally to radio communication systems, e.g., cellular *or satellite* systems." Pet. Reply 14 (citing Ex. 1001, 1:13–14) (emphasis added). Accordingly, we are persuaded that the broadest reasonable interpretation of "base station" includes the satellite communication devices taught in Adams.

With respect to claim 6, Patent Owner also argues that "the satellite receiver disclosed in Adams is not a device that is mobile" because it "is a PC that is connected to a satellite receiver 14." PO Resp. 45–46 (citing Ex. 2020 ¶ 65). Petitioner counters that "it was known and would have been obvious to use a mobile system, such as a laptop computer," and that "[Patent] Owner has failed to address the fact that it was known for satellite systems to include a mobile station with the claimed processor and transmitter for transmitting information. Pet. Reply 15 (citing Ex. 1005, Fig. 1; Ex. 1023 ¶ 10). In this regard, we credit the testimony of Dr. Bims. We are persuaded sufficiently that it was known, in 1996, for computer systems to send audio, video, and data, and that such systems could be mobile.

27

**A0027**

IPR2013-00602
Patent 6,466,568 B1

*Conclusion*

We are persuaded that Petitioner has demonstrated, by a preponderance of the evidence, that claims 1–6 are unpatentable as obvious over Adams.

*E. Patent Owner's Motion to Amend*

Patent Owner moves to substitute claims 8–13 for challenged claims 1–6, respectively, if we find claims 1–6 unpatentable.  Mot. to Amend 1.  As stated above, we determine that Petitioner has demonstrated by a preponderance of the evidence that all of the challenged claims are unpatentable, including claims 1–6.  Therefore, Patent Owner's Motion to Amend is before us for consideration.  For the reasons set forth below, Patent Owner's Motion to Amend is *denied*.

Proposed substitute claim 8, the only independent claim, is reproduced below:

> 8.    (Proposed substitute for Original claim 1).    A communication station comprising:
>
> a processor for arranging information for transmission including providing at least one first field in which payload information is disposed and providing at least one second field, separate from said first field, which includes a service type identifier which identifies <u>transmission characteristics of a service and</u> a type of payload information provided in said at least one first field; and
>
> a transmitter for transmitting information received from said processor including said at least one first field and said at least one second field.

Mot. to Amend 1–2.

28

**A0028**

IPR2013-00602
Patent 6,466,568 B1

A motion to amend claims in an *inter partes* review is not, itself, an amendment. As the moving party, Patent Owner bears the burden of proof to establish that it is entitled to the relief requested. 37 C.F.R. § 42.20(c). Therefore, Patent Owner's proposed substitute claims are not entered automatically, but only upon Patent Owner having demonstrated by a preponderance of the evidence the patentability of those substitute claims. *See, e.g.*, 37 C.F.R. § 42.1(d) (noting that the "default evidentiary standard [in proceedings before the Board] is a preponderance of the evidence").

1. *Written Description Support*

A motion to amend claims must identify clearly the written description support for each proposed substitute claim. 37 C.F.R. § 42.121(b). The requirement that the motion to amend must set forth the support in the original disclosure of the patent is with respect to *each claim*, not for a particular feature of a proposed substitute claim. The written description test is whether the original disclosure of the application relied upon reasonably conveys to a person of ordinary skill in the art that the inventor had possession of the claimed subject matter as of the filing date. *Ariad Pharms., Inc. v. Eli Lilly & Co.*, 598 F.3d 1336, 1351 (Fed. Cir. 2010) (en banc). Thus, the motion should account for the claimed subject matter as a whole, i.e., the *entire* proposed substitute claim, when showing where there is sufficient written description support for each claim feature. *See Nichia Corp. v. Emcore Corp.*, Case IPR2012-00005, slip op. at 4 (PTAB June 3, 2013) (Paper 27).

In its Motion to Amend, Patent Owner addresses the written description support for the claimed subject matter as a whole. Mot. to

29

**A0029**

IPR2013-00602
Patent 6,466,568 B1

Amend 5–10.  Petitioner argues that there is not adequate written description support for a "service type identifier" that identifies "transmission characteristics" because neither of the two portions of the '568 patent cited by Patent Owner mentions the term "transmission characteristics."  Opp. to Mot. to Amend 2–3.  Petitioner acknowledges, however, that the '568 patent describes how "the FOC [i.e., the service type identifier] can provide information regarding the type of service which the associated payload is currently supporting, the channel coding *and/or* interleaving associated therewith."  *Id.* at 3–4 (citing Ex. 1001, 9:27–32) (emphasis added).  We are unpersuaded by Petitioner's interpretation of this passage to mean that "the service type identifier just identifies the type of information and the receiver infers how to process the information."  *Id.* at 4 (citing Ex. 1001, 9:32–38).  By using "and/or," the '568 patent clearly describes the service type identifier as being capable of providing information regarding not only the type of information in the payload, but also channel coding.  Moreover, Petitioner argues that "interleaving is not a transmission characteristic" (Pet. Reply 5), but does not argue that channel coding is not a transmission characteristic.  Accordingly, we are persuaded that Patent Owner has shown adequate written description support for the proposed amendment.

2. *Patentability over Prior Art*

The patent owner bears the burden of proof in demonstrating patentability of the proposed substitute claims over the prior art in general, and, thus, entitlement to add these claims to its patent.  *See Idle Free Systems, Inc. v. Bergstrom, Inc.,* IPR2012-00027, Paper 26, 7.  In a motion to amend, the patent owner must show that the conditions for novelty and

30

**A0030**

IPR2013-00602
Patent 6,466,568 B1

non-obviousness are met with respect to the prior art available to one of ordinary skill in the art at the time of the invention.  With regard to obviousness as the basis of potential unpatentability of the proposed substitute claims, the patent owner should present and discuss facts which are pertinent to the first three underlying factual inquiries of *Graham*:  (1) the scope and content of the prior art, (2) differences between the claimed subject matter and the prior art, and (3) the level of ordinary skill in the art, *with special focus on the new claim features* added by the proposed substitute claims.  *See Graham v. John Deere Co.*, 383 U.S. 1, 17–18 (1966).  The patent owner should identify each new claim feature, and come forward with technical facts and reasoning about that particular feature.  Some discussion and analysis should be made about the specific technical disclosure of the closest prior art as to each particular feature, and the level of ordinary skill in the art, in terms of ordinary creativity and the basic skill set of a person of ordinary skill in the art, regarding the feature.

Here, we are unpersuaded that Patent Owner has demonstrated, by a preponderance of the evidence, that the proposed substitute claims are patentable.  Specifically, we are not persuaded that the proposed substitute claims are patentable over Morley.

Patent Owner argues "Morley teaches away from transmission characteristics" because "[a]ny change in format in Morley is related only to header type 0, and header type zero does not identify any 'information conveyed in the payload." Mot. to Amend. 11.  Patent Owner further argues that "the error correction disclosed in Morley is not associated with any alleged service type identifier (e.g., the header type.)." *Id.*  Patent Owner

31

**A0031**

IPR2013-00602
Patent 6,466,568 B1

also argues that "the header or identifier fields in . . . Morley are associated with only one type of data." *Id.* at 14.

Petitioner counters that "Morley discloses identifying a 'transmission characteristic' because Morley discloses using the header to determine the data rate at which to process the received data." Opp. to Mot. to Amend 6 (citing Ex. 1026 (Bims Decl.) ¶ 6). According to Petitioner:

> Morley describes that different buffers are processed at different rates based on the type of data -- the modem data rate is 14400 bps and the voice coder operates at 6800 bps. (Morley at 52:45-47; Ex. 1002). Morley's receiver uses the frame type, which is the type of information, to process voice data at a first rate, and other data at a second rate.

*Id.* With respect to Patent Owner's argument that Morley discloses only a single service, Petitioner counters that "claim 8 only recites identifying 'transmission characteristics of a service,' not different transmission characteristics for different services." *Id.* at 6–7. Moreover, Petitioner argues, even if claim 8 required a plurality of services, "Morley's different voice and data channels constitute different services." *Id.* at 7.

Patent Owner replies that "[t]he Morley header does not determine, nor affect, the rate of processing the data . . . or the voice frames . . . of a multiplex frame." PO Reply 2 (citations omitted). Patent Owner also argues that "[t]he data and video of a multiplex frame are transmitted together as a single service, whose video and data processing rates are defined by the receiver, not the header in Morley." *Id.*

We find Petitioner's arguments persuasive. Patent Owner's proposed construction of "transmission characteristics" includes transmission rate. Mot. to Amend 4. Morley discloses that the transmission rate of data is

32

**A0032**

IPR2013-00602
Patent 6,466,568 B1

14400 bps whereas the transmission rate of voice is 6800 bps.  Ex. 1002, 52:45–47.  By identifying a frame type as voice only or data only, the header necessarily identifies the transmission rate as either 14400 bps or as 6800 bps.  As a result, Morley's header identifies a transmission characteristic of a service.

Moreover, we agree with Petitioner that proposed substitute claim 8 does not require a plurality of services.  Even if it did, however, we are not persuaded by Patent Owner's argument that Morley's voice-only mux frame is the same "service" as Morley's data-only mux frame for the reasons discussed above in the analysis of original claims 1–6.

*3. Conclusion*

For the foregoing reasons, Patent Owner has not, in its Motion to Amend, satisfied its burden of proof.

### III.  CONCLUSION

Petitioner has demonstrated, by a preponderance of the evidence, that claims 1–6 of the '568 patent are unpatentable under 35 U.S.C. § 102(b) as anticipated by Morley, and under 35 U.S.C. § 103(a) as obvious over Adams.  Patent Owner's Motion to Amend is denied.

### IV.  ORDER

Accordingly, it is

ORDERED that claims 1–6 of the '568 patent are held unpatentable;

FURTHER ORDERED that Patent Owner's Motion to Amend is *denied*; and

33

**A0033**

IPR2013-00602
Patent 6,466,568 B1

FURTHER ORDERED that, because this is a Final Written Decision, the parties to the proceeding seeking judicial review of the decision must comply with the notice and service requirements of 37 C.F.R. § 90.2.

34

**A0034**

IPR2013-00602
Patent 6,466,568 B1

For PETITIONER:

Dominic E. Massa
Michael A. Diner
WILMER CUTLER PICKERING HALE AND DORR LLP
dominic.massa@wilmerhale.com
michael.diener@wilmerhale.com

For PATENT OWNER:

Peter J. Ayers
J. Christopher Lynch
LEE & HAYES PLLC
peter@leehayes.com
chris@leehayes.com
EricssonIPR2013-00601@leehayes.com
EricssonIPR2013-00602@leehayes.com

35

**A0035**

US006466568B1

(12) **United States Patent**
Raith et al.

(10) **Patent No.:**     **US 6,466,568 B1**
(45) **Date of Patent:**     **Oct. 15, 2002**

(54) **MULTI-RATE RADIOCOMMUNICATION SYSTEMS AND TERMINALS**

(75) Inventors: **Alex Krister Raith**, Durham; **James Ragsdale**, Raleigh; **John Diachina**, Garner, all of NC (US)

(73) Assignee: **Telefonaktiebolaget LM Ericsson (publ)**, Stockholm (SE)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **09/399,771**

(22) Filed: **Sep. 21, 1999**

**Related U.S. Application Data**

(62) Division of application No. 08/725,643, filed on Oct. 15, 1996, now Pat. No. 5,987,019.

(51) Int. Cl.[7] ................................................ G06F 11/00
(52) U.S. Cl. ........................ **370/347**; 370/328; 370/471; 455/422
(58) Field of Search ................................. 370/320, 342, 370/335, 347, 280, 294, 328, 329, 321, 330, 337, 479, 468, 469, 470, 471, 472; 455/422, 561, 575

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | |
|---|---|---|
| 5,177,740 A | 1/1993 | Toy et al. |
| 5,182,753 A | 1/1993 | Dahlin et al. |
| 5,230,003 A | 7/1993 | Dent et al. |
| 5,299,235 A | 3/1994 | Larsson et al. |
| 5,570,467 A | 10/1996 | Sawyer |

| | | | | |
|---|---|---|---|---|
| 5,603,081 A | | 2/1997 | Raith et al. | |
| 5,757,813 A | * | 5/1998 | Raith | ..................... 370/468 |
| 5,770,927 A | | 6/1998 | Abe | |
| 5,930,706 A | * | 7/1999 | Raith | ..................... 455/422 |

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| EP | 399612 | 11/1990 |
| EP | 605312 | 7/1994 |
| EP | 642233 | 3/1995 |
| WO | WO 95/01012 | 1/1995 |
| WO | WO 96/21998 | 7/1996 |

* cited by examiner

*Primary Examiner*—Wellington Chin
*Assistant Examiner*—Frank Duong
(74) *Attorney, Agent, or Firm*—Burns, Doane, Swecker & Mathis, L.L.P.

(57) **ABSTRACT**

Variances in bandwidth used by a radiocommunication connection are adapted to by changing the type of information being transmitted. For example, in a TDMA environment, a first downlink time slot associated with a double- or triple-rate connection may have a first format, while a second time slot associated with the same connection may have a second format different from the first format. Bandwidth in the second (or third) time slot can be used to carry information in a fast out-of-band channel (FOC). The FOC may provide information relating to the same connection as the payload or data field in that time slot, e.g., a service type identifier which informs the mobile or base station of the type of information (e.g., voice, video or data) being conveyed in the payload. Alternatively, the FOC information may be associated with a connection or connections which are different from that supported by the payload or data field containing the FOC.

**7 Claims, 8 Drawing Sheets**



A0036



FIG. 1

**U.S. Patent**    Oct. 15, 2002    Sheet 2 of 8    US 6,466,568 B1

*FIG. 2*

ONE FRAME = 1944 BITS (972 SYMBOLS) = 40 ms. (25 FRAMES PER SECOND)

| SLOT 1 | SLOT 2 | SLOT 3 | SLOT 4 | SLOT 5 | SLOT 6 |

ONE SLOT

*FIG. 3*

PRIOR ART



| 28 | 12 | 130 | 12 | 130 | 1 | 11 |
|------|-------|------|-------|------|----------|-----|
| SYNC | SACCH | DATA | CDVCC | DATA | RSVD = 1 | CDL |

0    27    39    169    181    311    312    323

**A0038**

## FIG. 4A



| SLOT 1 | SLOT 2 | SLOT 3 | SLOT 4 | SLOT 5 | SLOT 6 |

## FIG. 4B

| SLOT 1 | SLOT 2 | SLOT 3 | SLOT 4 | SLOT 5 | SLOT 6 |

## FIG. 5

BASE STATION —505

M —520

M —500

M —510

**A0039**

## FIG. 6

| SLOT 1 | SYNC | SACCH | DATA | CDVCC | DATA | CDL |
|--------|------|-------|------|-------|------|-----|
| SLOT 2 | SYNC | FOC | DATA | FOC | DATA | FOC |
| SLOT 3 | SYNC | FOC | DATA | FOC | DATA | FOC |

## FIG. 7A

| SLOT 1 | SYNC | SACCH | DATA | CDVCC | DATA | CDL |
|--------|------|-------|------|-------|------|-----|
| SLOT 2 | SYNC | FOC | DATA | FOC | DATA | CDL |
| SLOT 3 | SYNC | FOC | DATA | FOC | DATA | CDL |

## FIG. 7B

| SLOT 1 | SYNC | SACCH | DATA | CDVCC | DATA | CDL |
|--------|------|-------|------|-------|------|-----|
| SLOT 2 | SYNC | FOC | DATA | CDVCC | DATA | CDL |
| SLOT 3 | SYNC | FOC | DATA | CDVCC | DATA | CDL |

A0040





*FIG. 8C*

A0042

*FIG. 9*

**U.S. Patent**     Oct. 15, 2002     Sheet 8 of 8     US 6,466,568 B1

*FIG. 10* PRIOR ART

| 6 | 6 | 16 | 28 | 122 | 12 | 12 | 122 |
|---|---|------|------|------|-------|-------|------|
| G | R | DATA | SYNC | DATA | SACCH | CDVCC | DATA |

*FIG. 11*

| DATA | SYNC | DATA | SACCH | CDVCC | DATA |
|------|------|------|-------|-------|------|

| DATA | SYNC | DATA | FOC | FOC | DATA |
|------|------|------|-----|-----|------|

**A0044**

US 6,466,568 B1

**1**

# MULTI-RATE RADIOCOMMUNICATION SYSTEMS AND TERMINALS

## RELATED APPLICATION

This application is a divisional, of application Ser. No. 08/725,643 filed Oct. 15, 1996 now U.S. Pat. No. 5,987,019.

This application is related to U.S. Pat. No. 6,028,854, entitled "Radiocommunication Systems and Terminals with Increased Payload Bandwidth".

## BACKGROUND

Applicant's invention relates generally to radiocommunication systems, e.g., cellular or satellite systems, that use digital traffic channels in a multiple access scheme, e.g., time division multiple access (TDMA) or code division multiple access (CDMA).

The growth of commercial radiocommunications and, in particular, the explosive growth of cellular radiotelephone systems have compelled system designers to search for ways to increase system capacity without reducing communication quality beyond consumer tolerance thresholds. One way to increase capacity is to use digital communication and multiple access techniques such as TDMA, in which several users are assigned respective time slots on a single radio carrier frequency.

In North America, these features are currently provided by a digital cellular radiotelephone system called the digital advanced mobile phone service (D-AMPS), some of the characteristics of which are specified in the interim standard IS-54B, "Dual-Mode Mobile Station-Base Station Compatibility Standard", published by the Electronic Industries Association and Telecommunications Industry Association (EIA/TIA). Because of a large existing consumer base of equipment operating only in the analog domain with frequency-division multiple access (FDMA), IS-54B is a dual-mode (analog and digital) standard, providing for analog compatibility in tandem with digital communication capability. For example, the IS-54B standard provides for both FDMA analog voice channels (AVC) and TDMA digital traffic channels (DTC), and the system operator can dynamically replace one type with the other to accommodate fluctuating traffic patterns among analog and digital users. The AVCs and DTCs are implemented by frequency modulating radio carrier signals, which have frequencies near 800 megahertz (MHz) such that each radio channel has a spectral width of 30 kilohertz (KHz). A subsequent standard, referred to as IS-136, adds specifications for digital control channels. This standard document, in particular the version identified as PN-3474.1, dated Dec. 15, 1995 and published by EIA/TIA, is incorporated here by reference.

In a TDMA cellular radiotelephone system, each radio channel is divided into a series of time slots, each of which contains a burst of information from a data source, e.g., a digitally encoded portion of a voice conversation. The time slots are grouped into successive TDMA frames having a predetermined duration. According to IS-54B and IS-136, each TDMA frame consists of six consecutive time slots and has a duration of 40 milliseconds (msec). Thus, each frame can carry from one to six traffic channels (e.g., one to six radio connections). The number of connections which can be supported by each TDMA frame depends on the desired information transmission rate. For example, if the connections are used to support the transmission of voice information, the number of slots used per channel depends on the source rates of the speech coder/decoders (codecs) used to digitally encode the conversations. Such speech codecs can operate at either full-rate or half-rate, with full-rate codecs being expected to be used until half-rate codecs that produce acceptable speech quality are developed.

**2**

Thus, a full-rate DTC requires twice as many time slots in a given time period as a half-rate DTC, and in IS-54B, each radio channel can carry up to three full-rate DTCs or up to six half-rate DTCs. Each full-rate DTC uses two slots of each TDMA frame, i.e., the first and fourth, second and fifth, or third and sixth of a TDMA frame's six slots. Each half-rate DTC uses one time slot of each TDMA frame. During each DTC time slot, 324 bits are transmitted, of which the major portion, 260 bits, is due to the speech output of the codec, including bits due to error correction coding of the speech output, and the remaining bits are used for guard times and overhead signalling for purposes such as synchronization.

In addition to voice information being transmitted on the traffic channels, various other types of data can and will be transmitted thereon. For example, facsimile (fax) transmissions are commonly supported by radiocommunication systems. Similarly, packet data transmissions, which divide information streams into packets rather than providing dedicated (i.e., "connection-oriented") channels for each information stream, will be supported in radiocommunication systems. Other types of information transmission, e.g., video or hybrid voice, data and video to support internet connections, will likely be supported in the future.

These various types of information communication (also referred to herein as different "services") will likely have different optimal transmission characteristics. For example, services between a remote user and the internet may benefit by providing a greater bandwidth in the downlink (i.e., from the internet to the remote station) than in the uplink, since many users spend a significant portion of their connection time downloading information from the internet rather than uploading thereto. Thus, it may be desirable in such cases to allocate a triple rate connection in the downlink (e.g., all six time slots of an IS-136 TDMA frame) but only a full rate connection in the uplink (e.g., two time slots of an IS-136 frame). This inequality between uplink and downlink bandwidth is referred to herein as an "asymmetrical" connection. In addition to bandwidth considerations, other transmission characteristics may also be impacted. For example, different services may require different degrees of error protection. Thus, for example, an optimal channel coding for the transmission of voice information might be rate ½ since voice information transmission is typically not provided with a procedure for retransmission, while optimal channel coding for the transmission of data, e.g, facsimile, might be rate ⅚ since retransmission procedures are typically provided. Other transmission characteristics, for example, the ability to tolerate delay in the reception of information, may also vary between services. All of these differences in transmission characteristics should be considered together when determining an optimal specification for the air interface.

Accordingly, it would be desirable to provide techniques for transmitting information between remote stations and the system in radiocommunication networks that provide sufficient flexibility for the anticipated variety of information communication services described above, while also providing sufficient compatibility with existing technology so that equipment used by the existing consumer base will not become obsolete.

## SUMMARY

According to exemplary embodiments of the present invention, the type of information transmitted in the uplink

US 6,466,568 B1

3

or downlink may vary depending upon the transmission rate. For example, in a TDMA environment, a first downlink time slot associated with a double- or triple-rate connection may have a first format, while a second time slot associated with the same connection may have a second format different from the first format. The different formats take into account the need to transmit certain types of information at only full rate, and not double- or triple-rate.

According to some exemplary embodiments, bandwidth in the second (or third) time slot can be used to carry information in a fast out-of-band channel (FOC). The FOC may provide information relating to the same connection as the payload or data field in that time slot, e.g., a service type identifier which informs the mobile or base station of the type of information (e.g., voice, video or data) being conveyed in the payload. This information can be used by the receiving equipment to aid in processing the information conveyed in the payload, e.g., by knowing the channel coding rate. These exemplary embodiments find particular application to multimedia communications where the type of payload may vary rapidly, e.g., on a slot-by-slot basis, or even within each slot.

Various exemplary mapping techniques for associating the FOC information with each time slot or each block of data which may be interleaved over two or more time slots are also described herein. These exemplary mapping techniques also account for the fact that there may not be FOC information provided in each time slot.

According to other exemplary embodiments of the present invention, the FOC information may be associated with a connection or connection which is different from that supported by the payload or data field containing the FOC. For example, in asymmetrical connections, e.g., where a mobile station transmits in a different number of slots per frame than it receives, a downlink channel may carry payload to a first mobile station in the data fields in several time slots of a frame but the FOC may provide control information to one or more other mobile stations which are not interested in the payload. All of these mobile stations may share the same frequency on the uplink, e.g., the one or more other mobile stations may transmit packet data and use the FOC to receive retransmission requests.

### BRIEF DESCRIPTION OF THE DRAWINGS

The features and advantages of Applicants' invention will be understood by reading this description in conjunction with the drawings, in which:

FIG. 1 is a block diagram of an exemplary cellular radio telephone system in which the present invention may be applied;

FIG. 2 illustrates an exemplary TDMA frame structure;

FIG. 3 illustrates a conventional downlink traffic channel time slot format;

FIG. 4A illustrates triple rate downlink frame usage;

FIG. 4B illustrates full rate uplink frame usage;

FIG. 5 illustrates a base station and three mobile stations communicating therewith;

FIG. 6 illustrates downlink time slot formats according to a first exemplary embodiment of the present invention;

FIG. 7A illustrates downlink time slot formats according to a second exemplary embodiment of the present invention;

FIG. 7B illustrates downlink time slot formats according to a third exemplary embodiment of the present invention;

FIGS. 8A–8C illustrate exemplary mappings of FOC information to payload according to various exemplary embodiments of the present invention;

4

FIG. 9 is a flowchart illustrating an exemplary, alternative usage of an FOC field by a mobile station according to the present invention;

FIG. 10 is a conventional format for all uplink traffic channel time slots; and

FIG. 11 is an exemplary format for two or more uplink traffic channel time slots according to an exemplary embodiment of the present invention.

### DETAILED DESCRIPTION

The following description is scripted in terms of a cellular radiotelephone system, but it will be understood that Applicant's invention is not limited to that environment. Also, the following description is in the context of TDMA cellular communication systems, but it will be understood by those skilled in the art that the present invention may apply to hybrid access methodologies, e.g,. those including TDMA and Code Division Multiple Access (CDMA).

FIG. 1 represents a block diagram of an exemplary cellular mobile radiotelephone system, including an exemplary base station 110 and mobile station 120. The base station includes a control and processing unit 130 which is connected to the MSC 140 which in turn is connected to the PSTN (not shown). General aspects of such cellular radiotelephone systems are known in the art, as described by the above-cited U.S. patent applications and by U.S. Pat. No. 5,175,867 to Wejke et al., entitled "Neighbor-Assisted Handoff in a Cellular Communication System," and U.S. patent application Ser. No. 07/967,027 entitled "Multi-Mode Signal Processing," which was filed on Oct. 27, 1992, both of which are incorporated in this application by reference.

The base station 110 handles a plurality of traffic channels through a traffic channel transceiver 150, which is controlled by the control and processing unit 130. Also, each base station includes a control channel transceiver 160, which may be capable of handling more than one control channel. The control channel transceiver 160 is controlled by the control and processing unit 130. The control channel transceiver 160 broadcasts control information over the control channel of the base station or cell to mobiles locked to that control channel. It will be understood that the transceivers 150 and 160 can be implemented as a single device, like the traffic and control transceiver 170 in the mobile station, for use with control channels and traffic channels that share the same radio carrier frequency.

The traffic channels can be used in a dedicated, connection-oriented manner to transmit information, e.g., for a voice connection, where each channel is used continuously for a period of time to support transmission of a single stream of information or in a packet-oriented manner where each channel can be used to send independent units of information associated with different information streams. When used in the former sense, control channels and traffic channels will be referred to herein as DCCHs and DTCs, respectively. When used in the latter sense, control channels and traffic channels win be referred to herein as PCCHs or PDTCs, respectively. For more information regarding packet data radiocommunication systems generally, the interested reader is referred to U.S. patent application Ser. No. 08/544,836, entitled "Packet Channel Feedback", filed on Oct. 18, 1995, the disclosure of which is expressly incorporated here by reference.

After an idle mobile station 120 has located a control channel, e.g., by using digital control channel location information found on a traffic channel, it can then read the control information transmitted on that control channel, e.g.,

US 6,466,568 B1

5

paging messages, using its traffic and control channel transceiver **170**. Then, the processing unit **180** evaluates the received control channel information, which may include, for example, paging messages or requests to measure signals strengths on identified channels. When a connection between the mobile station **120** and the system is desired, the transceiver **170** will tune to an appropriate traffic channel as described below.

An exemplary organization of the information transmitted on each radio channel, i.e., the channel bursts, or time slots, in accordance with Applicant's invention is shown in FIG. **2**. The consecutive time slots on a radio channel are organized in TDMA frames of, for example, six slots each so that a plurality of distinct channels can be supported by a single radio carrier frequency. Each TDMA frame in this example has a duration of 40 msec and supports six half-rate logical channels, three full-rate logical channels, or greater bandwidth channels as indicated in the following table. Each slot can, for example, have a duration of 6.67 msec and carry 324 bits (162 symbols), which have positions in each slot that are conventionally consecutively numbered 1–324.

| Number of Slots | Used Slots | Rate |
|---|---|---|
| 1 | 1 | half |
| 2 | 1, 4 | full |
| 4 | 1, 4, 2, 5 | double |
| 6 | 1, 4, 2, 5, 3, 6 | triple |

Currently, IS-136 defines a downlink DTC slot format as illustrated in FIG. **3**. Therein, the numbers above each field denote the number of bits associated therewith. For example, the SYNC field is used for synchronization equalizer training and time slot identification. The SACCH (Slow Associated Control Channel) is a signalling channel used, for example, for transmission of control and supervision messages between the mobile station and the base station. The two DATA fields are used to transmit the "payload" of the slot, e.g., user information or control channel information as part of the FACCH (Fast Associated Control Channel). The CDVCC (Coded Digital Verification Color Code) is a cell identifier that identifies the base station which is transmitting to the mobile station. The CDL (Coded Digital Control Channel Locator) is a pointer which can be used to indicate on which frequency, or set of frequencies, a digital control channel is likely to be found. Conventionally, this downlink format is used for each time slot in a TDMA frame, i.e., all six time slots for systems operating according to IS-136. According to the present invention, however, it may be desirable to provide alternative slot formats to accommodate the different communication services provided above.

Consider again the situation where it is desirable to provide a triple rate connection in the downlink (i.e., base-to-mobile direction) and a full rate connection in the uplink (i.e., mobile-to-base direction). This situation is shown in FIGS. **4A** and **4B**. Therein, FIG. **4A** illustrates a downlink frame wherein all six time slots are allocated to a particular mobile, as denoted by the cross-hatching of each of time slots **1–6**. FIG. **4B** illustrates a corresponding uplink frame. Note that only slots **1** and **4** are allocated to the particular mobile station which is using all of the time slots of FIG. **4A**. Thus, the remaining time slots **2, 3, 5** and **6** are unallocated and, conventionally, would go unused.

Bandwidth being a precious commodity, exemplary embodiments of the present invention provide techniques for using unallocated bandwidth in a single link without

6

adversely impacting compatibility with existing air interface specifications, e.g., IS-136. According to a first exemplary embodiment described below, the unused uplink time slots can be used to send packet data. Packet data communications support independent usage of uplink and downlink frequencies. Accordingly, packet data can be sent on the unused time slots in the uplink from one or more other mobile stations to the base station. Consider FIG. **5**. Therein, mobile station **500** is allocated the downlink and uplink time slots illustrated in FIGS. **4A** and **4B** for communicating with base station **505**. To fully utilize the bandwidth resources according to the present invention, another mobile station **510** transmits packet data to base station **505** in a PDTC comprising time slots **2** and **5** of FIG. **4B**, while a third mobile station **520** transmits packet data to base station **505** on a PDTC comprising time slots **3** and **6**.

If either of the mobile stations **510** and **520** require downlink bandwidth, then a downlink channel may be assigned on some other frequency, since mobile station **500** is using all of the time slots of the frequency represented by FIG. **4A**. Alternatively, it may be the case that, for a particular time period during a packet data connection which is referred to herein as an "activity burst", one or both mobile stations **510** and **520** only need to transmit packet data and, therefore, do not require downlink bandwidth for the purposes of receiving packet data. Nonetheless, mobile stations **510** and **520** will still need to receive overhead information from base station **505**, e.g., relating to which packets were not received and whether each mobile station is allowed to transmit in a particular frame. Assigning a downlink PDTC purely for the transmission of such overhead information is spectrally inefficient. One solution would be to provide this overhead information to mobiles **510** and **520** on a PCCH and require the mobile stations to return to the PCCH periodically, e.g., after transmitting packets on the PDTC during the activity burst which lasts, for example, one second.

However, according to exemplary embodiments of the present invention, another technique for providing overhead information to mobile stations **510** and **520** using one or more downlink time slots whose data or "payload" fields are being used to transmit information to mobile station **500**. Specifically, the downlink time slot format illustrated in FIG. **3** can be altered to (1) provide overhead information regarding packet data communications to mobile stations **510** and **520**, without (2) significantly altering mobile station **500**'s ability to receive triple rate downlink information. FIG. **6** illustrates downlink time slot formats according to this exemplary embodiment of the present invention.

Therein, three downlink slot formats are illustrated for an exemplary traffic channel according to the present invention. These three slot formats might correspond, for example, to slots **1, 2** and **3** of FIG. **4A**. Slots **4, 5** and **6** would have the same format as slots **1, 2** and **3**, respectively for this exemplary embodiment. Unlike conventional systems, e.g., those currently specified by IS-136, the downlink formats illustrated in FIG. **6** differ within the frame. Specifically, while time slot **1** has the same slot format as conventional downlink traffic time slots (see, e.g., FIG. **3**), time slots **2** and **3** differ in that the SACCH, CDVCC and CDL fields of slot **1** have each been replaced by an FOC (fast out-of-band channel) field. It will be noted that, for the purposes of simplicity, the RSVD bit illustrated in FIG. **3** has been omitted. However, this bit may also be reserved and included in downlink slot formats according to the present invention.

In the example described above, mobile station **500** is using a triple rate downlink connection, i.e., it is reading the

US 6,466,568 B1

7

data fields of each of time slots **1, 2** and **3** in FIG. **6**. However, some of the other fields provided in the conventional downlink time slot format of FIG. **3** need not be transmitted in each time slot under these circumstances. For example, the type of overhead signalling that occurs on the SACCH is such that mobile station **500** need not receive the SACCH at triple rate. That is, mobile station **500** may only need to receive one SACCH burst every three time slots. Thus the field that is normally used for SACCH information in slots **2** and **3** can be replaced by FOC information according to the present invention. The CDVCC field includes information that aids in the identification of the radio link and is conventionally used for radio link control, e.g., tearing down of a connection. However, this information can be provided to the mobile station over the control channel at call-setup and, accordingly, need not be transmitted by the base station in each downlink time slot. Various techniques are described below to avoid problems caused by omitting the CDL information from some downlink time slots.

Omitting these fields in time slots **2** and **3** (as well as **5** and **6**) provides an opportunity to inform the other mobile stations, e.g., mobile stations **510** and **520**, of information pertaining to their uplink connections, without assigning a new PDTC or forcing mobile stations **510** and **520** to revert periodically to listening to the PCCH. For example, the FOC fields can be used to inform mobile station **510** or mobile station **520** that a previously transmitted packet was not properly received and should be retransmitted. Note that since the FOC information is "out-of-band" (i.e., is not encoded as part of the data), mobile stations **510** and **520** advantageously need not be aware of the channel coding and interleaving needed to read the data fields in time slots **2** and **3**.

Many variations of the foregoing exemplary embodiment are possible and contemplated by the present invention. For example, although the foregoing example is provided in terms of an asymmetrical connection wherein the downlink is triple rate and the uplink is full rate, any asymmetrical connection lends itself to application of the present invention. For example, the downlink may be double rate and the uplink full rate, whereupon the FOC fields would replace the SACCH, CDVCC and CDL fields in only one of slots **2** and **3** illustrated in FIG. **6**.

Moreover, it may not be desirable to replace all three of the SACCH, CDVCC and CDL fields with FOC information. For example, it may be determined that 36 bits of FOC information is not needed. Alternatively, for compatibility reasons, it may be determined that one or more of the SACCH, CDVCC and CDL fields should be maintained in each downlink slot. Thus, for example, downlink slot formats for the triple rate downlink/full rate uplink example provided above could instead be as illustrated in one of FIGS. **7A** and **7B**. Therein, the FOC replaces only the SACCH and CDVCC in FIG. **7A** and only the SACCH in FIG. **7B**. Those skilled in the art will appreciate that many more variations exist, such as time slot **2** or **3** being the "master" channel having the conventional slot format of FIG. **3** instead of slot **1**.

As mentioned above, exemplary embodiments of the present invention wherein the base station **505** only transmits the CDVCC and/or the CDL in some downlink slots of a traffic channel may cause difficulties for mobile stations that expect this information in all time slots on a downlink traffic channel. For extensive information relating to the CDL and mobile functionality relating to locating digital traffic channels, the reader is referred to U.S. patent appli-

8

cation Ser. No. 08/331,711 entitled "Method and Apparatus for Locating a Digital Control Channel in a Radiocommunication System", filed on Oct. 31, 1994, the disclosure of which is incorporated here by reference. In brief, the CDL field is used by unconnected mobile stations (e.g., at power-up) to locate a control channel if the first channel to which it tunes is a traffic channel. According to one exemplary technique, a mobile station reads the field corresponding to the CDVCC in the time slot to which it first tunes on a frequency. This conventional mobile station will identify this field as either a CDVCC (implying a traffic channel per the format of FIG. **3**) or a coded superframe phase (CSFP) (implying a control channel per IS-136). If a traffic channel, the mobile station will then use the CDL information as a pointer to search another channel number, or set of channel numbers, for a control channel.

Thus, if the CDVCC information is replaced by FOC information on some downlink time slots, a conventional mobile station reading this field for the purpose of identifying the channel as either a control channel or a traffic channel may misidentify a traffic channel as a control channel. Alternatively, the mobile station might read the FOC information as valid CDVCC data (thus correctly identifying the channel as a traffic channel) and then look for the CDL, which is not present (thus moving to an incorrect channel number or set to search).

Both of these problems can be avoided according to exemplary embodiments of the present invention by recognizing that both the CSFP and the CDVCC according to IS-136 are (12,8) encoded data words, i.e., 8 bits of data encoded to 12 bits that have particular characteristics. Specifically, the CDVCC is a 12,8) code word that remains the same in each time slot associated with a particular channel and has non-inverted checkbits, while the CSFP is a (12,8) code word that has inverted checkbits and acts as an upcounter. Since the universe of (12,8) codewords having these characteristics is relatively small as compared with the number of total number of 12 bit binary words, the FOC information can be made distinct from the CDVCC and CSFP to avoid confusion. Specifically, the base station can transmit FOC information in the field which conventionally been used in downlink channels as either the CSFP or the CDVCC (i.e., bits 169–181 in FIG. **3**), which is carefully tailored to avoid similarity with a (12,8) codeword having these characteristics by adding filler bits to distinguish therefrom as will be readily appreciated by those skilled in the art.

Of course, those mobile stations (or other receiving equipment) which are designed with the present invention in mind will be aware that the SACCH, CDVCC and CDL information can be located at a pre-defined full-rate portion of a multi-rate channel, which pre-defined portion is referred to herein as the "master channel". The master channel may, as in the afore-described examples, be transmitted on time slots **1** and **4**, or alternatively on time slots **2** and **5** or **3** and **6**. In any case, a mobile station which has been suitably programmed to be aware of master channels can simply tune to a master channel to find CDL information.

The present invention also has application in situations other than asymmetrical data/packet data situations described above. For example, in order to ensure complete compatibility, and for ease of implementation, it may be desirable to adopt the downlink slot format of slot **2** in FIG. **6** for situations in which packet data is transmitted in both the uplink and downlink, i.e., for uplink and downlink PDTCs as well as downlink DTCs and uplink PDTCs. That is, base stations according to the present invention which

US 6,466,568 B1

**9**

transmit packet data traffic channels can use this downlink format for transmitting to mobile stations. Moreover, this aspect of the present invention is also applicable to situations wherein the connection is not asymmetrical.

Another area in which the present invention finds application is in multimedia communication. As described above, it is anticipated that future radio communications will need to support intermingled voice, data and video service, wherein the type of information to be transmitted may vary rapidly, e.g., time slot by time slot and wherein the different services may require different levels of channel coding. One technique for dealing with this type of situation is to use call control signalling (e.g., over the FACCH) to identify which type of instantaneous service is to be supported over the channel. Another alternative is simply to allow the base station to transmit information pertaining to different services on a slot-by-slot basis, and require the mobile station to discriminate between the different services based on the differences in channel coding. See, for example, U.S. Pat. No. 5,230,003 to Dent and Raith, the disclosure of which is expressly incorporated here by reference. This procedure is currently used to determine whether FACCH information or voice information is carried in the DATA field of a particular downlink time slot. However, as the number of services expands beyond two, the complexity of discriminating between services in this manner becomes excessive.

Thus, according to another exemplary embodiment of the present invention, the FOC fields may also serve the purpose of service type identifier. In this embodiment, the FOC can provide information regarding the type of service which the associated payload is currently supporting, the channel coding and/or interleaving associated therewith. For example, in a multimedia connection information transfer may rapidly vary between voice, data and video information. In such a case, a change in the FOC can inform the mobile station of the type of information being transmitted, so that the mobile station will know how to process the received information, e.g., how to decode the received bits. As will be apparent from reviewing FIG. 6, FIG. 7A and FIG. 7B, exemplary embodiments of the present invention do not provide FOC fields in each time slot received by the mobile station in order to maintain full-rate transmission of SACCH, CDVCC and CDL. That is, using again IS-136 as an illustrative example, a mobile station receiving data at triple-rate will read FOC information in time slots **2, 3, 5,** and **6**, but not slots **1** and **4**. Thus, it is desirable to provide a mapping between the FOC information received in time slots **2, 3, 5,** and **6** and the information payload received by the mobile station in all six time slots.

More specifically, exemplary embodiments of the present invention provide a service type indicator for each block of information transmitted to the mobile station. These blocks of information are commonly referred to as "Layer 2 frames" which include, for example, speech frames associated with voice connections and radio link protocol (RLP) frames associated with data, e.g., fax, connections. Layer 2 frames, which are thus contained within the DATA fields of one or more downlink time slots, should not, however be confused with TDMA frames, which consist of a plurality of time slots. The number of time slots in which each Layer 2 frame is contained will vary depending upon the size of the Layer 2 frames and the amount of interleaving associated with a particular system.

For the purposes of illustration, the exemplary mappings provided below are described in the context of interleaving over two time slots, i.e., each Layer 2 frame is spread over two time slots. However, those skilled in the art will

**10**

appreciate that Layer 2 frames could be interleaved over more than two time slots in which case the mappings described below would also change accordingly.

Several exemplary associations between the FOC information and the Layer 2 frames for a triple-rate connection are illustrated in FIGS. 8A–8C. Therein, the six larger blocks **80–85** refer to the payload portion of each of the six time slots in a TDMA frame. For example, as shown in any of FIGS. **6, 7A** and **7B**, the payload portion includes the information contained in both DATA fields of a time slot. Within each payload portion parts of two Layer 2 frames are carried, as denoted by the letters A–G. As seen in FIGS. **8A–8C**, each Layer 2 frame in this example is interleaved over two time slots. Above the six payload portions are the four FOC portions **86–89** which are contained in slots **2, 3, 5** and **6**, respectively. For example, each FOC portion **86** could, for example, be 36 bits as shown in the exemplary embodiment of FIG. **6**, 24 bits as shown in the exemplary embodiment of FIG. **7A** or 12 bits as shown in the exemplary embodiment of FIG. **7B**.

The arrows in each of FIGS. **8A–8C** denote the mapping between the bits in each FOC portion and Layer 2 frames in each time slot. In particular, an arrow from an FOC portion **86–89** drawn to a time slot **80–85** implies that the FOC portion includes bits which identify the service type of the Layer 2 frame which begins in that time slot. For example, in FIG. **8A**, the arrow leading from FOC SLOT **2** block **86** to PAYLOAD SLOT **1** block **80**, indicates that some of the bits contained in the FOC field(s) of slot two are used to convey an identification of the service type of Layer 2 frame B to the recipient equipment (mobile or base station). Thus, according to the exemplary mapping of FIG. **8A**, Layer 2 frame C has bits in both FOC blocks **86** and **87** relating to an indication of its service identity, while Layer 2 frames B and D have identifying bits only in one of blocks **86** and **87**, respectively.

The way in which the identifier bits are divided between FOC **86** and FOC **87** can vary. For example, a straightforward approach might be to include the complete identifier for Layer 2 frame B, redundancy associated with that identifier, the complete identifier for Layer 2 frame C and redundancy associated with that identifier in FOC **86**. At the same time FOC **87** would include, the complete identifier for Layer 2 frame C, redundancy associated with that identifier, the complete identifier for Layer 2 frame D and redundancy associated with that identifier. As will be appreciated by those skilled in the art, redundancy is provided to allow for correction of errors created during transmission of the bits over the air interface. For ease of reference, this division of bits is referred to using the following notation:

FOC **86** includes: Ib, R{Ib}, Ic, R{Ic}

FOC **87** includes: Ic, R{Ic}, Id, R{Id}

wherein, for example, "Ib" refers to the identifier information associated with Layer 2 frame B and "R{Ib}" refers to the redundancy provided for identifier information associated with Layer 2 frame B.

This exemplary division of bits provides two complete identifiers for Layer 2 frame C, implying unequal redundancy, i.e., less redundancy for Layer 2 frames B and D. Another possible division of identifier bits, using the same notation above (and noting that division by 2 implies simply half of the bits associated with that information), would be:

FOC **86** includes: Ib, R{Ib}, (Ic, R{Ic})/2

FOC **87** includes: (Ic, R{Ic})/2, Id, R{Id}

Using this exemplary division of bits, equal redundancy is achieved. Similar comments and bit divisions apply to FOC

A0049

US 6,466,568 B1

**11**

88 and 89 with respect to identifying the service types of Layer 2 frames E, F and G.

FIG. 8B illustrates another exemplary mapping according to the present invention. Therein, like reference numerals are used to refer to like bits as described with respect to FIG. 8A. The only differences between FIG. 8B and FIG. 8A are that an additional arrow connects FOC block 86 to the payload of slot 3 and that an additional arrow connects FOC block 87 to the payload of slot 1 (analogous additional arrows are associated with FOC blocks 88 and 89 as well). As discussed above, this means that according to the exemplary mapping of FIG. 8B, bits in FOC blocks 86 and 87 are also provided which relate to the service identity of the Layer 2 frames B and D, respectively. Accordingly, an exemplary bit division between FOC blocks 86 and 87 (as well as 88 and 89 but for Layer 2 frames E, F and G) is as follows:

FOC 86 includes: (Ib, R{Ib})/2, (Ic, R{Ic})/2, (Id, R{Id})/2

FOC 87 includes: (Ib, R{Ib})/2, (Ic, R{Ic})/2, (Id, R{Id})/2

This exemplary embodiment provides an equal amount of redundancy for each Layer 2 frame service type indicator, as well as time slot interleaving of all indicators. However, the receiver will need to- wait longer than in the aforedescribed embodiment to take advantage of all of the redundancy.

A third exemplary mapping is illustrated in FIG. 8C. Therein, like reference numerals are used to refer to like bits as described with respect to FIGS. 8A and 8B. The only differences between FIG. 8C and FIG. 8B are that an arrow connects FOC block 87 to the payload of slot 4 (instead of slot 1 in FIG. 8B). Similarly, FOC block 89 has an arrow which points to the first time slot in the next TDMA frame. As discussed above, this means that according to the exemplary mapping of FIG. 8C, bits in FOC block 87 are also provided which relate to the service identity of the Layer 2 frame E. Accordingly, an exemplary bit division between FOC blocks 86 and 87 (as well as 88 and 89 but for Layer 2 frames E, F, G and A) is as follows:

FOC 86 includes: Ib, R{Ib}, Ic, R{Ic}, Id, R{Id}

FOC 87 includes: Ic, R{Ic}, Id, R{Id}, Ie, R{Ie}

This exemplary embodiment has less delay involved in decoding the identifier information than the exemplary embodiment of FIG. 8B since, e.g., all of the identifier information for Layer 2 frame B will have been received by time slot 2. Those skilled in the art will readily appreciate that other mappings are possible and are considered to be within the scope of the present invention.

As described above, the FOC can be used in the downlink in different ways. Specifically, if a mobile station is assigned to an asymmetrical data connection, then the FOC is not associated with the connection and may be used in the manner described above to provide feedback relating to one or more uplink packet data connections. Alternatively, if the mobile station is assigned a multimedia connection, then the FOC can instead serve as a signalling channel associated with the connection that provides out-of-band information regarding the connection itself. In the former case, the mobile station which is receiving, for example, at double- or triple-rate need not read the FOC since the information provided therein relates to a connection associated with another mobile station. In the latter case, the mobile station needs to read the FOC since its information pertains to the mobile station's connection. At call set-up or handoff, the mobile station can be informed, e.g., as part of the channel assignment message, which type of connection is being set-up. If, for example, the mobile station is informed that a non-multimedia (e.g., an asymmetrical data) connection is

**12**

being set-up, then that mobile station will know that it should ignore the FOC information.

This handling of the FOC by a mobile station is illustrated in the flow chart of FIG. 9. Therein, at decision block 90, the mobile station determines whether the new (greater than full-rate) connection is a multimedia connection. If so, then the flow proceeds to block 92, wherein the mobile station recognizes that because the connection is multimedia, the FOC provides instantaneous service type information for that mobile station's downlink connection and should be read. The mobile then proceeds to use the FOC information in processing the payload at block 94.

If the connection is not a multimedia connection, e.g., it is an asymmetrical data/fax connection wherein the mobile will be receiving at double- or triple-rate, then the flow follows the "No" branch leaving decision block 92. Thus, the mobile station will then recognize at block 96 that the FOC fields in some of the downlink time slots should be ignored since that information is used to provide feedback to other mobile stations regarding their uplink connections. Note, block 96 is not meant to imply that all mobile stations would ignore the FOC, only the mobile station receiving the double- or triple-rate downlink information on that frequency. This mobile station will then read the payload of the slots associated with the additional bandwidth, while ignoring the FOC fields at block 98.

To this point, the discussion has focused on adjustments which can be made to transmission formats in the downlink. However, there may also be situations where the mobile station transmits in more time slots in each frame than it receives. Thus, it is desirable to optimize the uplink traffic channel format for these situations as well.

FIG. 10 illustrates a conventional uplink traffic channel format as currently specified by IS-136. Therein, the bit sizes of each field are specified by the numbers above each field. Similarly identified fields, including DATA, SYNC, CDVCC, and SACCH, are used in the manner described above with respect to the conventional downlink traffic channel format of FIG. 3. Guard time field (G) and ramp time field (R) are provided to provide the base station some time between received time slots from different mobiles and to avoid spectral splatter. Unlike the downlink, the uplink has no CDL field since the base station has no need of such information.

However, the base station need not receive SACCH and/or CDVCC information in each uplink time slot when connected at greater than full rate to a mobile station. Thus, according to exemplary embodiments of the present invention, one or both of these fields can be filled with FOC information in a manner analogous to that described for the downlink. Accordingly, an exemplary uplink format according to the present invention may be as illustrated in FIG. 11. Therein, for double-rate transmission in the uplink, the slot format for the first (and fourth) slot in an exemplary six slot frame system will be as shown in the top row, while the format for the second (and fifth) slot will be as shown on the bottom. For triple-rate transmission in the uplink the third and sixth slots will have the same format as shown in the bottom row of FIG. 11. Thus, for example, 24 bits of FOC information per time slot can be provided in the uplink to, for example, identify the service type of the payload being transmitted by the mobile station. As in the exemplary embodiments for the downlink, it may be desirable to maintain one of the SACCH or the CDVCC in additional time slots, in which case FOC information may be provided only in one of the two fields shown in the bottom row of FIG. 11.

US 6,466,568 B1

13

It is, of course, possible to embody the invention in specific forms other than those described above without departing from the spirit of the invention. The embodiments described above are merely illustrative and should not be considered restrictive in any way. The scope of the invention is determined by the following claims, rather than the preceding description, and all variations and equivalents which fall within the scope of the claims are intended to be embraced therein.

What is claimed is:

1. A communication station comprising:

a processor for arranging information for transmission including providing at least one first field in which payload information is disposed and providing at least one second field, separate from said first field, which includes a service type identifier which identifies a type of payload information provided in said at least one first field; and

a transmitter for transmitting information received from said processor including said at least one first field and said at least one second field.

14

2. The communication station of claim 1, wherein said processor is also for changing said type of payload information from a first type to a second type during a connection involving said communication station and adjusting a value of said service type identifier to correspond to the second type of information.

3. The communication station of claim 2, wherein said first type of information is one of video, voice and data and said second type of information is different one of video, voice and data.

4. The communication station of claim 1, wherein said information is multimedia information.

5. The communication station of claim 1, wherein said communication station is a base station.

6. The communication station of claim 1, wherein said communication station is a mobile station.

7. The communication station of claim 1, wherein said processor is also for mapping said service type identifier to said at least one first field.

* * * * *

Paper No. _____

Filed on behalf of:   Telefonaktiebolaget L. M. Ericsson

UNITED STATES PATENT AND TRADEMARK OFFICE

_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD

_____

BROADCOM CORPORATION

Petitioner

v.

TELEFONAKTIEBOLAGET L.M. ERICSSON

Patent Owner

_____

Case IPR2013-00602
U.S. Patent Nos. 6,466,568

_____

**PATENT OWNER'S MOTION FOR ADDITIONAL DISCOVERY UNDER 37 C.F.R. § 42.51(b)**

Patent Owner Ericsson ("Ericsson") respectfully submits this motion to take additional discovery of Petitioner Broadcom, Inc. ("Broadcom"). Ericsson submits seven narrowly tailored Requests for Production relevant to whether Broadcom's petitions are barred under 35 U.S.C. §315(b).  (Ex. 2001).

These Petitions for IPR were filed shortly after Ericsson obtained a judgment for infringement of the subject patents against several of Broadcom's customers in *Ericsson v. D-Link, el al* ("D-Link Lawsuit").  (Exs. 2002, 2003, 2004).  Broadcom clearly had a substantial interest in that case because its "BCM4313 and BCM4321" chips formed the basis for some of the infringement allegations, (Petition at 2), and as Broadcom admits in its SEC filings, it is not uncommon for Broadcom to be "required to indemnify some customers and strategic partners under our agreements if a third party alleges or if a court finds that our products or activities have infringed upon, misappropriated or misused another party's proprietary rights." (Ex. 2005 at 46). To protect these interests, Broadcom "engage[s] in litigation to . . . determine the validity and scope of the proprietary rights of others, including [its] customers." *Id.* These IPRs are one example of Broadcom filing litigation on behalf of its customers pursuant to its indemnity obligations.[1]

For years, Broadcom has been working behind the scenes to help defeat Ericsson's infringement claims against its customers.  Indeed, as far back as July 2010, Broadcom assisted Acer, Inc., a D-Link Lawsuit defendant, (Ex. 2002), in analyzing the very patents that are now the subject of Broadcom's petitions.  When

---

[1]  Another chip supplier, Intel, actually intervened in the case, stating it had a direct and substantial interest because of its indemnity agreements.  (Ex. 2006 at 3).

1

This page contains confidential information.


Please refer to A0069, which contains the redacted, public version of this page.

A0058

of the defendants, (Pet. Ex. 1010); and (2) a majority of the same references that the defendants relied upon for their invalidity claims in the D-Link Lawsuit. This level of coordination raises serious questions about whether Broadcom is in privity with the defendants and is likewise time barred from filing these petitions by §315(b).

Because the certain facts as to Broadcom's standing are not publicly available and because Ericsson has exhausted all efforts to obtain them voluntarily, Ericsson submits this Motion. The requests are useful and relevant to Broadcom's standing, which the PTO has expressly identified as a basis for obtaining discovery. Ericsson worked diligently to obtain this evidence, and Broadcom faces no undue burden in responding. As such, Ericsson meets the interests of justice standard.

## I.    The Discovery Request Is Relevant to Broadcom's Standing.

If Broadcom is a privy to any of the D-Link Defendants, it is barred from obtaining *inter partes* review under 35 U.S.C. § 315(b) because Ericsson served the "D-Link Defendants"[2] more than one year before these petitions were filed. (Ex. 2004). The discovery sought goes directly to Section 315(b)'s application.

The PTO specifically identified standing as an issue that warrants additional discovery. *See* 77 Fed. Reg. 48680, 48689 (Aug. 14, 2012) ("additional discovery may be authorized where patent owner raises sufficient concerns regarding the petitioner's certification of standing."). The PTO also allows the Board to "permit new testimonial evidence where it addresses issues relating to the petitioner's

---

[2] The "D-Link Defendants" include, collectively, D-Link Corp., D-Link Systems, Inc., Netgear, Inc., Acer Inc.("Acer"), Acer America Corp. and Gateway Inc., Dell, Inc., Toshiba Corp., Toshiba America, Inc., Toshiba America Information Systems, Inc., Toshiba America Consumer Products, LLC, and Belkin International, Inc. (Exs. B, C)

standing, or where . . . the evidence demonstrates that the trial may not be instituted."
*Trial Practice Guide*, 77 Fed. Reg. 48756, 48764 (Aug. 14, 2012) ("TPG").  Thus, the PTO clearly intends to allow additional discovery for standing issues, like § 315.

Under § 315(b), IPR should be denied because Broadcom is in privity with at least one D-Link Defendant. The term "privity" describes a relationship between a litigant and a nonparty that is characterized by a "mutuality of interest," *Black's Law Dictionary*, 5th Ed. (1979), sufficient to justify applying principles of claim or issue preclusion to the nonparty, TPG at 48759. The PTO expanded the doctrine by noting its equitable and practical nature and stating it "should extend to parties to transactions and other activities relating to the property in question."  TPG at 48759 (quoting 157 Cong. Rec. S1376 (dialed ed. Mar. 8, 2011) (statement of Sen. Kyl)).

Under this expanded doctrine,[3] the Board must "evaluate what parties constitute 'privies' in a manner consistent with the flexible and equitable considerations established under federal caselaw."  TPG at 48759. For example, the TPG cites *Taylor v. Sturgell*, 553 U.S. 880, 893-95 (2008), as support for its interpretation.  *Id.* In doing so, the Board must determine if the parties' relationship is "sufficiently close such that both should be bound by the trial outcome and related estoppels." *Id.*; *see* 154 Cong. Rec. S9987 (Sept. 27, 2008) (statement of Sen. Kyl). "A common consideration is whether the non-party exercised or could have exercised control over a party's participation in a proceeding." *Id.*

---

[3] Section 315(b) under the AIA also expanded on former 35 U.S.C. § 317(b) by precluding real parties in interest in addition to privies.  *See* former 35 U.S.C. § 317(b) (1999), *amended by* 35 U.S.C. § 317, Pub. L. No. 112-29, § 6(a), 125 Stat. 303 (2011).

4

IPR2013-00602
Patent 6,466,568

Also, the Supreme Court set forth six categories for determining whether a nonparty to a suit is bound by its judgment in *Taylor,* and the PTO expressly validated them as guidelines for determining privity. *See* TPG at 48759. One category asks whether the nonparty maintains a "substantive legal relationship" with a party in suit. 553 U.S. at 894. This theory "originated 'as much from the needs of property law as from the values of preclusion by judgment.'" *Id.* (citations omitted).

Indemnity relationships satisfy *Taylor's* reasoning;[4] numerous federal courts agree and state that indemnity relationships justify third party preclusion. *See, F.T.C. v. Garvey,* 383 F.3d 891, 898 (9th Cir. 2004) ("To deny the right of indemnification would be to destroy the indemnitee's right by the result of an action . . . It is far better to preclude the third person . . . who often could have joined both adversaries in the first action."); *SCAC Transp. (USA) Inc. v. S.S. Danaos*, 845 F.2d 1157, 1162 (2d Cir. 1988) (indemnitor is precluded from disputing issues determined in the indemnitee's judgment); *Jennings v. U.S.*, 374 F.2d 983, 985 (4th Cir. 1967) ("where an indemnitor is notified and can take part in – indeed may control – the litigation, he is precluded from contesting the indemnitee's liability in the subsequent indemnity action.").

*Taylor* relies on the Restatement (second) of Judgments, 553 at 893 n. 6, which acknowledges that indemnity relationships justify privity preclusion. If an indemnitor has received "reasonable notice of the action" but declines to participate in the

---

[4] Broadcom relies on *Apple, Inc. v. Achates Ref. Publ'g, Inc.*, IPR2013-00080, Paper No. 18 (2013). However, Achates relied solely on an unsigned, public agreement with no evidence of concerted action. Here, evidence of Broadcom's past influence in negotiations, litigation history, corporate filings, contemporaneous attacks, *and* an indemnity agreement are evidence of control and a substantive legal relationship.

5

**A0061**

This page contains confidential information.


Please refer to A0073, which contains the redacted, public version of this page.

**A0062**

IPR2013-00602
Patent 6,466,568

A. <u>Useful information will be uncovered with additional discovery.</u>

Ericsson is already "in possession of a threshold amount of evidence or reasoning tending to show beyond speculation that something useful will be uncovered." *Garmin, supra,* at 7. "'Useful' means favorable in substantive value to a contention of the party moving for discovery." *Id.* Ericsson has come forward with considerable direct and circumstantial evidence that Broadcom colluded with the Defendants because of its indemnity obligations. (Exs. 2005, 2007, 2008, 2009, 2016). Ericsson has further evidence of the existence of the nature of this relationship but cannot submit this evidence because of confidentiality provisions that Broadcom and others refuse to waive. (Ex. 2012). Broadcom does not deny the existence of such indemnity agreements. *Id.* If produced, these contracts will be useful to reveal the full scope of these substantive legal relationships and Broadcom's participation in the D-Link Lawsuit so that the Board can sufficiently rule on Broadcom's standing.

B. <u>Equivalent information is not obtainable by any other means.</u>

Ericsson has actively pursued discovery from Broadcom and the defendants. First, Ericsson made limited requests from Broadcom related to the contractual relationships. (Ex. 2011). Broadcom did not, and still does not, deny the existence of the contracts, but instead relies on their confidentiality to avoid a 315(b) analysis. (Ex. 2012). Second, Ericsson asked the defendants to permit its IPR counsel to review any contracts relating to the "BCM4312 and BCM4321" chips without being subject

---

reasonably tailored to its genuine need to determine the relationship between Broadcom and the D-Link Defendants. Finally, the requests will not require a significant expenditure of human or financial resources, as they primarily relate to specific contracts and communications. *Garmin supra,* at 6-7.

7

**A0063**

to the "Prosecution Bar" in the Protective Order. (Ex. 2011). Broadcom's customers refused to waive that provision without Broadcom's consent. (Ex. 2013, 2014). Once again, Broadcom stonewalled Ericsson by hiding behind the protective order. [6]

Here, the parties to the relevant contracts and communications possess this evidence and it is amenable to concealment because all actions by the parties are taken behind closed doors, apparently locked by Confidentiality Agreements. Considering the nature and effect of this information, Ericsson has made all possible attempts to obtain it by other means. *Garmin*, *supra*, at 6. Thus, Ericsson has satisfied each factor; its limited requests should be granted in the interests of justice.

**C. Conclusion**

If the Board denies Ericsson's request, it is difficult to conceive of a case in which discovery into standing will be permitted, despite the TPG's indication to the contrary. Patent owners will rarely if ever be in possession of indemnity agreements and, if they are, they will be unable to rely upon them because of a protection order. This will promote collusion among parties and thereby undermine the policy behind §315(b) that encourages litigates to bring their validity challenges to the Board in a timely manner. Without an order from the Board, this evidence will seldom be obtainable by any patent owner. Thus, as the PTO has declared, patent owners require the use of additional discovery; otherwise, § 315(b) will essentially be eviscerated.

---

[6] Ericsson has concurrently filed an Emergency Motion for Relief from the Protective Order in the district court. (*See* Ex. 2015). To the extent the Board is inclined to deny Ericsson's motion as "speculative" in the absence of the underlying indemnity agreements, despite the circumstantial evidence, Ericsson requests that the Board hold the present motion in abeyance until the district rules on Ericsson' motion.

8

**A0064**

IPR2013-00602
Patent 6,466,568

Dated: December 11, 2013.

/Peter J. Ayers/

PETER AYERS
Lee & Hayes, PLLC
13809 Research Blvd., Suite 405
Austin, TX 78750
Telephone: 512.505.8162
Fax: 509.944.4693
Attorney for Patent Owner Telefinakteibolaget
     LM Ericsson

9

**A0065**

IPR2013-00602
Patent 6,466,568

CERTIFICATE OF SERVICE

The undersigned certifies that on December 11, 2013 the foregoing PATENT

OWNER'S MOTION FOR ADDITIONAL DISCOVERY UNDER 37 C.F.R. §

42.51(b) was served on Lead and Back-up Counsel for Broadcom Corporation by

sending the same via Federal Express to the service address provided in Broadcom's

Mandatory Notices:

Dominic E. Massa, Lead Counsel
Michael A. Diener, Back-up Counsel
Wilmer Cutler Pickering Hale and Dorr, LLP
60 State Street
Boston, MA 02109

LEE & HAYES PLLC

/Peter J. Ayers/
Peter J. Ayers, Reg. No. 38,374

10

**A0066**

Paper No. _____

Filed on behalf of:   Telefonaktiebolaget L. M. Ericsson

UNITED STATES PATENT AND TRADEMARK OFFICE

_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD

_____

BROADCOM CORPORATION

Petitioner

v.

TELEFONAKTIEBOLAGET L.M. ERICSSON

Patent Owner

_____

Case IPR2013-00602
U.S. Patent Nos. 6,466,568

_____

**PATENT OWNER'S MOTION FOR ADDITIONAL DISCOVERY UNDER 37
C.F.R. § 42.51(b)**

**A0067**

IPR2013-00602
Patent 6,466,568

Patent Owner Ericsson ("Ericsson") respectfully submits this motion to take additional discovery of Petitioner Broadcom, Inc. ("Broadcom"). Ericsson submits seven narrowly tailored Requests for Production relevant to whether Broadcom's petitions are barred under 35 U.S.C. §315(b). (Ex. 2001).

These Petitions for IPR were filed shortly after Ericsson obtained a judgment for infringement of the subject patents against several of Broadcom's customers in *Ericsson v. D-Link, el al* ("D-Link Lawsuit"). (Exs. 2002, 2003, 2004). Broadcom clearly had a substantial interest in that case because its "BCM4313 and BCM4321" chips formed the basis for some of the infringement allegations, (Petition at 2), and as Broadcom admits in its SEC filings, it is not uncommon for Broadcom to be "required to indemnify some customers and strategic partners under our agreements if a third party alleges or if a court finds that our products or activities have infringed upon, misappropriated or misused another party's proprietary rights." (Ex. 2005 at 46). To protect these interests, Broadcom "engage[s] in litigation to . . . determine the validity and scope of the proprietary rights of others, including [its] customers." *Id.* These IPRs are one example of Broadcom filing litigation on behalf of its customers pursuant to its indemnity obligations.[1]

For years, Broadcom has been working behind the scenes to help defeat Ericsson's infringement claims against its customers. Indeed, as far back as July 2010, Broadcom assisted Acer, Inc., a D-Link Lawsuit defendant, (Ex. 2002), in analyzing the very patents that are now the subject of Broadcom's petitions. When

---

[1]   Another chip supplier, Intel, actually intervened in the case, stating it had a direct and substantial interest because of its indemnity agreements. (Ex. 2006 at 3).

1

discussing an upcoming meeting, Acer noted, "Main purpose is to discuss comments from Acer's vendors, including Intel, Broadcom and Atheros." (Ex. 2007). More recently, Ericsson provided notice to Acer that it was seeking relief from the Protective Order in the D-Link Lawsuit to obtain the requested information by all other means. (Ex. 2008). In response, Acer admitted that such information was "privileged and [was] inadvertently produced." *Id.* This admission proves that a privilege exists that protects communications between Acer and Broadcom.

When its covert efforts failed to limit its indemnity obligations, Broadcom became more aggressive.

Broadcom now attacks Ericsson by petitioning for review of the same claims found to have been infringed by Broadcom's customers' use of its chips. Broadcom admits that it supplied the "Wi-Fi compliant products, such as the BCM4313 and BCM4321" to the defendants that were found to infringe. (Petition at 2). As Broadcom is now forced to indemnify its customers for damages and an ongoing activity, the timing and coordination of Broadcom's attacks is no coincidence. To be sure, Broadcom's petitions rely heavily on" (1) Ericsson's expert report on validity from the D-Link Lawsuit, a report that Broadcom could only have received from one

2

of the defendants, (Pet. Ex. 1010); and (2) a majority of the same references that the defendants relied upon for their invalidity claims in the D-Link Lawsuit. This level of coordination raises serious questions about whether Broadcom is in privity with the defendants and is likewise time barred from filing these petitions by §315(b).

Because the certain facts as to Broadcom's standing are not publicly available and because Ericsson has exhausted all efforts to obtain them voluntarily, Ericsson submits this Motion. The requests are useful and relevant to Broadcom's standing, which the PTO has expressly identified as a basis for obtaining discovery. Ericsson worked diligently to obtain this evidence, and Broadcom faces no undue burden in responding. As such, Ericsson meets the interests of justice standard.

## I.    The Discovery Request Is Relevant to Broadcom's Standing.

If Broadcom is a privy to any of the D-Link Defendants, it is barred from obtaining *inter partes* review under 35 U.S.C. § 315(b) because Ericsson served the "D-Link Defendants"[2] more than one year before these petitions were filed. (Ex. 2004). The discovery sought goes directly to Section 315(b)'s application.

The PTO specifically identified standing as an issue that warrants additional discovery. *See* 77 Fed. Reg. 48680, 48689 (Aug. 14, 2012) ("additional discovery may be authorized where patent owner raises sufficient concerns regarding the petitioner's certification of standing."). The PTO also allows the Board to "permit new testimonial evidence where it addresses issues relating to the petitioner's

---

[2] The "D-Link Defendants" include, collectively, D-Link Corp., D-Link Systems, Inc., Netgear, Inc., Acer Inc.("Acer"), Acer America Corp. and Gateway Inc., Dell, Inc., Toshiba Corp., Toshiba America, Inc., Toshiba America Information Systems, Inc., Toshiba America Consumer Products, LLC, and Belkin International, Inc. (Exs. B, C)

standing, or where . . . the evidence demonstrates that the trial may not be instituted." *Trial Practice Guide*, 77 Fed. Reg. 48756, 48764 (Aug. 14, 2012) ("TPG"). Thus, the PTO clearly intends to allow additional discovery for standing issues, like § 315.

Under § 315(b), IPR should be denied because Broadcom is in privity with at least one D-Link Defendant. The term "privity" describes a relationship between a litigant and a nonparty that is characterized by a "mutuality of interest," *Black's Law Dictionary*, 5th Ed. (1979), sufficient to justify applying principles of claim or issue preclusion to the nonparty, TPG at 48759. The PTO expanded the doctrine by noting its equitable and practical nature and stating it "should extend to parties to transactions and other activities relating to the property in question." TPG at 48759 (quoting 157 Cong. Rec. S1376 (dialed ed. Mar. 8, 2011) (statement of Sen. Kyl)).

Under this expanded doctrine,[3] the Board must "evaluate what parties constitute 'privies' in a manner consistent with the flexible and equitable considerations established under federal caselaw." TPG at 48759. For example, the TPG cites *Taylor v. Sturgell*, 553 U.S. 880, 893-95 (2008), as support for its interpretation. *Id.* In doing so, the Board must determine if the parties' relationship is "sufficiently close such that both should be bound by the trial outcome and related estoppels." *Id.*; *see* 154 Cong. Rec. S9987 (Sept. 27, 2008) (statement of Sen. Kyl). "A common consideration is whether the non-party exercised or could have exercised control over a party's participation in a proceeding." *Id.*

---

[3] Section 315(b) under the AIA also expanded on former 35 U.S.C. § 317(b) by precluding real parties in interest in addition to privies. *See* former 35 U.S.C. § 317(b) (1999), *amended by* 35 U.S.C. § 317, Pub. L. No. 112-29, § 6(a), 125 Stat. 303 (2011).

4

**A0071**

Also, the Supreme Court set forth six categories for determining whether a nonparty to a suit is bound by its judgment in *Taylor,* and the PTO expressly validated them as guidelines for determining privity. *See* TPG at 48759. One category asks whether the nonparty maintains a "substantive legal relationship" with a party in suit. 553 U.S. at 894. This theory "originated 'as much from the needs of property law as from the values of preclusion by judgment.'" *Id.* (citations omitted).

Indemnity relationships satisfy *Taylor's* reasoning;[4] numerous federal courts agree and state that indemnity relationships justify third party preclusion. *See, F.T.C. v. Garvey*, 383 F.3d 891, 898 (9th Cir. 2004) ("To deny the right of indemnification would be to destroy the indemnitee's right by the result of an action . . . It is far better to preclude the third person . . . who often could have joined both adversaries in the first action."); *SCAC Transp. (USA) Inc. v. S.S. Danaos*, 845 F.2d 1157, 1162 (2d Cir. 1988) (indemnitor is precluded from disputing issues determined in the indemnitee's judgment); *Jennings v. U.S.*, 374 F.2d 983, 985 (4th Cir. 1967) ("where an indemnitor is notified and can take part in – indeed may control –  the litigation, he is precluded from contesting the indemnitee's liability in the subsequent indemnity action.").

*Taylor* relies on the Restatement (second) of Judgments, 553 at 893 n. 6, which acknowledges that indemnity relationships justify privity preclusion. If an indemnitor has received "reasonable notice of the action" but declines to participate in the

---

[4] Broadcom relies on *Apple, Inc. v. Achates Ref. Publ'g, Inc.*, IPR2013-00080, Paper No. 18 (2013). However, Achates relied solely on an unsigned, public agreement with no evidence of concerted action. Here, evidence of Broadcom's past influence in negotiations, litigation history, corporate filings, contemporaneous attacks, *and* an indemnity agreement are evidence of control and a substantive legal relationship.

5

**A0072**

*CONFIDENTIAL MATERIAL REDACTED*

defense, absent a conflict of interest, it is "estopped from disputing the existence and extent of the indemnitee's liability" or "relitigating issues determined in the action" if the indemnitee reasonably defended the action.   Restatement (Second) of Judgments § 57(1) (1982). The weight of authority strongly supports that an indemnity agreement constitutes a substantive legal relationship sufficient to establish privity.

Here, evidence will prove that Broadcom has had the opportunity to control and maintains a substantive legal relationship with the D-Link Defendants sufficient to bind Broadcom to the District Court's judgment. Broadcom's corporate policy on litigation on behalf of its customers, its influence in Acer's discussions with Ericsson, and its collateral attacks on the Ericsson patents in ▇▇▇▇▇▇ the PTO contemporaneously with the D-Link Lawsuit demonstrate the nature of their relationship and actions thereon. Each of these attacks is based on the same BCM4313 and BCM4321 chips and the same patent claims. Rather than intervene in the D-Link Lawsuit like Intel, Broadcom launched collateral attacks ▇▇▇▇▇▇ ▇▇▇▇▇ Broadcom has yet to deny the existence of these contracts – further supporting this collusive attempt to undermine the award.

## II.    Discovery Request Should Be Granted in the Interest of Justice

The Board may grant additional discovery when it is "necessary in the interest of justice." *See* 37 C.F.R. § 42.51(b)(2).   Five factors control this standard. *See Garmin Int'l, Inc. v. Cuozzo Speed Tech., LLC*, IPR2012-00001, Notice 20 (2013). Given the length restrictions, Ericsson will concentrate on two factors, as the remaining factors can be proven by the Requests on their face.[5]

---

[5] Ericsson is not seeking Broadcom's litigation position, and the Requests' instructions are clear and concise.  Further, each of Ericsson's requests is sensible and

IPR2013-00602
Patent 6,466,568

A. <u>Useful information will be uncovered with additional discovery.</u>

Ericsson is already "in possession of a threshold amount of evidence or reasoning tending to show beyond speculation that something useful will be uncovered." *Garmin, supra,* at 7. "'Useful' means favorable in substantive value to a contention of the party moving for discovery." *Id.* Ericsson has come forward with considerable direct and circumstantial evidence that Broadcom colluded with the Defendants because of its indemnity obligations. (Exs. 2005, 2007, 2008, 2009, 2016). Ericsson has further evidence of the existence of the nature of this relationship but cannot submit this evidence because of confidentiality provisions that Broadcom and others refuse to waive.  (Ex. 2012). Broadcom does not deny the existence of such indemnity agreements. *Id.* If produced, these contracts will be useful to reveal the full scope of these substantive legal relationships and Broadcom's participation in the D-Link Lawsuit so that the Board can sufficiently rule on Broadcom's standing.

B. <u>Equivalent information is not obtainable by any other means.</u>

Ericsson has actively pursued discovery from Broadcom and the defendants. First, Ericsson made limited requests from Broadcom related to the contractual relationships. (Ex. 2011). Broadcom did not, and still does not, deny the existence of the contracts, but instead relies on their confidentiality to avoid a 315(b) analysis. (Ex. 2012). Second, Ericsson asked the defendants to permit its IPR counsel to review any contracts relating to the "BCM4312 and BCM4321" chips without being subject

---

reasonably tailored to its genuine need to determine the relationship between Broadcom and the D-Link Defendants.  Finally, the requests will not require a significant expenditure of human or financial resources, as they primarily relate to specific contracts and communications. *Garmin supra,* at 6-7.

to the "Prosecution Bar" in the Protective Order. (Ex. 2011). Broadcom's customers refused to waive that provision without Broadcom's consent. (Ex. 2013, 2014). Once again, Broadcom stonewalled Ericsson by hiding behind the protective order.[6]

Here, the parties to the relevant contracts and communications possess this evidence and it is amenable to concealment because all actions by the parties are taken behind closed doors, apparently locked by Confidentiality Agreements. Considering the nature and effect of this information, Ericsson has made all possible attempts to obtain it by other means. *Garmin*, *supra*, at 6. Thus, Ericsson has satisfied each factor; its limited requests should be granted in the interests of justice.

## C. Conclusion

If the Board denies Ericsson's request, it is difficult to conceive of a case in which discovery into standing will be permitted, despite the TPG's indication to the contrary. Patent owners will rarely if ever be in possession of indemnity agreements and, if they are, they will be unable to rely upon them because of a protection order. This will promote collusion among parties and thereby undermine the policy behind §315(b) that encourages litigates to bring their validity challenges to the Board in a timely manner. Without an order from the Board, this evidence will seldom be obtainable by any patent owner. Thus, as the PTO has declared, patent owners require the use of additional discovery; otherwise, § 315(b) will essentially be eviscerated.

---

[6] Ericsson has concurrently filed an Emergency Motion for Relief from the Protective Order in the district court. (*See* Ex. 2015). To the extent the Board is inclined to deny Ericsson's motion as "speculative" in the absence of the underlying indemnity agreements, despite the circumstantial evidence, Ericsson requests that the Board hold the present motion in abeyance until the district rules on Ericsson' motion.

8

**A0075**

IPR2013-00602
Patent 6,466,568

Dated: December 11, 2013.

/Peter J. Ayers/

PETER AYERS
Lee & Hayes, PLLC
13809 Research Blvd., Suite 405
Austin, TX 78750
Telephone: 512.505.8162
Fax: 509.944.4693
Attorney for Patent Owner Telefinakteibolaget
    LM Ericsson

9

**A0076**

IPR2013-00602
Patent 6,466,568

CERTIFICATE OF SERVICE

The undersigned certifies that on December 11, 2013 the foregoing PATENT

OWNER'S MOTION FOR ADDITIONAL DISCOVERY UNDER 37 C.F.R. §

42.51(b) was served on Lead and Back-up Counsel for Broadcom Corporation by

sending the same via Federal Express to the service address provided in Broadcom's

Mandatory Notices:

> Dominic E. Massa, Lead Counsel
> Michael A. Diener, Back-up Counsel
> Wilmer Cutler Pickering Hale and Dorr, LLP
> 60 State Street
> Boston, MA 02109

LEE & HAYES PLLC

    /Peter J. Ayers/
Peter J. Ayers, Reg. No. 38,374

10

**A0077**

UNITED STATES PATENT AND TRADEMARK OFFICE

---

BEFORE THE PATENT TRIAL AND APPEAL BOARD

---

BROADCOM CORPORATION

Petitioner

v.

TELEFONAKTIEBOLAGET L.M. ERICSSON

Patent Owner

---

Case IPR2013-00602
U.S. Patent No. 6,466,568

---

**PETITIONER'S OPPOSITION TO PATENT OWNER'S MOTION FOR ADDITIONAL DISCOVERY UNDER 37 C.F.R. § 42.51(b)**

ActiveUS 119713178v.1

**A0078**

Ericsson's ("Ericsson") Motion for Additional Discovery from Broadcom Corporation ("Broadcom") (the "Motion") should be denied because Broadcom is not in privity with the Texas Defendants[1] and because Ericsson has not demonstrated that its requested additional discovery is "necessary in the interest of justice." 35 U.S.C. § 316(a)(5); 37 C.F.R. § 42.51(b)(2)(i).

Discovery in *inter partes* review ("IPR") is "less than what is normally available in district court patent litigation" because "Congress intended *inter partes* review to be a quick and cost effective alternative to litigation." IPR2013-00080, Paper 18 at 3. The Board must therefore be "conservative in authorizing additional discovery." *Id.* Additional discovery–like that requested in Ericsson's Motion– should only be permitted where such discovery is "necessary in the interest of justice." *Id*., at 4. And the requested discovery must be more than a speculation or "mere possibility." *Id.* There must be "factual evidence or support" underlying a request for additional discovery that demonstrate that "something useful [to the proceeding] will be found." *Id*. Ericsson, despite all its colorful rhetoric about Broadcom's "covert efforts" (Mot. at 2), and "attacks" on Ericsson and its patents (*id.* at 2), has failed entirely to satisfy this standard.

---

[1] The "Texas Defendants" are the defendants in *Ericsson Inc. v. D-Link Corp. et al.*, Civil Action No. 10-cv-473 (E.D. Tex.) ("Texas Litigation"), namely D-Link Corp., D-Link Systems, Inc., Netgear, Inc., Acer Inc., Acer America Corp., Gateway Inc., Dell, Inc., Toshiba Corp., Toshiba America, Inc., Toshiba America Information Systems, Inc., Toshiba America Consumer Products, LLC, and Belkin International, Inc. Broadcom is not a defendant.

1

ActiveUS 119713178v.1

Indeed, Ericsson's Motion, which by Ericsson's own admission is premised on "circumstantial evidence," (Mot. at 8, n.6) is precisely the type of "fishing expedition" the Board cautioned against during the December 6, 2013 conference call allowing Ericsson's Motion. In its Order Authorizing Motion for Additional Discovery, the Board required that Ericsson explain specifically why the discovery sought was "relevant to determining whether any of the [Texas Defendants] are real parties in interest or privies of Petitioner." *Id.* at 3. Ericsson failed to make such a showing. And any effort to do so is futile, because Broadcom is not in privity with the Texas Defendants, and no amount of discovery in this proceeding or in the Texas Litigation will prove otherwise.

Ericsson also unreasonably delayed in raising this issue with Broadcom and the Board. Ericsson has been aware of the facts upon which its Motion is based since Broadcom filed its Petitions in September. But Ericsson waited until November 15, 2013 to first approach Broadcom regarding this issue. Ex. 2010. Ericsson then delayed further in approaching the Board, waiting until December 6, 2013 to seek permission to file this Motion. Ericsson's behavior suggests that it is more interested in engaging in irrelevant discovery to delay the Board's processes than the central issue for this IPR – the invalidity of Ericsson's patents.

## I.   Ericsson's Requested Discovery Is Futile

### A.   Broadcom Is Not in Privity with the Texas Defendants

2

ActiveUS 119713178v.1

**A0080**

Ericsson alleges that additional discovery is necessary to establish that Broadcom is in privity with one or more of the Texas Defendants and therefore barred under 35 U.S.C. § 315(b) from pursuing its IPR petitions. Motion at 3. Ericsson's "evidence" of such purported privity consists of vague and speculative allegations regarding potential indemnity provisions in product purchase agreements between Broadcom and at least one Texas Defendant. Motion at 4. But the existence of indemnity provisions alone is not, as Ericsson asserts, sufficient to establish privity. *See* IPR2013-00175, Paper 20 (July 23, 2013) ("indemnification is not one of the "substantive legal relationships" cited in *Taylor* [] as binding a person not a party to a lawsuit to a judgment in that suit."); *see also* IPR2013-00080, Paper 18 at 6 ("Indemnification is not one of the 'substantive legal relationships' cited in *Taylor* [] and is significantly different from those relationships, which involve successive property interest.")[2]

Whether privity exists focuses on "how courts generally have used the terms to 'describe relationships and considerations sufficient to justify applying conventional principles of estoppel and preclusion.'" IPR2013-000080, Paper 18 at 4. The Board must evaluate "whether a non-party may be recognized as a 'real

---

[2] In *Taylor v. Sturgell*, 553 U.S. 880 (2008), the Supreme Court held that "non-party preclusion may be justified based on a variety of "substantive legal relationship[s]" between the person to be bound and a party to the judgment. Qualifying relationships include, but are not limited to, preceding and succeeding owners of property, bailee and bailor, and assignee and assignor." *Id.* at 894.

3

*CONFIDENTIAL MATERIAL REDACTED*

party-in-interest' or 'privy'" and must do so "in a manner consistent with the flexible and equitable considerations established under federal caselaw." Fed. Reg. at 48759-60 (relevant factors for privity include whether the non-party funded or directed the proceedings or "exercised or could have exercised control over a party's participation in a proceeding.") Ultimately, the Board must determine whether the relationship between two parties is "sufficiently close that both should be bound by the trial outcome and related estoppels." 77 Fed. Reg. 48756, 48759.

Ericsson cannot offer evidence to the contrary. In addition to its assertions regarding Broadcom's purported indemnity obligations, Ericsson identifies Exhibits 2005, 2007, 2009 and 2016 as "evidence" in support of its Motion. (Mot.

4

ActiveUS 119713178v.1

*CONFIDENTIAL MATERIAL REDACTED*

at p. 7).[3] But Ericsson's allegations fail under even the most cursory review. For example, Exhibit 2005 is simply a general risk statement in Broadcom's SEC filings discussing the attendant risks for Broadcom of patent litigation brought against its customers. Ex. 2005 at p. 46. Exhibit 2007 is an email chain between Acer, Broadcom, Atheros, and Intel that merely states that Acer is going to discuss technical comments from Broadcom, one of its chipset suppliers, regarding Ericsson's infringement allegations. Ex. 2007 at p.1. Providing technical information to a customer does not establish "control" or "privity."

---

[3] Although Ericsson refers to an "Exhibit 2016", no such Exhibit exists.

[4] Ericsson argues that Exhibit 2008 shows a common interest privilege between Acer and Broadcom because certain documents produced in the Texas Litigation "were inadvertently produced during email discovery," thus proving that "a privilege exists that protects communications between Acer and Broadcom." Mot.

5

## II.    Ericsson's Additional Discovery Is Not "Necessary in the Interests of Justice"

The Board may grant additional discovery in IPRs only where such discovery is necessary "in the interests of justice."  37 C.F.R. § 42.51(b)(2).  The requested discovery must be "more than a possibility and mere allegation."  IPR2012-00001, Paper No. 26 at 6.  The Board has previously articulated five factors that are relevant to determining whether additional discovery is warranted in IPRs, only two of which are relevant to this Motion.  *Id.*, at 6.[5]  Ericsson's discovery requests fail under each of these two factors.

### 1.    Ericsson's Requested Discovery Will Not Yield "Useful Information"

To prevail in its request for additional discovery, Ericsson must demonstrate that it is "already be in possession of a threshold amount of evidence or reasoning tending to show beyond speculation that something useful will be uncovered."  *See Id.*, at 7.  "Useful" in this context means information that is not merely "relevant"

---

at p. 2.  Ericsson's assertion is without merit.  Existence of (or participation in) a joint defense group is not sufficient to establish privity.  C.F.R. 48760 (party not a "'real party-in-interest' or a 'privy'" based on participation in a Joint Defense Group; *Innovad Inc. v. Microsoft Corp.*, 260 F.3d 1326, 1334 (Fed. Cir. 2001)).

[5] Although Ericsson fails to address the burden associated with responding to its discovery requests or whether the requests seek Broadcom's litigation positions, these factors weigh against the discovery Ericsson seeks.  IPR2012-00001, Paper 26 at 6-7.  Ericsson's request for "communications between Broadcom (or its counsel) and any of the D-Link Defendants (or their counsel) regarding validity" of the patents at issue in the Texas litigation is overly broad, and further evidence that Ericsson's discovery requests are nothing more than a fishing expedition.

6

ActiveUS 119713178v.1

or "admissible" but that which is "favorable in substantive value to a contention of the party moving for discovery." *See id.*, at 7.

Ericsson cannot satisfy this heightened burden.  Ericsson asserts its requested additional discovery–which Ericsson concedes is premised on "circumstantial evidence" (Mot. at 8, n.6)–will establish that Broadcom is in privity with the Texas Defendants.  But Broadcom is not in privity with the Texas Defendants, and no amount of discovery by Ericsson will establish that it is.

### 2.     Ericsson Cannot Generate "Equivalent Information" Because No Such Information Exists

Ericsson complains that the Board must grant its request for "additional discovery" because it cannot "generate equivalent information by other means." Mot. at 7.  This argument fails for, at least, three reasons.  *First*, there is no "equivalent information" for Ericsson to generate because the information Ericsson seeks will not establish Broadcom is in privity with any of the Texas Defendants.

*Second*, according to Ericsson's own motion and its conduct in the Texas Litigation, Ericsson's additional discovery is not necessary because Ericsson has sought the same information through other means.  On December 6, 2013–two and a half months after Broadcom's IPR filing–Ericsson filed an "emergency" motion in the Texas Litigation seeking production for use in this IPR certain categories of documents that it also seeks through this Motion.  Ex. 1019.  In its Texas motion, Ericsson requested that the Court order production of such documents in sufficient

7

ActiveUS 119713178v.1

**A0085**

time for Ericsson to submit those document as part of the Patent Owner's

Statement.  *Id*. at p. 1.   Ericsson's motion in the Texas Litigation is fully briefed

and pending before the Texas Court.  Ex. 1020.[6]

*Finally*, Ericsson is incorrect that its additional discovery is warranted

because Broadcom has "stonewalled Ericsson by hiding behind the [Texas]

protective order" and by refusing to allow the Texas Defendants to produce

Ericsson's requested information.  *Id*. at 8.  Broadcom is not a party to the Texas

Litigation, and it does not control the conduct of the Texas Defendants.  Broadcom

therefore cannot require the Texas Defendants to waive the terms of a Protective

Order that Broadcom did not negotiate.  Ex. 2011 at p.1-2.

## III.   CONCLUSION

For the reasons stated above, Broadcom respectfully requests that Ericsson's

Motion be denied.

Dated: December 20, 2013.

Respectfully submitted,

/Dominic E. Massa/
Dominic E. Massa, Reg. No. 44,905
60 State St.
Boston, MA 02109

---

[6] The Board should reject Ericsson's request to "hold the present motion in abeyance until the district court rules on Ericsson's motion."  Mot. at 8, n.6  As set forth above, even if Ericsson obtains the documents in its Texas motion, such documents will not establish Broadcom is in privity with the Texas Defendants.

8

ActiveUS 119713178v.1

## **CERTIFICATE OF SERVICE**

I hereby certify that, on December 20, 2013, I caused a true and correct copy of the foregoing PETITIONER'S OPPOSITION TO PATENT OWNER'S MOTION FOR ADDITIONAL DISCOVERY UNDER 37 C.F.R. § 42.51(b) to be served via email on the attorneys identified in Ericsson's Updated Mandatory Notice (Paper 8), whom consented to electronic service:

| | |
|---|---|
| Lead Counsel: | Peter J. Ayers |
| Email Address: | peter@leehayes.com |
| Back-up Counsel: | J. Christopher Lynch |
| Email Address: | chris@leehayes.com |

/Dominic E. Massa/
Dominic E. Massa
Registration No. 44,905

9

**A0087**

UNITED STATES PATENT AND TRADEMARK OFFICE

BEFORE THE PATENT TRIAL AND APPEAL BOARD

BROADCOM CORPORATION

Petitioner

v.

TELEFONAKTIEBOLAGET L.M. ERICSSON

Patent Owner

Case IPR2013-00602
U.S. Patent No. 6,466,568

**PETITIONER'S OPPOSITION TO PATENT OWNER'S MOTION FOR
ADDITIONAL DISCOVERY UNDER 37 C.F.R. § 42.51(b)**

ActiveUS 119713178v.1

Ericsson's ("Ericsson") Motion for Additional Discovery from Broadcom Corporation ("Broadcom") (the "Motion") should be denied because Broadcom is not in privity with the Texas Defendants[1] and because Ericsson has not demonstrated that its requested additional discovery is "necessary in the interest of justice." 35 U.S.C. § 316(a)(5); 37 C.F.R. § 42.51(b)(2)(i).

Discovery in *inter partes* review ("IPR") is "less than what is normally available in district court patent litigation" because "Congress intended *inter partes* review to be a quick and cost effective alternative to litigation." IPR2013-00080, Paper 18 at 3. The Board must therefore be "conservative in authorizing additional discovery." *Id.* Additional discovery–like that requested in Ericsson's Motion– should only be permitted where such discovery is "necessary in the interest of justice." *Id.*, at 4. And the requested discovery must be more than a speculation or "mere possibility." *Id.* There must be "factual evidence or support" underlying a request for additional discovery that demonstrate that "something useful [to the proceeding] will be found." *Id.* Ericsson, despite all its colorful rhetoric about Broadcom's "covert efforts" (Mot. at 2), and "attacks" on Ericsson and its patents (*id.* at 2), has failed entirely to satisfy this standard.

---

[1] The "Texas Defendants" are the defendants in *Ericsson Inc. v. D-Link Corp. et al.*, Civil Action No. 10-cv-473 (E.D. Tex.) ("Texas Litigation"), namely D-Link Corp., D-Link Systems, Inc., Netgear, Inc., Acer Inc., Acer America Corp., Gateway Inc., Dell, Inc., Toshiba Corp., Toshiba America, Inc., Toshiba America Information Systems, Inc., Toshiba America Consumer Products, LLC, and Belkin International, Inc. Broadcom is not a defendant.

1

Indeed, Ericsson's Motion, which by Ericsson's own admission is premised on "circumstantial evidence," (Mot. at 8, n.6) is precisely the type of "fishing expedition" the Board cautioned against during the December 6, 2013 conference call allowing Ericsson's Motion. In its Order Authorizing Motion for Additional Discovery, the Board required that Ericsson explain specifically why the discovery sought was "relevant to determining whether any of the [Texas Defendants] are real parties in interest or privies of Petitioner." *Id.* at 3. Ericsson failed to make such a showing. And any effort to do so is futile, because Broadcom is not in privity with the Texas Defendants, and no amount of discovery in this proceeding or in the Texas Litigation will prove otherwise.

Ericsson also unreasonably delayed in raising this issue with Broadcom and the Board. Ericsson has been aware of the facts upon which its Motion is based since Broadcom filed its Petitions in September. But Ericsson waited until November 15, 2013 to first approach Broadcom regarding this issue. Ex. 2010. Ericsson then delayed further in approaching the Board, waiting until December 6, 2013 to seek permission to file this Motion. Ericsson's behavior suggests that it is more interested in engaging in irrelevant discovery to delay the Board's processes than the central issue for this IPR – the invalidity of Ericsson's patents.

## I.     Ericsson's Requested Discovery Is Futile

### A.     Broadcom Is Not in Privity with the Texas Defendants

2

ActiveUS 119713178v.1

**A0090**

Ericsson alleges that additional discovery is necessary to establish that Broadcom is in privity with one or more of the Texas Defendants and therefore barred under 35 U.S.C. § 315(b) from pursuing its IPR petitions.  Motion at 3. Ericsson's "evidence" of such purported privity consists of vague and speculative allegations regarding potential indemnity provisions in product purchase agreements between Broadcom and at least one Texas Defendant.  Motion at 4. But the existence of indemnity provisions alone is not, as Ericsson asserts, sufficient to establish privity.  *See* IPR2013-00175, Paper 20 (July 23, 2013) ("indemnification is not one of the "substantive legal relationships" cited in *Taylor* [] as binding a person not a party to a lawsuit to a judgment in that suit."); *see also* IPR2013-00080, Paper 18 at 6 ("Indemnification is not one of the 'substantive legal relationships' cited in *Taylor* [] and is significantly different from those relationships, which involve successive property interest.")[2]

Whether privity exists focuses on "how courts generally have used the terms to 'describe relationships and considerations sufficient to justify applying conventional principles of estoppel and preclusion.'"  IPR2013-000080, Paper 18 at 4.  The Board must evaluate "whether a non-party may be recognized as a 'real

---

[2] In *Taylor v. Sturgell*, 553 U.S. 880 (2008), the Supreme Court held that "non-party preclusion may be justified based on a variety of "substantive legal relationship[s]" between the person to be bound and a party to the judgment. Qualifying relationships include, but are not limited to, preceding and succeeding owners of property, bailee and bailor, and assignee and assignor." *Id.* at 894.

3

This page contains confidential information.


Please refer to A0082, which contains the redacted, public version of this page.

This page contains confidential information.


Please refer to A0083, which contains the redacted, public version of this page.

## II.   Ericsson's Additional Discovery Is Not "Necessary in the Interests of Justice"

The Board may grant additional discovery in IPRs only where such discovery is necessary "in the interests of justice."  37 C.F.R. § 42.51(b)(2).  The requested discovery must be "more than a possibility and mere allegation." IPR2012-00001, Paper No. 26 at 6.  The Board has previously articulated five factors that are relevant to determining whether additional discovery is warranted in IPRs, only two of which are relevant to this Motion.  *Id.*, at 6.[5]  Ericsson's discovery requests fail under each of these two factors.

### 1.   Ericsson's Requested Discovery Will Not Yield "Useful Information"

To prevail in its request for additional discovery, Ericsson must demonstrate that it is "already be in possession of a threshold amount of evidence or reasoning tending to show beyond speculation that something useful will be uncovered."  *See Id.*, at 7.  "Useful" in this context means information that is not merely "relevant"

---

at p. 2.  Ericsson's assertion is without merit.  Existence of (or participation in) a joint defense group is not sufficient to establish privity.  C.F.R. 48760 (party not a "'real party-in-interest' or a 'privy'" based on participation in a Joint Defense Group; *Innovad Inc. v. Microsoft Corp.*, 260 F.3d 1326, 1334 (Fed. Cir. 2001)).
[5] Although Ericsson fails to address the burden associated with responding to its discovery requests or whether the requests seek Broadcom's litigation positions, these factors weigh against the discovery Ericsson seeks.  IPR2012-00001, Paper 26 at 6-7.  Ericsson's request for "communications between Broadcom (or its counsel) and any of the D-Link Defendants (or their counsel) regarding validity" of the patents at issue in the Texas litigation is overly broad, and further evidence that Ericsson's discovery requests are nothing more than a fishing expedition.

6

ActiveUS 119713178v.1

**A0094**

or "admissible" but that which is "favorable in substantive value to a contention of the party moving for discovery." *See id.*, at 7.

Ericsson cannot satisfy this heightened burden. Ericsson asserts its requested additional discovery–which Ericsson concedes is premised on "circumstantial evidence" (Mot. at 8, n.6)–will establish that Broadcom is in privity with the Texas Defendants. But Broadcom is not in privity with the Texas Defendants, and no amount of discovery by Ericsson will establish that it is.

### 2.    Ericsson Cannot Generate "Equivalent Information" Because No Such Information Exists

Ericsson complains that the Board must grant its request for "additional discovery" because it cannot "generate equivalent information by other means." Mot. at 7. This argument fails for, at least, three reasons. *First*, there is no "equivalent information" for Ericsson to generate because the information Ericsson seeks will not establish Broadcom is in privity with any of the Texas Defendants.

*Second*, according to Ericsson's own motion and its conduct in the Texas Litigation, Ericsson's additional discovery is not necessary because Ericsson has sought the same information through other means. On December 6, 2013–two and a half months after Broadcom's IPR filing–Ericsson filed an "emergency" motion in the Texas Litigation seeking production for use in this IPR certain categories of documents that it also seeks through this Motion. Ex. 1019. In its Texas motion, Ericsson requested that the Court order production of such documents in sufficient

7

ActiveUS 119713178v.1

time for Ericsson to submit those document as part of the Patent Owner's

Statement. *Id*. at p. 1.   Ericsson's motion in the Texas Litigation is fully briefed

and pending before the Texas Court. Ex. 1020.[6]

*Finally*, Ericsson is incorrect that its additional discovery is warranted

because Broadcom has "stonewalled Ericsson by hiding behind the [Texas]

protective order" and by refusing to allow the Texas Defendants to produce

Ericsson's requested information. *Id*. at 8.  Broadcom is not a party to the Texas

Litigation, and it does not control the conduct of the Texas Defendants.  Broadcom

therefore cannot require the Texas Defendants to waive the terms of a Protective

Order that Broadcom did not negotiate. Ex. 2011 at p.1-2.

## III.   CONCLUSION

For the reasons stated above, Broadcom respectfully requests that Ericsson's

Motion be denied.

Dated: December 20, 2013.

Respectfully submitted,

/Dominic E. Massa/
Dominic E. Massa, Reg. No. 44,905
60 State St.
Boston, MA 02109

---

[6] The Board should reject Ericsson's request to "hold the present motion in abeyance until the district court rules on Ericsson's motion."  Mot. at 8, n.6  As set forth above, even if Ericsson obtains the documents in its Texas motion, such documents will not establish Broadcom is in privity with the Texas Defendants.

8

ActiveUS 119713178v.1

## **CERTIFICATE OF SERVICE**

I hereby certify that, on December 20, 2013, I caused a true and correct copy of the foregoing PETITIONER'S OPPOSITION TO PATENT OWNER'S MOTION FOR ADDITIONAL DISCOVERY UNDER 37 C.F.R. § 42.51(b) to be served via email on the attorneys identified in Ericsson's Updated Mandatory Notice (Paper 8), whom consented to electronic service:

| | |
|---|---|
| Lead Counsel: | Peter J. Ayers |
| Email Address: | peter@leehayes.com |
| Back-up Counsel: | J. Christopher Lynch |
| Email Address: | chris@leehayes.com |

/Dominic E. Massa/
Dominic E. Massa
Registration No. 44,905

9

ActiveUS 119713178v.1

**A0097**

Trials@uspto.gov                                         Paper: 21
Tel: 571-272-7822                                Entered: Jan 24, 2014

UNITED STATES PATENT AND TRADEMARK OFFICE

_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD

_____

BROADCOM CORPORATION
Petitioner

v.

TELEFONAKTIEBOLAGET LM ERICSSON (PUBL)
Patent Owner

_____

Cases IPR2013-00601(Patent 6,772,215 B1)
IPR2013-00602 (Patent 6,446,568 B1)
IPR2013-00636 (6,424,625 B1)[1]

_____

Before KARL D. EASTHOM, KALYAN K. DESHPANDE, and
MATTHEW R. CLEMENTS, *Administrative Patent Judges.*

EASHTOM, *Administrative Patent Judge.*

DECISION
Ericsson's Motion for Additional Discovery
*37 C.F.R. § 42.51(b)(2)*

_____

[1] The Board exercises its discretion to issue one Order to be filed in each
case. The parties are not authorized to use this heading style.

**A0098**

IPR2013-00601; IPR2013-00602; IPR2013-00636
Patents 6,772,215 B1; 6,446,568 B1; 6,424,625 B1

*Introduction*

Patent Owner ("Ericsson") filed a redacted motion for additional discovery in the instant proceedings (Paper 13, "Mot." or "Motion"), and Petitioner ("Broadcom") filed a redacted opposition (Paper 16 "Opp." or "Opposition").[2]  In its Motion, Ericsson requests discovery regarding indemnity agreements, defense agreements, payments, and email, or other communications, between Broadcom and defendants ("D-Link Defendants") in related litigation, *Ericsson Inc., et al. v. D-LINK Corp., et al.*, Civil Action No. 6:10-CV-473 (LED/KGF) ("Texas Litigation").  *See* Mot.; Ex. 2001 ("Patent Owner's Requests for Production," hereinafter "Request").

In the Texas Litigation, a jury found Ericsson's challenged patents in the instant proceedings infringed by the D-Link Defendants due partly to their use of Broadcom's Wi-Fi compliant products.  *See* Pet. 1–2.  Broadcom was not a party to the Texas Litigation.  *Id.* at 1.  According to Broadcom, the jury did not address the issue of validity with respect to the patents challenged in IPR2013-00601 and IPR2013-00602.  *See* IPR2013-00601, Paper 3, 2; IPR2013-00602, Paper 2, 1-2.   Ericsson maintains that the requested discovery will show that "Broadcom is in privity with at least one D-Link Defendant" in the Texas Litigation.  Mot. 4.

For the reasons stated below, Ericsson's motion is *denied*.

*35 U.S.C. § 315(b)*

Under 35 U.S.C. § 315(b) , "[a]n inter partes review may not be instituted if the petition requesting the proceeding is filed more than 1 year

---

[2] The parties also filed sealed redacted versions. *See* note 3.  Unless otherwise noted, reference throughout is to redacted papers filed in IPR2013-00636.  The same or similar papers are filed in the other two cases, IPR2013-00601 and IPR2013-00602.

2

**A0099**

IPR2013-00601; IPR2013-00602; IPR2013-00636
Patents 6,772,215 B1; 6,446,568 B1; 6,424,625 B1

after the date on which the petitioner, real party in interest, or privy of the petitioner is served with a complaint alleging infringement of the patent." Broadcom does not dispute that one or more of the D-Link Defendants were served with a complaint more than one year prior to the filing of the Petition. Therefore, if Ericsson can show privity existed between the D-Link Defendants and Broadcom in the Texas Litigation, an *inter partes* review may not be instituted under 35 U.S.C. § 315(b).  *See* Paper 9 (Order Authorizing Motion for Additional Discovery).

*Request*

Pursuant to its discovery Motion, Ericsson seeks the following discovery items:

1.  All executed contracts or agreements between Broadcom and any of the D-Link Defendants relating to Wi-Fi compliant products, such as the BCM4313 and BCM4321, that are used in any of the D-Link Defendants' products accused of infringement in the D-Link Litigation.

2. All executed contracts or agreements between Broadcom and any of the D-Link Defendants that include any indemnity or duty to defend provisions.

3.  All joint defense agreements, or other agreements addressing cooperation on the defense of the D-Link Litigation, between Broadcom and any of the D-Link Defendants relating to the D-Link Litigation.

4.  All invoices provided to or received from any of the D-Link Defendants, or their counsel, seeking reimbursement for any fees or expenses incurred in the D-Link Litigation.

5.  Records of any payments made by Broadcom to any of the D-Link Defendants, or their counsel, or to Ericsson, pursuant to any actual or alleged contractual duty to defend or

3

**A0100**

IPR2013-00601; IPR2013-00602; IPR2013-00636
Patents 6,772,215 B1; 6,446,568 B1; 6,424,625 B1

indemnify any [of] the D-Link Defendants for any fees or expenses incurred in the D-Link Litigation.

6.  All emails and written correspondence between any of the D-Link Defendants, or their counsel, and Broadcom, or its counsel, relating to any claimed duty of Broadcom to defend or indemnify any of the D-Link Defendants in the D-Link Litigation from January 1, 2010 to the present.

7.  All emails and written correspondence between Broadcom, or its counsel, and any of the D-Link Defendants, or their counsel, from January 1, 2010 to the present relating to:
A. The filing of IPR2013-00601, IPR2013-00602, and IPR2013-00636;
B. Intervention by Broadcom in the D-Link Litigation;
C. The claim construction or interpretation of any of the patents at issue in the D-Link Litigation, including, but not limited to, the '568 Patent, the '625 Patent, or the '215 Patent; and
D. The validity or alleged invalidity of any of the patents at issue in the D-Link Litigation, including, but not limit[ed] to, the '568 Patent, the '625 Patent, or the '215 Patent.

Ex. 2001.

*Analysis*

To show privity, Ericsson relies, *inter alia*, on known indemnity agreements, wherein Broadcom agreed to indemnify certain D-Link Defendants.  Ericsson also relies on allegations about litigation activity by Broadcom, filing of an amicus appeal brief by Broadcom in the Texas Litigation, SEC filings, communications with Acer, Inc., a D-Link Defendant, Broadcom's use of Ericsson's expert report in the filing of the Petition, timing of the filing of the IPRs, and email correspondence about indemnity and other matters.  *See* Mot. 1-7 (citing Ex. 1010; Exs. 2002-

4

**A0101**

IPR2013-00601; IPR2013-00602; IPR2013-00636
Patents 6,772,215 B1; 6,446,568 B1; 6,424,625 B1

2017).[3]  For its part, Broadcom asserts that "Broadcom is not in privity with the Texas Defendants, and no amount of discovery in this proceeding or in the Texas Litigation will prove otherwise."  Opp. 2.

Pursuant to the America Invents Act (AIA), certain discovery is available in *inter partes* review proceedings.  *See* 35 U.S.C. § 316(a)(5); 37 C.F.R. §§ 42.51-53.  Discovery in an *inter partes* review proceeding, however, is less than what is normally available in district court patent litigation, as Congress intended *inter partes* review to be a quick and cost effective alternative to litigation.  *See* H. Rep. No. 112-98 at 45-48 (2011).  A party seeking discovery beyond what is expressly permitted by rule must do so by motion, and "must show that such additional discovery is in the interests of justice."  37 C.F.R. § 42.51(b)(2)(i); *accord* 35 U.S.C. § 316(a)(5) ("such discovery shall be limited to . . . what is otherwise necessary in the interest of justice").

The AIA legislative history makes clear that additional discovery

---

[3] As indicated above, note 2, in addition to the redacted papers, the parties filed un-redacted papers that remain under seal: Ericsson filed a protected motion, Paper 11, with protected exhibits that remain under seal.  Similarly, Broadcom filed a protected opposition, Paper 16, and a protected exhibit, Ex. 1017, that remain under seal.  (Broadcom should clarify if Exhibit 1018 is to be placed under seal. It appears, based on the face of the document and related characterizations, that it contains confidential information.  It is under seal at PTAB at this time.)  After review of the un-redacted materials, the Board determines that they do not alter the outcome.  In this Motion Decision, Broadcom's sealed opposition and exhibits are not addressed further, because they do not impact Ericsson's initial burden of showing that the requested discovery is necessary in the interests of justice.  Ericsson's sealed motion, Paper 11, additionally shows confidential litigation activity by Broadcom that fails to imply or show control by Broadcom over the Texas Litigation.

5

**A0102**

IPR2013-00601; IPR2013-00602; IPR2013-00636
Patents 6,772,215 B1; 6,446,568 B1; 6,424,625 B1

should be confined to "particular limited situations, such as minor discovery that PTO finds to be routinely useful, or to discovery that is justified by the special circumstances of the case." 154 Cong. Rec. S9988-89 (daily ed. Sept. 27, 2008) (statement of Sen. Kyl). In light of this, and given the statutory deadlines required by Congress for *inter partes* review proceedings, the Board must be conservative in authorizing additional discovery. *See id.*

An important factor in determining whether additional discovery is in the interests of justice is whether there exists more than a "mere possibility" or "mere allegation that something useful [to the proceeding] will be found." *Garmin International, Inc. et al. v. Cuozzo Speed Technologies LLC*, IPR2012-00001, Paper 20, 2–3, "Order—Authorizing Motion for Additional Discovery" (listing important factors to determine whether a discovery request meets the applicable standard) (hereinafter the "Garmin factors"); *accord Apple v. Achates Reference Publishing, Inc*., IPR2013-00080, Paper 18, "Decision—Achates Motion for Additional Discovery" (applying the Garmin factors to indemnity agreements). The party seeking discovery must come forward with some factual evidence or support for its request. *See* IPR2012-00001, Paper 26 (decision addressing the Garmin discovery factors).

Whether a non-party is a "real party-in-interest" or "privy" for purposes of an *inter partes* review proceeding is a "highly fact-dependent question" that takes into account how courts generally have used the terms to "describe relationships and considerations sufficient to justify applying conventional principles of estoppel and preclusion." *Office Patent Trial Practice Guide*, 77 Fed. Reg. 48,756, 48,759 (Aug. 14, 2012) ("Trial

6

**A0103**

IPR2013-00601; IPR2013-00602; IPR2013-00636
Patents 6,772,215 B1; 6,446,568 B1; 6,424,625 B1

Practice Guide" or "TPG").  Whether parties are in privity, for instance, depends on whether the relationship between a party and its alleged privy is "sufficiently close such that both should be bound by the trial outcome and related estoppels."  *Id.*  Depending on the circumstances, a number of factors may be relevant to the analysis, including whether the non-party "exercised or could have exercised control over a party's participation in a proceeding," and whether the non-party is responsible for funding and directing the proceeding.  *Id.* at 48,759-60.

Ericsson's evidence does not amount to more than a "mere allegation that something useful will be found" to show privity, as is required by the first Garmin factor.  To show privity requires a showing that Broadcom would be bound to the outcome of the Texas Litigation.  To be bound, in normal situations, Broadcom must have had control over the Texas Litigation.  According to long-standing precedent, *Bros, Inc. v. W.E. Grace Mfg. Co.*, 261 F.2d 428, 429 (5th Cir. 1958), when a patent holder sues a dealer, seller, or distributer of an accused product, as is the case at hand, indemnity payments and minor participation in a trial are not sufficient to establish privity between the non-party manufacturer of the accused device and the defendant parties:

> While the mere payment of counsel fees or participation in a trial by one not a named party to it would not alone be sufficient, *cf. I.T.S. Rubber Co. v. Essex Co.*, [] 272 U.S. 429 [(1926)]. . . Restatement, Judgment § 84, comment e (1942), the extent and nature of that participation may completely alter the consequences.  This is particularly so in patent infringement cases in which, from tactical or strategic considerations relating to venue, desirability of a particular forum and the like, such cases are so often filed and tried against a dealer, a seller, a distributor, or a user of the accused device manufactured by

7

**A0104**

IPR2013-00601; IPR2013-00602; IPR2013-00636
Patents 6,772,215 B1; 6,446,568 B1; 6,424,625 B1

> another.  If the manufacturer stands aloof, he risks a judgment adverse to his interest resulting perhaps from inadequate or incompetent defense by one who has a secondary interest.  *Such judgment, to be sure, would normall[y] not be binding by estoppel or res judicata,* but it would take its place in the jurisprudence where its practical effect as stare decisis might be as decisive.  The alternative, of course, is to jump in and give the case full and active defense as though the manufacturer were the real named party.  This assures that the issues will be presented and contested in a way deemed most effective by the nominally remote, but practically immediate, party at interest.

261 F.2d at 429 (emphases added); cited with approval by *Emerson Elec. Co. v. Black and Decker Mfg. Co.*, 606 F.2d 234, 242, n. 20 (8th Cir. 1979) ("If Emerson does control the Maryland suit, the outcome will be binding on, or inure to the benefit of, Emerson under principles of res judicata."); *see also United States v. Webber,* 396 F.2d 381, 387 (3d Cir.1968) (finding that appellants were "privies" because of their "control over and interest in the earlier litigation.")

*Bros, Inc.* relies on a long line of precedent to support the normal rule that privity requires a finding of active control of the trial:

> Where that course is followed and the non-party actively and avowedly conducts the defense, manages and directs the progress of the trial at its expense and under its supervision, the outcome, which if favorable would have redounded to his benefit, if adverse becomes sauce for goose and gander alike, and binding under principles of res judicata. *Minneapolis-Honeywell Regulator Co. v. Thermoco, Inc.*, 116 F.2d 845 (2d Cir. 1941); *Nash Motors Co. v. Swan Carburetor Co.*, 105 F.2d 305 (4th Cir. 1939); *Warford Corp. v. Bryan Screw Machine Products Co.*, 44 F.2d 713 (6th Cir. 1930); *N. O. Nelson Manufacturing Co. v. F. E. Myers & Bro. Co.*, 25 F.2d 659 (6th Cir. 1928); *Beyer Co. v. Fleischmann Co.*, 15 F.2d 465 (6th Cir. 1926); Restatement, Judgments 84, comment b, illustration 5 (1942).

8

**A0105**

IPR2013-00601; IPR2013-00602; IPR2013-00636
Patents 6,772,215 B1; 6,446,568 B1; 6,424,625 B1

261 F.2d at 429 (citations reformatted).

Similarly, under *TRW Inc. V. Ellipse Corp.*, 495 F.2d 314, 318 (7th Cir. 1974), "the crucial distinction . . . is the extent of participation, for privity in the law of judicial finality usually connotes representation." In *Dentsply Intern., Inc. v. Kerr Mfg. Co.*, 42 F.Supp.2d 385 (D.Del. 1999), the court characterized *TRW* as requiring control of the trial to show privity:

> In *TRW*, the Court of Appeals for the Seventh Circuit refused to apply the doctrine of res judicata to TRW, a nonparty, who agreed to indemnify a named party in a prior suit, but whose role in the prior suit was limited to observing the proceedings and filing amicus curiae briefs. In reaching this conclusion, the court noted that *the crucial distinction* between *TRW* and other cases, in which nonparty indemnitors were found to have interests sufficiently close for establishing privity for res judicata purposes, was TRW's *limited extent of participation in the prior lawsuit*. Indeed, *the court explicitly distinguished* TRW*'s situation from the situation in which a nonparty indemnitor retained the indemnitee-defendant's counsel and controlled the litigation.*

*Dentsply*, 42 F.Supp.2d at 398 (emphasis added).

Contrary to Ericsson's assertion that "[t]he weight of authority strongly supports that an indemnity agreement . . . establish[es] privity," Mot. 6, *Bros. Inc, TRW*, *Dentsplay* and other cases noted *supra* illustrate that more is required. Control of the litigation, or some sort of representation, constitutes a "crucial" factor. *Dentsply*, 42 F.Supp.2d at 398.

Ericsson relies, *inter alia*, on *Jennings v. U.S.*, 374 F.2d 983, 985 (4th Cir. 1967) for the following proposition: "where an indemnitor is notified and can take part in – indeed may control – the litigation, he is precluded from contesting the indemnitee's liability in the subsequent indemnity action." Mot. 5. Ericsson does not explain how this *dicta* in *Jennings*

9

**A0106**

IPR2013-00601; IPR2013-00602; IPR2013-00636
Patents 6,772,215 B1; 6,446,568 B1; 6,424,625 B1

applies to the situation at hand or otherwise supports a departure from the long-standing rule that includes control or representation as a crucial factor that may bind a non-party to a trial outcome.

For example, in *Dentsplay*, the court found that "even if Centrix was ultimately relieved of its legal duty to defend and indemnify Kerr, as a factual matter, Centrix did defend Kerr for approximately two years, in a manner which was consistent with various terms of the agreement." 42 FSupp. 2d at 396, n. 4. Certain indemnity agreements involved in *Dentsply* corroborated control of the litigation, and the court found *extensive participation in the litigation* by indemnitor Centrix. *See id*. at 397-399. "Because of the contractual relationship between Centrix and Kerr, Centrix's extensive participation in the litigation and Centrix's knowledge of the injunction, the Court concludes that privity exists between Kerr and Centrix." *Id*. at 399.

Nevertheless, Ericsson seeks to discover indemnity agreements and asserts that certain SEC filings show that "it is not uncommon for Broadcom" to indemnify its customers. Mot. 1 (citing Ex. 2005, 46). Ericsson also asserts that "Broadcom does not deny the existence of such indemnity agreements." Mot. 7. Ericsson attaches an order from the Texas Litigation, Ex. 2016, in which the district court mentions two indemnity agreements and an e-mail communication about indemnity.[4]

---

[4] In the order, the court denied Ericsson's motion to release discovery of those items, partially because it was under a protective order there, and granting the motion would undermine the negotiations which produced the protective order and discovery items. *See* Ex. 2016, 3. The court noted that granting Ericsson's motion would allow Ericsson to employ the district

10

**A0107**

IPR2013-00601; IPR2013-00602; IPR2013-00636
Patents 6,772,215 B1; 6,446,568 B1; 6,424,625 B1

Ericsson also attaches evidence of other litigation activity by Broadcom (which remains under a protective order in this proceeding), Ex. 2009, and attaches a "Motion of Amici Wi-Fi Chip Companies Broadcom Corporation . . . for Leave to File Amicus Brief" in the Court of Appeals for the Federal Circuit," Ex. 2017, as further evidence of collusion, litigation activity, or control by Broadcom.

The totality of this evidence fails to amount to more than a "mere possibility" that Broadcom controlled, or could have controlled, the Texas Litigation. Paying for trial expenses pursuant to indemnity normally does not establish privity or control. Therefore, the sought-after indemnity agreements, and the requested discovery items seeking evidence of payment pursuant to indemnity or other agreements, fail to amount to more than a "mere allegation that something useful will be found" to establish privity. *See* Ex. 2001 (discovery items 1–6, also listed *supra*).

Similarly, although filing an amicus brief shows interest in the outcome, it only shows some potential future control as a non-party over the appeal of an issue of damages. *See* Ex. 2017, 2 (motion by Broadcom to file amicus brief to address royalties and noting that the "award may also provoke indemnity issues"). Filing an amicus brief on appeal does not bind Broadcom to the trial below outcome or show that Broadcom exercised control over that outcome. *See Dentsplay*, 42 F.Supp.2d at 398 (quoted *supra*, discussing *TRW*—agreeing to indemnify a named party, but having a role limited to observing the proceedings and filing amicus curiae briefs, is insufficient to show privity). The other litigation activity by Broadcom in

---

court's broader "relevancy" standard and circumvent the PTO's narrower standard. *Id*.

11

**A0108**

IPR2013-00601; IPR2013-00602; IPR2013-00636
Patents 6,772,215 B1; 6,446,568 B1; 6,424,625 B1

another forum, Ex. 2009 (under seal), appears to have occurred during the Texas Litigation, prior to the court's entry of judgment. Nonetheless, it does not show control of the Texas Litigation or otherwise show that Broadcom would be bound by that outcome.

Ericsson also requests discovery of "emails and written correspondence," Ex. 2001 (discovery requests 6, 7), between Broadcom and the D-Link defendants relating to "[i]ntervention by Broadcom in the D-Link Litigation," *id*. (request 7), relating to a duty to defend or indemnify, *id*. (request 6) and also "agreements addressing cooperation on the defense of the D-Link Litigation," *id*. (request 3). Other than indemnity agreements, Ericsson does not provide sufficient evidence, if any, that any such other agreements exist or were discussed.

Ericsson also does not explain how a discovery request regarding intervention would show privity on the part of non-party Broadcom. For its part, Broadcom asserts that "Ericsson chose, for its own strategic reasons, not to sue [Broadcom] in this case." Opp. 1. The evidence also indicates that Ericsson partially opposed another manufacturer's motion to intervene. *See* Ex. 2006, 1. As Broadcom points out, participation in joint defense groups, even if such a group exists, also fails to show privity. *See* Opp. 5–6, n. 4; TPG 48,760 ("Joint Defense Group," by itself, insufficient to show privity).

Ericsson also asserts that filing a request for IPR (*inter partes* review) and the other noted litigation activity, Ex. 2009, constitutes evidence of "Broadcom filing litigation on behalf of its customers pursuant to its indemnity obligation." *See* Mot. 1; Ex. 2001 (discovery request 7A, IPR filings). Ericsson's allegation amounts to conjecture because Ericsson does

12

**A0109**

IPR2013-00601; IPR2013-00602; IPR2013-00636
Patents 6,772,215 B1; 6,446,568 B1; 6,424,625 B1

not show how IPR filings and other filings were pursuant to indemnity agreements, and even if they were, the IPR filings fail to show control over the Texas Litigation.  The evidence does not amount to more than speculation that any of Broadcom's activity constitutes evidence of collusion with the D-Link defendants in the Texas Litigation in a manner that would bind Broadcom to the outcome thereof.

Ericsson also asserts that Broadcom's reliance, in its IPR filings, on "a majority of the same references that the defendants relied upon for their invalidity claims in the D-Link lawsuit" shows "coordination [that] raises serious questions about wither Broadcom is in privity with the defendants." Mot. 3.  Ericsson also asserts that the IPR filings rely heavily on Ericsson's expert report from the Texas Litigation.  *Id.*  Again, these allegations of "serious questions" amount to just that, questions or speculation about collusion or control.  Filing IPRs does not constitute evidence that shows control over prior litigation.  Broadcom, as a manufacturer of accused products, had an interest in the trial; however, using some of the same trial evidence, including known prior art, in the IPR proceedings, and using an expert report, does not constitute evidence beyond mere speculation that Broadcom controlled, or should be bound by the outcome of, the Texas Litigation.

Ericsson's assertion that D-Link Defendant Acer sought "to discuss comments from Acer's vendors," including Broadcom, also fails to show control.  *See* Mot. 2 (citing Ex. 2007).   Even if the record shows that Acer sought to discuss the accused products with Broadcom, the manufacturer of the products, this implies control by Acer, not Broadcom.  *See* Ex. 2007.  As Broadcom also points out, providing technical information to customers

13

**A0110**

IPR2013-00601; IPR2013-00602; IPR2013-00636
Patents 6,772,215 B1; 6,446,568 B1; 6,424,625 B1

does not establish control over the trial.  Opp. 5.

Ericsson also asserts that "Acer admitted" that some Texas Litigation discovery that Acer produced was "privileged" and shows that "a privilege exists that protects communications between Acer and Broadcom."  Mot. 2 (discussing Ex. 2008).  The relevance of this assertion is not clear.  The emails show that Acer's counsel relies on the "Protective Order[, which] mandates that designated information may only be used for purposes of litigation between the parties," and that "fact discovery and trial in the Ericsson v. D-Link case concluded long ago."  Ex. 2008 (email dated Dec. 4, 2013 11:44AM; *accord* email Dec. 5, 2013 1:46PM and other emails attached).  Acer's counsel also stated that "as far as we understand it, the IPR is a proceeding initiated by Broadcom to which our clients are not parties" and "[w]e do not believe our clients are under any obligation to respond to your request."  *Id.* (email dated Nov. 12, 2013 4:55 PM).  This email chain shows that Acer's counsel sought to abide by the trial court's protective order, and does not imply any control by Broadcom over Acer's actions in the Texas Litigation.

Ericsson's discovery request for correspondence between Broadcom and the D-Link Defendants regarding claim construction and invalidity positions "including, but not limited to, the '568 Patent, the '625 Patent, or the '215 Patent," Ex. 2001 (requests 7C, 7D), also amounts to a speculative request.  Ericsson does not point the Board to evidence that documents about some of these positions exist or that communication about them occurred.  Moreover, the request is overly broad because it is not limited to patents at issue here.  Ericsson fails to explain how discovering information about other patents bears on control over the Texas Litigation.

14

**A0111**

IPR2013-00601; IPR2013-00602; IPR2013-00636
Patents 6,772,215 B1; 6,446,568 B1; 6,424,625 B1

The request for "all executed contracts or agreements between Broadcom and any of the D-Link Defendants relating to Wi-Fi compliant products," Ex. 2001 (request 1), seeks discovery that broadly embraces Broadcom's commercial activity including, for example, contracts regarding the sale of such products. Ericsson fails to explain how such broad information "relating" to selling accused products shows that Broadcom was in privy with the D-Link Defendants. The breadth and cost of searching for all potential agreements, which may include sales or other agreements, weighs against Ericsson's request.

The evidence and arguments fail to show that the sought-after discovery would have more than a mere possibility of producing useful privity information, i.e., that Broadcom controlled or could have controlled the Texas Litigation. This Garmin factor weighs heavily against Ericsson. The privity precedent outlined *supra* shows that determining whether privity exists, especially without some evidence of actual control of a trial, typically spirals into what amounts to a separate trial that involves a myriad of considerations. This impacts the PTAB's mandate to expedite the proceedings and provide limited discovery in the interests of justice. In the attached order denying Ericsson's request, the court in the Texas Litigation noted that "*[a]ccording to Ericsson*, the Indemnity documents show Broadcom is in privity with Dell and Toshiba, *or at least show additional discovery is warranted on the issue.*" Ex. 2016, 2 (emphasis added). The AIA discovery procedures do not contemplate allowing discovery on the basis that it may show that "additional discovery is warranted."

The Board agrees with Ericsson that the requests are simple to understand, and that this Garmin factor weighs in Ericsson's favor. *See* Mot.

15

**A0112**

IPR2013-00601; IPR2013-00602; IPR2013-00636
Patents 6,772,215 B1; 6,446,568 B1; 6,424,625 B1

6–7, n. 5.  Nevertheless, that and other Garmin factors, including the ability to generate equivalent information, and seeking litigation positions by other means, do not outweigh the Garmin factor related to discovering useful information discussed above.

Other than the indemnity agreements, certain email correspondence, certain litigation activity, and other tangential items, Ericsson has not provided evidence to show that there is more than a mere possibility that the sought-after discovery even exists.  Ericsson has not shown that the sought-after discovery has more than a mere possibility of producing useful evidence on the crucial privity factor—control of the Texas Litigation by Broadcom in a sufficient manner to bind Broadcom through principles of res judicata or estoppel.  Notwithstanding that Ericsson argues that no other way exists to obtain the discovery because of the Protective Order, *see* Mot. 7-8 (citing Exs. 2011–2014), the Board cannot determine on this record, with more than conjecture, whether Ericsson otherwise would be able to obtain much of the sought-after discovery, because Ericsson has not shown beyond mere speculation that it exists.  For example, Ericsson has not shown that communication about any defense agreements, duty to defend agreements, agreements to intervene, invalidity positions, and claim interpretation, exist.

After weighing the factors surrounding the issue of privity as advanced by Ericsson, including the redacted information and arguments presented by Ericsson and Broadcom that remain under seal, the Board finds that Ericsson has not met its burden of demonstrating that additional discovery is in the interests of justice.

In consideration of the foregoing, it is hereby

ORDERED that Ericsson's motion for additional discovery is *denied*.

16

**A0113**

IPR2013-00601; IPR2013-00602; IPR2013-00636
Patents 6,772,215 B1; 6,446,568 B1; 6,424,625 B1

Petitioner:

Dominic Massa
Michael Diener
michael.diener@wilmerhale.com
Dominic.massa@wilmerhale.com
Michael.diener@wilmerhale.com

Patent Owner:

Peter J. Ayers
J. Christopher Lynch
Lee & Hayes PLLC
Peter@leehayes.com
chris@leehayes.com

17

**A0114**

Paper No. _____

Filed on behalf of:   Telefonaktiebolaget L. M. Ericsson

UNITED STATES PATENT AND TRADEMARK OFFICE

_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD

_____

BROADCOM CORPORATION

Petitioner

v.

TELEFONAKTIEBOLAGET L.M. ERICSSON

Patent Owner

_____

Case IPR2013-00602
U.S. Patent Nos. 6,466,568

_____

**PATENT OWNER'S REQUEST FOR REHEARING**

IPR2013-00602
Patent 6,466,568

# I.    Introduction

Pursuant to 37 C.F.R. § 42.71, Patent Owner Telefonaktiebolaget LM Ericsson ("Ericsson") respectfully requests that the Board reconsider its denial of Ericsson's Motion for Additional Discovery ("Decision") because Ericsson submits that the Board overlooked certain critical legal authorities bearing on the Motion.

# II.    Argument

## A. Standard of Review

The Board will review requests for rehearing for an abuse of discretion.  37 C.F.R. 42.71(d).  The Board will grant requests for rehearing where a decision rests on an erroneous application of the law.  *Schrader-Bridgeport Int'l, Inc. et al. v. Cont'l Automotive Sys. US, Inc.*, IPR2013-00014 Paper No. 15 at 3; *Star Fruits S.N.C. v. U.S.*, 393 F.3d 1277, 1281 (Fed. Cir. 2005).  Ericsson respectfully submits that the Board erred (a) in its holding that limitation of discovery holds a higher statutory priority than limitation of duplicative proceedings; and (b) in its holding that "Broadcom must have had control over the Texas Litigation" before 35 U.S.C. § 315(b) bar may be invoked, *See* Decision at 7.

B. The Board Overlooked that the Principal Purpose of the America Invents Act (AIA) is to Limit Multiple Proceedings, and that Limiting Discovery is a Subsidiary Purpose, and Erred by Elevating the Latter Over the Former.

A major goal of the AIA was "to limit unnecessary and counterproductive litigation costs." H. Rep. No. 112-98 at 40 (2011). The AIA limited litigation costs in two ways: (1) by enacting provisions intended to eliminate duplicative, wasteful and harassing proceedings; and (2) by limiting discovery costs.

The first goal of AIA, limiting and constraining repetitive litigation, was plainly a primary goal. Congress expressly condemned "repeated litigation and administrative attacks on the validity of a patent." H. Rep. No. 112-98 at 48. Toward that end, Congress enacted several measures so that AIA could not "be used as [a] tool[ ] for harassment" of patent owners. *Id.*

First, Congress expressly provided that the Board could *not take jurisdiction* of any *inter partes* review unless all real parties in interest were identified. *See* 35 U.S.C. § 312 ("A petition filed under section 311 may be considered *only if* . . . the petition identifies all real parties in interest") (emphasis added). The obvious purpose of this provision was to curtail the ability of related parties to use others as a shill for them while preserving the ability to repeat litigation in other fora. "Real parties in interest" is not a defined term, but Congress did not refer to a "privy", or to "control" anywhere in in Section 312.

Congress further provided in 35 U.S.C. § 315(a)(1) that "*inter partes* review may not be instituted if . . . the petitioner or any real party in interest filed a civil action challenging the validity of a claim of the patent." In addition, it provided for an *automatic* stay of the civil action in the event that the petitioner or real party in interest files a civil action challenging the validity of a claim of the patent. *Id.* at 315(a)(2). These clauses clearly preclude repetitive litigation.

Congress then barred institution of *inter partes* review for any "petitioner, real party in interest, or privy of the petitioner" if any are served with a complaint alleging infringement of the patent by the patent owner if the defendants were served more than one year before filing. *Id.* at 315(b). This clause furthers the statutory imperitive to prevent multiple actions. Congress also provided that multiple proceedings before the Board involving the same action may be consolidated. *Id.* at 315(d). Finally, Congress directed that any final written decision from the PTO shall bind the petitioner, real party in interest, and the privy of the petitioner and estop them from any subsequent attacks before the Office, any district court, or the International Trade Commission. *Id.* at 315(e). Thus, Congress enumerated *multiple* provisions to curb excessive litigation and repetitive attacks on patent owners.

The goal of limiting discovery was clearly a subsidiary method to control costs. Congress authorized discovery in one section, 35 U.S.C. § 316(5). Nevertheless, Congress permitted discovery as "necessary in the interest of justice." *Id.* Moreover,

REQUEST FOR REHEARING                    4                    IPR2013-00602

**A0118**

the PTO specifically stated that discovery can be utilized to resolve the primary goal of reducing repetitive litigation. *See* Changes to Implement Inter Partes Review Proceedings, Post-Grant Review Proceedings, and Transitional Program for Covered Business Method Patents, 77 Fed. Reg. 48680, 48689 (Aug. 14, 2012) ("additional discovery may be authorized where patent owner raises sufficient concerns regarding the petitioner's certification of standing.").

Ericsson respectfully submits that the Decision, which promoted the subsidiary goal – limitation of discovery costs – at the expense of the primary goal – elimination of repetitive and harassing proceedings – was erroneous as a matter of law, and as a matter of discretion because it was not "in the interests of justice." Limited discovery is necessary to determine the facts bearing on whether Broadcom was a real party in interest or privy of the defendants in *Ericsson Inc., et al. v. D-LINK Corp., et al.*, Civil Action No. 6:10-CV-473 (LED/KGF).

C. The Board Erred as a Matter of Law in its Holding that "Broadcom must have had control over the Texas Litigation."

Congress did not define "real party in interest" or "privy," but the text and structure of the AIA militate in favor of a broad and liberal construction to achieve the AIA's intended result of limiting repetitive litigation. Both Congress and the PTO stated that the term "privity" has acquired an "expanded meaning" and that it will give effect to judgments by extending the term "beyond its classical description."

*See* 154 Cong. Rec. S9987 (daily ed. Sept. 27, 2008) (statement of Sen. Kyl) (citing

*Cal. Physicians' Serv. v. Aoki Diabetes Research Inst.,* 163 Cal. App. 4th 1506 (Cal.

App. 2008)); *see also* Trial Practice Guide, 77 Fed. Reg. 48,756, 48,759 (Aug. 14,

2012) ("Trial Practice Guide" or "TPG").

The PTO further acknowledged the broad aim of the AIA in the Trial Practice

Guide, which clearly states that the determination of who is a real party in interest or

privy must be made on the facts of each case. *See* TPG at 48,760. The PTO cited

*Cal. Physicians* with approval in its discussion regarding the expansion of the scope

of privity beyond the "control" test. *Cal. Physicians* held that "[t]he word 'privy' has

acquired expanded meaning. The courts, *in the interest of justice and to prevent*

*expensive litigation,* are striving to give effect to judgments by extending 'privies'

beyond the classical description. The emphasis is not on a concept of identity of

parties, but on the practical situation . . . The concept refers 'to a relationship between

the party to be estopped and the unsuccessful party in the prior litigation which is

'sufficiently close' so as to justify application of the doctrine of collateral estoppel.'"

163 Cal. App. 4th at 1521 (citations omitted) (emphasis added).

The court then declared that "[n]otions of privity have been expanded to the

limits of due process." *Id.* at 1522. The proper test for privity that satisfies due

process is to determine if the parties have "an identity or community of interests with,

and adequate representation by, the losing party in the first action as well as that the

REQUEST FOR REHEARING                          6                          IPR2013-00602

circumstances must have been such that the party to be estopped should reasonably have expected to be bound by the prior adjudication." *Id.* Further, when the appellant argued that it did not control the prior litigation, the court denied the contention and stated, "preclusion can apply even in the absence of such control." *Id.* at 1524.

The PTO adopted that exact language in the Trial Practice Guide, *see* TPG at 48,760; the Board's contrary holding, that "Broadcom must have had control over the Texas Litigation," was, respectfully, in error.

Where Ericsson' burden is to show an identity or community of interest sufficient to make Broadcom expect to be bound by the Texas Litigation, it was error to require a showing of control. The combination of Broadcom's indemnification agreements, ancillary legal actions, discussions with D-Link Defendants, amicus curiae brief, and its reliance on evidence from the Texas Litigation collectively indicate that Broadcom has an identity or community of interest that was served in the Texas Litigation. It was error to refuse to permit discovery sufficient to further show this community of interest.

IPR2013-00602
Patent 6,466,568

## III.    Conclusion

Ericsson respectfully requests that the Board reconsider its Decision.  Allowing limited discovery on the relationship between petitioner and the D-Link Defendants promotes Congress' principal purpose of the AIA – to prevent repeated litigation and multiple attacks on the validity of patents.  It also conforms to the broad doctrine of privity because denying privies the right to *inter partes* review is in the interest of justice, as provided by both Congress and the PTO.


Dated: February 7, 2014.


    /Peter J. Ayers/
PETER AYERS
Lee & Hayes, PLLC
13809 Research Blvd., Suite 405
Austin, TX 78750
Telephone: 512.505.8162
Fax: 509.944.4693
Attorney for Patent Owner Telefonaktiebolaget
    LM Ericsson

REQUEST FOR REHEARING                         8                         IPR2013-00602

## A0122

IPR2013-00602
Patent 6,466,568

CERTIFICATE OF SERVICE

The undersigned certifies that on February 7, 2014 the foregoing was served

via email on Lead and Back-up Counsel for Broadcom Corporation identified in

Broadcom's Mandatory Notices, whom consented to electronic service:

Dominic E. Massa, Lead Counsel
Michael A. Diener, Back-up Counsel
Wilmer Cutler Pickering Hale and Dorr, LLP
60 State Street
Boston, MA 02109
WH-External-Broadcom-IPR2013-601@wilmerhale.com
dominic.massa@wilmerhale.com
michael.diener@wilmerhale.com

LEE & HAYES PLLC

   /Peter J. Ayers/
Peter J. Ayers, Reg. No. 38,374

   I.

REQUEST FOR REHEARING                9                IPR2013-00602

Trials@uspto.gov
Tel: 571-272-7822

Paper: 26
Entered: Feb. 20, 2014

UNITED STATES PATENT AND TRADEMARK OFFICE

_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD

_____

BROADCOM CORPORATION
Petitioner

v.

TELEFONAKTIEBOLAGET LM ERICSSON and ERICSSON, INC.
Patent Owner

_____

Case IPR2013-00602
Patent 6,446,568 B1

_____

Before KARL D. EASTHOM, KALYAN K. DESHPANDE, and
MATTHEW R. CLEMENTS, *Administrative Patent Judges.*

EASHTOM, *Administrative Patent Judge.*

DECISION
Request for Rehearing
*37 C.F.R. § 42.71(d)*

Patent Owner, "Ericsson," requests rehearing, Paper 25 ("Reh'g

Req."), of the Decision on Ericsson's Motion for Additional Discovery,

Paper 21 ("Dec. on Mot."), which denies additional discovery by Ericsson of

**A0124**

IPR2013-00602
Patents 6,446,568 B1

material possessed by Petitioner, "Broadcom." Ericsson requests that the Board reverse its decision and allow for limited discovery. Reh'g Req. 8. The request is *denied*.

Ericsson argues that the Board erred "(a) in its holding that limitation of discovery holds a higher statutory priority than limitation of duplicative proceedings; and (b) in its holding that 'Broadcom must have had control over the Texas Litigation' before [the] 35 U.S.C. § 315(b) bar may be invoked."[1] Reh'g Req. 2.

Ericsson's first argument is new. This new rehearing argument is improper. "The [rehearing] request must specifically identify all matters the party believes the Board misapprehended or overlooked, and the place where each matter was previously addressed in a motion . . . ." 37 C.F.R. § 42.71(d); *see also* 37 C.F.R. § 42.71(c) ("a panel will review the [rehearing] decision for an abuse of discretion.")[2]

The Board could not have misapprehended or overlooked an argument presented for the first time in Ericsson's Rehearing Request. Ericsson fails to point the Board to where it made the argument or where the Board made the alleged holding regarding "a higher statutory priority." The Board carefully balanced numerous factors and determined that Ericsson failed to meet the statutorily mandated "interests of justice" standard for additional discovery. *See* Dec. on Mot. 5 (citing 35 U.S.C. § 316(a)(5) ("such

---

[1] *Ericsson Inc., et al. v. D-LINK Corp., et al.*, Civil Action No. 6:10-CV-473 (LED/KGF) ("Texas Litigation").
[2] An abuse of discretion may be determined if a decision is based on an erroneous interpretation of law, if a factual finding is not supported by substantial evidence, or if the decision represents an unreasonable judgment in weighing relevant factors. *Arnold Partnership v. Dudas*, 362 F3d 1338, 1340 (Fed. Cir. 2004).

2

**A0125**

IPR2013-00602
Patents 6,446,568 B1

discovery shall be limited to . . . what is otherwise necessary in the interest of justice")); *id.* at 4–16 (balancing factors, addressing precedent and legislative history).

Ericsson's second argument does not show that the Board erred in determining that the weight of authority requires some control over the Texas Litigation by Broadcom to show privity. *See* Dec. on Mot. 7 (citing and discussing "long-standing precedent"). Ericsson relies heavily on one of the cases cited in the Office Patent Trial Practice Guide, 77 Fed. Reg. 48,756, 48,759, 48,760 (Aug. 14, 2012)("TPG")—*Cal. Physicians' Serv. v. Aoki Diabetes Research Inst.* 163 Cal. App. 4th 1506, 1524 (Cal. App. 2008). *See* Reh'g Req. 5–7. Ericsson ignores the weight of authority cited by the Board that shows control over prior litigation is a crucial factor normally required to bind a party to that prior litigation using collateral estoppel. *See* Dec. on Mot. 7-10; Reh'g Req. 5–7.

Immediately before citing *Aoki* as an example, the TPG qualifies *Aoki* as follows: "But whether something less than *complete funding and control* suffices to justify similarly treating the party requires consideration of the pertinent facts. *See e.g.*, *Cal. Physicians' Serv. v. Aoki Diabetes Research Inst.* 163 Cal. App. 4th 1506, 1524 (Cal. App. 2008) . . . ." (Emphasis added). In other words, although the TPG cites *Aoki*, it retains an emphasis on control. In other places, for example, the TPG states that "[a] common consideration is whether the non-party exercised control over a party's participation in a proceeding" and "the rules do not enumerate particular factors regarding a 'control' theory." TPG at 48,759.

Ericsson also quotes selectively from the Board's decision, ignoring the phrase "in normal situations" that qualifies the language it quotes. *See*

3

**A0126**

IPR2013-00602
Patents 6,446,568 B1

Reh'g Req. 7 (discussing the Board's rationale that "Broadcom must have had control over the Texas Litigation"); Dec. on Mot. 7. The Board's characterization of the law in the previous sentence, Dec. on Mot. 7 ("[t]o show privity requires a showing that Broadcom would be bound to the outcome of the Texas Litigation") is consistent with the characterization by the court in *Aoki*, 163 Cal. App. 4th at 1524 ("[t]he question is whether, under the circumstances as a whole, the party to be estopped should reasonably have expected to be bound by the prior adjudication.").

Ericsson is essentially correct in that *Aoki* held that "'preclusion can apply even in the absence of . . . control.'" Reh'g Req. 7 (quoting *Aoki*, 163 Cal. App. 4th at 1524). Nevertheless, *Aoki* also noted that "control over the prior action is commonly present" in collateral estoppel applications. *Id*. *Aoki* is also highly fact specific, as are typical cases involving collateral estoppel. *See* Dec. on Mot. 7-10.

*Aoki* begins its privity analysis by noting that "the doctrine [of collateral estoppel] applies 'only if several threshold requirements are fulfilled. First, the issue sought to be precluded from relitigation must be identical to that decided in a former proceeding.'" *Id*. at 1520 (citation omitted). Departing from the normal privity rule that requires control, and delineating its finding of privity based on a community of interest theory, which included a finding of an identical issue to be precluded, *see id*. at 1521 (discussing exact same single issue of denial of coverage for an experimental procedure), the court cited as an important factor, "prevent[ing] the possibility of a dramatically inconsistent judgment," *id*. at 1524.

4

**A0127**

IPR2013-00602
Patents 6,446,568 B1

On its face, this important factor, preventing a "dramatically inconsistent judgment," underlies or coalesces with the fundamental threshold requirement enunciated by *Aoki*—precluding only the identical issue previously litigated—which issue, of course, is necessary to produce a (later) inconsistent judgment. That concern is not present in this proceeding. In general, as compared to district courts, different burdens of proof, different presumptions, different claim construction standards for unexpired patents, and different prior art, typically apply to PTAB proceedings. *See* 37 C.F.R. § 42.100(b); TPG at 48,766 (the broadest reasonable construction standard). Of course, Congress was aware of the differences between the two proceedings when it listed a "privy" as precluded from a time-barred *inter partes* proceeding under 35 U.S.C. 315(b). Therefore, although identical issues may not be required to establish privity through collateral estoppel at the PTAB, the TPG emphasizes control, which implies that control is an important factor to establish privity in the absence of identical issues and otherwise.

In other words, while the TPG and 35 U.S.C. 315(b) may indicate a relaxation, to a certain extent, of collateral estoppel principles, and *Aoki* generally may present guiding principles regarding privity, *Aoki* also recognizes that "[n]otions of privity have been expanded *to the limits of due process*." 163 Cal. App. 4th at 1522 (citation omitted) (emphasis added). In order to bind a non-party under collateral estoppel, this expansion cannot exceed the bounds of due process. Ultimately, Ericsson does not show that the Board overlooked a material consideration in determining that Ericsson failed to meet its burden of showing that additional discovery would have

5

**A0128**

IPR2013-00602
Patents 6,446,568 B1

more than a mere possibility of showing that Broadcom should be bound by the Texas Litigation.  *See* Dec. on Mot. 11-13.


DECISION on REHEARING

Ericsson's sought-after relief is DENIED.


PETITIONER:

Dominic Massa
Michael Diener
michael.diener@wilmerhale.com
Dominic.massa@wilmerhale.com


PATENT OWNER:

Peter J. Ayers
J. Christopher Lynch
Lee & Hayes PLLC
Peter@leehayes.com
chris@leehayes.com

**A0129**

Trials@uspto.gov
571-272-7822

Paper 27
Entered:  March 10, 2014

UNITED STATES PATENT AND TRADEMARK OFFICE

_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD

_____

BROADCOM CORPORATION
Petitioner

v.

TELEFONAKTIEBOLAGET L. M. ERICSSON
Patent Owner

_____

Case IPR2013-00602
Patent 6,466,568

_____

Before KARL D. EASTHOM, KALYAN K. DESHPANDE, and
MATTHEW R. CLEMENTS, *Administrative Patent Judges*.

CLEMENTS, *Administrative Patent Judge*.

DECISION
Institution of *Inter Partes* Review
*37 C.F.R. § 42.108*

Case IPR2013-00602
Patent 6,466,568

## I.    INTRODUCTION

Broadcom Corporation ("Petitioner") filed a petition requesting *inter partes* review of claims 1-6 (the "challenged claims") of U.S. Patent No. 6,466,568 (Ex. 1001, "the '568 patent"). Paper 2 ("Pet."). Telefonaktiebolaget L. M. Ericsson ("Patent Owner") filed an election to waive its preliminary response. Paper 20. We have jurisdiction under 35 U.S.C. § 314.

The standard for instituting an *inter partes* review is set forth in 35 U.S.C. § 314(a), which provides as follows:

> THRESHOLD.—The Director may not authorize an inter partes review to be instituted unless the Director determines that the information presented in the petition filed under section 311 and any response filed under section 313 shows that there is a reasonable likelihood that the petitioner would prevail with respect to at least 1 of the claims challenged in the petition.

Upon consideration of the petition, we determine that the information presented by Petitioner establishes that there is a reasonable likelihood that Petitioner would prevail in showing unpatentability of the challenged claims of the '568 patent. Accordingly, pursuant to 35 U.S.C. § 314, we institute an *inter partes* review of claims 1-6 of the '568 patent.

### A. Related Proceedings

Petitioner and Patent Owner indicate that the '568 patent is involved in a case captioned *Ericsson Inc., et al. v. D-LINK Corp., et al.,* Civil Action No. 6:10-cv-473 (E.D. Tex.) ("Texas Litigation"). Pet. 1-2; Paper 6 at 1. Patent Owner also identifies an appeal at the Federal Circuit captioned

2

**A0131**

Case IPR2013-00602
Patent 6,466,568

*Ericsson Inc., et al. v. D-LINK Corp., et al.*, Case Nos. 2013-1625, -1631, -1632, and -1633. Paper 6 at 1. Petitioner also has filed two petitions for *inter partes* review of related patents: IPR2013-00601 (U.S. Patent No. 6,772,215), IPR2013-00636 (U.S. Patent No. 6,424,625).

### B. The '568 patent

The '568 patent relates generally to radiocommunications systems, such as cellular or satellite systems, that use digital traffic channels in a multiple access scheme, such as time division multiple access ("TDMA") or code division multiple access ("CDMA"). Ex. 1001, col. 1, ll. 13-17.

Figure 2 of the '598 patent is reproduced below.

## FIG. 2



Figure 2 depicts how, in a TDMA system, the consecutive time slots on a radio channel are organized in TDMA frames of, for example, six slots each so that a plurality of distinct channels can be supported by a single radio carrier frequency. *Id.* at col. 5, ll. 11-15. Each TDMA frame has a duration of 40 milliseconds and supports six half-rate logical channels, three full-rate logical channels, or greater bandwidth channels as indicated in the table below:

3

Case IPR2013-00602
Patent 6,466,568

| Number of Slots | Used Slots | Rate |
|---|---|---|
| 1 | 1 | half |
| 2 | 1, 4 | full |
| 4 | 1, 4, 2, 5 | double |
| 6 | 1, 4, 2, 5, 3, 6 | triple |

As shown in the table, a full-rate digital traffic channel ("DTC"), for example, uses two slots of each TDMA frame—i.e., the first and fourth, second and fifth, or third and sixth. *Id.* at col. 2, ll. 8-11.

A conventional downlink DTC slot format is defined as shown in Figure 3, reproduced below.



**FIG. 3**

*PRIOR ART*

As shown in Figure 3, a slot includes a SYNC field, SACCH field, two DATA fields used to transmit the "payload" of the slot, a CDVCC field, and a reserved bit CDL field. *Id.* at col. 5, ll. 31-47. Conventionally, this format is used for each time slot in a TDMA frame—i.e., all six time slots. *Id.* at ll. 47-49. However, if a mobile station is using a triple rate downlink connection—i.e., it is reading the DATA fields of each of time slots 1, 2, and 3—some of the other fields provided in the conventional downlink time slot of Figure 3 need not be transmitted in each time slot. *Id.* at col. 6, l. 66 – col. 7, l. 4. For example, a mobile station need not receive SACCH at triple rate; that is, a mobile station may only need to receive one SACCH for every

4

**A0133**

Case IPR2013-00602
Patent 6,466,568

three time slots. *Id.* at col. 7, ll. 4-8. Likewise, the CDVCC field need not be transmitted by the base station at triple rate. *Id.* at ll. 10-17.

To address these issues, the '568 patent discloses an alternative slot format to accommodate the different communication services described above. *Id.* at col. 5, ll. 50-52.

Figure 6 is reproduced below.

## FIG. 6

| SLOT 1 | SYNC | SACCH | DATA | CDVCC | DATA | CDL |
|--------|------|-------|------|-------|------|-----|

| SLOT 2 | SYNC | FOC | DATA | FOC | DATA | FOC |
|--------|------|-----|------|-----|------|-----|

| SLOT 3 | SYNC | FOC | DATA | FOC | DATA | FOC |
|--------|------|-----|------|-----|------|-----|

As illustrated in Figure 6, in one embodiment of the invention, the fields that are conventionally used for SACCH and CDVCC information in slots 2 and 3 can be replaced by FOC information. *Id.* at Fig. 6, col. 7, ll. 8-10. Omitting these fields in time slots 2 and 3 (as well as 5 and 6) provides an opportunity to inform other mobile stations of information pertaining to their uplink connections. *Id.* at ll. 21-25. For example, the FOC fields can be used to inform another mobile station that a previously transmitted packet was not properly received and should be retransmitted. *Id.* at ll. 26-29.

According to another embodiment of the invention, the FOC may serve the purpose of a service type identifier by providing information relating to the same connection as the payload or data field in that time slot, such as a service type identifier that informs the mobile or base station of the

5

**A0134**

Case IPR2013-00602
Patent 6,466,568

type of information (e.g., voice, video, or data) being conveyed in the payload. *Id.* at col. 3, ll. 11-16, col. 9, ll. 27-32. This information can be used by the receiving equipment to aid in processing the information conveyed in the payload. *Id.* at col. 3, ll. 16-19. For example, in a multimedia connection, the information being transferred may rapidly vary between voice, data, and video. *Id.* at col. 9, ll. 32-34. In such a case, the FOC can inform a mobile station of the type of information being transmitted so that the mobile station will know how to process the received information. *Id.* at ll. 35-38.

### C. Exemplary Claim

Of the challenged claims, claim 1 is independent. Claim 1 is reproduced below:

1.  A communication station comprising:

    a processor for arranging information for transmission including providing at least one first field in which payload information is disposed and providing at least one second field, separate from said first field, which includes a service type identifier which identifies a type of payload information provided in said at least one first field; and

    a transmitter for transmitting information received from said processor including said at least one first field and said at least one second field.

### D. References Relied Upon

Petitioner relies upon the following references:

6

**A0135**

Case IPR2013-00602
Patent 6,466,568

| Morley | US 5,488,610 | Jan. 30, 1996 | Ex. 1002 |
| Sharma | US 5,500,859 | Mar. 19, 1996 | Ex. 1004 |
| Menand | US 5,548,532 | Aug. 20, 1996 | Ex. 1005 |
| Adams | US 5,541,662 | July 30, 1996 | Ex. 1006 |
| Padovani | US 5,659,569 | Aug. 19, 1997 | Ex. 1007 |
| Zehavi | US 5,581,575 | Dec. 3, 1996 | Ex. 1017 |
| Michel Mouly, Marie-Bernadette Pautet, "The GSM System for Mobile Communications," Cell & Sys. Correspondence, 1992 ("GSM") | | | Ex. 1008 |

### E.  The Asserted Grounds of Unpatentability

Petitioner argues that the challenged claims are unpatentable based upon the following grounds:

| Reference[s] | Basis | Claims challenged |
|---|---|---|
| Morley | § 102 | 1-6 |
| Morley | § 103 | 5 and 6 |
| Sharma | § 102 | 1-4 and 6 |
| Sharma | § 103 | 5 and 6 |
| Menand | § 102 | 1-6 |
| Menand | § 103 | 5 and 6 |
| Adams | § 103 | 1-6 |
| Padovani | § 102 | 1-6 |
| Padovani and Zehavi | § 103 | 4 |

7

**A0136**

Case IPR2013-00602
Patent 6,466,568

## II. ANALYSIS

### A. Claim Construction

In an *inter partes* review, claim terms in an unexpired patent are interpreted according to their broadest reasonable construction in light of the specification of the patent in which they appear. 37 C.F.R. § 42.100(b); Office Patent Trial Practice Guide, 77 Fed. Reg. 48,756, 48,766 (Aug. 14, 2012). Also, claim terms are given their ordinary and customary meaning, as would be understood by one of ordinary skill in the art in the context of the entire disclosure. *In re Translogic Tech., Inc.*, 504 F.3d 1249, 1257 (Fed. Cir. 2007).

Independent claim 1 recites "a service type identifier which identifies a type of payload information." Petitioner proposes that this phrase be construed as "an identifier that identifies the type of information conveyed in the payload. Examples of types of information include, but are not limited to, video, voice, data, and multimedia." Pet. 7-8. Petitioner argues that this construction is consistent with the broadest reasonable construction in light of the specification and is consistent with how the term "service" is used in the '568 patent. *Id*. Petitioner further argues that, during prosecution of the '568 patent, Patent Owner distinguished the recited "service type identifier" from a prior art identifier that identified "transmission characteristics." *Id.* at 8 (citing Ex. 1016, 5 (distinguishing the claimed service type identifier as "claiming the use of a field to identify the type of payload information *and not the type of channel coding*.") (emphasis added)). Thus, according to Petitioner, the recited "service type identifier" cannot encompass identifiers

8

Case IPR2013-00602
Patent 6,466,568

of "transmission characteristics" such as channel coding. *Id.* Based on the specification and corroborating arguments made during prosecution of the '568 patent, we agree. The '568 patent uses the term "services" to refer to "various types of information" being transmitted on traffic channels, and explicitly lists "facsimile (fax) transmissions . . . , packet data transmissions, . . . [and o]ther types of information transmission, e.g., video or hybrid voice, data and video to support internet connections." Ex. 1001, col. 2, ll. 18-29. On this record, we are persuaded that, in the context of the '568 patent, the broadest reasonable interpretation of "service type identifier" is an identifier that identifies the type of information conveyed in the payload, including but not limited to video, voice, data, and multimedia. Accordingly, we adopt Petitioner's construction.

### B. The Challenged Claims – Anticipated by Morley

Petitioner argues that claims 1-6 are unpatentable under 35 U.S.C. § 102(b) as anticipated by Morley. Pet. 18-27. In support of this ground of unpatentability, Petitioner provides detailed explanations as to how each claim limitation is disclosed by Morley, and relies upon the Declaration of Dr. Bims. *Id.* (citing Ex. 1009 ¶¶ 29-37).

#### Morley (Exhibit 1002)

Morley describes a multiplexer for use in a system for transmitting more than one type of data, e.g., voice and data. Ex. 1002, Abstract.

Figure 2 of Morley is reproduced below.

9

**A0138**

Case IPR2013-00602
Patent 6,466,568



FIG.2

Figure 2 is a block diagram showing the main components of communication system 10 of Morley's invention. *Id.* at col. 2, ll. 52-53, 66-67. Controller 18 comprises processor 19, storage means 20, multiplexer/demultiplexer 22, voice coder/decoder 24, and line interface 27. *Id.* at col. 3, ll. 1-9. Communication system 10 can be used to share voice and visual data with another user of a similar system. *Id.* at ll. 10-11. Multiplexer 22 multiplexes the voice and data signals, adds synchronization information, and transmits the composite signal to the physical layer (e.g., a high speed modem (V32bis) connected to the Public Switched Telephone Network (PSTN) or a GSM mobile network). *Id.* at col. 5, ll. 4-6, 39-41; col. 99, ll. 40-46. The composite signal is organized into frames each containing a header and one or more complete voice frames and/or other non-voice data. *Id.* at col. 5, ll. 41-44, 52-53. The content of each frame is

10

Case IPR2013-00602
Patent 6,466,568

determined by the applications and may change during the call. *Id.* at ll. 55-56, 63-64.

Figures 5a to 5g, reproduced below, show the structures of some possible frames.



In Figures 5a to 5g, "H" is a header field that identifies the frame type, which is used to identify the contents of a frame. *Id.* at col. 6, ll. 22-25. Sixteen possible headers for supporting one voice channel and up to three data channels are shown in the table below:

11

**A0140**

Case IPR2013-00602
Patent 6,466,568

| Header Type | Frame Type | Header Value |
|---|---|---|
| 0 | Sync | 0 × 19b3 |
| 1 | Extend | 0 × 007f |
| 2 | Voice Only | 0 × 4ce6 |
| 3 | Not Defined | 0 × 0000 |
| 4 | Data 0 | 0 × 34e9 |
| 5 | Data 0* | 0 × 3366 |
| 6 | Voice + Data 0 | 0 × 2ad5 |
| 7 | Voice + Data 0* | 0 × 1e3c |
| 8 | Data 1 | 0 × 4b69 |
| 9 | Data 1* | 0 × 52da |
| 10 | Voice + Data 1 | 0 × 552a |
| 11 | Voice + Data 1* | 0 × 61c3 |
| 12 | Data 2 | 0 × 664c |
| 13 | Data 2* | 0 × 7870 |
| 14 | Voice + Data 2 | 0 × 078f |
| 15 | Voice + Data 2* | 0 × 4b16 |

*Analysis*

In light of the arguments and evidence, Petitioner has established a reasonable likelihood that the challenged claims are unpatentable as anticipated by Morley.

For example, independent claim 1 recites

a processor for arranging information for transmission including providing at least one first field in which payload information is disposed and providing at least one second field, separate from said first field, which includes a service type identifier which identifies a type of payload information provided in said at least one first field.

Morley discloses controller 18—e.g., a PC—comprising processor 19—e.g., an Intel 386 processor—and multiplexer 22—e.g., a GMM/Sync 2 CCP intelligent communications card and software.  Ex. 1002, col. 3, ll. 4-9, 33-41.  Under the direction of processor 19, multiplexer 22 arranges voice and non-voice data for transmission in frames.  *Id.* at col. 5, ll. 4-6, 39-44.  A frame may contain at least a field V (voice) or D (non-voice data) in which payload information is disposed.  *Id.* at Figs. 5a-5g, col. 6, ll. 4-55.  A frame

12

Case IPR2013-00602
Patent 6,466,568

also contains a separate field, H (header), that identifies the frame type—i.e., the type of payload information—as voice only, data only, or voice and data. *Id.* at Figs. 5a-5g, col. 6, ll. 22-32, col. 7, ll. 1-17.

Claim 1 also recites "a transmitter for transmitting information received from said processor including said at least one first field and said at least one second field." Morley discloses a "high speed modem 26" for transmitting the frames arranged by multiplexer 22 over the PSTN or using GSM. *Id.* at col. 3, l. 3, ll. 58-59, col. 4, ll. 42-44, col. 99, ll. 40-45.

Claim 5 recites "wherein said communication station is a base station." Claim 6 recites similarly "wherein said communication station is a mobile station." Morley discloses implementing the claimed invention using GSM. *Id.* at col. 99, ll. 40-45. In addition, Petitioner argues that a "base station" and a "mobile station" are inherent in GSM (Pet. 23), and cites the Bims Declaration for the following:

> It is inherent that GSM radio communications systems include base stations, and it is also known that base stations can receive data from mobile stations and retransmit data to other mobile stations. It is also inherent that GSM radio communications systems include mobile stations. Base stations and mobile stations in a GSM cellular system, or in other cellular systems, each have a processor for processing data to be sent, and a transmitter for sending data. That processor sends data that has been arranged in frames defined by the GSM protocol. (See, e.g., Mouly and Pautet, GSM, Ex. 1008, pp. 89-99).

Ex. 1009 ¶ 36. We are persuaded by the reasoning in the above-quoted analysis of Dr. Bims.

13

**A0142**

Case IPR2013-00602
Patent 6,466,568

Petitioner also argues that claims 2-4 are disclosed by Morley.  Pet.

22-23.  On this record, Petitioner's showing is reasonable.

*Conclusion*

We are persuaded that Petitioner has established a reasonable

likelihood that it would prevail in showing that claims 1-6 are unpatentable

as anticipated by Morley.

*C. The Challenged Claims – Obvious over Adams*

Petitioner argues that claims 1-6 are unpatentable under 35 U.S.C.

§ 103(a) as obvious over Adams.  Pet. 45-54.  In support of this ground of

unpatentability, Petitioner provides detailed explanations as to how each

claim limitation is taught or suggested by Adams, and relies upon the

Declaration of Dr. Bims.  *Id*. (citing Ex. 1009 ¶¶ 71-79).

*Adams (Exhibit 1006)*

Adams describes an interactive video system that processes a video

data stream and an associated data stream corresponding to the video data

stream.  Ex. 1006, Abstract.  The interactive video system includes satellite

receiver 14, cable television ("CATV") receiver 16, or television broadcast

receiver 18.  *Id.* at Figure 1, col. 4, ll. 2-4.   Satellite receiver 14 enables

reception of packetized digital data streams over a satellite link.  *Id.* at ll. 5-

6.  The packetized digital data streams received by satellite receiver 14

include video data packets, audio data packets, and associated data packets.

*Id.* at ll. 9-12.

Figure 5 is reproduced below.

14

**A0143**

Case IPR2013-00602
Patent 6,466,568



*Figure 5*

Figure 5 illustrates a packetized digital data stream, including video packet 80, audio packet 82, and associated data packet 84. *Id.* at col. 7, ll. 9-14. Video packet 80, audio packet 82, and associated data packet 84 each comprise a packet header and payload. *Id.* at ll. 15-17. Video packet 80 includes (1) a video payload that provides digital video data; and (2) a header with a video identifier (VIDEO_ID) that identifies the packet as carrying video data. *Id.* at ll. 22-26. Audio packet 82 includes (1) an audio payload; and (2) a header with an audio identifier (AUDIO_ID) that identifies the packet as carrying audio data. *Id.* at ll. 27-31. Associated packet 84 includes (1) an associated data payload; and (2) a header with an associated data identifier (DATA_ID) that identifies the packet as carrying associated data. *Id.* at ll. 32-37.

> *Analysis*

In light of the arguments and evidence, Petitioner has established a reasonable likelihood that the challenged claims are unpatentable as obvious over Adams.

For example, independent claim 1 recites

15

**A0144**

Case IPR2013-00602
Patent 6,466,568

a processor for arranging information for transmission including providing at least one first field in which payload information is disposed and providing at least one second field, separate from said first field, which includes a service type identifier which identifies a type of payload information provided in said at least one first field.

Adams teaches digital video packets that include a first field with payload information—i.e., video payload, audio payload, or associated data payload—and a second field, separate from the first field, with a service type identifier—i.e., VIDEO_ID, AUDIO_ID, or DATA_ID—that identifies the type of payload information provided in the first field. Ex. 1006, col. 7, ll. 9-37.

Petitioner acknowledges that Adams teaches explicitly only a receiver. Pet. 47. Petitioner argues that Adams teaches implicitly "a communication station with a processor for formatting the audio and video data, and a transmitter for transmitting a packetized digital data stream to the device shown in Adams." *Id.* (citing Ex. 1006, Figs. 1 and 5; col. 2, ll. 54-65, col. 3, ll. 33-36, col. 3, l. 65-col. 4, l. 6, col. 4, ll. 9-14, 25-34, and col. 6, ll. 7-26; Ex. 1009 ¶ 72). Dr. Bims testifies as follows:

> Adams discloses receiving "at least one first field" in which payload information is disposed because in Adams each packet that is received includes an audio payload, a video payload, or a data payload. An object of the invention in Adams is to enable a content programmer to create a video display screen from a programming studio. (*Id.* at 2:21-23.) Because Adams discloses implementing a content programmer, it is obvious (if not inherent) that the communication station sending to Adams include a processor for arranging information for transmission.

16

**A0145**

Case IPR2013-00602
Patent 6,466,568

> Adams also discloses receiving "at least one second field, separate from the first field" that identifies a type of payload information because Adams discloses that each video packet includes a packet header that includes an identifier that identifies whether audio, video, or data is carried in the packet payload. (*Id*. at Figures 3, 5, and 6, 6:7-58, 7:8-37). One of ordinary skill in the art would have understood the Adams reference to teach a transmitter for transmitting said at least one first field and said at least one second field on said radio channel.

Ex. 1009 ¶ 72. We are persuaded by the reasoning in the above-quoted analysis of Dr. Bims.

Claim 1 also recites "a transmitter for transmitting information received from said processor including said at least one first field and said at least one second field." As with the limitation above, Petitioner acknowledges that Adams teaches explicitly only a receiver, and argues that Adams teaches implicitly the recited "transmitter." Pet. 47 (citing Ex. 1009 ¶ 71). Dr. Bims testifies as follows:

> The subject matter of claim 1 would have been obvious in view of Adams. Adams is focused on a receiver, while the claims are to a transmitting device. However, one of ordinary skill in the art would have understood that the Adams reference implicitly teaches a communication station for transmitting packetized digital data streams, including the three types of payload, in Adams. Therefore it would have been obvious to provide a transmitter for sending the type of data that Adams receives.

Ex. 1009 ¶ 71. We are persuaded by the reasoning in the above-quoted analysis of Dr. Bims.

17

**A0146**

Case IPR2013-00602
Patent 6,466,568

Claim 5 recites "wherein said communication station is a base station." Adams teaches transmission of packetized digital data streams over a satellite link. *See, e.g.,* Ex. 1006, Fig. 1, col. 4, ll. 2-14. Petitioner argues that "[i]t is well-known in the art that such satellite communication devices include base stations." Pet. 50 (citing Ex. 1009 ¶ 76). Dr. Bims testifies as follows:

> Dependent claim 5 recites that the communication station is a base station. Adams discloses transmission of packetized digital data streams over a satellite link, and thus the transmitter would typically be a base station. (*Id.* at Figure 1, 3:65-5:22). It is well-known in the art that such satellite communications devices include base stations. Adams also discloses communication of an analog or digital video signal over a coaxial transmission line. Transmission over a coaxial transmission line is typically by a head-end, or base station. Further, I believe it would have been obvious to provide Adams over almost any wireless system. Adams does not require any particular type of system, and thus could use systems like cellular systems with base stations. This would be the use of a known technique (of providing payloads and identifiers) applied to a known type of device (base station) to yield the predictable result of allowing the base station to send content and identify the packets that make up the content.

Ex. 1009 ¶ 76. We are persuaded by the reasoning in the above-quoted analysis of Dr. Bims.

Claim 6 recites "wherein said communication station is a mobile station." Adams teaches computer system 10 for receiving packetized digital data streams. *See, e.g.,* Ex. 1006, Fig. 1, col. 3, l. 65 – col. 4, l. 1. Petitioner argues that it was known for computer systems to *send* video,

18

**A0147**

Case IPR2013-00602
Patent 6,466,568

audio, and data, and that such computer systems could be mobile, such as with laptop computers.  Pet. 50-51 (citing Ex. 1009 ¶ 77).  Dr. Bims testifies as follows:

> Dependent claim 6 recites that the station is a mobile station.  It would have been obvious to provide a protocol for sending voice, video, and data to a mobile station, as a mobile station (e.g., like the laptop in Menand) could create multiple types of content to be sent, and therefore it would have been obvious to provide the ability to identify what type of data was included in a packet to allow the packet to be processed appropriately.  This would be the use of a known technique (of providing payloads and identifiers) applied to a known type of device (mobile) to yield the predictable result of allowing the mobile to send content and identify the packets that make up the content.

Ex. 1009 ¶ 77.  We are persuaded by the reasoning in the above-quoted analysis of Dr. Bims.

Petitioner also argues that claims 2-4 are taught or suggested by Adams.  Pet. 48-49.  On this record, Petitioner's showing is reasonable.

*Conclusion*

We are persuaded that Petitioner has established a reasonable likelihood that it would prevail in showing that claims 1-6 are unpatentable as obvious over Adams.

### *D. Other Grounds*

Petitioner also asserts the following grounds of unpatentability:

19

**A0148**

Case IPR2013-00602
Patent 6,466,568

| Reference[s] | Basis | Claims challenged |
|---|---|---|
| Morley | § 103 | 5 and 6 |
| Sharma | § 102 | 1-4 and 6 |
| Sharma | § 103 | 5 and 6 |
| Menand | § 102 | 1-6 |
| Menand | § 103 | 5 and 6 |
| Padovani | § 102 | 1-6 |
| Padovani and Zehavi | § 103 | 4 |

Pet. 28-45, 54-59. Those asserted ground are redundant in light of the determination that there is a reasonable likelihood that the challenged claims are unpatentable based on the grounds of unpatentability on which we institute an *inter partes* review. *See* 37 C.F.R. § 42.108(a).

## III.  CONCLUSION

For the foregoing reasons, we determine that the information presented in the petition establishes that there is a reasonable likelihood that Petitioner would prevail in establishing the unpatentability of claims 1-6 of the '568 patent.

The Board has not made a final determination on the patentability of any challenged claims.

20

**A0149**

Case IPR2013-00602
Patent 6,466,568

## IV.  ORDER

Accordingly, it is

ORDERED that pursuant to 35 U.S.C. § 314, an *inter partes* review is hereby instituted as to claims 1-6 of the '568 patent on the following grounds:

1.  Claims 1-6 under 35 U.S.C. § 102 as anticipated by Morley;

2.  Claims 1-6 under 35 U.S.C. § 103 as obvious over Adams;

FURTHER ORDERED that all other grounds raised in Petitioner's petition are *denied* because they are deficient for the reasons discussed above;

FURTHER ORDERED that pursuant to 35 U.S.C. § 314(d) and 37 C.F.R. § 42.4, notice is hereby given of the institution of a trial on the grounds of unpatentability authorized above; the trial commences on the entry date of this decision; and

FURTHER ORDERED that an initial conference call with the Board is scheduled for 2:00 PM Eastern Time on April 1, 2014; the parties are directed to the Office Patent Trial Practice Guide[1] for guidance in preparing for the conference call, and should be prepared to discuss any proposed changes to the Scheduling Order entered concurrently herewith and any motion the parties anticipate filing during the trial.

---

[1] Office Patent Trial Practice Guide, 77 Fed. Reg. 48,756, 48,765-66 (Aug. 14, 2012).

21

Case IPR2013-00602
Patent 6,466,568

For PETITIONER:

Dominic E. Massa
Michael A. Diner
WILMER CUTLER PICKERING HALE AND DORR LLP
dominic.massa@wilmerhale.com
michael.diener@wilmerhale.com

For PATENT OWNER:

Peter J. Ayers
J. Christopher Lynch
LEE & HAYES PLLC
peter@leehayes.com
chris@leehayes.com

22

**A0151**

Case IPR2013-00602

## PATENT OWNER RESPONSE TO PETITION

## I.    Statement of Precise Relief Requested

Pursuant to 35 U.S.C. § 316 and 37 C.F.R. § 42.120, Patent Owner requests that the Board confirm the validity of claims 1-6 of the '568 Patent. Specifically Patent Owner requests that the Board find:

A.    Claims 1-6 of the '568 Patent are not anticipated under 35 U.S.C. § 102 by Morley;

B.    Claims 1-6 of the '568 Patent are non-obvious under 35 U.S.C. 103 over Adams; and

C.    That this *inter partes* review is barred under 35 U.S.C. § 315(b).

## II.    Statement of Facts

Over three years before Broadcom filed the present Petition, Ericsson served a complaint On September 14, 2010, Ericsson filed a complaint against D-Link Corporation and D-Link Systems, Inc. ("D-Link"), Netgear, Inc. ("Netgear"), Acer Inc. and Acer America Corporation ("Acer"), and Gateway Inc. ("Gateway") for infringement of its patents. *Ericsson Inc. v. D-Link Corp.*, No. 6:10-CV-473 (LED/KGF) ("D-Link Lawsuit"); (Ex. 2002). Ericsson later amended its complaint and added Dell, Inc. ("Dell"), Toshiba Corporation, Toshiba America,

2

**A0160**

Case IPR2013-00602

Inc., Toshiba America Information Systems, Inc. and Toshiba America Consumer

Products, LLC ("Toshiba"), and Belkin International, Inc. ("Belkin") as

defendants.[1] (Ex. 2003).

The complaint alleged infringement of U.S. Patent Nos. 6,424,625,

6,519,215, and 6,466,568. (Ex. 2004). The D-Link Defendants challenged the

validity of Ericsson's patents and denied infringement. With respect to validity, the

D-Link Defendants served thousands of pages of invalidity contentions and expert

reports, involving many of the same assertions that are now the basis for

Broadcom's IPR petition. With respect to infringement, the Defendants' supplier,

Broadcom, produced technical documents relating to the design and operation of

its chips and agreed to voluntarily appear and testify at trial on behalf of the D-

Link Defendants. (Exs. 2004, 2015). On the eve of trial, the D-Link Defendants

abandoned their invalidity case regarding the '215 Patent and the '568 Patent, but

continued challenging validity with respect to the '625 Patent. At the end of the

trial, the jury found that the D-Link Defendants infringed three Ericsson patents

based on their WLAN-compliant products. (Ex. 2018). The D-Link Defendants

---

[1] The defendants listed in the Complaint and the Amended Complaint shall collectively be referred to as "D-Link Defendants."

3

**A0161**

Case IPR2013-00602

appealed to the Federal Circuit (where the appeal is now pending), D-Link Lawsuit, Nos. 2013-1625, -1631, -1632, -1633.

Broadcom has been working behind the scenes for years to help its customers defeat Ericsson's infringement claims. As far back as July 2010, Broadcom assisted Acer, during negotiations with Ericsson, in analyzing the very patents that are now the subject of Broadcom's petition. (Ex. 2007). Discussing an upcoming meeting on that topic, an Acer executive noted, "[The] [m]ain purpose is to discuss comments from Acer's vendors, including Intel, Broadcom and Atheros." *Id*. As part of its effort to bring to the attention of the Board information bearing on the relationship among Broadcom and the D-Link Defendants, Ericsson provided notice to Acer that it was seeking relief from the Protective Order in the D-Link Lawsuit. (Ex. 2008). In response, Acer asserted that the information Ericsson sought to give the Board was "privileged and [was] inadvertently produced." *Id.* Acer obviously believes that its relationship with Broadcom is sufficiently close, and their interests are sufficiently aligned, to support a privilege covering relevant communications between the two.

Broadcom's SEC filings furnish additional evidence that it was a real party-in-interest in the D-Link Lawsuit, in privity with the D-Link Defendants, and that the D-Link Defendants are real parties in interest to its IPR petition. (Ex. 2005).

4

**A0162**

This page contains confidential information.

Please refer to A0218, which contains the redacted, public version of this page.

Case IPR2013-00602

references the D-Link Defendants used in their invalidity case.[2] Broadcom made

the rote assertion that there were no other real parties in interest, but in the body of

its petition admitted that it supplied "Wi-Fi compliant products, such as the

BCM4313 and BCM4321" to the D-Link Defendants that were found to infringe.

Paper No. 2 at 1. It requires no logical leap to see first, that Broadcom has a duty to

indemnify (and a community of interest with) some or all D-Link Defendants

because its own products caused the D-Link Defendants to infringe Ericsson's

patents, and second, that the coordination of Broadcom's successive attack on

Ericsson's patents is no coincidence.

There is further evidence that the D-Link Defendants are real parties in

interest to Broadcom's IPR proceeding. Broadcom filed a "Motion of Amici Wi-Fi

Chip Companies" in this Court, in the pending appeal from the judgment in the D-

Link Lawsuit.  (Ex. 2017).  In that motion, Broadcom specifically stated that the

damages verdict "affect[s] amici even though they were not parties to the case"

because "the award would affect demand for those chips and *may also provoke*

*indemnification issues*."  (*Id.* at p.4) (emphasis added).  This demonstrates not only

---

[2] Broadcom immediately petitioned for *inter partes* review ("IPR") of the three patents the D-Link Defendants were found to infringe—U.S. Patent Nos. 6,466,568 ("the '568 Patent") (IPR2013-00602), 6,424,625 ("the '625 Patent") (IPR2013-00636, and 6,772, 215 ("the '215 Patent") (IPR2013-00601).

Case IPR2013-00602

the effect of the relationship, but also Broadcom's willingness to take action in support of the D-Link Defendants.

Broadcom cannot deny the existence of indemnity agreements and other evidence bearing on its community of interests with the D-Link Defendants, but Ericsson was prevented from bringing these to the attention of the Board because they are subject to a Protective Order. (Ex. 2016).   The contents of these documents continues to remain secret, but their existence is not: in its public order denying Ericsson Inc.'s Emergency Motion for Relief from the Protective Order, the district court recited that "[d]uring the course of the litigation, Ericsson discovered (1) an indemnity agreement between Toshiba and non-party Broadcom Corporation ('Broadcom'), (2) an indemnity agreement between Dell and Broadcom, and (3) an email between Dell and Broadcom discussing indemnification[.]" (Ex. 2016). There is no question an indemnity relationship exists between Broadcom and at least two of the D-Link Defendants and there was communication regarding the relationship during the pendency of the D-Link lawsuit.

The Board denied Ericsson's request for discovery that would have established the existence of the indemnity relationships, the substance of the conversation between Dell and Broadcom pertaining to Broadcom's indemnity

7

**A0165**

Case IPR2013-00602

obligation, and likely produced additional evidence establishing Broadcom's privity relationship with the defendants. Paper No. 21. Ericsson filed a Request for Rehearing that the Board denied. Paper No. 26. The Board issued its Decision for Institution of *Inter Partes* Review on March 10, 2014, Paper No. 27, and Ericsson now submits its Patent Owner's Response.

## III.    Broadcom Cannot Prevail

The D-Link Defendants were formally served with a complaint more than one year before the filing date of the Petition; Petitioner is subject to the 35 U.S.C. § 315(b)[3] bar as a privy to the D-Link Defendants, and because the D-Link Defendants are real parties-in-interest to this action, despite Petitioner's failure to designate them as such under 35 U.S.C. § 312(a)(2).

### A.    Broadcom is in Privity with the D-Link Defendants

Broadcom has an indemnity relationship with Dell and Toshiba, and has initiated multiple legal actions on behalf of the community of interest. These

---

[3] Under 35 U.S.C. § 315(b), "[a]n inter partes review may not be instituted if the petition requesting the proceeding is filed more than 1 year after the date on which the petitioner, real party in interest, or privy of the petitioner is served with a complaint alleging infringement of the patent."

Case IPR2013-00602

actions specifically relate to the '568 Patent and Broadcom's BCM4313 and BCM4321 chips, the property in question here. The result of these legal actions will directly impact both Broadcom and these D-Link Defendants, demonstrating that their relationship is sufficiently close that both should be bound by the trial outcome and related estoppels.

The term "privity" describes a relationship between a litigant and a nonparty that is characterized by a "mutuality of interest," Ex. 2019 (*Black's Law Dictionary*, 9th Ed. (2009)), "sufficiently close such that both should be bound by the trial outcome and related estoppels," Office Patent Trial Practice Guide, 77 Fed. Reg. at 48759. Both Congress and the PTO expanded the meaning of privity for use in the AIA and acknowledged that the PTO will give effect to judgments by extending the term "beyond the classical description." 154 Cong. Rec. S9987 (daily ed. Sept. 27, 2008) (statement of Sen. Kyl) (citing *Cal. Physicians' Serv. v. Aoki Diabetes Research Inst.,* 163 Cal. App. 4th 1506 (Cal. App. 2008)); *see also* Trial Practice Guide, 77 Fed. Reg. at 48,759. The PTO further noted that "privity is an equitable rule that takes into account the 'practical situation,' and should extend to parties to transactions and other activities relating to the property in question." Trial Practice Guide, 77 Fed. Reg. at 48759 (quoting 157 Cong. Rec. S1376 (dialed ed. Mar. 8, 2011) (statement of Sen. Kyl)). Thus, both Congress and

Case IPR2013-00602

the PTO specifically expanded the traditional notions of privity to cater the doctrine to the unique context of IPR proceedings.

The PTO acknowledged the aim of the AIA in the Trial Practice Guide and stated that there are *multiple* factors relevant to the "real party-in-interest" and "privity" analysis, and it specifically cited both *Taylor v. Sturgell*, 553 U.S. 880 (2008) and *Aoki*, 163 Cal. App. 4th 1506. *Taylor* listed six distinct bases on which a party in a later case could be bound by the judgment in an earlier case to which he was not a party. 553 U.S. at 894–95. Two relevant factors listed in *Taylor* are whether the parties maintain a pre-existing "substantive legal relationship," or whether the later party had the *opportunity* to control the original party's participation in a proceeding. *Id.* Each of these factors is applicable here.

When discussing "substantive legal relationships," *Taylor* specifically stated that these relationships "are sometimes collectively referred to as 'privity.'" *Id.* at 894 n.8. The Court then cited to the Restatement:

> [A] person standing in one of a variety of pre-existing legal relationships with a party may be bound by a judgment affecting that party. These relationships are often referred to as involving "privity." The circumstances under which such relationships result in preclusion are the subject of specific rules such as those governing . . . *indemnitor and indemnitee*[.]

2 Restatement of Judgments § 62, Comment a (emphasis added); *see also Speedtrack, Inc. v. Office Depot, Inc.*, No. C 07-3602 PJH, 2014 WL 1813292, at

10

**A0168**

Case IPR2013-00602

*5-6 (N.D. Cal. May 6, 2014) (an indemnification agreement between the defendants and their software supplier established that the parties were in privity despite a lack of control over the suit, barring the infringement claims as res judicata).    The Supreme Court specifically relied on the Restatement, and explained that the term "privity" has "come to be used more broadly, as a way to express the conclusion that nonparty preclusion is appropriate on any ground." *Taylor*, 553 U.S. at 894 n. 8 (citing 18A Wright & Miller § 4449, pp. 351-353, and n. 33). Thus, the Court not only relied on authority that prescribes an indemnity relationship as a pre-existing substantive legal relationship, but also confirmed the broader interpretation of the term "privity."

The substantive legal relationship between Broadcom and the D-Link Defendants, specifically Dell and Toshiba, relates to the property in question. Ericsson's patents are the property in question both here and in the previous litigation—and, as Broadcom admits, both proceedings are closely related: "Patent Owner's infringement allegations were based in part on Defendants' use of Petitioner's WiFi compliant products, such as the BCM4313 and BCM4321." Paper No. 3 at 1. Ericsson proved the existence of Broadcom's indemnity relationships that dictate its contractual relationship to the property, and also that Broadcom has an express policy of initiating litigation to control the property, and

11

**A0169**

Case IPR2013-00602

did take several actions relating to the property in question during the D-Link Lawsuit. (*See* Exs. 2005 at 53/65; 2009, 2015 at p. 3, 6, 2016, 2017). Thus, not only does Broadcom maintain substantive legal relationships with the D-Link Defendants, but it has carried out multiple legal actions to control the property in question, and could have exercised control the D-Link Lawsuit. These substantive legal relationships and corresponding actions to control the '568 Patent prove that Broadcom is in privity with the Dell and Toshiba, among others, and therefore barred under Section 315(b).

**B.    The D-Link Defendants are Real Parties-in-Interest.**

The D-Link Defendants' substantive legal relationships with Broadcom and the parties' coordinated activity demonstrate that the D-Link Defendants are real parties in interest to this IPR. In IPR proceedings, "the 'real party-in-interest' is the party that desires review of the patent. Thus, the 'real party-in-interest' may be the petitioner itself, and/or it may be the party or parties at whose behest the petition has been filed." Trial Practice Guide, 77 Fed. Reg. at 48759. The same factors for determining privity apply to real parties in interest. *Id.* In addition, the PTO also relies on *In re Guan Inter Partes Reexamination* Proceeding, Control No. 95/001,045, Decision Vacating Filing Date, at 8 (Aug. 25, 2008), which states that the petitioner must identify another entity as the real party in interest if it

12

**A0170**

Case IPR2013-00602

"[a]llow[s] another entity to direct or control the content (e.g., *provide the prior patents/printed publication on which the reexam is to be based*) of the request whether such is termed 'technical review' or some other phrase." (emphasis added). Broadcom's substantive legal relationships with at least Dell and Toshiba, Broadcom's use of the same prior art references as the D-Link Defendants, and the timing of Broadcom's Petition for IPR confirm that both Broadcom and the D-Link Defendants are real parties in interest.

On August 8, 2013, Ericsson obtained a judgment of infringement against the D-Link Defendants for three patents. (Ex. 2018). Less than three months later, Broadcom filed its Petition for IPR of the same claims infringed by the D-Link Defendants' use of its chips, relying on the same reference the D-Link Defendants used in their invalidity case. For obvious reasons, Broadcom did not seek review of the claims the district court found to *not* be infringed. (Ex. 2018).

Broadcom instead made the rote assertion that there were no other real parties in interest. However, Broadcom admitted that it supplied the property in question, namely the "Wi-Fi compliant products, such as the BCM4313 and BCM4321" to the D-Link Defendants. Paper No. 3 at 1. The only logical inference is that Broadcom's duty to indemnify some or all the D-Link Defendants triggered

13

**A0171**

Case IPR2013-00602

the successive attack on Ericsson's patents, and that the D-Link Defendants desire review of the '215 Patent.

In addition, Broadcom made it clear that both itself and the D-Link Defendants desire review of the patent in its "Motion of Amici Wi-Fi Chip Companies." Broadcom specifically stated that the damages verdict in the D-Link Lawsuit "affect[s] amici even though they were not parties to the case" because "the award would affect demand for those chips and *may also provoke indemnification issues*." (Ex. 2017 at p. 4) (emphasis added). This demonstrates that Broadcom and the D-Link Defendants have common interests in the '568 Patent, and that Broadcom is willing to take action on behalf of the D-Link Defendants. Broadcom cannot hide behind its rote assertions when it is clear that the D-Link Defendants "desire[ ] review of the patent" and, therefore, are real parties in interest.

The coordination between Broadcom and the D-Link Defendants and their indemnity agreements clearly demonstrate that the D-Link Defendants are real parties in interest. Broadcom failed to properly designate them as such under 35 U.S.C. § 312(a)(2), and because the D-Link Defendants were served with a complaint alleging infringement of the '568 Patent more than one year before Broadcom filed its Petition, Broadcom is barred from review under Section 315(b).

14

**A0172**

**UNITED STATES PATENT AND TRADEMARK OFFICE**

**BEFORE THE PATENT TRIAL AND APPEAL BOARD**

BROADCOM CORPORATION
Petitioner

v.

TELEFONAKTIEBOLAGET LM ERICSSON (PUBL)
Patent Owner

_____

Case IPR2013-00602
Patent 6,466,568
Title: Multi-Rate Radiocommunication Systems and Terminals

**PATENT OWNER'S RESPONSE
BY ERICSSON UNDER 37 C.F.R. § 42.120**

**A0207**

Case IPR2013-00602

## PATENT OWNER RESPONSE TO PETITION

### I.    Statement of Precise Relief Requested

Pursuant to 35 U.S.C. § 316 and 37 C.F.R. § 42.120, Patent Owner requests that the Board confirm the validity of claims 1-6 of the '568 Patent. Specifically Patent Owner requests that the Board find:

A.    Claims 1-6 of the '568 Patent are not anticipated under 35 U.S.C. § 102 by Morley;

B.    Claims 1-6 of the '568 Patent are non-obvious under 35 U.S.C. 103 over Adams; and

C.    That this *inter partes* review is barred under 35 U.S.C. § 315(b).

### II.    Statement of Facts

Over three years before Broadcom filed the present Petition, Ericsson served a complaint On September 14, 2010, Ericsson filed a complaint against D-Link Corporation and D-Link Systems, Inc. ("D-Link"), Netgear, Inc. ("Netgear"), Acer Inc. and Acer America Corporation ("Acer"), and Gateway Inc. ("Gateway") for infringement of its patents. *Ericsson Inc. v. D-Link Corp.*, No. 6:10-CV-473 (LED/KGF) ("D-Link Lawsuit"); (Ex. 2002). Ericsson later amended its complaint and added Dell, Inc. ("Dell"), Toshiba Corporation, Toshiba America,

2

**A0215**

Case IPR2013-00602

Inc., Toshiba America Information Systems, Inc. and Toshiba America Consumer

Products, LLC ("Toshiba"), and Belkin International, Inc. ("Belkin") as

defendants.[1] (Ex. 2003).

The complaint alleged infringement of U.S. Patent Nos. 6,424,625,

6,519,215, and 6,466,568.  (Ex. 2004).  The D-Link Defendants challenged the

validity of Ericsson's patents and denied infringement. With respect to validity, the

D-Link Defendants served thousands of pages of invalidity contentions and expert

reports, involving many of the same assertions that are now the basis for

Broadcom's IPR petition. With respect to infringement, the Defendants' supplier,

Broadcom, produced technical documents relating to the design and operation of

its chips and agreed to voluntarily appear and testify at trial on behalf of the D-

Link Defendants.  (Exs. 2004, 2015).  On the eve of trial, the D-Link Defendants

abandoned their invalidity case regarding the '215 Patent and the '568 Patent, but

continued challenging validity with respect to the '625 Patent.  At the end of the

trial, the jury found that the D-Link Defendants infringed three Ericsson patents

based on their WLAN-compliant products.  (Ex. 2018). The D-Link Defendants

---

[1] The defendants listed in the Complaint and the Amended Complaint shall collectively be referred to as "D-Link Defendants."

3

**A0216**

Case IPR2013-00602

appealed to the Federal Circuit (where the appeal is now pending), D-Link Lawsuit, Nos. 2013-1625, -1631, -1632, -1633.

Broadcom has been working behind the scenes for years to help its customers defeat Ericsson's infringement claims.  As far back as July 2010, Broadcom assisted Acer, during negotiations with Ericsson, in analyzing the very patents that are now the subject of Broadcom's petition.  (Ex. 2007). Discussing an upcoming meeting on that topic, an Acer executive noted, "[The] [m]ain purpose is to discuss comments from Acer's vendors, including Intel, Broadcom and Atheros." *Id.*  As part of its effort to bring to the attention of the Board information bearing on the relationship among Broadcom and the D-Link Defendants, Ericsson provided notice to Acer that it was seeking relief from the Protective Order in the D-Link Lawsuit. (Ex. 2008).  In response, Acer asserted that the information Ericsson sought to give the Board was "privileged and [was] inadvertently produced." *Id.* Acer obviously believes that its relationship with Broadcom is sufficiently close, and their interests are sufficiently aligned, to support a privilege covering relevant communications between the two.

Broadcom's SEC filings furnish additional evidence that it was a real party-in-interest in the D-Link Lawsuit, in privity with the D-Link Defendants, and that the D-Link Defendants are real parties in interest to its IPR petition.  (Ex. 2005).

4

**A0217**

Case IPR2013-00602

Broadcom states in these filings that it is not uncommon for Broadcom "to indemnify some customers and strategic partners under our agreements if a third party alleges or if a court finds that our products or activities have infringed upon, misappropriated or misused another party's proprietary rights." (*Id.* at 53/65). To protect these interests, Broadcom "engage[s] in litigation to . . . determine the validity and scope of the proprietary rights of others, including [its] customers." (*Id.*) This IPR is just another instance of Broadcom filing litigation on behalf of its customers pursuant to its indemnity obligations.



(Ex. 2009).

(*Id.* at ¶101).

Less than three months after Ericsson obtained a judgment of infringement against the D-Link Defendants, Broadcom filed its petition for IPR of the same claims infringed by the D-Link Defendants' use of its chips, relying on the same

5

**A0218**

Case IPR2013-00602

references the D-Link Defendants used in their invalidity case.[2] Broadcom made the rote assertion that there were no other real parties in interest, but in the body of its petition admitted that it supplied "Wi-Fi compliant products, such as the BCM4313 and BCM4321" to the D-Link Defendants that were found to infringe. Paper No. 2 at 1. It requires no logical leap to see first, that Broadcom has a duty to indemnify (and a community of interest with) some or all D-Link Defendants because its own products caused the D-Link Defendants to infringe Ericsson's patents, and second, that the coordination of Broadcom's successive attack on Ericsson's patents is no coincidence.

There is further evidence that the D-Link Defendants are real parties in interest to Broadcom's IPR proceeding. Broadcom filed a "Motion of Amici Wi-Fi Chip Companies" in this Court, in the pending appeal from the judgment in the D-Link Lawsuit. (Ex. 2017). In that motion, Broadcom specifically stated that the damages verdict "affect[s] amici even though they were not parties to the case" because "the award would affect demand for those chips and *may also provoke indemnification issues*." (*Id.* at p.4) (emphasis added). This demonstrates not only

---

[2] Broadcom immediately petitioned for *inter partes* review ("IPR") of the three patents the D-Link Defendants were found to infringe—U.S. Patent Nos. 6,466,568 ("the '568 Patent") (IPR2013-00602), 6,424,625 ("the '625 Patent") (IPR2013-00636, and 6,772, 215 ("the '215 Patent") (IPR2013-00601).

6

**A0219**

Case IPR2013-00602

the effect of the relationship, but also Broadcom's willingness to take action in support of the D-Link Defendants.

Broadcom cannot deny the existence of indemnity agreements and other evidence bearing on its community of interests with the D-Link Defendants, but Ericsson was prevented from bringing these to the attention of the Board because they are subject to a Protective Order. (Ex. 2016). The contents of these documents continues to remain secret, but their existence is not: in its public order denying Ericsson Inc.'s Emergency Motion for Relief from the Protective Order, the district court recited that "[d]uring the course of the litigation, Ericsson discovered (1) an indemnity agreement between Toshiba and non-party Broadcom Corporation ('Broadcom'), (2) an indemnity agreement between Dell and Broadcom, and (3) an email between Dell and Broadcom discussing indemnification[.]" (Ex. 2016). There is no question an indemnity relationship exists between Broadcom and at least two of the D-Link Defendants and there was communication regarding the relationship during the pendency of the D-Link lawsuit.

The Board denied Ericsson's request for discovery that would have established the existence of the indemnity relationships, the substance of the conversation between Dell and Broadcom pertaining to Broadcom's indemnity

7

**A0220**

Case IPR2013-00602

obligation, and likely produced additional evidence establishing Broadcom's privity relationship with the defendants. Paper No. 21. Ericsson filed a Request for Rehearing that the Board denied. Paper No. 26. The Board issued its Decision for Institution of *Inter Partes* Review on March 10, 2014, Paper No. 27, and Ericsson now submits its Patent Owner's Response.

## III.    Broadcom Cannot Prevail

The D-Link Defendants were formally served with a complaint more than one year before the filing date of the Petition; Petitioner is subject to the 35 U.S.C. § 315(b)[3] bar as a privy to the D-Link Defendants, and because the D-Link Defendants are real parties-in-interest to this action, despite Petitioner's failure to designate them as such under 35 U.S.C. § 312(a)(2).

### A.    Broadcom is in Privity with the D-Link Defendants

Broadcom has an indemnity relationship with Dell and Toshiba, and has initiated multiple legal actions on behalf of the community of interest. These

---

[3] Under 35 U.S.C. § 315(b), "[a]n inter partes review may not be instituted if the petition requesting the proceeding is filed more than 1 year after the date on which the petitioner, real party in interest, or privy of the petitioner is served with a complaint alleging infringement of the patent."

8

**A0221**

Case IPR2013-00602

actions specifically relate to the '568 Patent and Broadcom's BCM4313 and BCM4321 chips, the property in question here. The result of these legal actions will directly impact both Broadcom and these D-Link Defendants, demonstrating that their relationship is sufficiently close that both should be bound by the trial outcome and related estoppels.

The term "privity" describes a relationship between a litigant and a nonparty that is characterized by a "mutuality of interest," Ex. 2019 (*Black's Law Dictionary*, 9th Ed. (2009)), "sufficiently close such that both should be bound by the trial outcome and related estoppels," Office Patent Trial Practice Guide, 77 Fed. Reg. at 48759. Both Congress and the PTO expanded the meaning of privity for use in the AIA and acknowledged that the PTO will give effect to judgments by extending the term "beyond the classical description." 154 Cong. Rec. S9987 (daily ed. Sept. 27, 2008) (statement of Sen. Kyl) (citing *Cal. Physicians' Serv. v. Aoki Diabetes Research Inst.,* 163 Cal. App. 4th 1506 (Cal. App. 2008)); *see also* Trial Practice Guide, 77 Fed. Reg. at 48,759. The PTO further noted that "privity is an equitable rule that takes into account the 'practical situation,' and should extend to parties to transactions and other activities relating to the property in question." Trial Practice Guide, 77 Fed. Reg. at 48759 (quoting 157 Cong. Rec. S1376 (dialed ed. Mar. 8, 2011) (statement of Sen. Kyl)). Thus, both Congress and

9

**A0222**

Case IPR2013-00602

the PTO specifically expanded the traditional notions of privity to cater the doctrine to the unique context of IPR proceedings.

The PTO acknowledged the aim of the AIA in the Trial Practice Guide and stated that there are *multiple* factors relevant to the "real party-in-interest" and "privity" analysis, and it specifically cited both *Taylor v. Sturgell*, 553 U.S. 880 (2008) and *Aoki*, 163 Cal. App. 4th 1506. *Taylor* listed six distinct bases on which a party in a later case could be bound by the judgment in an earlier case to which he was not a party. 553 U.S. at 894–95. Two relevant factors listed in *Taylor* are whether the parties maintain a pre-existing "substantive legal relationship," or whether the later party had the *opportunity* to control the original party's participation in a proceeding. *Id.* Each of these factors is applicable here.

When discussing "substantive legal relationships," *Taylor* specifically stated that these relationships "are sometimes collectively referred to as 'privity.'" *Id.* at 894 n.8. The Court then cited to the Restatement:

> [A] person standing in one of a variety of pre-existing legal relationships with a party may be bound by a judgment affecting that party. These relationships are often referred to as involving "privity." The circumstances under which such relationships result in preclusion are the subject of specific rules such as those governing . . . *indemnitor and indemnitee*[.]

2 Restatement of Judgments § 62, Comment a (emphasis added); *see also Speedtrack, Inc. v. Office Depot, Inc.*, No. C 07-3602 PJH, 2014 WL 1813292, at

10

**A0223**

Case IPR2013-00602

*5-6 (N.D. Cal. May 6, 2014) (an indemnification agreement between the defendants and their software supplier established that the parties were in privity despite a lack of control over the suit, barring the infringement claims as res judicata). The Supreme Court specifically relied on the Restatement, and explained that the term "privity" has "come to be used more broadly, as a way to express the conclusion that nonparty preclusion is appropriate on any ground." *Taylor*, 553 U.S. at 894 n. 8 (citing 18A Wright & Miller § 4449, pp. 351-353, and n. 33). Thus, the Court not only relied on authority that prescribes an indemnity relationship as a pre-existing substantive legal relationship, but also confirmed the broader interpretation of the term "privity."

The substantive legal relationship between Broadcom and the D-Link Defendants, specifically Dell and Toshiba, relates to the property in question. Ericsson's patents are the property in question both here and in the previous litigation—and, as Broadcom admits, both proceedings are closely related: "Patent Owner's infringement allegations were based in part on Defendants' use of Petitioner's WiFi compliant products, such as the BCM4313 and BCM4321." Paper No. 3 at 1. Ericsson proved the existence of Broadcom's indemnity relationships that dictate its contractual relationship to the property, and also that Broadcom has an express policy of initiating litigation to control the property, and

11

**A0224**

Case IPR2013-00602

did take several actions relating to the property in question during the D-Link Lawsuit. (*See* Exs. 2005 at 53/65; 2009, 2015 at p. 3, 6, 2016, 2017). Thus, not only does Broadcom maintain substantive legal relationships with the D-Link Defendants, but it has carried out multiple legal actions to control the property in question, and could have exercised control the D-Link Lawsuit. These substantive legal relationships and corresponding actions to control the '568 Patent prove that Broadcom is in privity with the Dell and Toshiba, among others, and therefore barred under Section 315(b).

## B. The D-Link Defendants are Real Parties-in-Interest.

The D-Link Defendants' substantive legal relationships with Broadcom and the parties' coordinated activity demonstrate that the D-Link Defendants are real parties in interest to this IPR. In IPR proceedings, "the 'real party-in-interest' is the party that desires review of the patent. Thus, the 'real party-in-interest' may be the petitioner itself, and/or it may be the party or parties at whose behest the petition has been filed." Trial Practice Guide, 77 Fed. Reg. at 48759. The same factors for determining privity apply to real parties in interest. *Id.* In addition, the PTO also relies on *In re Guan Inter Partes Reexamination* Proceeding, Control No. 95/001,045, Decision Vacating Filing Date, at 8 (Aug. 25, 2008), which states that the petitioner must identify another entity as the real party in interest if it

12

**A0225**

Case IPR2013-00602

"[a]llow[s] another entity to direct or control the content (e.g., *provide the prior patents/printed publication on which the reexam is to be based*) of the request whether such is termed 'technical review' or some other phrase." (emphasis added). Broadcom's substantive legal relationships with at least Dell and Toshiba, Broadcom's use of the same prior art references as the D-Link Defendants, and the timing of Broadcom's Petition for IPR confirm that both Broadcom and the D-Link Defendants are real parties in interest.

On August 8, 2013, Ericsson obtained a judgment of infringement against the D-Link Defendants for three patents. (Ex. 2018). Less than three months later, Broadcom filed its Petition for IPR of the same claims infringed by the D-Link Defendants' use of its chips, relying on the same reference the D-Link Defendants used in their invalidity case. For obvious reasons, Broadcom did not seek review of the claims the district court found to *not* be infringed. (Ex. 2018).

Broadcom instead made the rote assertion that there were no other real parties in interest. However, Broadcom admitted that it supplied the property in question, namely the "Wi-Fi compliant products, such as the BCM4313 and BCM4321" to the D-Link Defendants. Paper No. 3 at 1. The only logical inference is that Broadcom's duty to indemnify some or all the D-Link Defendants triggered

13

**A0226**

Case IPR2013-00602

the successive attack on Ericsson's patents, and that the D-Link Defendants desire review of the '215 Patent.

In addition, Broadcom made it clear that both itself and the D-Link Defendants desire review of the patent in its "Motion of Amici Wi-Fi Chip Companies." Broadcom specifically stated that the damages verdict in the D-Link Lawsuit "affect[s] amici even though they were not parties to the case" because "the award would affect demand for those chips and *may also provoke indemnification issues*." (Ex. 2017 at p. 4) (emphasis added). This demonstrates that Broadcom and the D-Link Defendants have common interests in the '568 Patent, and that Broadcom is willing to take action on behalf of the D-Link Defendants. Broadcom cannot hide behind its rote assertions when it is clear that the D-Link Defendants "desire[ ] review of the patent" and, therefore, are real parties in interest.

The coordination between Broadcom and the D-Link Defendants and their indemnity agreements clearly demonstrate that the D-Link Defendants are real parties in interest. Broadcom failed to properly designate them as such under 35 U.S.C. § 312(a)(2), and because the D-Link Defendants were served with a complaint alleging infringement of the '568 Patent more than one year before Broadcom filed its Petition, Broadcom is barred from review under Section 315(b).

14

**A0227**

Case IPR2013-00602

type identifier"[4] means "an identifier that identifies the type of information conveyed in the payload, including but not limited to video, voice, data, and multimedia." But this construction is inconsistent with the intrinsic evidence as it gives no meaning to "service type" and is therefore unreasonable. *In re Abbott Diabetes Care Inc.*, 696 F.3d 1142, 1149 (Fed. Cir. 2012); (Akl Dec. ¶ 22.).

The broadest reasonable construction of the term "service type identifier which identifies a type of payload information" is "*an identifier that identifies a transmission characteristic of the service and the type of information conveyed in the payload*." (Akl Dec. ¶ 23.) As a starting point, the claim language requires two things of the "identifier": It must be of a "service type" and it must "identif[y] a type of payload information." '568 Pat. at cl. 1. While Broadcom's and the APJ's construction addresses the latter requirement, it reads the former out of the claim. (Akl Dec. ¶ 23.) And there is no justification for ignoring the recited claim language. Ericsson's construction, on the other hand, gives meaning to all words of the claim, and should be preferred. *See Garmin Int'l, Inc. v. Cuozzo Speed Techs. LLC*, IPR2012-00001, Paper No. 59, at 10 (Nov. 13, 2013) (construction

---

[4] Although the APJ adopted the Petitioner's construction, it nonetheless applied the petitioner's construction to a shorter phrase, *viz.*, "service type identifier."

21

**A0234**

Case IPR2013-00602

unsupportable. Instead, the broadest reasonable interpretation for "a service type identifier which identifies a type of payload information provided in said at least one first field" consistent with the totality of the written description is "an identifier that identifies a transmission characteristic of the service and identifies type of payload information."

## C.    Claims 1-6 are Not Anticipated by Morley

Morley does not anticipate claims 1-6 of the '568 Patent for two reasons. First, Morley does not disclose a "service type identifier" using the proper construction for that term. Second, Morley does not disclose an "identifier which identifies a type of payload information." Morley teaches or suggests the communication only one type of information, a composite voice frame and data, regardless of whether either one is present, and therefore the header does not identify a service. Additionally, the header in Morley does not identify transmission characteristics. Morley discloses transmitting a combined voice frame and data over a telephone network. The header, rather than identifying the type of information in the payload, identifies the format of the frame for the receiver to process the received information. Nor does Morley address optimally communicating each of these types of information as separate services.

27

**A0240**

Case IPR2013-00602

characteristics of the data. Even assuming that changing the mux frame format relates to transmission characteristics (which it does not), Morley teaches away from transmission characteristics. Any change in format in Morley is related only to header type 0, and header type zero does not identify any "information conveyed in the payload." (Morley, 8:18-40.)

Because the header identifies only the structure of the mux frame for proper decoding, the header value of Morley and Morley as a whole fail to disclose, teach or suggest "a service type identifier which identifies a type of payload information provided in said at least one first field" as recited by claim 1. (Akl Dec. ¶ 49.) Accordingly, Morley does not anticipate claim 1 of the '568 Patent. (Akl. Dec. ¶ 49.)

### 4. Morley does not anticipate claims 2-6 of the '568 Patent

Claims 2-6 of the '568 Patent depend from claim 1. Because Morley does not disclose, teach or suggest "a service type identifier which identifies a type of payload information provided in said at least one first field" as recited by claim 1, Broadcom cannot show that that claims 2-6 are anticipated by Morley.

### D.    Adams Does Not Render Claims 1-6 of the '568 Patent Obvious

Adams does not render obvious claims 1-6 of the '568 Patent for two reasons. First, Adams does not disclose a "service type identifier." Second,

37

**A0250**

Case IPR2013-00602

Adams does not disclose an "identifier which identifies a type of payload information" as required by the APJ's proposed construction. Adams discloses a system for receiving only three types of related data (video, audio, and associated data) for content programmer control of a satellite television display. Because Adams is concerned with only the transmission of a data stream as three different known and invariant packet types, and ignores identification of any transmission characteristics of such information communication, Adams discloses only one type of service, and thus does not disclose service type identifiers. (Akl Dec. ¶ 51.)

### 1. Overview of Adams

Adams relates to a satellite television receiver system that uses video and audio data streams in conjunction with associated data streams for "content programmer control of display and selection functions for a video system." (Ex. 1006 (Adams) at 1:9-11.) Adams discloses a "video system that employs packetized digital data streams to provide a video stream, an audio stream and a command and control associated data stream." (*Id.* at 2:53-56.) The system relies on devices that receive a data stream having separate audio, video, and data packets. Adams is not concerned with efficiently using bandwidth of the wireless media. (Akl Dec. ¶ 52.) Rather, Adams is directed toward programmer control of

38

**A0251**

Paper No. __

UNITED STATES PATENT AND TRADEMARK OFFICE

---

BEFORE THE PATENT TRIAL AND APPEAL BOARD

---

BROADCOM CORPORATION

Petitioner

v.

WI-FI ONE, LLC

Patent Owner

---

Case IPR2013-00602
U.S. Patent No. 6,466,568

---

**PETITIONER'S REPLY TO PATENT OWNER'S RESPONSE
UNDER 37 C.F.R. § 42.120**

Petitioner's Reply to Patent Owner's Response (IPR2013-00602)

## I.    BROADCOM'S PETITION IS NOT BARRED BY 35 U.S.C. § 315(B)

Owner[1] asserts that Broadcom's Petition is barred because Broadcom is a "privy" of the D-Link Defendants, the alleged "real parties-in-interest to this Action." (Response at 8; Paper 20). Owner has raised this identical argument twice, and has failed each time. This Board previously denied Owner's Motion for Additional Discovery regarding privity and real party-in interest issues and the Federal Circuit subsequently denied Owner's Petition for a Writ of Mandamus seeking to overturn this Board's decision. This third attempt relies on exactly the same arguments Owner made to this Board and the Federal Circuit and should be rejected for the same reasons. Owner offers no new reason whatsoever for this Board to reverse its prior decision that Owner's proffered "evidence" and legal authorities fail to amount to anything more than "speculation" or "a mere possibility" that Broadcom is in privity with the D-Link Defendants or that the D-Link Defendants are real parties-in-interest.

### A.    Broadcom is Not in Privity with the D-Link Defendants

Owner again relies on unsubstantiated allegations of Broadcom's "substantive legal relationship" of indemnity with the D-Link Defendants, "multiple legal actions on behalf of the community of interest," and Broadcom's

---

[1]    After institution, Ericsson transferred the '625 patent to Wi-Fi One, LLC. This Reply refers to the current and prior owners as "Owner".

**A0265**

Petitioner's Reply to Patent Owner's Response (IPR2013-00602)

"attendance" at the Texas trial to support its claim of privity. (*Id.*; Paper 20).

Owner's arguments, which rely on the same flawed and speculative "evidence"

asserted previously, fail to establish Broadcom as a privy. As the Board correctly

held, "indemnity payments and minor participation at trial are not sufficient to

establish privity." (Discovery Decision at 7 (*citing Bros, Inc. v. W.E. Grace Mfg.

Co.*, 261 F.2d 428, 429 (5th Cir. 1958); Paper 20). Instead, Owner must

demonstrate that Broadcom actively controlled the Texas Litigation. (*Id.* at 7-8;

Paper 20; *see also Goodman v. Super Mold Corp.*, 103 F.2d 474,482 (9th Cir.

1939) (no privity where there was no evidence manufacturer of accused infringing

device "had the right to control the defense of the suit."). Owner cannot, however

satisfy this burden, because Broadcom did not control – actively or otherwise – the

Texas Litigation. (Exhibit 1021.[2]) Indeed, this Board has already found that "the

---

[2]    The Board should again reject Owner's argument that if Broadcom had the

"opportunity to control" the Texas Litigation, this is sufficient to establish it as a

privy. First, Owner offers no evidence that Broadcom had any "opportunity" to

control the Texas Litigation. Second, mere "opportunity" to control litigation

cannot create privity; a party must have actual control of the related litigation. (*Id.*

at 9 (citing *Dentsply Intern., Inc. v. Kerr Mfg. Co.*, 42 F.Supp.2d 385, 398 (D. Del.

1999) (no privity where party's role in a prior suit was "limited to observing the

proceedings and filing amicus curiae briefs.")); Paper No. 20).

- 2 -

**A0266**

Petitioner's Reply to Patent Owner's Response (IPR2013-00602)

totality of [the] evidence fails to amount to more than a 'mere possibility' that

Broadcom controlled, or could have controlled, the Texas Litigation." (Discovery

Decision at 11; Paper No. 20). Such a mere possibility, insufficient even to

warrant further discovery, cannot possibly rise to the level sufficient to bar this

Petition.

**B.**      **Broadcom, Not the D-Link Defendants, is the Real Party-in-Interest**

Owner's infringement allegations in the Texas Litigation (and its foreign

litigation activities) accuse functionality found entirely within Broadcom's Wi-Fi

products, not within other components of the end-user products sold by the D-Link

Defendants. As the manufacturer of the accused functionality, Broadcom has a

very real interest in demonstrating that Owner's patents are invalid. And, because

Broadcom was not a party to – and did not control – the Texas Litigation, it has

had no prior opportunity to raise the arguments in its Petition. That Broadcom's

Petition uses "some of the same evidence, including known prior art" as in the

Texas Litigation, does not demonstrate that Broadcom controlled the Texas

litigation or that the D-Link Defendants controlled Broadcom's Petition. Again,

this Board has already found that the evidence proffered by Owner "does not

amount to more than speculation that any of Broadcom's activity constitutes

evidence of collusion with the D-Link Defendants." (Discovery Decision at 13;

**A0267**

Petitioner's Reply to Patent Owner's Response (IPR2013-00602)

Paper No. 20).  Again, such speculation, insufficient even to warrant further discovery, cannot possibly bar this Petition.

## II.    CLAIM CONSTRUCTION

The Board properly construed the term "service type identifier" to mean "an identifier that identifies the type of information conveyed in the payload, including but not limited to video, voice, data, and multimedia."  This construction is consistent with numerous statements in the specification and even a definition:

> Other ***types of information transmission, e.g., video or hybrid voice, data and video*** to support internet connections, will likely be supported in the future.  ***These various types of information communication (also referred to herein as different "services")*** will likely have different optimal transmission characteristics.

('568 patent at 2:25-30; Ex. 1001.[3])

Despite this, Owner argues that the term means (as compared to the Board's construction): "an identifier that identifies <u>a transmission characteristic of the service ***and*** </u> the type of information conveyed in the payload, ~~including but not limited to video, voice, data, and multimedia~~."  Owner's construction should be

---

[3]    All emphasis is added unless otherwise stated.

- 4 -

Petitioner's Reply to Patent Owner's Response (IPR2013-00602)

rejected because it is inconsistent with the claims, the specification, and statements made by Owner during prosecution of the '568 patent.

*First*, the phrase "of the service" in Owner's proposed construction lacks antecedent basis. The only other recitation of "service" in claim 1 is the term "service type identifier," which does not provide antecedent basis for a "service." Indeed, the dependent claims never refer to a "service," rather they refer back to "said service type identifier." ('568, claims 2 and 7; Ex. 1001).

*Second*, the term "service type identifier" appears twice in the detailed description, and neither such occurrence supports Owner's proposed construction. The first occurrence states that the:

> FOC may provide information relating to the same connection as the payload or data field in that time slot, e.g., a ***service type identifier which informs the mobile or base station of the type of information (e.g., voice, video or data) being conveyed in the payload***.

('568 at 3:11-19; Ex. 1001). This excerpt supports the Board's construction, because it discloses identifying *just* the "type of information." The second occurrence also fails to support Owner's proposed construction. (See '568 at 9:27-38; Ex. 1001). Instead, it makes clear that a service type identifier can identify one or more of (a) the type of service in the payload, (b) the channel coding, "and/or"

- 5 -

**A0269**

Petitioner's Reply to Patent Owner's Response (IPR2013-00602)

(c) interleaving, not that the service type identifier must identify "transmission characteristics" as proposed by Owner.  According to the '568 patent – and Owner's expert – a service type identifier can identify just the type of information and the receiver can infer the channel coding and/or interleaving based on the type of information.  ('568 patent at 9:32-38; Ex. 1001; Akl Tr. at 39:12-19; Ex. 1022).

The only other mention of "service type identifier" is in the Abstract, which states, consistent with the Board's construction, that the service type identifier "***informs the mobile or base station of the type of information (e.g., voice, video or data) being conveyed in the payload***."  (*See, e.g., id.* 60:6-15 and 61:5-14).

*Third*, Owner's construction is inconsistent with statements Owner made during prosecution.   Specifically, Owner represented that it was "claiming the use of a field to identify the type of payload information ***and not*** *the type of channel coding*."  (*See*, May 10, 2002 Amd. at p. 5; Exhibit 1016).  Petitioner identified this very statement in its Petition (Paper No. 2 at 8), yet Owner failed to address this specific disclaimer other than to provide a blanket assertion that the prosecution history does not undermine its construction.  (*See* Resp. at 24, Paper No. 36).

## III.   CLAIMS 1-6 ARE INVALID OVER MORLEY

### A.    Morley Anticipates All Claims Under the Board's Construction

Under the Board's proper construction of "service type identifier," Morley anticipates claims 1-6.  To distinguish Morley from the Board's construction,

Petitioner's Reply to Patent Owner's Response (IPR2013-00602)

Owner argues that Morley "teaches away from transmission characteristics." (*Id.* at 37, Paper No. 36). However, identifying "transmission characteristics" is only required by Owner's construction, ***not*** the Board's, and thus is no distinction at all.

Owner's "first" argument is that "the header [in Morley] is not a 'service type identifier' because Morley only communicates a composite frame of voice and data." (Resp. at 32; Paper 36). It is unclear whether this argument is under the Board's construction or Owner's, but it reads in extraneous limitations to the term "service type identifier." Claim 1 only requires that the identifier be in a separate field from the payload, and "identif[y] a type of payload information." ('568 at claim 1; Ex. 1001). Owner agrees that "the header identifies the 'frame type,'" and that the "header value can be used to indicate which of a voice channel, one of three different data channels, or a combination of these channels is included in the multiplex frame." (Resp. at 29, 31-32; Paper 36). Morley thus discloses the "service type identifier." Owner's discussion about multiplexing and frame types is irrelevant.

Owner argues that Morley "does not disclose the "identifier identifying a type of information conveyed in the payload." (Resp. at 35-37, Paper No. 36). Again it is unclear whether this is under the Board's construction or Owner's, because this section of Owner's Response refers to transmission characteristics,

- 7 -

**A0271**

Petitioner's Reply to Patent Owner's Response (IPR2013-00602)

and again tries to read in additional characteristics of what a service is with irrelevant discussion.

Owner argues that "[t]he header in Morley defines the format (or structure) of the information transmitted, rather than identify the payload data itself." (*Id.* at 36). Owner therefore argues that Morley's header serves only two purposes: (1) to identify the frame type; and (2) to provide error correction. (*Id.* at 29-30) Owner's argument that identifying a video frame is different from identifying video data in a frame is already incorrect, but it is further undercut by Morley's disclosure that the header is used "to identify the ***contents*** of the frame." (Morley at 6:22-25; 1002). Morley discloses thirteen different types of frames, each including types of information: voice data, non-voice data (multiple types), or a combination of both. (*Id.* at 6:64-7:17; 1002).

Owner attempts to draw a distinction between the claimed "service type identifier" and a header value that "specifies which portions of the payload data are to be sent to the voice buffers and which portions are sent to the data buffers." (Resp. at 36, Paper 36). This distinction is without merit – identifying that data should be provided to voice or data processing is the same as identifying the type of data. The '568 patent itself explains that the identifier is used to "inform[] the mobile or base station of the type of information (*e.g.*, voice, video, or data) being conveyed in the payload," which "can be used by the receiving equipment to aid in

- 8 -

**A0272**

processing the information conveyed in the payload, *e.g.*, by knowing the channel coding rate." (*See, e.g.,* '568 at 3:16-18; Ex. 1001). So too in Morley, where the identifier identifies a type of information to allow the receiver to provide the identified data to the appropriate processing function.

**B.      Morley Anticipates All Claims Under Owner's Proposed Construction**

Owner argues that under its proposed construction (which is incorrect), Morley's header that identifies voice, data, and/or a combination (i.e., "service") does not identify any transmission characteristics. (Resp. at 33-35; Paper No. 36). This is incorrect because Morley discloses using the header to determine how to process the received data. (*See* Bims Reply Decl. ¶ 4; Ex. 1023). In Morley, the receiver operates at different rates for different types of information, *e.g.*, the modem data rate is 14,400 bps and the voice coder operates at 6,800 bps. (Morley at 52:45-47; Ex. 1002), and uses the header to process data (voice or non-voice) at the proper rate. For example, Figure 8 shows received data going to the appropriate voice or data buffer: "[f]rames of voice [data] are supplied to the voice decoder from the receive voice buffer 70. These can be read at a rate derived from the voice decoder clock." (*Id.* at 10:23-25; 1002) Thus, identifying the type of payload information *also* identifies the data rate (a transmission characteristic). (Bims Decl. ¶ 4; Ex. 1023). Owner's expert, Dr. Akl, agreed with the Board's

- 9 -

**A0273**

Petitioner's Reply to Patent Owner's Response (IPR2013-00602)

explanation that voice and data transmissions can be different services. (Akl Tr. at 12:14-13:1; Ex. 1022).

Morley also discloses that the "format of the mux frame may need to change according to the particular characteristics of a call" (Morley at 7:27-29; Ex. 1002), and that the structure of the multiplexer frames can be optimized "according to 'long term' requirements of the application and protocol layers," such as voice coder data rate and frame rate, and data bandwidth requirements. (*Id.* at 5:60-64; Ex. 1002). For example, in addition to the various voice and data frames, Morley includes a "Not Defined" frame type 3 that is "reserved for future expansion where more frame types may be required." (*Id.* at 7:23-25; Ex. 1002). Therefore, Morley discloses that a receiver can use the header to determine the associated voice and/or data channels and the rate at which to process the received data, all of which would be transmission characteristics. (Bims Decl. ¶ 5; Ex. 1023).

Owner argues Morley does not disclose a service type identifier for two flawed reasons. First, Owner argues that the '568 patent requires "a separate service type identifier for each service rather than redundant service type identifiers for a single service." (Resp. at 32; Paper No. 36). Owner therefore argues that Morley only discloses one "service" – a composite frame of voice and data. This argument is without merit. Owner's construction does not require separate service type identifiers for a plurality of services, and the claims do not

- 10 -

**A0274**

Petitioner's Reply to Patent Owner's Response (IPR2013-00602)

require it. Rather, Owner's construction requires an identifier that identifies a transmission characteristic "of the service."

Even if Owner's construction required separate service type identifiers for separate types of data, Morley discloses a header that identifies frames with voice data and separate frames with just data 0, data 1, or data 2 (where data 0, data 1 and data 2 are from different data channels), so Morley could have frames with voice only and other frames with data only. (Morley at 6:64-7:17; Ex. 1002). Morley's disclosure of transmitting voice, data, and hybrid voice/data therefore discloses transmitting data for different types of services. (*See* Akl Tr. at 12:14-13:1; Ex. 1022).

Second, Owner argues that the header in Morley does not identify transmission characteristics of the service because it does not identify any transmission characteristics of the composite mux frame. But Owner ignores Morley's disclosure that the header provides information that the receiver uses to decode the data (voice or non-voice data) in the payload by providing it to the appropriate decoder operating under an appropriate data rate for the type of information.

Owner provides no separate basis for validity of challenged claims 2-6 under any construction with respect to Morley, and therefore these claims should be cancelled for the reasons in the Petition, and for the same reasons as claim 1.

- 11 -

**A0275**

Petitioner's Reply to Patent Owner's Response (IPR2013-00602)

## IV.    CLAIMS 1-6 ARE INVALID OVER ADAMS

Owner argues that Adams does not disclose identifying transmission characteristics. But this is not part of the Board's construction. And Adams discloses a service type identifier under Owner's construction, because Adams discloses using the type of data to derive transmission characteristics to determine how to process the data.

### A.    Adams Renders the Challenged Claims Obvious Under the Board's Construction

In an attempt to avoid the Board's construction, Owner argues that merely classifying received data packets as video, audio or data "says nothing about the transmission characteristics of the received packet." (Resp. at 43; Paper No. 36). However, the Board's construction does not require identifying transmission characteristics, rather just identifying "the type of information conveyed in the payload." Owner admits that Adams classifies packets as containing video, audio, or data. (Resp. at 42; Paper No. 36). Therefore Owner cannot distinguish the claimed service type identifier from the identifiers disclosed in Adams under the Board's construction.

### B.    Adams Discloses an Identifier that Identifies (i) the Type of Information and (ii) a Transmission Characteristic of the Service

Adams discloses the type of information conveyed in the payload and a transmission characteristic of the service, because Adams discloses using the

- 12 -

## A0276

Petitioner's Reply to Patent Owner's Response (IPR2013-00602)

header to determine the proper driver to process the received data, and this driver indicates transmission characteristics.  (Bims Reply Decl. at ¶ 7, Ex. 1023).

As shown in Figure 7, if Adams receives a video packet, it uses the video driver routines 108 to update the video display window.  (Adams at FIG. 7 and 9:18-21; Ex. 1006).  This includes using MPEG decoding.  (*Id.* at 4:6-9; Ex. 1006).  If Adams receives an audio packet, it uses the audio driver routines 104 to play the audio packet using the audio subsystem.  (*Id.* at FIG. 7 and 9:24-32).  Owner makes the leap that since only MPEG is disclosed, that all data types would use MPEG, even though MPEG is a video standard (i.e., ***Motion Picture*** Experts Group) for encoding video data.  Audio data can be encoded using any number of encodings different from MPEG and requires different transmission characteristics.  If Adams receives a data packet, it reads the associated data and performs certain functions by sending it to the appropriate processing.  (*Id.* at FIG. 7 and 9:41-48; Ex. 1006).  Other types of data typically have transmission characteristics different from audio; e.g., a higher data rate and more robust channel coding.  (Bims Reply Decl. at ¶ 8; Ex. 1023).

### C.    It Would Have Been Obvious to Provide a Transmitter in Adams to Transmit Data

Owner argues it would not have been obvious to provide a transmitter for sending data in Adams.  In particular, Owner argues Adams does not disclose how data is transmitted.  (Resp. at 44; Paper No. 36).  However, Adams discloses a

- 13 -

**A0277**

Paper No. <u>64</u>

Filed on behalf of: Wi-Fi One, LLC

## UNITED STATES PATENT AND TRADEMARK OFFICE

_____

## BEFORE THE PATENT TRIAL AND APPEAL BOARD

_____

BROADCOM CORPORATION,

Petitioner,

V.

WI-FI ONE, LLC,

Patent Owner.

_____

CASE NO.: IPR2013-00602
PATENT NO. 6,446,568 B1

_____

**PATENT OWNER'S REQUEST FOR REHEARING OF
FINAL WRITTEN DECISION (PAPER NO. 60)**

Pursuant to 37 CFR § 42.71(d)(2), Patent Owner submits this Request for Rehearing of the Board's Final Written Decision (Paper No. 60).

## I.    INTRODUCTION

In its Final Written Decision, the Board made certain fundamental errors with respect to its determination that this IPR Petition is not time-barred under 35 U.S.C. § 315(b). This case is a prime example of concerns expressed less than two weeks ago by USPTO Director Michelle Lee, who noted that Patent Owners frequently are not given sufficient discovery on the "real party in interest" issue, meaning that panels often decide this issue on an inadequate evidentiary record.[1] In light of Director Lee's comments, the Board should take a close look at this request for rehearing.

**First**, in this case the Board misapprehended the purpose and effect of the "real party in interest, or privy" language in § 315(b), as plainly set forth in the text of the statute, and as confirmed by the legislative history and the USPTO's public

---

[1] *See* http://www.uspto.gov/blog/director/entry/ptab_s_quick_fixes_for, USPTO Director Michelle K. Lee, "PTAB's Quick-Fixes for AIA Rules are to be Implemented Immediately," (March 27, 2015) (last visited April 6, 2015) ("[W]e understand that the existence of ample discovery to establish the real-party-in-interest (RPI) of the petitioner has been a concern. And we want to be sure that the availability of appropriate RPI evidence does not pose a problem for patent owners.")

comments. As a result, the Board applied the wrong legal standard for assessing the § 315(b) issue, focusing too narrowly (and exclusively) on whether Petitioner has controlled the co-pending District Court Litigation, and ignoring other relevant facts, such as whether the District Court Defendants are controlling this IPR.[2]

**Second**, the Board overlooked the substantial evidence Patent Owner has presented showing that Broadcom and the District Court Defendants share a common economic and legal interest, and have been in cahoots in opposing the '568 Patent for many years. This evidence shows **both** that (1) Broadcom's District Court Defendant customers are real-parties in interest to this IPR proceeding, **and also** that (2) the District Court Defendant customers are in privity with Broadcom for purposes of this IPR and the District Court Litigation.

The Board's refusal to permit any discovery at all on this issue – even the introduction of Broadcom's known indemnity agreements – is a clear abdication of the Board's duty to consider a full and reasonable evidentiary record on matters related to its own jurisdiction, and inherently renders the Board's decision suspect.

**Third**, the Final Written Decision itself presents additional administrative law issues that Patent Owner raises in this request for rehearing. Because the Petition was

---

[2] The terms "District Court Litigation" and "District Court Defendants" refer to parallel infringement litigation and defendants as cited in the Board's Decision denying additional discovery.  Paper No. 21 at 2.

and is time-barred under § 315(b), the Board's Final Written Decision is an *ultra vires* action that exceeds the Board's delegated statutory authority. Moreover, the Board's Final Written Decision is contrary to several provisions of the Administrative Procedures Act ("APA"), as discussed more fully below.

It is undisputed that the Board would have no authority, under § 315(b), to consider this IPR Petition if it had been filed by the District Court Defendants themselves. It would have been time-barred. Section 315(b) does not permit Broadcom to assist its customers in circumventing the one-year time-bar. That is precisely what the "real party in interest, or privy" language was intended to prevent.

## II.    IDENTIFICATION OF BASIS FOR REHEARING REQUEST

As required by 37 C.F.R. § 42.71(d), Patent Owner hereby specifically identifies the matters Patent Owner contends the Board misapprehended or overlooked:

(1)    The Board misapprehended the purpose of the "real party in interest or privy" language in 35 U.S.C. § 315(b), and misapprehended the correct legal standard for determining whether a non-party is a "real party in interest or privy of petitioner" under § 315(b). *See, e.g.* Patent Owner's Request for Rehearing, Paper No. 25 at 3-7.

(2)    The Board misapprehended the entirety of the factual record and overlooked evidence supporting Patent Owner's contention that certain District Court Defendants are real parties in interest and/or privies of petitioner in this IPR. *See* Patent Owner's Response, Paper No. 36 at 3-15.

In addition, the Board's Final Written Decision itself raises certain administrative law issues that Patent Owner could not have previously raised. *See* Section III(D), *infra.*

## III.  ARGUMENT

### A.  The Board misapprehended the purpose of the "real party in interest, or privy" language in § 315(b).

#### 1.  The purpose of § 315(b), in general, is to prevent district court litigants from using IPR petitions as a delay tactic.

By its plain language, and as confirmed by the legislative history, § 315(b) was intended to impose a time-bar on the filing of IPR Petitions so that district court litigants could not use IPR Practice for purposes of delaying the district court litigation. The statute states:

> An inter partes review may not be instituted if the petition requesting the proceding is filed more than 1 year after the date on which the petitioner, real party in interest, or privy of the petitioner is served with a complaint alleging infringement of the patent. . . .

§ 315(b). The legislative purpose of this statute is to ensure IPR Petitions are *not used as a litigation tactic for purposes of delay*. *See*, *e.g.*, 157 Cong. Rec. S1326 (daily ed. March 7, 2011) (statement of Sen. Reid) ("The bill . . . imposes time limits on starting an inter partes or post-grant review when litigation is pending. . . . [T]hese reforms will help ensure that post-grant review operates fairly and *is not used for purposes of harassment or delay*." (emphasis added)); H. Judiciary Comm. Rep., H.

Rep. No. 112-98, at 47-48 (discussing that certain amendments, including the time-bar of § 315(b), are intended to prevent harassment of Patent Owners and delay of infringement litigation); 154 Cong. Rec. S9989 (daily ed. Sept. 27, 2008) (statement by Sen. Kyl) ("The real reforms in this bill that would protect patent owners from abusive and duplicative proceedings are the various restrictions imposed in section 327" – which included a three-month time bar that was later amended to become the one-year period as codified in § 315(b)). *See also Zoll Lifecor Corp. v. Philips Elec. N. Am. Corp.*, IPR2013-00609, Paper 15 at 8-9 (discussing the legislative history of § 315(b)).

> **2.      The purpose of the "real party in interest, or privies" language is to ensure that litigation defendants do not subvert the statute by using their cohorts to file an IPR Petition when they themselves are time-barred.**

The plain text of the statute makes clear that the "real party in interest, or privy of the petitioner" language in § 315(b) is intended to prevent litigation defendants from subverting the statutory time-bar by having their agents or cohorts file an IPR petition that they themselves are barred from filing. The statutory time-bar applies not only to the petitioner, but also to (1) any real party in interest **and also** (2) any privy of the petitioner. *See* 35 U.SC. § 315(b). The Patent Trial Guide confirms that this is the purpose of the "real party in interest, or privy" language in § 315(b). *See* Trial Practice Guide, 77 Fed. Reg. 48,756, 48,759 (Aug. 14, 2012) (One of the "core functions" of the real-parties-in-interest or privies language is to "protect patent owners from harassment via successive petitions *by the same or related parties* . . .

IPR2013-00602
Patent 6,446,568 B1

.") Without this language in § 315(b), district court litigants could easily circumvent the time bar by simply having others file a time-barred petition on their behalf.

**B.    The Board misapprehended the legal test that should be applied to determine whether a non-party is a "real party in interest, or privy" for purposes of § 315(b).**

**1.    The legislative history and the USPTO's public comments indicate that "real party in interest, or privy" in § 315(b) is to be read broadly and flexibly.**

It goes without saying that the legal standard for determining whether a third party is a "real party in interest, or privy of petitioner" under § 315(b) should draw from and coincide with the legislative purpose behind the statute. The legal standard must be aimed at determining whether a given set of facts shows that an IPR petitioner is sufficiently related or connected to a time-barred third party, such that the petitioner should also be subject to the time-bar. To serve the statutory purpose, the legal standard must be sufficiently flexible to capture all the various ways that parties might collude or conspire to circumvent the § 315(b) time-bar. For example: (1) a time-barred third party employing the petitioner as its agent or shill, specifically for the purpose of circumventing the statute; (2) where parties are "in cahoots" to execute a coordinated divide-and-conquer strategy designed to subvert the § 315(b) time-bar in an effort to harass or delay a patent owner; or (3) a scenario where any one party controls both the litigation and IPR activity in a coordinated effort.

The legislative history and official public comments of the USPTO demonstrate that the applicable legal standard is flexible and multi-faceted so that

REQUEST FOR REHEARING          6          IPR2013-00602

**A0289**

individual cases can be judged on their unique circumstances. *See* 154 Cong. Rec. S9989 (daily ed. Sept. 27, 2008) (statement of Sen. Kyl) (discussing the breadth of "privy" as explained by recent case law developments). This breadth and flexibility of "real party in interest, or privy" was also recognized by the USPTO in its official public comments in the Office Patent Trial Practice Guide. *See* Trial Practice Guide, 77 Fed. Reg. at 48759-60. As articulated by the USPTO and by Senator Kyl in the legislative history, this legal standard is purposefully broad and flexible so that the Board can determine, on a case-by-case basis and in light of all relevant facts, whether particular parties are attempting to circumvent the § 315(b) time-bar.

    **2.**     **The Board erred as a matter of law in applying a legal standard imposing an inflexible standard requiring that Petitioner must have exercised control over the District Court Defendants in the District Court Litigation.**

In its decision on the § 315(b) issue, the Board did not apply a broad and flexible standard for "real party in interest or privy." Instead, the Board applied a narrow and rigid standard that is erroneous as a matter of law.

The standard applied by the Board requires – as an absolute and necessary condition – that Broadcom controlled or could have exercised control over one or more of the District Court Defendants in relation to the District Court Litigation. *See* Decision on Ericsson's Motion for Additional Discovery, Paper No. 21 at 7 ("To show privity requires a showing that Broadcom would be bound by the outcome of the Texas litigation. To be bound, in normal situations, Broadcom *must have had*

REQUEST FOR REHEARING     7      IPR2013-00602

*control over the Texas Litigation.*"); *id.* at 11 ("The totality of the evidence fails to amount to more than a 'mere possibility' that Broadcom *controlled, or could have controlled, the Texas litigation.*"); *id.* at 12-13 ("[T]he IPR filings fail to show control over the Texas litigation. . . . The evidence does not amount to more than speculation that any of Broadcom's activity constitutes evidence of collusion with the Texas Defendants in the Texas litigation *in a manner that would bind Broadcom to the outcome thereof.*"); *id.* at 15 ("The evidence and arguments fail to show that the sought-after discovery would have more than a mere possibility of producing useful privity information, i.e., *that Broadcom controlled or could have controlled the Texas Litigation.*"); *see also* Final Written Decision, Paper No. 60 at 7-8.

The legal standard applied by the Board in this case is narrower and inconsistent with the legal standard applied by the Board in other cases. *See, e.g., Zoll,* IPR2013-00609, Paper No. 15 at 9-16 (considering "real party in interest" and "privy" separately; and also considering, *inter alia,* the non-party's control over the IPR).

The legal standard applied by the Board in this case does not reflect – and in fact undermines - the legislative purpose of § 315(b). Under the Board's standard, even if there were irrefutable evidence that the District Court Defendants had expressly hired Broadcom to file this IPR petition, and that the District Court Defendants were paying for and controlling every aspect of Broadcom's IPR activity, the Board's standard **still** would not be satisfied - because the evidence would not show that Broadcom was controlling the District Court Litigation or that Broadcom

**A0291**

would be bound by the result of that litigation. That would be an *absurd result*, in direct contravention of the plain text of § 315(b) and its clear legislative purpose. This example conclusively demonstrates that the Board's legal standards for "real party in interest, or privy" under § 315(b) is fundamentally wrong because it is too rigid and narrow. It is not grounded in the text or purpose of the statute, and it does not capture all the ways that parties might conspire to subvert the statutory time-bar.

Under § 315(b), Broadcom's control of the District Court Litigation might be sufficient to establish that the District Court Defendants are real parties in interest or privies, but it should not be a necessary condition. A showing that petitioner controls the litigation should be one path to that result, but not the only path. An exclusive focus on whether Broadcom would be bound by a judgment in the District Court litigation is misplaced, because no one is seeking to bind Broadcom to the results of the District Court litigation by virtue of this IPR, or otherwise.

Instead, the issue under § 315(b) is whether the District Court Defendants have attempted to circumvent the one-year statutory time-bar, *i.e.* whether Broadcom and one or more of the District Court Defendants should be treated collectively for purposes of determining whether the petition is time-barred. Under the plain language of § 315(b), they should be treated as one if a **District Court Defendant is a "real party in interest or privy" of <u>Broadcom</u>**. The standard applied by the Board, focusing exclusively on Broadcom's connection to the District Court litigation, turns the real issue on its head.

REQUEST FOR REHEARING                9                IPR2013-00602

**A0292**

Patent Owner respectfully submits that the Board's misapprehension of the correct legal standard may stem from the fact that a separate statutory provision, § 315(e), also uses the phrase "real party in interest or privy" in the context of defining the scope of estoppel that results from a final written decision by the Board. Most of the discussion of "real party in interest or privy" in the Trial Practice Guide also relates to estoppel. *See* Trial Practice Guide, 77 Fed. Reg. at 78,759-60. In the context of § 315(e) estoppel, it might make sense to focus on the "control" factor, like common law estoppel cases do.

But § 315(b) is not an estoppel provision, and the "real party in interest, or privy" language in § 315(b) serves a much different purpose. The standard applied by the Board ignores the statutory language and purpose, and serves to undermine the statute altogether by not capturing most of the ways parties could purposefully circumvent the statutory time-bar.

**C.    The Board misapprehended the entirety of the evidentiary record on the § 315(b) issue, and overlooked evidence establishing that certain District Court Defendants are real parties in interest and/or privies of Broadcom.**

The evidentiary record before the Board strongly indicates that one or more of the District Court Defendants are real parties in interest, and/or that they are in privity with Petitioner for purposes of this IPR.

Significantly, Petitioner had an opportunity to present evidence that the District Court Defendants are not coordinating or controlling aspects of this IPR – but they

presented no evidence on this point at all. Tellingly, Petitioner's proof seems carefully worded to focus **exclusively** on Broadcom's ties to the District Court litigation and avoid any mention of the District Court Defendants' role in this IPR. *See* Petitioner's Opposition to Motion for Additional Discovery, Paper No. 17 at 4-5 (including cited exhibits). Petitioner, who had every opportunity to illuminate the District Court Defendants' role (or lack thereof) in this IPR, purposefully chose to offer no evidence as to whether the District Court Defendants are paying all or part of the costs of this IPR; whether Petitioner filed this IPR for the benefit of, or at the behest of, the District Court Defendants; or whether the District Court Defendants have coordinated or controlled any aspects of this IPR proceeding. *See Zoll*, IPR2013-00609, Paper No. 15 at 11-12 (placing weight on Petitioner's <u>failure</u> to provide evidence of the non-party's lack of participation in or control over the IPR).

Patent Owner, on the other hand, has made a strong circumstantial showing that Petitioner and at least some of their District Court Defendant customers are in cahoots in defending against the '568 Patent, both in the District Court Litigation and in this IPR. *See* Patent Owner's Response, Paper No. 36 at 3-15. It is not disputed in the evidence that there are indemnity agreements between Broadcom and certain District Court Defendants (as expressly stated in Judge Davis's order denying relief from the litigation protective order). *See* Ex. 1021.  Nor is it disputed that Broadcom and its District Court Defendant customers share a common economic and legal interest in opposing the '568 Patent. *See* Ex. 2008 (asserting a common interest

privilege); Ex. 2009 at ¶ 101. It is not disputed that Broadcom has been coordinating with the District Court Defendants for many years in an effort to oppose the '568 Patent. *See* Patent Owner's Response, Paper No. 36 at 4-8. And it is not disputed that Petitioner has taken concrete steps, such as the filing of this IPR and otherwise, to oppose the '568 Patent on behalf of its customers. *See id.*

The Board should presume that the indemnity agreement contains some covenants related to the funding and control of efforts to oppose claims of patent infringement. Any indemnity agreement will expressly allocate the obligation to pay for defense of claims and also the rights to control the defense and settlement. Failing to do so would be drafting malpractice. For this reason, the Board erred when it decided the § 315(b) issue without reviewing the known indemnity agreements, which are likely the most crucial documents. These agreements could have been provided to the Board with no burden whatsoever to Broadcom.

Even without the agreements in evidence, the circumstantial evidence overwhelmingly shows that Petitioner has been in cahoots with its District Court Defendant customers since long before this IPR petition was filed. Petitioner's declaration is conclusory, carefully worded, and narrowly tailored to avoid addressing issues central to the § 315(b) issue. As such it obscures the true nature of the relationship between Broadcom and its District Court Defendant customers.

The only reasonable conclusion in light of this evidentiary record is that the Petition is time-barred under § 315(b) because Broadcom's District Court Defendant

customers are a real party in interest in this IPR, and/or the District Court

Defendants are privies of Petitioner in this case. In light of this record, it is

unreasonable to conclude that Petitioner should not be bound by the statutory time-

bar, just like the District Court Defendants are. At a minimum, the Board should

reopen these proceedings for further fact-finding so the Board can make a

determination on a full evidentiary record, including having the benefit of the

indemnity agreements.

D.    **The Board's Final Written Decision violates fundamental principles of administrative law.**

1.    **The Final Written Decision is an *ultra vires* action that exceeds the Board's statutory authority as delegated by Congress.**

Section 315(b) is a jurisdictional limit on the power delegated to the Board by

Congress. *See* 35 U.S.C. § 315(b); 37 C.F.R. § 42.3(b) ("**Jurisdiction** . . . A petition to

institute a trial must be filed with the Board consistent with any time period required

by statute."). The Board's Final Written Decision and other actions in this IPR are

*ultra vires*, undertaken without statutory authority.

The Board's determination of the § 315(b) issue will be reviewed on appeal

with little (if any) deference. *See City of Arlington, Texas v. FCC*, 133 S. Ct. 1863, 1874

(2013) (appellate courts must "tak[e] seriously, and appl[y] rigorously, in all cases,

statutory limits on agencies' authority. Where Congress has established a clear line, the

agency cannot go beyond it; and where Congress has established an ambiguous line,

the agency can go no further than the ambiguity will fairly allow.").

The USPTO Director has taken the position that the Board's determinations under § 315(b) are never reviewable. *See* Brief for Intervenor – Director of the USPTO at 14-16, *Achates Reference Publ'g, Inc. v. Apple, Inc.*, Appeal No. 2014-1767 (Fed. Cir. Feb. 24, 2015). This position is contrary to a wealth of United States Supreme Court authority directly on point. *See Bowen v. Michigan Academy of Family Physicians*, 476 U.S. 667, 672 n.3 (1986) (collecting authority). It is also contrary to the APA. *See* 5 U.S.C. § 706(2)(C). Patent Owner fully intends to present this *ultra vires* argument to the Federal Circuit on appeal.

### 2. The Board's Final Written Decision and other actions violate the Administrative Procedures Act.

The Board's refusal to consider a reasonably full evidentiary record in connection with the § 315(b) issue; its denial of all discovery on the issue; and its refusal to consider the terms of the known indemnity agreement and other known facts all violate the Board's duties under the APA. *See Olenhouse v. Commodity Credit Corp.*, 42 F.3d 1560, 1581 (10th Cir. 1994); *Intel Corp. v. U.S. Int'l Trade* Commiss'n, 946 F.2d 821, 836-39 (Fed. Cir. 1991).

Moreover, the Board's actions in this proceeding are contrary to the USPTO's own official public statements made during the rulemaking process. *See* 77 Fed. Reg. 48,680, 48,694-95 (Aug. 14, 2012) ("Additional discovery may be authorized where a patent owner raises sufficient concerns regarding the petitioner's certification."); 77 Fed. Reg. at 48760 (discussing the legal standard). The Board's actions are

**A0297**

inconsistent with these comments and, therefore violate the APA. *See* 5 U.S.C. §

552(a), § 706(2)(A),(C); *Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512 (1994).

The Board's Final Written Decision is also contrary to the Board's own

promulgated substantive rules – specifically, 37 C.F.R. § 42.3(b). The Board's failure

to follow its own rules is contrary to the APA. *See* 5 U.S.C. § 552(a), § 706(2)(C), (D);

*Align Tech., Inc. v. ITC*, 771 F.3d 1317, 1322 (Fed. Cir. 2014).

Finally, the Board's Final Written Decision does not set forth proper findings

of fact or conclusions of law establishing that the Board has jurisdiction to hear this

petition in light of 35 U.S.C. §315(b). This is contrary to the requirements of the APA,

5 U.S.C. § 557(c). *See Austin Road Co. v. Occupational Safety and Health Review Comm'n*,

683 F.2d 905, 908 (5th Cir. 1982).

## IV.   CONCLUSION

For the foregoing reasons, the Board should grant this request for rehearing,

vacate its Final Written Decision, and dismiss the Petition pursuant to 35 U.S.C.

§315(b). In the alternative, the Board should vacate the Final Written Decision and

reopen this proceeding so additional fact-finding can be done on the §315(b) issue.

IPR2013-00602
Patent 6,446,568 B1

Dated  April 6, 2015

Respectfully submitted,

/s/ Sarah E. Spires
Sarah E. Spires (Reg. No. 61,501)

Peter Ayers (Reg. No. 38,374)
Lee & Hayes, PLLC
11501 Alterra Parkway, Suite 450
Austin, TX 78758
Telephone: 512.605.0252
Fax: 512.605.0252
**Lead Counsel for Patent Owner**
Wi-Fi One, LLC

Sarah E. Spires (Reg. No. 61,501)
SKIERMONT PUCKETT LLP
2200 Ross Ave. Ste. 4800W
Dallas, TX 75201
P: 214-978-6600/F: 214-978-6601
**First Back-Up Counsel for Patent Owner**

J. Christopher Lynch (Reg. No. 34,216)
Lee & Hayes, PLLC
601 W. Riverside Ave., Suite 1400
Spokane, WA 99201
Telephone: 509.324.9256
Fax: 509.323.8979
Attorney for Patent Owner
Wi-Fi One, LLC

John Shumaker (Reg. No. 52,223)
Lee & Hayes, PLLC
11501 Alterra Parkway, Suite 450
Austin, TX 78758
Telephone: 512.605.0260
Fax: 509.323.8979
Attorney for Patent Owner
Wi-Fi One, LLC

**A0299**

IPR2013-00602
Patent 6,446,568 B1

## CERTIFICATE OF SERVICE

The undersigned certifies that on April 6, 2015 the foregoing PATENT OWNER'S REQUEST FOR REHEARING OF FINAL WRITTEN DECISION was served via email on Lead and Back up Counsel for Broadcom Corporation identified in Broadcom's Mandatory Notices, whom consented to electronic service:

Dominic E. Massa, Lead Counsel
Zachary Piccolomini, Back-up Counsel
Wilmer Cutler Pickering Hale and Dorr, LLP
60 State Street
Boston, MA 02109
Dominic.massa@wilmerhale.com
Zachary.piccolomini@wilmerhale.com

Skiermont Puckett LLP

/s/ Sarah E. Spires
Sarah E. Spires (Reg. No. 61,501)

**A0300**

Trials@uspto.gov
571-272-7822

Paper 65
Entered: June 1, 2015

UNITED STATES PATENT AND TRADEMARK OFFICE

————————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

————————

BROADCOM CORPORATION,
Petitioner,

v.

WI-FI ONE, LLC,
Patent Owner.

—————————

IPR2013-00601 (Patent 6,772,215 B1)
IPR2013-00602 (Patent 6,466,568 B1)
IPR2013-00636 (Patent 6,424,625 B1)[1]

—————————

Before KARL D. EASTHOM, KALYAN K. DESHPANDE, and
MATTHEW R. CLEMENTS, *Administrative Patent Judges.*

CLEMENTS, *Administrative Patent Judge.*

DECISION
Request for Rehearing
*37 C.F.R. § 42.71(d)*

———————————

[1] We exercise our discretion to issue one Order to be filed in each case.  The
parties are not authorized to use this style heading for any subsequent
papers.

**A0301**

IPR2013-00601 (Patent 6,772,215 B1)
IPR2013-00602 (Patent 6,466,568 B1)
IPR2013-00636 (Patent 6,424,625 B1)

## I.    SUMMARY

Patent Owner, Wi-Fi One, LLC,[2] requests rehearing of the Final Written Decisions (IPR2013-00601, Paper 66, "601 Dec."; IPR2013-00602, Paper 60, "602 Dec."; IPR2013-00636, Paper 60, "636 Dec.").  Paper 70 ("Req.").[3]  Patent Owner seeks rehearing on the grounds that:

1. The Board misapprehended the purpose of the "real party in interest or privy" language in 35 U.S.C. § 315(b), and misapprehended the correct legal standard for determining whether a non-party is a "real party in interest or privy of petitioner" under § 315(b); and

2. The Board misapprehended the entirety of the factual record and overlooked evidence supporting Patent Owner's contention that certain district court defendants are real parties in interest and/or privies of Petitioner in this proceeding.

Req. 2.  Patent Owner also argues that our Final Written Decisions raise administrative law issues.  *Id.* at 4, 13–15.

The Requests for Rehearing are *denied*.

---

[2] On July 11, 2014, Patent Owner filed an Updated Mandatory Notice in IPR2013-00601 indicating that the patent-at-issue had been assigned to Wi-Fi One, LLC, and that Wi-Fi One, LLC and PanOptis Patent Management, LLC are now the real parties-in-interest.  Paper 43.  The same paper was filed in IPR2013-00602 (Paper 40) and IPR2013-00636 (Paper 38).

[3] Patent Owner filed a Request for Rehearing in each of IPR2013-00601 (Paper 70), IPR2013-00602 (Paper 64), and IPR2013-00636 (Paper 64).  All three requests put forward substantively the same arguments and, thus, we address them together with reference to the Request in IPR2013-00601.  Citations are to IPR2013-00601, unless otherwise noted.

2

**A0302**

IPR2013-00601 (Patent 6,772,215 B1)
IPR2013-00602 (Patent 6,466,568 B1)
IPR2013-00636 (Patent 6,424,625 B1)

## II.    DISCUSSION

The applicable standard for a request for rehearing is set forth in 37 C.F.R. § 42.71(d), which provides in relevant part:

> A party dissatisfied with a decision may file a request for rehearing, without prior authorization from the Board. The burden of showing a decision should be modified lies with the party challenging the decision. The request must specifically identify all matters the party believes the Board misapprehended or overlooked, and the place where each matter was previously addressed in a motion, opposition, or a reply.

### A.  35 U.S.C. § 315(b)

Patent Owner argues that the Board misapprehended the purpose of the "real party in interest, or privy" language of § 315(b). Req. 4. Specifically, Patent Owner argues that "the legislative purpose of [35 U.S.C. § 315(b)] is to ensure IPR Petitions are not used as a litigation tactic for purposes of delay" (*id.* at 4), and that "[t]he plain text of the statute makes clear that . . . § 315(b) is intended to prevent litigation defendants from subverting the statutory time-bar by having their agents or cohorts file an IPR petition that they themselves are barred from filing" (*id.* at 5). Patent Owner also argues that the legal standard for determining whether a third party is a "real party in interest, or privy of petition" under § 315(b) "is purposefully broad and flexible so that the Board can determine, on a case-by-case basis and in light of all relevant facts, whether particular parties are attempting to circumvent the § 315(b) time-bar." Req. 7.

Patent Owner has not argued in its Patent Owner Response the legislative purpose of § 315(b). We could not have misapprehended or overlooked arguments not before us. Moreover, Patent Owner identifies

3

**A0303**

IPR2013-00601 (Patent 6,772,215 B1)
IPR2013-00602 (Patent 6,466,568 B1)
IPR2013-00636 (Patent 6,424,625 B1)

nothing in our Decision that it contends mischaracterizes the legislative purpose of § 315(b). We are not persuaded, therefore, that we have overlooked or misapprehended the legislative purpose of § 315(b).

Patent Owner also argues that we misapprehended the legal test that should be applied to determine whether a non-party is a "real party in interest, or privy" for purposes of § 315(b). Req. 6. Specifically, Patent Owner contends that "the Board applied a narrow and rigid standard that is erroneous as a matter of law" (*id.* at 7) because it "requires — as an absolute and necessary condition — that Broadcom controlled or could have exercised control over one or more of the District Court Defendants in relation to the District Court Litigation" (*id.*) without "also considering, *inter alia*, the non-party's control over the IPR" (*id.* at 8). According to Patent Owner, "the issue under § 315(b) is whether the District Court Defendants have attempted to circumvent the one-year statutory time-bar." Req. 9.

Although our Decision on Patent Owner's Motion for Additional Discovery (Paper 23) focuses primarily on Broadcom's ("Petitioner") exercise of control, or opportunity to exercise control over the prior District Court lawsuit (Req. 8), that is because that was the focus of Patent Owner's Motion for Additional Discovery. *See, e.g.,* Paper 14, 6 ("Here, evidence will prove that Broadcom has had the opportunity to control and maintains a substantive legal relationship with the D-Link Defendants sufficient to bind Broadcom to the District Court's judgment.").

That decision, however, did not characterize the legal standard, for all cases, as being limited strictly to a petitioner's control, or opportunity to control, a non-party in previous litigation. To the contrary, it addressed

4

**A0304**

IPR2013-00601 (Patent 6,772,215 B1)
IPR2013-00602 (Patent 6,466,568 B1)
IPR2013-00636 (Patent 6,424,625 B1)

control, or opportunity to control, by a non-party generally as one of a number of factors:

> Whether parties are in privity, for instance, depends on whether the relationship between a party and its alleged privy is "sufficiently close such that both should be bound by the trial outcome and related estoppels." [*Office Patent Trial Practice Guide*, 77 Fed. Reg. 48,756, 48,759 (Aug. 14, 2012]. Depending on the circumstances, a number of factors may be relevant to the analysis, including whether the non-party "exercised or could have exercised control over a party's participation in a proceeding," and whether the non-party is responsible for funding and directing the proceeding. *Id*. at 48,759-60.

Paper 23, 7.

That decision also addresses Patent Owner's theory that the indemnity agreements imply that the District Court Defendants are real parties in interest in these *inter partes* reviews ("IPRs"). *See id*. at 12–13. Patent Owner relied on substantively the same arguments and evidence in its Patent Owner Response as in its Motion for Additional Discovery, and our Final Written Decision, thus, applied essentially the same analysis. 601 Dec. 8–9. Accordingly, we are not persuaded that we misapprehended the proper legal standard for establishing privity or real party in interest.

### B. District Court Defendants

Patent Owner argues that we misapprehended and overlooked evidence establishing that certain District Court defendants are real parties in interest and/or are in privity with Petitioner for purposes of this proceeding. Req. 10–13. Specifically, Patent Owner argues that it has made "a strong circumstantial showing that Petitioner and at least some of their District Court Defendant customers are in cahoots" because "there are indemnity

5

**A0305**

IPR2013-00601 (Patent 6,772,215 B1)
IPR2013-00602 (Patent 6,466,568 B1)
IPR2013-00636 (Patent 6,424,625 B1)

agreements," they "share a common economic and legal interest," and "[Petitioner] has been coordinating with the District Court Defendants for many years." *Id.* at 11–12. According to Patent Owner, "the Board erred when it decided the § 315(b) issue without reviewing the known indemnity agreements." *Id.* at 12.

Patent Owner's arguments are not persuasive. The evidence cited by Patent Owner were Paper 3, and Exhibits 2005 and 2015–2018. PO Resp. 8–14. Exhibit 2018 is a final judgment of infringement in the co-pending district court litigation that sheds no light on whether Broadcom controlled, or could have controlled, the district court defendants, or vice-versa. All of the other evidence was considered in our Decision on Patent Owner's Motion for Additional Discovery. For example, we considered, and rejected, Patent Owner's argument that an indemnity relationship is sufficient to establish privity:

> Contrary to Ericsson's assertion that "[t]he weight of authority strongly supports that an indemnity agreement . . . establish[es] privity," Mot. 6, *Bros. Inc, TRW, Dentspl[]y* and other cases noted *supra* illustrate that more is required. Control of the litigation, or some sort of representation, constitutes a "crucial" factor. *Dentsply*, 42 F.Supp.2d at 398.

Paper 23, 9. As we indicated in our Final Written Decision, Patent Owner's Response relied on substantively the same arguments and evidence as its Motion for Additional Discovery, and we were not persuaded for the same reasons as explained in our decision on that motion. 601 Dec. 8–9. Accordingly, we are not persuaded that we misapprehended or overlooked the evidence relied upon by Patent Owner. To the extent Patent Owner is arguing that we should have granted its Motion for Additional Discovery

6

**A0306**

IPR2013-00601 (Patent 6,772,215 B1)
IPR2013-00602 (Patent 6,466,568 B1)
IPR2013-00636 (Patent 6,424,625 B1)

directed to the indemnity agreements, the argument is untimely because our decision denying that discovery was issued well over a year before our Final Written Decision, Patent Owner requested rehearing (Paper 27) and we denied that request (Paper 28). *See* 37 C.F.R. § 42.71(d)(1).

In these proceedings, Patent Owner does not set forth a persuasive argument, supported by evidence, that the District Court Defendants funded, controlled, or could have controlled these proceedings, or that Petitioner's indemnity agreements even mention IPRs, let alone would show funding, control, or ability to control IPRs, or would have obligated Broadcom to file specific, if any, IPRs. *See* Req. 12. Instead, Patent Owner generally asserts that "Broadcom's duty to indemnify triggered the successive attack on [it]s patents," without specifying, based on cited precedent supporting the theory, how even a generic trigger for some unspecified future action, even if it existed, elevates the District Court Defendants to real parties in interest in the IPRs. *See* PO Resp. 13.

Patent Owner also argues that Petitioner failed to provide evidence of the non-party's lack of participation in, or control over, this proceeding, and that the Declaration of David Djavaherian (Ex. 1007) submitted by Petitioner in its Opposition to Patent Owner's Motion for Additional Discovery is carefully worded to obscure the true nature of the relationship between Petitioner and the District Court defendants. Req. 11, 12. Patent Owner did not make these arguments in the Patent Owner Response. We, therefore, could not have misapprehended or overlooked them.

IPR2013-00601 (Patent 6,772,215 B1)
IPR2013-00602 (Patent 6,466,568 B1)
IPR2013-00636 (Patent 6,424,625 B1)

*C. Administrative Law Issues*

Patent Owner argues that "the Board's Final Written Decision and other actions in this IPR are *ultra vires*, undertaken without statutory authority." Req. 13. Specifically, Patent Owner argues the following:

> The Board's refusal to consider a reasonably full evidentiary record in connection with the § 315(b) issue; its denial of all discovery on the issue; and its refusal to consider the terms of the known indemnity agreement and other known facts all violate the Board's duties under the APA. *See Olenhouse v. Commodity Credit Corp.*, 42 F.3d 1560, 1581 (10th Cir. 1994); *Intel Corp. v. U.S. Int'l Trade* [*Comm'n*], 946 F.2d 821, 836-39 (Fed. Cir. 1991).

*Id.* at 14. Patent Owner also argues that (1) our actions are inconsistent with public statements made during the rulemaking process and, therefore, violate the Administrative Procedure Act ("APA"); (2) our Decision is contrary to 37 C.F.R. § 42.3(b) and our failure to follow our rules is contrary to the APA; and (3) our Decision does not establish that we have jurisdiction to hear this petition in light of 35 U.S.C. § 315(b), contrary to the APA. *Id.* at 15.

Patent Owner's arguments are predicated on its contention that we lack jurisdiction under § 315(b) because the defendants in the co-pending district court litigation are real parties-in-interest who were served with a complaint alleging infringement more than one year before the filing of the Petitions in these proceedings. As discussed above, we are not persuaded that we erred in determining that those defendants are not real parties in interest. As a result, we are not persuaded that the Petitions were time-barred under § 315(b), and we are, therefore, not persuaded that our Final Written Decisions are *ultra vires* actions that exceed our statutory authority.

8

**A0308**

IPR2013-00601 (Patent 6,772,215 B1)
IPR2013-00602 (Patent 6,466,568 B1)
IPR2013-00636 (Patent 6,424,625 B1)

### III.   Conclusion

For the foregoing reasons, Patent Owner has not shown that our Final Written Decision in IPR2013-00601 should be modified.  For the same reasons, Patent Owner also has failed to show that our Final Written Decisions in IPR2013-00602 and IPR2013-00636 should be modified.

### ORDER

Accordingly, it is:

ORDERED that Patent Owner's Requests for Rehearing are *denied*.

9

**A0309**

IPR2013-00601 (Patent 6,772,215 B1)
IPR2013-00602 (Patent 6,466,568 B1)
IPR2013-00636 (Patent 6,424,625 B1)

For PETITIONER:

Dominic E. Massa
Michael A. Diner
Zachary Piccolomini
WILMER CUTLER PICKERING HALE AND DORR LLP
Dominic.massa@wilmerhale.com
michael.diener@wilmerhale.com
Zachary.piccolomini@wilmerhale.com

For PATENT OWNER:

Peter J. Ayers
J. Christopher Lynch
Sarah Spires
LEE & HAYES PLLC
peter@leehayes.com
chris@leehayes.com
Sarah.spires@skiermontpuckett.com

10

Paper No. <u>66</u>

Filed on behalf of: Wi-Fi One, LLC

UNITED STATES PATENT AND TRADEMARK OFFICE

_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD

_____

BROADCOM CORPORATION,

Petitioner,

V.

WI-FI ONE, LLC,

Patent Owner.

_____

CASE NO.: IPR2013-00602
PATENT NO. 6,466,568 B1

_____

**PATENT OWNER'S NOTICE OF APPEAL**

IPR2013-00602
Patent 6,466,568 B1

In accordance with 35 U.S.C. §§ 141-142, 319 and 37 CFR § 90.2(a), 90.3, Patent Owner Wi-Fi One, LLC ("Wi-Fi One") appeals to the United States Court of Appeals for the Federal Circuit from the Final Written Decision of the Patent Trial and Appeal Board (the "Board") entered on March 6, 2015 (Paper No. 60) (the "Final Written Decision") and the Board's Decision on Patent Owner's Request for Rehearing entered on June 1, 2015 (Paper No. 65) (the "Rehearing Decision"), and from all underlying orders, decisions, rulings, opinions and/or findings, including without limitation the Board's Decision on Institution of *Inter Partes* Review entered on March 10, 2014 (Paper No. 27) regarding Wi-Fi One's U.S. Patent No. 6,466,568.

For the limited purposes of compliance with 37 C.F.R. § 90.2(a)(3)(ii), Wi-Fi One expects that the issues on appeal may include the following, along with any underlying findings, determinations, rulings, opinions, orders, decisions, or other related issues:

- The Board's determination of unpatentability of claims 1-6 of U.S. Patent 6,466,568 (the "'568 patent"), under 35 U.S.C. §§ 102(b) and 103(a), and any finding or determination (factual or legal) supporting that determination;

NOTICE OF APPEAL                    1                    IPR2013-00602

**A0312**

IPR2013-00602
Patent 6,466,568 B1

- The Board's determination that it had invalidation authority to render its Final Written Decision in this case;

- The Board's determination that this Petition is not barred by 35 U.S.C. § 315(b), and any other finding or determination (factual or legal) supporting or related to this determination;

- The Board's failure to terminate this Petition after institution under 35 U.S.C. § 315(b), and any other finding or determination (legal or factual) supporting or related to this failure; and

- The Board's decision to deny Wi-Fi One's motion for additional discovery related to the issue of real-party-in-interest or privity under 35 U.S.C. § 315(b), and any other finding or determination (legal or factual) supporting or related to this determination.

Wi-Fi One reserves the right to challenge any finding or determination supporting or related to the issues listed above and to challenge the other issues decided adversely to Wi-Fi One in the Board's Final Written Decision, the Board's Decision on Request for Rehearing regarding the Final Written Decision, and/or any orders, decisions, or rulings underlying the Board's Final Written Decision or Decision on Request for Rehearing regarding the same.

Copies of this Notice of Appeal are being filed simultaneously with the Director of the United States Patent and Trademark Office, the Patent Trial and

**A0313**

IPR2013-00602
Patent 6,466,568 B1

Appeal Board, the Court of Appeals for the Federal Circuit, and served on the

Petitioner.

NOTICE OF APPEAL                    3                    IPR2013-00602

**A0314**

IPR2013-00602
Patent 6,466,568 B1

Dated July 13, 2015

Respectfully submitted,

/s/ Sarah E. Spires
Sarah E. Spires (Reg. No. 61,501)

Peter Ayers (Reg. No. 38,374)
Lee & Hayes, PLLC
11501 Alterra Parkway, Suite 450
Austin, TX 78758
Telephone: 512.605.0252
Fax: 512.605.0252
**Lead Counsel for Patent Owner**
Wi-Fi One, LLC

Sarah E. Spires (Reg. No. 61,501)
SKIERMONT PUCKETT LLP
2200 Ross Ave. Ste. 4800W
Dallas, TX 75201
P: 214-978-6600/F: 214-978-6601
**First Back-Up Counsel for Patent Owner**

J. Christopher Lynch (Reg. No. 34,216)
Lee & Hayes, PLLC
601 W. Riverside Ave., Suite 1400
Spokane, WA 99201
Telephone: 509.324.9256
Fax: 509.323.8979
Attorney for Patent Owner
Wi-Fi One, LLC

John Shumaker (Reg. No. 52,223)
Lee & Hayes, PLLC
11501 Alterra Parkway, Suite 450
Austin, TX 78758
Telephone: 512.605.0260
Fax: 509.323.8979
Attorney for Patent Owner
Wi-Fi One, LLC

NOTICE OF APPEAL                    4                    IPR2013-00602

**A0315**

IPR2013-00602
Patent 6,466,568 B1

## CERTIFICATE OF FILING

The undersigned certifies that on July 13, 2015, in addition to being filed electronically through the Patent Trial and Appeal Board's PRPS System, the foregoing PATENT OWNER'S NOTICE OF APPEAL was filed via Express Mail with the Director of the United States Patent and Trademark Office, at the following address (in accordance with 37 C.F.R. §§ 90.2(a), 104.2):

Director of the United States Patent and Trademark Office
c/o Office of the General Counsel
United States Patent and Trademark Office
P.O. Box 1450
Alexandria, Virginia 22313-1450

## CERTIFICATE OF FILING

The undersigned certifies that on July 13, 2015, a true and correct copy of the foregoing PATENT OWNER'S NOTICE OF APPEAL was filed via Express Mail with the Clerk's Office of the United States Court of Appeals for the Federal Circuit at the following address:

Clerk of Court
United States Court of Appeals for the Federal Circuit
717 Madison Place NW
Washington, DC 20005

## CERTIFICATE OF SERVICE

The undersigned certifies that on July 13, 2015 the foregoing PATENT OWNER'S NOTICE OF APPEAL was served via email on Lead and Back up Counsel for Broadcom Corporation identified in Broadcom's Mandatory Notices, whom consented to electronic service:

Dominic E. Massa, Lead Counsel
Zachary Piccolomini, Back-up Counsel
Wilmer Cutler Pickering Hale and Dorr, LLP
60 State Street
Boston, MA 02109
Dominic.massa@wilmerhale.com
Zachary.piccolomini@wilmerhale.com

**A0316**

IPR2013-00602
Patent 6,466,568 B1

Skiermont Puckett LLP

/s/ Sarah E. Spires
Sarah E. Spires (Reg. No. 61,501)

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

**WI-FI ONE, LLC,**
**Owner/Appellant**

v.

**BROADCOM CORPORATION,**
**Petitioner/Appellee**

**Proceeding No: IPR2013-00602**

## NOTICE FORWARDING CERTIFIED LIST

A Notice of Appeal to the United States Court of Appeals for the Federal

Circuit was timely filed on July 13, 2015, in the United States Patent and

Trademark Office in connection with the above identified *Inter Partes Review*

proceeding. Pursuant to 35 U.S.C. § 143, a Certified List is this day being

forwarded to the Federal Circuit.

Respectfully submitted,

By: _Macia L. Fletcher_____
Macia L. Fletcher
Paralegal
Mail Stop 8
P.O. Box 1450
Alexandria, VA 22313-1450
571-272-9035

Under Secretary of Commerce for
Intellectual Property and Director of the
United States Patent and Trademark Office

Date: August 24, 2015

**A0327**

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the

foregoing has been served on Appellant and Appellee this 24th day of August,

2015, as follows:

For PETITIONER:

Dominic E. Massa
Michael A. Diner
Zachary Piccolomini
WILMER CUTLER PICKERING HALE AND DORR LLP
Dominic.massa@wilmerhale.com
michael.diener@wilmerhale.com
Zachary.piccolomini@wilmerhale.com


For PATENT OWNER:

Peter J. Ayers
J. Christopher Lynch
Sarah Spires
LEE & HAYES PLLC
peter@leehayes.com
chris@leehayes.com
Sarah.spires@skiermontpuckett.com


By: _____
Macia L. Fletcher
Paralegal
Mail Stop 8
P.O. Box 1450
Alexandria, VA 22313-1450
571-272-9035


**A0328**

## U.S. DEPARTMENT OF COMMERCE
### United States Patent and Trademark Office

**August 24, 2015**

(Date)

**THIS IS TO CERTIFY** that the attached document is a list of the papers that comprise the record before the Patent Trial and Appeal Board (PTAB) for the *Inter Partes Review* proceeding identified below.

### BROADCOM CORPORATION,
**Petitioner,**

**v.**

### WI-FI ONE, LLC,
**Patent Owner.**

**Case:  IPR2013-00602**
**Patent No. 6,466,568 B1**

By authority of the

**DIRECTOR OF THE UNITED STATES**
**PATENT AND TRADEMARK OFFICE**

*Marcia L. Fletcher*

*Certifying Officer*



**A0329**

Prosecution History IPR2013-00602

| Date | Document |
|------|----------|
| 9/20/2013 | Petition for Inter Partes Review |
| 9/20/2013 | Petitioner's Power of Attorney |
| 9/20/2013 | Fee Authorization |
| 9/30/2013 | Notice of Filing Date Accorded to Petition |
| 10/21/2013 | Patent Owner's Power of Attorney |
| 10/21/2013 | Patent Owner's Mandatory Notices |
| 11/1/2013 | Patent Owner's Power of Attorney |
| 11/1/2013 | Patent Owner's Updated Mandatory Notice |
| 12/11/2013 | Order - Authorizing Motion for Additional Discovery |
| 12/11/2013 | Patent Owner's Motion to Seal (confidential) |
| 12/11/2013 | Patent Owner's Motion for Additional Discovery (confidential) |
| 12/16/2013 | Patent Owner's Motion to Seal |
| 12/16/2013 | Patent Owner's Motion for Additional Discovery |
| 12/20/2013 | Petitioner's Motion to Seal (Redacted) |
| 12/20/2013 | Petitioner's Motion to Seal (confidential) |
| 12/20/2013 | Petitioner's Opposition (Redacted) |
| 12/20/2013 | Petitioner's Opposition (confidential) |
| 12/20/2013 | Petitioner's Exhibit List |
| 12/30/2013 | Patent Owner's Election to Waive Its Preliminary Response |
| 1/24/2014 | Decision - Motion for Additional Discovery |
| 1/27/2014 | Petitioner's Motion to Seal |
| 2/7/2014 | Patent Owner's Request for Rehearing |
| 2/20/2014 | Decision - Request for Rehearing |
| 3/10/2014 | Decision - Institution of Inter Partes Review |
| 3/10/2014 | Scheduling Order |
| 3/28/2014 | Patent Owner's List of Proposed Motions |
| 4/1/2014 | Patent Owner's Notice of Related Matters |
| 4/2/2014 | Order - Conduct of the Proceeding |
| 5/15/2014 | Patent Owner's Power of Attorney |
| 5/15/2014 | Notice of Appearance - Shumaker |
| 6/11/2014 | Patent Owner's Motion to Seal (confidential) |
| 6/11/2014 | Patent Owner's Motion to Seal (Redacted) |
| 6/11/2014 | Patent Owner's Response (confidential) |
| 6/11/2014 | Patent Owner's Response (Redacted) |
| 06/11/2014 | Patent Owner's Motion to Amend |
| 6/30/2014 | Decision - Motions to Seal |
| 7/11/2014 | Patent Owner's Updated Mandatory Disclosure |
| 7/11/2014 | Patent Owner's Updated Power of Attorney |
| 7/17/2014 | Petitioner's Standard Acknowledgement for Access to Protective Order Material - Massa |
| 7/17/2014 | Petitioner's Standard Acknowledgement for Access to Protective Order Material - Diener |

**A0330**

Prosecution History IPR2013-00602

| Date | Document |
|------|----------|
| 8/29/2014 | Notice of Stipulated Modification of Due Dates 2-3 |
| 9/17/2014 | Notice of Appearance - Piccolomini |
| 10/1/2014 | Petitioner's Reply to Patent Owner's Response |
| 10/1/2014 | Petitioner's Opposition to Motion to Amend |
| 10/29/2014 | Notice of Stipulated Modification of Due Dates 4-5 |
| 11/3/2014 | Patent Owner's Reply to Opposition to Motion to Amend |
| 11/12/2014 | Petitioner's Request for Oral Argument |
| 11/12/2014 | Patent Owner's Request for Oral Argument |
| 11/12/2014 | Patent Owner's Updated Exhibit List |
| 11/17/2014 | Order - Trial Hearing |
| 12/4/2014 | Petitioner's Demonstratives for Oral Argument |
| 12/4/2014 | Patent Owner's Updated Exhibit List |
| 12/7/2014 | Patent Owner's Notice of Related Matters |
| 12/7/2014 | Letter from Ayers to Vignone re service of New Exhibit |
| 12/19/2014 | Petitioner's Revised Mandatory Notice |
| 2/5/2015 | Oral Hearing Transcript |
| 3/6/2015 | Final Written Decision |
| 4/3/2015 | Patent Owner's Power of Attorney |
| 4/3/2015 | Patent Owner's Revised Mandatory Notice |
| 4/3/2015 | Patent Owner's Standard Acknowledgment for Access to Protective Order Material - Spires |
| 4/6/2015 | Patent Owner's Request for Rehearing |
| 6/1/2015 | Decision - Request for Rehearing |

## I.    MANDATORY NOTICES

### A.    Real Parties-in-Interest

Broadcom Corporation ("Petitioner") is the real party-in-interest and submits this *inter partes* review Petition ("Petition") for review of certain claims of U.S. Patent No. 6,466,568 ("the '568 patent") (Ex. 1001).

### B.    Related Matters

In September 2010, Ericsson Inc. et al ("the Patent Owner) filed suit in the Eastern District of Texas against D-Link Systems, Inc., Netgear, Inc., Belkin International, Inc., Dell, Inc., Toshiba Corporation, Acer Inc., and Gateway Inc. (the "Defendants") alleging infringement of several U.S. patents, including the '568 patent. (*See  Ericsson Inc., et al. v. D-LINK Corp., et al.*, Civil Action No. 6:10-CV-473 (LED/KGF) ("Texas Litigation")).[1]  The Patent Owner's infringement allegations were based, in part, on Defendants' use of Petitioner's Wi-Fi compliant products, such as the BCM4313 and BCM4321.  The Patent Owner did not allege that Petitioner infringed any patent asserted in the Texas Litigation, and Petitioner was not a party to the Texas Litigation.

Following an eight-day trial, the jury found claim 1 of the '568 patent infringed.  The Defendants, who were allowed only 15 hours to present their case

---

[1]    On November 19, 2011, Intel Corporation filed a Motion to Intervene in the Texas Litigation, which the Court granted on May 4, 2012.

1

**A0334**

for the five (5) patents[2], damages and certain equitable issues, did not address the invalidity of the '568 patent at trial.

### C.    Counsel

Lead Counsel:  Dominic E. Massa  (Registration No. 44,905)

Backup Counsel:  Michael A. Diener  (Registration No. 37,122)

### D.    Service Information

Email:  Michael A. Diener, michael.diener@wilmerhale.com

Post and Hand Delivery:  Wilmer Cutler Pickering Hale & Dorr LLP, 60 State St., Boston, MA 02109

Telephone:  617-526-6454          Facsimile:  617-526-5000

### E.    Certification of Grounds for Standing

Petitioner certifies pursuant to Rule 42.104(a) that the patent for which

---

[2]    The Patent Owner asserted the following additional patents at trial in the Texas Litigation:  U.S. Patent No. 6,330,435 (the "'435 patent"), U.S. Patent No. 6,519,223 (the "'223 patent"), U.S. Patent No. 6,424,625 (the "'625 patent"), and U.S. Patent No. 6,772,215 (the "'215 patent").  U.S. Patent No. 5,987,019, the parent of the '568 patent, was originally asserted by Ericsson, but dismissed from the case prior to trial.  The jury found infringement of the '215, '625 and '568 patents.  The jury found no infringement as to the '435 and '223 patents.

2

**A0335**

review is sought is available for *inter partes* review and that Petitioner is not

barred or estopped from requesting an *inter partes* review challenging the patent

claims on the grounds identified in this Petition.

## II.    OVERVIEW OF CHALLENGE AND RELIEF REQUESTED

Pursuant to Rules 42.22(a)(1) and 42.104 (b)(1)-(2), Petitioner challenges

Claims 1-6 of the '568 patent (Ex. 1001) under 35 U.S.C. §§ 102 and 103, in view

of the references listed below.

### A.    Prior Art Patents and Printed Publications

Petitioner relies upon the following patents and printed publications:

1. Morley, U.S. Patent No. 5,488,610, entitled "Communication
   System," filed July 12, 1994 as a foreign application of European
   Patent Application No. 93306797, filed August 26, 1993 ("Morley",
   Ex. 1002).  European Patent Application No. 93306797 published on
   March 1, 1995 as EP 0641098 A1.  ("Morley EP", Ex. 1003).  Morley
   issued on January 30, 1996, and is prior art to the '568 patent at least
   under 35 U.S.C. § 102(a) and 102(e).  Morley EP is prior art under 35
   U.S.C. § 102(b).

2. Sharma, U.S. Patent No. 5,500,859, entitled "Voice and Data
   Transmission System," filed August 11, 1994 as a divisional of U.S.
   Patent No. 5,452,289 filed on January 8, 1993 ("Sharma", Ex. 1004) .

3

Ex. 1017), which is a continuation of an application filed Nov. 1, 1993

and issued Dec. 3, 1996, and is prior art to the '568 patent at least

under 35 U.S.C. § 102(e).

## B.    Grounds for Challenge

Petitioner requests cancellation of claims 1-6 (the "Challenged Claims"), as

unpatentable under 35 U.S.C. §§ 102 and 103.

Ground 1: the Challenged Claims are anticipated under § 102 by Morley.

Ground 2: Morley renders claims 5-6 as obvious under § 103.

Ground 3: claims 1-4 and 6 are anticipated under § 102 by Sharma.

Ground 4: Sharma renders claims 5-6 as obvious under § 103.

Ground 5: claims 1-6 are anticipated under § 102 by Menand.

Ground 6: Menand renders claims 5-6 as obvious under § 103.

Ground 7: the Challenged Claims are rendered obvious under § 103 by

Adams.

Ground 8: claims 1-6 are anticipated under § 102 by Padovani.

Ground 9: Padovani renders claim 4 as obvious under § 103, in view of

Zehavi.

This Petition, supported by the Declaration of Dr. Harry Bims ("Bims

Declaration" or "Bims Decl.") (Ex. 1009) filed with this Petition, demonstrates that

there is a reasonable likelihood that Petitioner will prevail with respect to at least

5

**A0338**

one of the challenged claims and that each of the challenged claims is unpatentable

for the reasons cited in this petition.  *See* 35 U.S.C. § 314(a).

As will be shown below, during the Texas Litigation, Patent Owner

submitted an expert report ("Report"; Ex. 1010)[3] to rebut opinions that claims 1-5

(which were asserted at the time) were anticipated by Morley, Menand, and/or

Adams.  Thus, Patent Owner has already had an opportunity to respond to many of

the grounds raised here.  As will be shown, the responses in the Report fail and are

not convincing.

## III.   Claim Construction

The claims in an *inter partes* review should be given their "broadest

reasonable construction in light of the specification" as commonly understood by

those of ordinary skill in the art.[4]   *See* 37 C.F.R. § 42.100(b).

---

[3]     The Report has a confidentiality legend.  Portions of the Report never made

available to Petitioner have been redacted; it is Petitioner's understanding that this

redacted material was the only alleged confidential information in the Report.

[4]     A person of ordinary skill in the art for the '568 patent would have a

bachelor's or graduate degree in a relevant field, such as electrical or computer

engineering or computer science, with some amount of work experience in

communications.  (*See* Bims Decl. at ¶ 16; Ex. 1009).

6

**A0339**

## I.  INTRODUCTION

In the event that the challenged claims are found unpatentable, Patent Owner Telefonaktiebolaget L.M. Ericsson ("Ericsson") hereby moves pursuant to the Board's March 10, 2014 Order, Paper No. 27, and 37 C.F.R. § 42.121 to cancel claims 1-6 of U.S. Pat. No. 6,466,568 ("the '568 Patent) and submit proposed substitute claims 8-13 in their place.

## II.  LISTING OF PROPOSED SUBSTITUTE CLAIMS

The following claim listing identifies the changes to the '568 Patent so that the Board can identify the new limitations and deletions of limitations.  *See* 37 C.F.R. § 42.121(b); *Nichia Corp. v. Emcore Corp.*, IPR2012-00005, Paper 68 at *50 (PTAB Feb. 11, 2014).  Petitioner has used underlining to indicate text inserted in the corresponding original claim, as suggested by the Board.  *Toyota Motor Corp. v. Am. Vehicular Sciences LLC*, IPR2013-00419, Paper 32 at *2 (PTAB March 7, 2014).

Proposed Claims

8. (Proposed Substitute for Original Claim 1)  A communication station comprising: a processor for arranging information for transmission including providing at least one first field in which payload information is disposed and providing at least one second field, separate from said first field, which includes a service type identifier which identifies transmission characteristics of a service and

1

**A0406**

a type of payload information provided in said at least one first field; and a transmitter for transmitting information received from said processor including said at least one first field and said at least one second field.

9. (Proposed Substitute for Original Claim 2) The communication station of claim ~~1~~8, wherein said processor is also for changing said type of payload information from a first type to a second type during a connection involving said communication station and adjusting a value of said service type identifier to correspond to the second type of information.

10. (Proposed Substitute for Original Claim 3) The communication station of claim ~~2~~9, wherein said first type of information is one of video, voice and data and said second type of information is different one of video, voice and data.

11. (Proposed Substitute for Original Claim 4) The communication station of claim ~~1~~8, wherein said information is multimedia information.

12. (Proposed Substitute for Original Claim 5) The communication station of claim ~~1~~8, wherein said communication station is a base station.

13. (Proposed Substitute for Original Claim 6) The communication station of claim ~~1~~8, wherein said communication station is a mobile station.

### III. STATEMENT OF SUBSTITUTION CONTINGENCIES

Under 37 C.F.R. § 42.121(a)(3), this Motion includes one proposed substitute claim for each challenged claim to be replaced. Under 37 C.F.R. §

2

**A0407**

Paper No. __

UNITED STATES PATENT AND TRADEMARK OFFICE

BEFORE THE PATENT TRIAL AND APPEAL BOARD

BROADCOM CORPORATION

Petitioner

v.

WI-FI ONE, LLC

Patent Owner

Case IPR2013-00602
U.S. Patent No. 6,466,568

**PETITIONER'S OPPOSITION TO PATENT OWNER'S MOTION TO
AMEND**

**A0430**

Petitioner's Opposition to Patent Owner's Motion to Amend (IPR2013-00602)

can provide information regarding three different aspects of the transmission,

namely, 1) type of service, 2) channel coding, and 3) interleaving.  These different

aspects can be alternatives or they *can all be indicated by the FOC field*."

(emphasis added)).  Because interleaving is not a transmission characteristic, but

just a way of rearranging data prior to transmission (Bims Opp. Decl. at ¶ 4; Ex.

1026), the '568 patent at best supports identifying channel coding in addition to the

contents of the payload.

## B.    Owner's Proposed Claims Are Invalid

Owner contends that proposed claims 8-13 are patentably distinct over the

prior art and identifies Menand, Ex. 1005, as the closest prior art.  However, the

alleged distinctions relied upon by Owner are disclosed in at least the following

prior art references:

   (1) U.S. Patent No. 5,488,610 ("Morley," Ex. 1002);

   (2) U.S. Patent No. 5,757,813 ("Raith," Ex. 1024); and

   (3) U.S. Patent No. 6,172,988 to Tiernan et al. ("Tiernan," Ex. 1025).

The understanding of one of ordinary skill in the art of these references is

supported by Dr. Bims's Opposition Declaration attached as Exhibit 1026.

### i.    Claims 8-13 are Anticipated by Morley

Morley discloses an identifier that identifies both a type of data in the

payload and a transmission characteristic of the data, as set forth in the Petition.

**A0437**

Petitioner's Opposition to Patent Owner's Motion to Amend (IPR2013-00602)

(Paper No. 2 at 18-29).  In addition, Morley discloses identifying a "transmission characteristic" because Morley discloses using the header to determine the data rate at which to process the received data.  (Bims Opp. Decl. at ¶ 6; Ex. 1026).

In particular, Morley describes that different buffers are processed at different rates based on the type of data -- the modem data rate is 14400 bps and the voice coder operates at 6800 bps.  (Morley at 52:45-47; Ex. 1002).  Morley's receiver uses the frame type, which is the type of information, to process voice data at a first rate, and other data at a second rate.  Morley explains in conjunction with FIG. 8 that "Frames of voice [data] are supplied to the voice decoder from the receive voice buffer 70. These can be read at a rate derived from the voice decoder clock."  (Morley at 10:23-25; Ex. 1002).

Owner argues that Morley only discloses a single service, and therefore does not disclose "a service type identifier which identifies transmission characteristics of a service" as claimed in claim 8:

> Morley discloses a multiplexer that supports one voice
> channel and up to three data channels (Morley, 6:31-32)
> and creates a composite signal for transmission and
> reception on a single communications channel (*Id.* at 1:3-
> 5).

(Paper No. 38 at 10; *see also* Akl. Dec. at ¶ 44).  But claim 8 only recites identifying "transmission characteristics of a service," not different transmission

- 6 -

**A0438**

Petitioner's Opposition to Patent Owner's Motion to Amend (IPR2013-00602)

characteristics for different services.   Morley's frame structure can support one voice channel and up to three separate data channels.  (Morley at 6:31-32, 7:1-17; Ex. 1002).  The '568 patent uses the term "services" to refer to types of information, which include voice and data.  ('568 at 2:17-30; Ex. 1001).  Therefore Morley's different voice and data channels constitute different services.

Other limitations and dependent claims are disclosed by Morley as discussed in the Petition, and are not disputed by Owner.

### ii.    Claims 8-13 Would Have Been Obvious Over Morley in view of Raith

Even if the '568 patent includes written support for an identifier that identifies different transmission characteristics for different services *as well as* the type of information in the payload (which it does not), and to the extent the claims could be so construed without explicitly reciting separate fields or information, claims 8-13 would have been obvious over Morley in view of Raith.  Raith qualifies as prior art to the '568 patent under 35 U.S.C. § 102(e).

Morley discloses that the "format of the mux frame may need to change according to the particular characteristics of a call." (Morley at 7:27-29; Ex. 1002). Morley optimizes the structure of the mux frames "according to 'long term' requirements of the application and protocol layers," such as voice coder data rate and frame rate, and data bandwidth requirements (i.e., transmission characteristics).  (Morley at 5:60-64; Ex. 1002).  A person of ordinary skill in the

- 7 -

**A0439**

UNITED STATES PATENT AND TRADEMARK OFFICE

_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD

_____

BROADCOM CORPORATION

Petitioner

v.

WI-FI ONE, LLC

Patent Owner

_____

Case IPR2013-00602

U.S. Patent No. 6,466,568

_____

**PATENT OWNER'S REPLY TO PETITIONER'S OPPOSITION**

**TO MOTION TO AMEND U.S. PATENT NO. 6,466,568**

**A0451**

identifies both transmission characteristics and a type of payload information just as in the proposed amendment.

## II.    Morley does not anticipate claims 8-13 of the '568 patent.

Morley (Ex. 1002) discloses a header field that identifies the format of a multiplex frame to be transmitted.  (Paper No. 38 at 10-11.)  The format of the multiplex frame defines the amount, if any, of data and video frames included in the multiplex frame.  (Akl Dec. ¶ 12.)  Data in the multiplex frame is processed at 14400 bps, the rate defined by the modem data rate (Morley, at 10:32-33), while voice data frames in the multiplex frame are processed at 6800 bps, the rate of the voice decoder (Morley, at 10:23-25 and 10:33-34.)  The Morley header does not determine, nor affect, the rate of processing the data (Bims Tr. (Ex. 2025) at 89:5-17) or the voice frames (*id*. at 88:14-89:4) of a multiplex frame. (Akl Dec. ¶ 12.)

Contrary to Broadcom's contention (Paper No. 47 at 7), Morley does not disclose separate voice and data channels as different services.  Morley "aims to provide an improved communication system for combining at least two types of data and sending a composite signal over a single physical channel." (Morley 1:56-59.) The data and video of a multiplex frame are transmitted **together as a single service**, whose video and data processing rates are defined by the receiver, not the header in Morley.  (Morley 4:38-44, 5:4-6, 39-51; Akl Dec. ¶ 13.)  Morley discloses transmitting the voice and data as individual frames only as a multiplex

2

**A0455**

frame because the Morley header merely defines the format of the transmitted multiplex frame.  (Akl Dec. ¶ 13.)

**III.  Claims 8-13 of the '568 patent are not rendered obvious by Morley in view of Raith.**

Broadcom erroneously contends that "Morley contemplates changing the format of the mux frame based on transmission characteristics."  (Paper No. 47 at 8.)  Morley discloses optimizing the <u>structure</u> of the multiplex frames according to "'long term' requirements of the application and protocol layers" and the structure "may change during the call." (Morley at 5:60-65.)   Both the fixed, invariant processing requirements of the transmitter and receiver, and the amount of data relative to voice frames to be transmitted – neither of which are transmission characteristics – are analyzed to determine the optimized structure of the multiplex frame to be transmitted.  (Akl Dec. ¶ 14.)

 "[E]nsuring error free data" is critical in Morley.  (Morley at 8:35.)  "Due to the synchronous nature of voice, an error correction scheme using block retransmissions cannot be used."  (Morley at 8:18-21.)  Broadcom concedes that "Morley does not expressly disclose using the header to separately indicate the type of error correction."  (Paper No. 47 at 8.)

Raith (Ex. 1024) discloses modifying the channel coding based on error detection during transmission to obtain an optimal level of channel coding to reduce the "number of retransmissions to achieve the highest throughput."  (Raith

3

**A0456**

Case IPR2013-00601 Patent 6,772,215; Case IPR2013-00602
Patent 6,466,568; Case IPR2013-00636 Patent 6,424,625

packet then becomes the last sequence number of the received window. The received window then is adjusted so that the packet that's been received now is the sequence number of the last section of the received window as opposed to the first part of the received window as normal.

So what this means is that Vornefeld as opposed to releasing expectations of packets having prior sequence numbers actually creates expectations, and that's shown in the figure -- the wheel figure in the bottom, which has a 0, 1 and 2 in the gray section, and that gray section is the packets that the receiver is now expecting to receive rather than being released.

And I'll stop there, Your Honor, unless you have questions and I'll reserve the rest of my time for rebuttal.

JUDGE EASTHOM: Thank you, counsel. I don't have any questions. Any questions? Actually I had one bookkeeping question. Are you now Wi-Fi One or --

DR. SHUMAKER: Wi-Fi One owns the patents at suit now. Ericsson owns an interest in some of the patents in terms of the past damage issue, but Wi-Fi One owns the patents going forward.

JUDGE EASTHOM: So should we -- we should change the name to --

DR. SHUMAKER: To Wi-Fi One?

JUDGE EASTHOM: Right.

DR. SHUMAKER: Yes, Wi-Fi One, LLC.

JUDGE EASTHOM: Thank you.

75

**A0535**

US005488610A

# United States Patent [19]

## Morley

[11] **Patent Number:** 5,488,610

[45] **Date of Patent:** Jan. 30, 1996

[54] **COMMUNICATION SYSTEM**

[75] Inventor: **Stephen Morley**, Stoke Gifford, United Kingdom

[73] Assignee: **Hewlett-Packard Company**, Palo Alto, Calif.

[21] Appl. No.: **274,203**

[22] Filed: **Jul. 12, 1994**

[30] **Foreign Application Priority Data**

Aug. 26, 1993 [EP] European Pat. Off. .............. 93306797

[51] **Int. Cl.**$^6$ ..................................................... **H04J 3/02**
[52] **U.S. Cl.** ..................... **370/82**; 370/105.1; 370/112; 379/93; 371/30; 371/47.1
[58] **Field of Search** ........................... 370/79, 82, 105.1; 379/93, 96; 371/37.1, 30, 47.1, 48, 49.1, 53

[56] **References Cited**

### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 5,214,650 | 5/1993 | Renner et al. | 370/934 |
| 5,331,670 | 7/1994 | Sorbara et al. | 370/105.1 X |

### FOREIGN PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 0170413 | 5/1986 | European Pat. Off. | H04J 3/16 |
| 9215159 | 9/1992 | WIPO | H04L 7/00 |

OTHER PUBLICATIONS

Patent Abstracts of Japan, vol. 01, No. 3181 (E–750) 27 Apr. 1989 & JP–A–10 007 738 (K.D.D. Co Ltd).

Proceeding IEEE International Symposium on Subscriber Loops and Services 20 Mar. 1978, Atlanta (US)—pp. 126–130.

Kaiser et al. 'Digital two–wire local connection providing office subscribers with speech, data and new teleinformation services.'—p. 129, column 2, line 37—p. 130, column 1, line 18.

I.B.M. Technical Disclosure Bulletin vol. 15, No. 8, 1 Jan. 1973, pp. 2527–2528—J. Besseyre 'Self timing framing in a digital telephone system'.

*Primary Examiner*—Douglas W. Olms
*Assistant Examiner*—Russell W. Blum

[57] **ABSTRACT**

The present invention concerns a multiplexer for use in a system for transmitting more than one type of data, e.g. a system for transmitting voice and data. The invention eliminates transmission errors in framed data due to clock errors on the transmission side by appropriate choice of the length of multiplexer frames. Two embodiments are disclosed, one in which the frame rate of the multiplexer is greater than the frame rate of a voice coder and another in which the length of multiplexer frames is slightly adjustable to account for clock errors.

**8 Claims, 8 Drawing Sheets**



BROADCOM 1002

A0566

**U.S. Patent**　　　Jan. 30, 1996　　　Sheet 1 of 8　　　**5,488,610**



FIG.1



FIG.2

A0568



FIG.3

FIG.4

APPLICATION — 44

PROTOCOL — 42

MUX — 22

PSTN/MODEM — 40



FIG.6

A0572

**U.S. Patent**        Jan. 30, 1996        Sheet 7 of 8        5,488,610





FIG.8

A0574

5,488,610

## 1

### COMMUNICATION SYSTEM

The present invention relates to a multiplex system for transmitting and receiving a composite signal on a single communications channel. The present invention has application in a system handling a composite voice and data signal for allowing remote users to speak to one another and, at the same time, to share visual data. A telephone network can be used for this type of communication, either the Public Switched Telephone Network or a private telephone network.

In one known scheme, a low bit rate voice encoder samples an analogue speech waveform and generates frames of encoded voice data. These frames are transmitted on a communications channel to a remote decoder which converts the frames back to an analogue voice signal. Other (non-voice) data may be transmitted in the same communications channel as the voice frames, for example image data.

FIG. 1 illustrates the potential for timing errors in such a scheme. A first clock 1 controls the voice encoder and a second clock 2 controls the multiplexer and hence the timing for the communications channel. A third clock 3 controls the timing of the receiving voice decoder.

Error 1 is the error between clocks 1 and 2. Error 2 is the error between the clocks 2 and 3. Error 3 is the cumulative error between the clocks 1 and 3.

If clocks 1 and 2 are synchronous to each other then the voice frames can be transmitted without error on the communications channel. If clocks 1 and 2 are not synchronous to each other then a clocking error (Error 1) builds up over time and voice frames may be lost. It may be difficult or impossible in many situations to lock the timing of the voice encoder and multiplexer in which case error 1 can lead to errors in the transmission of voice information.

At the receiving end, error 3 causes a similar problem and occasionally voice frames have to be dropped or repeated.

In prior schemes different attempts have been made to overcome the problem caused by error 1.

One way is that, when one frame of timing error has built up, the transmitter either deletes a voice frame (if the voice encoder is generating data too quickly) or repeats a voice frame (if the voice encoder is generating data too slowly). This method introduces errors into the transmitted voice signal however.

Another way is for the transmitter to allocate extra bandwidth on the communications channel to allow for an overspeed voice encoder. Any unused bits are 'stuffed' and then removed at the receiver. This method has the disadvantage of compromising bandwidth efficiency on the communications channel.

The present invention aims to provide a multiplexer enabling voice frames, or other framed data, to be transmitted without degradation due to timing errors whilst maintaining efficient use of bandwidth.

The present invention also aims to provide an improved communication system for combining at least two types of data and sending a composite signal over a single physical channel.

According to the present invention we provide a system for multiplexing digital data in the form of frames of predetermined size with other data for transmission on a single physical channel, comprising means for:

a) receiving the frames of data at a first frame rate, wherein the source of framed data is controlled by a first clock;

b) receiving the other data;

## 2

c) generating multiplexer frames under the control of a second clock, the multiplexer frames being of a substantially predetermined size wherein individual frames incorporate the framed and/or other data according to which of these data is available for inclusion in that multiplexer frame and a header containing information about the contents of the frame,

whereby the length of the multiplexer frames is chosen so as to reduce or eliminate transmission errors due to timing errors between the first and second clocks.

Here the term 'physical channel' is intended to cover radio channels as well as hard-wired channels and is used to draw the distinction between physical and logical channels.

For the purposes of the statements of the present invention the term 'header' shall cover any portion of a frame carrying information about the contents of the frame whether or not that portion is at the front of the frame.

The present invention has the advantage of eliminating the effect of transmission timing errors without compromising bandwidth efficiency.

Preferably the present invention relates to a system in which the multiplexer frames are transmitted at a second frame rate which is greater than the first frame rate. In such an embodiment, the flexibility in the content of each multiplexer frame means that sufficient bandwidth can still be provided for the framed data.

Alternatively, in another embodiment the present invention may comprise:

means for comparing the clock rates of the first clock and the second clock;

means for calculating the cumulative error (the first error) between the first and second clocks and for adjusting the length of a multiplexer frame to be transmitted from the multiplexer by a predetermined amount whenever said first error reaches a predetermined threshold.

Preferably, the length adjustments are derived by measuring the position of the headers in the received multiplexer frames.

Advantageously, as well as representing multiplexer frame content information, the headers are also used as frame delimiters.

It is preferred that the multiplexer frame headers are error protected and the set of headers chosen to represent frame content information are hamming codes.

Preferably the framed data is voice data. In embodiments to be described a voice encoder is used to compress and digitise the voice data, generating frames of predetermined size which are sent to the multiplexer.

Specific embodiments of the present invention will now be described, by way of example, with reference to the accompanying drawings of which:

FIG. 1 is a diagram referred to above relating to timing errors;

FIG. 2 is a block diagram showing the main components of a communication system of the present invention;

FIG. 3 is a perspective view of a graphics tablet for use in connection with the present invention;

FIG. 4 is a diagram of the voice and data protocol stack;

FIG. 5 shows the structure of multiplexer frames;

FIG. 6 is a block diagram of the components of first and second embodiments of the multiplexer of FIG. 2;

FIG. 7 is a block diagram of the transmit buffers of the multiplexer;

FIG. 8 is a block diagram of the receive buffers of the multiplexer.

### SYSTEM OVERVIEW

FIG. 2 is a block diagram of a communication system 10 of the present invention which comprises:

5,488,610

**3**

a graphics tablet 12 having a pen 14;

a telephone 16;

a high speed modem 26;

a controller 18 in the form of a PC having:
    a processor 19;
    storage means 20;
    a multiplexer/demultiplexer 22;
    a voice coder/decoder 24;
    and a line interface 27.

The system 10 can be used to share voice and visual data with another user of a similar system. Once a connection between two systems 10 of the present invention has been established, the users utilise their telephone handsets in the normal manner to talk to one another and they use their tablets 12 to exchange visual data. The visual data can simply be handwritten input made by the users, either textual input or drawings or a mixture of these. Alternatively the users can exchange stored images, again either text or image or a mixture of these, and can subsequently discuss the exchanged images, making annotations using the pen 14 as they wish. Annotations made by one user appear superimposed on the image displayed on the tablet 12 of the other user. Voice and visual data are transmitted so as to remain in synchronisation as perceived by the recipient.

The same reference numbers suffixed 'a' will be used for the corresponding components of a remote system.

FIG. 3 shows in more detail the tablet 12 which is a digitising tablet having a VGA resolution liquid crystal display screen 28 including an electromagnetic digitiser and a non-tethered, passive pen 14. The tablet 12 is provided with contrast and brightness buttons 30 and 32. The tablet 12 has a hinged stand 34 to provide an angled writing surface for the user.

The controller 18 is a PC which will normally be housed in a box sited under the user's desk. The processor 19 is an Intel 386 processor. The storage means 20 provides 4 Mbytes of RAM, an 80 MBYTE hard disc and a floppy disc drive. The multiplexer 22, voice coder/decoder 24 and the line interface 27 use expansion slots on the PC.

The multiplexer/demultiplexer ('mux') 22 comprises a GMM/Sync 2 CCP intelligent communications card sold by GMM Research together with controlling software. Embodiments of the mux 22 will be described in detail with reference to FIGS. 5 to 9.

The voice coder/decoder ('coder') 24 is a low bit rate voice encoder/decoder in the form of a standard PC speech card such as the CACI AC5-50 together with software implementing a speech encoding algorithm of the linear predictive type such as a CELP (codebook excited linear predictive) algorithm. The voice coder 24 generates fifty voice frames per second at an output rate of 6.4 kbps. The sampling is performed at 8 Khz and one frame of encoded voice data typically represents 20 mS of analogue speech.

The line interface 27 is operable to switch the telephone 16 between the PSTN and the coder 24 and in the latter case also provides power, isolation and the four-to-two wire conversion normally provided by the local telephone exchange to the telephone 16.

The modem 26 is a V32 or V32 bis full duplex high speed synchronous modem operating at a rate of at least 9.6 kbps.

The process of call set up/close down will now be described.

Referring to FIG. 2, initially the line interface 27 connects the telephone 16 to the PSTN line. The speech coder 24 is disabled and the comunications card of the mux 22 is programmed to exchange AT commands with the modem 26.

To make an outgoing call, the user of the originating station lifts the telephone handset and will hear the normal

**4**

PSTN dial tone. He/she dials the number of the remote voice and data device in the normal way.

At the remote device the telephone will ring. Its modem will send a RING response message to the communications card of the receiving mux 22a which sets a status to indicate that this device is the answering station. The other user lifts the telephone handset and a normal voice conversation can ensue.

At some point in the voice call, the users may decide to start a voice and data call. They both press a CONNECT button on their displays. At this point the communications cards of the muxes 22 and 22a send commands to the modems 26 and 26a which causes them to go on line and begin to train up (ATD is sent to the originating modem and ATA to the answering modem).

The line interfaces 27 and 27a connect the telephones 26 and 26a to the speech coders 24 and 24a and the speech coders start up.

When the modems 26 and 26a have trained, a CONNECT response is sent to the communications cards of the muxes 22 and 22a which then execute the multiplexer code. When the multiplexers have synchronised, a message is displayed at the screens 28 and 28a and the users may now proceed with a voice and data call.

The call is cleared by either user replacing the telephone handset, both the local and remote devices return to the initial state

During a conversation in which voice and visual data are being shared, the telephone 16 is switched into the coder 24. Analogue voice signals from the telephone handset are sent to the coder 24 which digitises and compresses these outgoing voice signals and generates frames of voice data. The voice frames are sent to the mux 22 using a 'terminate and stay resident' (TSR) program running on the PC. Pen movements on the tablet 12 are sampled by the PC, encoded and written to the mux 22. Images stored on the PC which are selected by the user of the tablet 12 for sending are written to the mux 22 and to the tablet 12 for display. The user can annotate such images. The mux 22 multiplexes the voice frames received from the coder 24 and the data received from the PC to form mux frames including both voice and image data. Further detail on the mux frames is given below. The mux frames are sent to the modem 26 which converts them into an analogue signal which is sent over the PSTN.

The analogue signal received is converted back into frames of digital data by the modem 26a and sent to the mux 22a where they are demultiplexed into frames of voice data and a stream of data. The voice frames are sent to the coder 24 using the same TSR program and the coder 24 decompresses the voice data and converts it back into an analogue signal which is sent to the telephone 16. The processor 19 reads non-voice data and responds accordingly eg by displaying a corresponding image on the screen 28 of the tablet 12 or by performing the appropriate control function.

It will be understood that a system according to the present invention comprises both the transmitting and receiving components of the mux 22.

The system is designed so that voice and visual data remain in synchronisation as perceived by the recipient.

In an alternative mode of operation the line interface 27 connects the telephone 16 directly into the PSTN for use as a standard telephone.

The multiplexer 22 will now be more fully described.

FIG. 4 represents the communication stack of a voice and data system.

The physical layer 40 transmits and receives data between two voice and data devices. In FIG. 2, a high speed modem

5,488,610

5 | 6

(V32bis) is used, connected to the Public Switched Telephone Network (PSTN). A serial link from the modem DTE port provides the interface to the multiplexer layer.

The multiplexer layer **22** multiplexes the voice and data signals, adds synchronisation information, and transmits the composite signal to the physical layer **40**. The voice signal is generated by a speech coder, in the form of regular fixed length frames. The data signals are generated by the protocol layer and may be continuous data, for example when sending an image, or more 'bursty' data, for example when sending sketch marks. Receive data is demultiplexed into voice and data components according to the synchronisation information. The multiplexer can provide one or more separate data channels (non voice) to the upper layers of the communication stack. Error correction may be added to the data channels by the multiplexer. In the embodiments described the interface between the mutiplexer and physical layers is an RS232 serial link.

The protocol layer **42** manages a connection between two voice and data devices. Protocol layers in two connected voice and data devices communicate with each other via data channels on the multiplexer to negotiate call parameters and to exchange signals from the application such as selecting documents, turning pages in a document etc. The protocol is able to dynamically create and destroy data channels on the multiplexer for sending application data such as images or sketching information. In the embodiments described the interface between the protocol and multiplexer is an API communicating through shared memory on the multiplexer expansion card in the PC.

The application layer **44** takes pen input from the digitising tablet and codes it into sketching information. It also displays images and sketching on the display. Via the lower layers of the communication stack it communicates changes at the pen and screen interface to a remote voice and data device. In the embodiments described, the application layer communicates with the protocol layer using software messages.

As previously stated, the multiplexer generates a composite voice and data signal which is transmitted to the physical layer. This composite signal is organised into frames each containing a header for synchronisation purposes. Each frame may also contain one or more complete voice frames and/or other non voice data. In the embodiments described the frames are transmitted and received on a synchronous RS232 serial link between the multiplexer and a PSTN modem. The clocks for this link are provided by the modem. This multiplexer system may use other means of providing the physical channel and the link between the multiplexer and physical layers may be synchronous or asynchronous, serial or parallel.

The mux transmits frames containing a header and which may contain one or more complete voice frames and data. The mux **22** transmits continually even in the absence of data from the applications. The content of each frame is determined by the applications. The voice content, data content (or both) of a frame may be dropped according to what data is available at the time the mux frame is being generated.

The structure of the multiplexer frames is optimised according to 'long term' requirements of the application and protocol layers, e.g. voice coder data rate and frame rate, data bandwidth requirements . . . It may change during the call (after negotiation by the protocol layers) and it need not be the same in the transmit and receive directions. The multiplexer places a number of constraints on the frame structure which ensure that clock error **1**, as defined above, is eliminated. These constraints will be defined in the descriptions of the two embodiments of the multiplexer which follow.

FIG. **5a–5g** shows the structures of some possible mux frames. The length of a frame is fixed by the protocol being used at the relevant time, although the frame length can be altered from time to time to optimise operation according to which applications are active. The type of frame transmitted changes according to the 'short term' requirements of the application and protocol layers, e.g. what data must be transmitted at a particular point in time. The various fields in the mux frames will now be explained.

In FIGS. **5a–5f** the frame length is 24 octets, the mux **22** is transmitting one voice frame per mux frame and the coder frame ram is 50 frames per second. In FIG. **5g** the frame length is 88 octets and the mux is transmitting two voice frames per mux frame. In each case the parts of a frame are referenced as follows and the number of octets in each part is shown underneath that part:

H—header: All multiplexer frames contain a header which identifies the frame type. It is used to achieve and maintain synchronisation and also to identify the contents of a frame. Each header is two octets in length. In the basic multiplexer scheme there are 16 possible headers and hence 16 frame types. The 16 codes used have a hamming distance of at least five from each other, allowing the receiver to correct up to two bit errors in a header. The codes used are set out in a table below. The basic multiplexer can support one voice channel and up to three separate data channels.

V—voice: The V field of a multiplexer frame is optional and, if present, may be one or more complete voice frames. Voice frames are never split across multiplexer frames, this allows multiplexer frame synchronisation to be used for voice frame synchronisation. The length of the V field depends upon the speech coder used, typical values are 15 to 25 octets. Some speech coders generate a checksum (the CS field) which can be used for error detection at a remote speech decoder. The multiplexer at the receiver passes this transparently to the speech decoder, it is not used for error detection by the multiplexer.

D—data: Data (non voice) fields. All remaining octets after V and H fields have been allocated can be used for data. If there is not enough data from a channel to fill the frame then an L (length) field must also be transmitted to indicate the number of data octets in the frame. The L field is always one octet. Each multiplexer frame contains data from only one channel.

F—fill: these are unused octets in a frame and they are always 0.

Note that if there is no voice or data to be sent then the multiplexer sends a 'sync' frame (type **0**) with the 'in synchronisation' qualifier, see below.

Q—qualifier: a Q octet is only transmitted in 'sync' frames (type **0**). It is used when achieving synchronisation with a multiplexer in a remote voice and data device as described in the following section.

Sixteen possible headers for supporting one voice channel and up to three data channels are shown in the table below, with the header value expressed in hexadecimal (indicated by the '0×' prefix).

5,488,610

**7**

| Header Type | Frame Type | Header Value |
|---|---|---|
| 0 | Sync | 0 × 19b3 |
| 1 | Extend | 0 × 007f |
| 2 | Voice Only | 0 × 4ce6 |
| 3 | Not Defined | 0 × 0000 |
| 4 | Data 0 | 0 × 34e9 |
| 5 | Data 0* | 0 × 3366 |
| 6 | Voice + Data 0 | 0 × 2ad5 |
| 7 | Voice + Data 0* | 0 × 1e3c |
| 8 | Data 1 | 0 × 4b69 |
| 9 | Data 1* | 0 × 52da |
| 10 | Voice + Data 1 | 0 × 552a |
| 11 | Voice + Data 1* | 0 × 61c3 |
| 12 | Data 2 | 0 × 664c |
| 13 | Data 2* | 0 × 7870 |
| 14 | Voice + Data 2 | 0 × 078f |
| 15 | Voice + Data 2* | 0 × 4b16 |

Frame types marked with an asterisk are those in which the data does not occupy all of the available space in the frame. A length field is added in these frames. Header type **1** is to allow for future expansion of the header length to four octets.

Frame type **3**, 'extend', is used to lengthen the header field. This is for future expansion where more frame types may be required.

As explained above, the format of the mux frames may need to change according to the particular characteristics of a call. A change in format is notified to the receiving mux **22a** by the transmitting mux **22** sending a frame with header type **0** and a qualifier value of 0×38.

### Synchronisation

Synchronisation between two multiplexers is achieved and maintained by searching for the mux frame headers. Synchronisation frames (type **0**) are transmitted, the Q field indicates the synchronisation state of the local multiplexer as follows:

| Q field (hex) | Meaning |
|---|---|
| 0 × 0 | Out of synchronisation |
| 0 × 7 | Synchronising |
| 0 × 38 | In synchronisation |

At the start of a call and after a loss of synchronisation a multiplexer transmits a 'sync' frame (type **0**) with the 0×0 qualifier. It searches the receive data for sync frames and will continue to transmit 'sync' frames with the 0×0 qualifier until it has synchronised to these.

It then transmits 'sync' frames with the 0×7 qualifier to indicate that it is synchronising. When the remote multiplexer indicates that it also synchronising (ie 'sync' frames with the 0×7 qualifier are being received) then the multiplexer indicates that it is in synchronisation by sending one 'sync' frame with the 0×38 qualifier. Subsequent frames can then be of any type according to voice or non voice data available to the multiplexer.

The frames used to achieve synchronisation sync may be shortened frames for greater efficiency or may alternatively be full length frames if that is preferred in the particular implementation.

Synchronisation is maintained by checking headers in the receive data. When a frame has been received the two octets in the header position in the frame are 'scored' in turn against each header in the list of possible headers. This

**8**

scoring is a bitwise exclusive-OR, the number of bits set to one after this operation indicates the number of bits different to the header being matched, ie the number of errors. Therefore, if the header in the receive frame is error free it will be a perfect match to one of the headers in the list of possible headers and the 'score' will be 0. If no headers score 0 then the header with the lowest score is chosen and a count of receive frame errors is incremented. If three consecutive frames are received with headers in error then a resynchronisation is forced.

Synchronisation is regained during a call using the same method as described above for achieving synchronisation at the start of a call.

### Error Protection

Frame headers carry their own error protection. They are hamming codes with a distance of five from each other. This guarantees that a receive header with one or two bit errors will be corrected to the correct header.

Due to the synchronous nature of voice, an error correction scheme using block retransmissions cannot be used. Some voice coders incorporate forward error correction (FEC) and some send a checksum. Both schemes increase the bandwidth required by the voice channel, the additional information is used for error correction/detection at the voice decoder. The multiplexer passes this extra information transparently and does not perform any local error protection on the voice frames. In the embodiments described the speech coder uses FEC, the extra bandwidth for this is taken into account in the number of octets reserved for a voice frame in each multiplexer frame.

The multiplexer may perform error correction on data channels, thus ensuring error free data to the protocol and application layers. The protocol negotiates which data channels (if any) use error correction. The error correction scheme used is V42 which is a known standard that retransmits blocks that are received in error.

### First Embodiment

If the voice encoder and communications channel clocks are not synchronous and the encoder clock is overspeed then voice frames will be lost at the transmitter as the multiplexer frame rate is too slow to provide transport for all of the voice frames arriving from the voice coder.

To overcome this problem, in this embodiment, the multiplexer frame length is chosen so that the multiplexer frame rate is faster than the voice encoder frame rate thereby ensuring that no voice frames are lost at the transmitter.

In this embodiment of the invention, the multiplexer uses fixed length frames. The length of the frame is carefully chosen to eliminate effects of clock error **1**. The following constraints ensure this:

1. Minimum multiplexer frame length=nH+nV
   where nH: Number of octets in the H (header) field (=2)
   nV: Number of octets in the V (voice) field, this is always an integer multiple of the voice frame length plus any FEC or checksum octets

2. Maximum multiplexer frame length=(nOS/nFS)−1
   where nOS: Number of octets transmitted on the physical layer per second
   nFS: Number of frames produced by the speech coder per second

5,488,610

9

The '−1' in this calculation ensures that multiplexer frame rate is always faster than the speech coder frame rate thereby ensuring that voice frames are not lost at the transmitter.

For example

nOs=1200 octets/second, nFs=50 frames/second, nV=17 octets

Minumum multiplexer frame length=2+17=19 octets

Maximum multiplexer frame length=(1200/50)−1=23 octets

In this example, the mulitplexer may use a frame length between 19 and 23 octets to eliminate the effects of clock error **1**.

In one implementation of this embodiment, the multiplexer **50** is implemented in software which executes on an intelligent communications card fitted in a host PC. FIG. **6** is a block diagram of this card.

The multiplexer **50** comprises:

an NEC V40 microprocessor **52**;

random access memory (RAM) **54**;

a host PC interface **56**;

a UART **58**.

V40 comprises:

the NEC V40 is an integrated micoprocessor which features a 16 bit CPU and on chip peripherals. These include a DMA controller for high speed data transfer between memory and external peripherals, a Timer for counting or timing V40 internal and external events, and an interrupt controller.

The host PC interface **56** allows the PC to read to and write from RAM **54** on the intelligent communications card. At power up the V40 program, which implements the multiplexer functionality in this embodiment is written to the RAM via this interface. During multiplexer operation the host PC writes commands, voice frames and non voice data to buffers in RAM **54**. It also reads status, voice frames and non voice data. A single data channel is used for data transmission.

In the transmit process, the V40 program reads voice and non voice data from these buffers and adds headers to form multiplexer frames in memory. These frames are then output to the UART (and hence the modem) using DMA.

FIG. **7** illustrates the buffers in RAM **54** used for transmission. A voice buffer **60** and a data buffer **62** send data alternately to two frame buffers **64** and **66**. Thus there are

10

two buffers **64**, **66** holding assembled multiplexer frames in the transmit direction. At any one time, one buffer is being addressed (written to) by the multiplexer and the other is being read by the DMA controller. This is indicated by solid lines in FIG. **6**. The dashed lines represent the alternative paths which are not being used at that point in time.

When a frame has been output the DMA controller automatically switches buffers and begins to output the next multiplexer frame. An interrupt is generated which triggers the V40 to begin assembling a new transmit frame.

In the receive direction, incoming multiplexer frames are written into buffers in RAM using DMA. FIG. **8** illustrates the buffers in RAM **54** used for reception. As with the transmit direction, there are two buffers **74** and **76** for receive frames. When a frame has been input using one of the buffers **74** or **76**, the DMA controller automatically inputs the next frame into the other one of these buffers. An interrupt is generated which triggers the V40 to begin dis-assembling the frame just received. The header of a received frame is checked and status, voice and non voice fields are written to voice and data buffers **70** and **72** as appropriate.

Frames of voice dam are supplied to the voice decoder from the receive voice buffer **70**. These can be read at a rate derived from the voice decoder clock. If the voice decoder and communications channel clocks are not synchronised then frame slip will occur over time and whole voice frames will either be missed or read twice by the voice decoder.

During synchronisation, the voice and data buffers in the host interface are not used, synchronisation frames are generated by the multiplexer.

In the embodiment described the modem data rate is 14400 bps or 1800 octets per second. The voice coder operates at 6800 bps and generates 50 frames per second. Each voice coder frame is therefore 17 octets.

Using the equations above:

Minumum multiplexer frame length=17+2=19 octets

Maximum multiplexer frame length=(1800/50)−1=35 octets

A frame length of 24 octets can, for example, be chosen.

The following sections list the pseudo code for this embodiment. The software has been written in C++, an object oriented programming language. Only those sections of the software running on the intelligent communications card that relate to the multiplexer have been described here.

A0579

5,488,610

11                                                              12

```
/*

Main

Define objects and execute multiplexer controller

*/


// Object definitions


MuxController        MuxCtrl
TxFrame              OutFrame
RxFrame              InFrame


main()
{
        do
        {
                MuxCtrl.Update()
        }
        while(1)
}
```

A0580

5,488,610

13                                                                      14

```
/*

HostInterface

Defines and controls the interface between the host PC and the multiplexer.

*/

class HostInterface

// The following buffers contain control, status, voice and data
// exchanged between the multiplexer and the host PC :

MUXCOMMAND      // Commands from the host PC to the multiplexer
MUXSTATUS            // Status returned to the host PC from the mutliplexer
VOICEIN         // Voice frames to be transmitted by the multiplexer
VOICEOUT        // Voice frames received by the mutliplexer

// Note that there is one DATAIN and DATAOUT buffer allocated for each
// data channel on the multiplexer.

DATAIN          // Data (non voice) to be transmitted by the multiplexer
DATAOUT         // Data (non voice) received by the multiplexer

// Methods

ReadCommand()           // Reads a command from MuxCommand
                        // Relevant commands are :
                        // MUXOFF : terminates multiplexer execution

WriteStatus(STATUS)     // Writes status to MuxStatus
                        // Relevant stati are :
                        // SYNCHRONISED : multiplexer has synchronised
                        // RESYNCHRONISING : multiplexer has lost
                        // synchronisation
```

A0581

5,488,610

15                                                                          16

```
/*

StateMachine

*/

class StateMachine

// Methods

GotoState( STATE )  // Sets statemachine to a new state, STATE

Getstate()          // Returns the state of statemachine
```

5,488,610

17                                                                                          18

```
/*

MuxController

Top level control for the multiplexer. The action performed depends upon the current state
of the multiplexer.

*/

class MuxController : HostInterface, StateMachine // Note inheritance

// A multiplexer can be in one of the following states :

RESYNCHRONISE           // Initialises the multiplexer for a resync, at
                        // power up or after a sync loss
SYNCHRONISING           // Transmit and receive synchronisation frames
VOICEDATA               // Transmit and receive voice and data frames

// Methods

Update()                // Call handler for appropriate state of the
                        // multiplexer
{
        switch MuxCtrl.GetState ()
        {
                case RESYNCHRONISE :

                        MuxCtrl.Resynchronise()
                        MuxCtrl.GotoState( SYNCHRONISING )

                case  SYNCHRONISING :

                        MuxCtrl.Synchronising()

                case  VOICEDATA

                        MuxCtrl.VoiceDataHandler()
```

**A0583**

5,488,610

19                                          20

```
        }
        while (1)
    }


Resynchronise()
    {
        // Stop and reinitialise DMA channels
        InFrame.DmaStop()
        OutFrame.DmaStop()


        // Start input and output DMA channels
        // of synchronisation
        InFrame.DmaStart()
        OutFrame.DmaStart()


        // Send and receive 'out of sync' synchronisation frames
        InFrame.SYNCSTATE = OUTOFSYNC


        // Write multiplexer status to host PC
        MuxCtrl.WriteStatus( RESYNCHRONISING )
    }
```

5,488,610

21                                                                                     22

```
Synchronising()        // Send appropriate synchronisation frame
{
        if InFrame.Read() != NOFRAME
        {
                switch Inframe.SYNCSTATE
                {
                        case OUTOFSYNC :

                                OutFrame.SendSyncFrame( 0x0 )

                        case   SYNCING :

                                OutFrame.SendSyncFrame( 0x7 )

                        case   INSYNC :

                                // Send only one frame of this type then advance
                                // state and inform host that the multiplexer is
                                // now in synchronisation
                                OutFrame.SendSyncFrame( 0x38 )
                                MuxCtrl.Gotostate( VOICEDATA )
                                MuxCtrl.WriteStatus( SYNCHRONISED )
                }
        }
}


VoiceDataHandler()   // Send voice and data frames
{

        // Copy receive voice frames to host PC
        if  InFrame.VOICEBUFFER full
        and VOICEOUT empty
        {
                Copy VOICEBUFFER to VOICEOUT
        }

        // Copy receive data to host PC
```

5,488,610

23                                                          24

```
if  InFrame.DATABUFFER not empty
and DATAOUT not full
{
        Copy data from InFrame.DATABUFFER to DATAOUT
}


// Receive a multiplexer frame
MuxCtrl.ReceiveNextFrame()


// Transmit a multiplexer frame
MuxCtrl.TransmitNextFrame()


// Copy data from host PC to intermediate buffer
if  DATAIN not empty
and OutFrame.DATABUFFER not full
{
        Copy data from DATAIN to OutFrame.DATABUFFER
}


// Finish if MUXOFF command received from host PC
if MuxCtrl.ReadCommand = MUXOFF exit
}
```

5,488,610

25                                                                                  26

```
TransmitNextFrame()          // Assembles a multiplexer output frame for
                             // transmission under DMA
{
        // Check transmitter is ready for a new frame
        if OutFrame.Ready()
        {
                if VOICEIN empty
                // No voice to transmit, data only or empty frames transmitted
                {
                        if Outframe.DATABUFFER not empty
                        {
                                if enough data octets to fill a frame
                                {

                                        Outframe.Fill( D )
                                }
                                else
                                {
                                        Outframe.Fill( LD )
                                }
                        }
                        else OutFrame.Fill( SYNC )
                }
                else
                // Voice to transmit
                {
                        if Outframe.DATABUFFER not empty
                        {
                                if enough data octets to fill a frame
                                {
                                        Outframe.Fill( VD )
                                }
                                else
                                {
                                                Outframe.Fill( VLD )
                                }
                        }
```

A0587

5,488,610

27                                                          28

```
            else OutFrame.Fill( V )
      }


      // Send the frame
      OutFrame.Sendframe()
   }
}
```

5,488,610

29                                                        30

```
ReceiveNextFrame()  // A multiplexer frame is received in InFrame.Read()
                    // Check status of InFrame.Read and resynchronise if
                    // three consecutive bad frames are detected
{
        switch Inframe.Read()
        {
                case NOFRAME :
                case    SYNC :
                case    V :
                case    VD :
                case    VLD :
                case    D :
                case    LD :
                        // A good frame has been received, no action required

                default :

                        // A bad frame has been received
                        if three consecutive bad frames received
                        {
                                MuxCtrl.GotoState( RESYNCHRONISE )
                        }
        }
}
```

**A0589**

5,488,610

31                                                                    32

```
/*

DmaChannel

Controls the DMA controller hardware

*/

class DmaChannel

// The following boolean is TRUE when a DMA has completed ( ie one
// multiplexer frame has been input or output ) on the appropriate
// channel

DMACOMPLETED          // TRUE when DMA has completed

// Methods

DmaStop()             // Stop and initialise a DMA channel
DmaStart()            // Start DMA channel
DmaLoad( FRAME )      // Loads FRAME to the DMA controller. This frame
                      // be transmitted or received after the next
                      // DMA interrupt
Ready()               // Returns the state of DMACOMPLETED, TRUE or FALSE
```

5,488,610

33                                                                                    34

```
/*

Frame

Defines the structure of and storage for multiplexer frames

*/

class Frame : DmaChannel          // Note inheritance

// In the embodiment described, only one data (non voice) channel is
// is used. The following frame formats are used :

// H : Header ( number in brackets is the header used )
// Q : Qualifier, F : Fill, D : Data, V : Voice field ( number in
// brackets is the length of the field in octets

    SYNC              // Synchronisation , frame type 0
                      // H(0x19b3), Q(1),F(21)

    V                 // Voice only, frame type 2
                      // H(0x4ce6), V(17), F(5)

    VD                // Voice and data, frame type 6
                      // H(0x2ad5), V(17), D(5)

    VLD               // Voice and partial data ( L field required ), frame type 7
                      // H(0x1e3c), V(17), L(1), D(n), F(4-n)

    D                 // Data only, frame type 4
                      // H(0x34e9), D(22)

    LD                // Partial data only ( L field required ), frame type 5
                      // H(0x3366), L(1), D(n), F(21-n)

    FRAMETYPE         // Variable holding a frame format
```

A0591

5,488,610

35   .   36

```
// The following synchronisation states define the qualifier ( Q field )
// sent and received in synchronisation frames :


OUTOFSYNC              // '0x0' qualifier
SYNCING         // '0x7' qualifier
INSYNC          // '0x38' qualifier


SYNCSTATE              // Variable holding the synchronisation state


// The following is a temporary buffer for voice frames, it is only used
// by RxFrame objects


VOICEBUFFER     // Buffer for voice frames


// The following is a temporary buffer for non voice data, it is used by
// both TxFrame and RxFrame objects


DATABUFFER      // Buffer for non voice data


// The following buffers hold assembled frames to be transmitted and
// received frames. There are two defined. One is accessed by the
// DMA controller whilst the other is accessed by the multiplexer.


BUFFER[ 2 ]     // Buffers holding assembled multiplexer frames
ACTIVEFRAME     // Variable taking value 0 or 1, points to buffer
                // currently being accessed by the multiplexer


/*


TxFrame


Defines methods for transmitting multiplexer frames


*/


class TxFrame : Frame     // Note inheritance


Fill( FRAMETYPE )         // Assembles a transmit frame of the type FRAMETYPE
```

5,488,610

37                                                                38

```
                        // in BUFFER[ ACTIVEFRAME ]

                        // H field is defined by FRAMETYPE
                        // Q field is defined by SYNCSTATE
                        // V field is read from VOICEIN buffer
                        // D field is read from DATABUFFER

    {
        switch FRAMETYPE
        {

            case SYNC :

                Write H, Q and F fields to BUFFER[ ACTIVEFRAME ]

            case V :

                Write H, V and F fields to BUFFER[ ACTIVEFRAME ]

            case  VD :

                Write H, V and D fields to BUFFER[ ACTIVEFRAME ]

            case  VLD :

                Write H, V, L, D and F fields to BUFFER[ ACTIVEFRAME ]

            case D :

                Write H, and D fields to BUFFER[ ACTIVEFRAME ]

            case LD :

                Write H, D and F fields to BUFFER[ ACTIVEFRAME ]
        }
    }
```

**A0593**

5,488,610

39                                                                                    40

```
SendSyncFrame( Q )          // Assembles and transmits a synchronisation frame
                            // with the Q qualifier when the DMA controller is
                            // ready
    {
        if DMACOMPLETED
        {
            // Assemble the frame
            Fill( SYNC )

            // Set up the Dma controller
            DmaLoad( BUFFER[ ACTIVEFRAME ] )

            DMACOMPLETED = FALSE
            ACTIVEFRAME = !ACTIVEFRAME
        }
    }


SendFrame()             // Transmits a non synchronisation frame

    {
        if DMACOMPLETED
        {
            // Set up the DMA controller
            DmaLoad( BUFFER[ACTIVEFRAME] )

            DMACOMPLETED = FALSE
            ACTIVEFRAME = !ACTIVEFRAME
        }
    }
```

5,488,610

41                                                                42

```
/*

RxFrame

Defines the methods for receiving multiplexer frames

*/

class RxFrame : Frame       // Note inheritance

Read()                  // Processed a receive multiplexer frame

{
    if DMACOMPLETED
    // If a receive frame is available
    {
        DMACOMPLETED = FALSE

        // Test header
        Read header position in BUFFER[ ACTIVEFRAME ]

        if exact match found store header

        switch header
        {
            case SYNC :

                FRAMETYPE = SYNC

            case V :

                FRAMETYPE = V

            case   VD :

                FRAMETYPE = VD
```

**A0595**

5,488,610

43                                                      44

```
                case VLD :

                    FRAMETYPE = VLD

                case D :

                    FRAMETYPE = D

                case LD :

                    FRAMETYPE = LD

                default :

                    // Header error, get closest match
                    FRAMETYPE = HammingDistance()
                    Increment header error counter
            }

        switch FRAMETYPE
        {
            case SYNC :

                    // Test qualifier
                    switch Qualifier
                    {
                        case 0x0 :

                            switch SYNCSTATE
                            {
                                case OUTOFSYNC :

                                    If three consecutive 0x0  received
                                    {
                                            SYNCSTATE = SYNCING
                                    }

                                case   SYNCING :
```

A0596

5,488,610

45 46

```
                            No action required

                        default :

                            SYNCSTATE = OUTOFSYNC
                    }

                case 0x7 :

                    switch SYNCSTATE
                    {
                        case OUTOFSYNC :

                            If three consecutive 0x7
                              received
                            {
                                SYNCSTATE = SYNCING
                            }

                        case SYNCING :

                            SYNCSTATE = INSYNC

                        default :

                            No action required
                    }
                }

            case V :

                Copy V field from BUFFER[ ACTIVEFRAME ]
                to VOICEBUFFER

            case   VD :

                Copy V field from BUFFER[ ACTIVEFRAME ]
                to VOICEBUFFER
```

**A0597**

5,488,610

47                                                                                    48

```
                                Copy D field from BUFFER[ ACTIVEFRAME ]
                                to DATABUFFER

                     case VLD :

                                Copy V field from BUFFER[ ACTIVEFRAME ]
                                to VOICEBUFFER

                                Copy D field ( L octets ) from BUFFER[ ACTIVEFRAME]
                                to DATABUFFER

                     case   D :

                                Copy D field from BUFFER[ ACTIVEFRAME ]
                                to DATABUFFER

                     case LD :
                                Copy D field ( L octets ) from BUFFER[ACTIVEFRAME]
                                to DATABUFFER
                 }


        // Set up DMA channel
        DmaLoad( BUFFER[ ACTIVEFRAME ] )

        ACTIVEFRAME = !ACTIVEFRAME
        return FRAMETYPE
        }
        // Indicate frame not received
        else return NOFRAME
    }

    HammingDistance()        // Returns FRAMETYPE that matches closest to
                             // the H field in BUFFER[ ACTIVEFRAME ]
    {
    }
```

5,488,610

49                                                        50

```
/*

DMAInterrupt()

Executed when a DMA transfer has completed, ie when a multiplexer frame has been input
or output. Sets DMACOMPLETED flag true for the appropriate DMA channel


*/

DMAInterrupt()
{
        if input DMA completed
        {
                Inframe.DMACOMPLETED = TRUE
        }
        if output DMA completed
        {
                Outframe.DMACOMPLETED = TRUE
        }
}
```

**Second Embodiment**

In this embodiment of the invention, the multiplexer uses a variable length frame to eliminate the effects of clock error 1. The following constraints apply :

1. Nominal multiplexer frame length = n0S / nFS

where n0S : Number of octets transmitted on the physical layer per
      second
nFS : Number of frames produced by the speech coder per second

2. The multiplexer may compress a transmitted frame ( ie shorten it by 1 octet ) or expand a transmitted frame ( ie lengthen it by 1 octet ). Compression and expansion is controlled by a timing algorithm, it compensates for clock error 1.

**A0599**

5,488,610

## 51

### Second Embodiment

In this embodiment of the invention, the multiplexer uses a variable length frame to eliminate the effects of clock error 1. The following constraints apply:

1. Nominal multiplexer frame length=nOS/nFS
   where nOS: Number of octets transmitted on the physical layer per second
   nFS: Number of frames produced by the speech coder per second

2. The multiplexer may compress a transmitted frame (ie shorten it by 1 octet) or expand a transmitted frame (ie lengthen it by 1 octet). Compression and expansion is controlled by a timing algorithm, it compensates for clock error 1.

3. The multiplexer does not compress or expand consecutive transmitted frames.

For example

nOS=1200 octets/second, nFS=50 frames/second, nV=16 octets

Nominal multiplexer frame length=1200/50=24 octets

Compressed frame length=23 octets

Expanded frame length=25 octets

Now assume that there is a 1% error between the multiplexer clock and the speech coder clock ie clock error 1=1%

Line data rate=nOS*8=9600 bps

Speech coder data rate=nFS*nV* 8=6400 bps

The multiplexer always transmits nV voice octets per frame.

With a 1% clock error, 1 in 100 speech coder frames would be in error at the transmitter due to the accumulating error (if the speech coder is overspeed then 1 in 100 frames are lost, if it is underspeed then 1 in 100 are repeated).

The cumulative error in 1 second is 6400*0.01=64 bits or 8 octets.

In the overspeed case, if 8 frames per second are compressed this error is cancelled out and no voice frames are lost. In the underspeed case 8 frames per second must be expanded.

A timing algorithm at the transmitter measures clock error 1 to determine the rate at which frames should be compressed or expanded. In the example shown, by compressing or expanding 1 in 2 frames (the multiplexer will not compress or expand consecutive frames) a clock error of up to approx 3% can be eliminated.

At the receiver, the multiplexer must now search for a header in one of three positions: normal, compressed or expanded. The three possible header positions are scored using an XOR function. The wrong header position will only be chosen when the real header has more than two bit errors (the headers are hamming codes with a minimum distance of 5) and a false header postion matches a header hamming code with two or less bit errors. The probability of this is very small.

## 52

The transmitting multiplexer does not compress or expand consecutive frames. This prevents the number of header positions to be searched at the receiver from accumulating after one frame has been received with a header in error.

The length adjustment affects only a small proportion of multiplexer frames. For example, if the clock error 1 in FIG. 1 is 100 ppm, at a channel data rate of 9600 bps 0.96 bits of error will build up each second. One octet of error will therefore take 8.33 seconds to build up and this is equivalent to 208 frames. Therefore, in this example, only 0.5% of frames will need stretching or compressing.

If a header is missed completely then the potential positions for the next header are searched. Since no two consecutive multiplexer frames can both be compressed or stretched the number of possible header positions is still three. The same approach is used to find the position of this header and in this way it is possible to recover the previous frame without its header. If this fails then there is a need to resynchronise as for the start of a call.

As the headers are error protected by hamming codes, the multiplexer is able to correct up to 2 bit errors in the receive header. A count of receive errors in headers is maintained. If consecutive receive headers have to be corrected then synchronisation has been lost and the receive multiplexer must synchronise again as for the start of a call.

In one implementation of this embodiment, the multiplexer 50 is implemented in software which executes on an intelligent communications card fitted in a host PC as described above with reference to FIG. 6 in relation to the first embodiment.

Likewise the buffers in RAM 54 are also as shown in FIGS. 7 and 8 and the operation is the same as for the first embodiment except for the timing aspects described as follows.

One of the timers in the V40 counts modem clock pulses. When the host PC writes a voice frame to the multiplexer an interrupt is generated, the timer is read and reset in the interrupt service routine. The timing error between the modem and the voice coder is estimated from the value of this timer and an accumulating total is kept. When one octet of error has built up a flag is generated which causes the next transmit multiplexer frame to be compressed or expanded as appropriate.

The receiving multiplexer checks the three possible header positions, for compressed, normal or expanded frames.

In the embodiment described the modem data rate is 14400 bps or 1800 octets per second. The voice coder operates at 6800 bps and generates 50 frames per second. Each voice coder frame is therefore 17 octets.

Using the equations listed above:

Nominal multiplexer frame length=1800/50=36 octets

Compressed frame length=35 octets

Expanded frame length=37 octets

The following is the pseudo code for this second embodiment. The software has been written in C++, an object oriented programming language. Only those sections of the software running on the intelligent communications card that relate to the multiplexer have been described.

5,488,610

53                                            54

```
/*

Main

Define objects and execute multiplexer controller

*/

// Object definitions

MuxController        MuxCtrl
TxFrame              OutFrame
RxFrame              InFrame

main()
{
        do
        {
                MuxCtrl.Update()
        }
        while(1)
}
```

**A0601**

5,488,610

55                                                                              56

```
/*

HostInterface

Defines and controls the interface between the host PC and the multiplexer.

*/

class HostInterface

// The following buffers contain control, status, voice and data
// exchanged between the multiplexer and the host PC :

MUXCOMMAND      // Commands from the host PC to the multiplexer
MUXSTATUS       // Status returned to the host PC from the mutliplexer
VOICEIN         // Voice frames to be transmitted by the multiplexer
VOICEOUT        // Voice frames received by the mutliplexer

// Note that there is one DATAIN and DATAOUT buffer allocated for each
// data channel on the multiplexer.

DATAIN          // Data (non voice) to be transmitted by the multiplexer
DATAOUT         // Data (non voice) received by the multiplexer

// Methods

ReadCommand()        // Reads a command from MuxCommand
                     // Relevant commands are :
                     //     MUXOFF : terminates multiplexer execution

WriteStatus(STATUS)  // Writes status to MuxStatus
                     // Relevant stati are :
                     //     SYNCHRONISED : multiplexer has synchronised
                     //     RESYNCHRONISING : multiplexer has lost
                     //                       synchronisation
```

**A0602**

5,488,610

57                                                                                    58

```
/*

StateMachine

*/

class StateMachine

// Methods

GotoState( STATE )  // Sets statemachine to a new state, STATE

Getstate()          // Returns the state of statemachine
```

5,488,610

59                                                    60

```
/*

MuxController

Top level control for the multiplexer. The action performed depends upon the current state
of the multiplexer.

*/

class MuxController : HostInterface, StateMachine   // Note inheritance

// A multiplexer can be in one of the following states :

RESYNCHRONISE           // Initialises the multiplexer for a resync, at
                        // power up or after a sync loss
SYNCHRONISING           // Transmit and receive synchronisation frames
VOICEDATA               // Transmit and receive voice and data frames

// Methods

Update()                // Call handler for appropriate state of the
                        // multiplexer
{
    switch MuxCtrl.GetState ()
    {
        case RESYNCHRONISE :

            MuxCtrl.Resynchronise()
            MuxCtrl.GotoState( SYNCHRONISING )

        case   SYNCHRONISING :

            MuxCtrl.Synchronising()

        case   VOICEDATA

            MuxCtrl.VoiceDataHandler()
```

5,488,610

61 62

```
                }
                while (1)
        }


Resynchronise()
        {
                // Stop and reinitialise DMA channels
                InFrame.DmaStop()
                OutFrame.DmaStop()


                // Start input and output DMA channels
                // of synchronisation
                InFrame.DmaStart()
                OutFrame.DmaStart()


                // Send and receive 'out of sync' synchronisation frames
                InFrame.SYNCSTATE = OUTOFSYNC


                // Write multiplexer status to host PC
                MuxCtrl.WriteStatus( RESYNCHRONISING )
        }
```

5,488,610

63                                                                64

```
Synchronising()        // Send appropriate synchronisation frame
{
        if InFrame.Read() != NOFRAME
        {
                switch Inframe.SYNCSTATE
                {
                        case OUTOFSYNC :

                                OutFrame.SendSyncFrame( 0x0 )

                        case   SYNCING :

                                OutFrame.SendSyncFrame( 0x7 )

                        case   INSYNC :

                                // Send only one frame of this type then advance
                                // state and inform host that the multiplexer is
                                // now in synchronisation
                                OutFrame.SendSyncFrame( 0x38 )
                                MuxCtrl.Gotostate( VOICEDATA )
                                MuxCtrl.WriteStatus( SYNCHRONISED )
                }
        }
}


VoiceDataHandler()   // Send voice and data frames
{

        // Copy receive voice frames to host PC
        if  InFrame.VOICEBUFFER full
        and VOICEOUT empty
        {
                Copy VOICEBUFFER to VOICEOUT
        }

        // Copy receive data to host PC
```

A0606

5,488,610

65                        66

```
if  InFrame.DATABUFFER not empty
and DATAOUT not full
{
      Copy data from InFrame.DATABUFFER to DATAOUT
}


// Receive a multiplexer frame
MuxCtrl.ReceiveNextFrame()


// Transmit a multiplexer frame
MuxCtrl.TransmitNextFrame()


// Copy data from host PC to intermediate buffer
if  DATAIN not empty
and OutFrame.DATABUFFER not full
{
      Copy data from DATAIN to OutFrame.DATABUFFER
}


// Finish if MUXOFF command received from host PC
if MuxCtrl.ReadCommand = MUXOFF exit
}
```

**A0607**

5,488,610

67                                                                68

```
TransmitNextFrame()              // Assembles a multiplexer output frame for
                                 // transmission under DMA
{
    // Check transmitter is ready for a new frame
    if OutFrame.Ready()
    {
        if VOICEIN empty
        // No voice to transmit, data only or empty frames transmitted
        {
            if Outframe.DATABUFFER not empty
            {
                if enough data octets to fill a frame
                {
                    Outframe.Fill( D )
                }
                else
                {
                    Outframe.Fill( LD )
                }
            }
            else OutFrame.Fill( SYNC )
        }
        else
        // Voice to transmit
        {
            if Outframe.DATABUFFER not empty
            {
                if enough data octets to fill a frame
                {
                    Outframe.Fill( VD )
                }
                else
                {
                    Outframe.Fill( VLD )
                }
            }
            else OutFrame.Fill( V )
```

**A0608**

5,488,610

69                                                70

```
            }



        // Send the frame
        OutFrame.Sendframe()

    }
}
```

5,488,610

71                                                                      72

```
ReceiveNextFrame()  // A multiplexer frame is received in InFrame.Read()
                    // Check status of InFrame.Read and resynchronise if
                    // three consecutive bad frames are detected
{
     switch Inframe.Read()
     {
             case NOFRAME :
             case   SYNC :
             case   V :
             case   VD :
             case   VLD :
             case   D :
             case   LD :
                     // A good frame has been received, no action required

             default :

                     // A bad frame has been received
                     if three consecutive bad frames received
                     {
                             MuxCtrl.GotoState( RESYNCHRONISE )
                     }
     }
}
```

**A0610**

5,488,610

73                                                                  74

```
/*

DmaChannel

Controls the DMA controller hardware

*/

class DmaChannel

// The following boolean is TRUE when a DMA has completed ( ie one
// multiplexer frame has been input or output ) on the appropriate
// channel

DMACOMPLETED        // TRUE when DMA has completed

// Methods

DmaStop()           // Stop and initialise a DMA channel
DmaStart()          // Start DMA channel
DmaLoad( FRAME )    // Loads FRAME to the DMA controller. This frame
                    // be transmitted or received after the next
                    // DMA interrupt
Ready()             // Returns the state of DMACOMPLETED, TRUE or FALSE
```

5,488,610

75                                                                      76

```
/*

Frame

Defines the structure of and storage for multiplexer frames

*/

class Frame : DmaChannel        // Note inheritance

// In the embodiment described, only one data (non voice) channel is
// is used. The following frame formats are used :

// H : Header ( number in brackets is the header used )
// Q : Qualifier, F : Fill, D : Data, V : Voice field ( number in
// brackets is the length of the field in octets for nominal length
// multiplexer frames

    SYNC            // Synchronisation , frame type 0
                    // H(0x19b3), Q(1),F(33)

    V               // Voice only, frame type 2
                    // H(0x4ce6), V(17), F(17)

    VD              // Voice and data, frame type 6
                    // H(0x2ad5), V(17), D(17)

    VLD             // Voice and partial data ( L field required ), frame type 7
                    // H(0x1e3c), V(17), L(1), D(n), F(16-n)

    D               // Data only, frame type 4
                    // H(0x34e9), D(34)

    LD              // Partial data only ( L field required ), frame type 5
                    // H(0x3366), L(1), D(n), F(33-n)

    FRAMETYPE       // Variable holding a frame format
```

A0612

5,488,610

77 78

```
// The following synchronisation states define the qualifier ( Q field )
// sent and received in synchronisation frames :


    OUTOFSYNC           // '0x0' qualifier
    SYNCING             // '0x7' qualifier
    INSYNC              // '0x38' qualifier


    SYNCSTATE           // Variable holding the synchronisation state


// The following is a temporary buffer for voice frames, it is only used
// by RxFrame objects


    VOICEBUFFER    // Buffer for voice frames


// The following is a temporary buffer for non voice data, it is used by
// both TxFrame and RxFrame objects


    DATABUFFER     // Buffer for non voice data


// The following buffers hold assembled frames to be transmitted and
// received frames. There are two defined. One is accessed by the
// DMA controller whilst the other is accessed by the multiplexer.


    BUFFER[ 2 ]        // Buffers holding assembled multiplexer frames
    ACTIVEFRAME        // Variable taking value 0 or 1, points to buffer
                       // currently being accessed by the multiplexer




    /*

    TxFrame

    Defines methods for transmitting multiplexer frames

    */


// The following booleans are used to flag generation of compressed or
// expanded multiplexer frames
```

5,488,610

79                                                                              80

```
COMPRESS              // Generate a compressed multiplexer frame
EXPAND                // Generate an expanded multiplexer frame

class TxFrame : Frame        // Note inheritance

Fill( FRAMETYPE )        // Assembles a transmit frame of the type FRAMETYPE
                         // in BUFFER[ ACTIVEFRAME ]

                         // H field is defined by FRAMETYPE
                         // Q field is defined by SYNCSTATE
                         // V field is read from VOICEIN buffer
                         // D field is read from DATABUFFER


{
    if COMPRESS
    {
            decrement frame length
            COMPRESS = FALSE
    }
    if EXPAND
    {
            increment frame length
            EXPAND = FALSE
    }

    switch FRAMETYPE
    {
            case SYNC :

                    Write H, Q and F fields to BUFFER[ ACTIVEFRAME ]

            case V :

                    Write H, V and F fields to BUFFER[ ACTIVEFRAME ]

            case   VD :

                    Write H, V and D fields to BUFFER[ ACTIVEFRAME ]
```

**A0614**

5,488,610

81                                                                                          82

```
case   VLD :

        Write H, V, L, D and F fields to BUFFER[ ACTIVEFRAME ]

case D :

        Write H, and D fields to BUFFER[ ACTIVEFRAME ]

case LD :

        Write H, D and F fields to BUFFER[ ACTIVEFRAME ]
    }
}
```

A0615

5,488,610

83                                                                84

```
SendSyncFrame( Q )          // Assembles and transmits a synchronisation frame
                            // with the Q qualifier when the DMA controller is
                            // ready
{
        if DMACOMPLETED
        {
                // Assemble the frame
                Fill( SYNC )

                // Set up the Dma controller
                DmaLoad( BUFFER[ ACTIVEFRAME ] )

                DMACOMPLETED = FALSE
                ACTIVEFRAME = !ACTIVEFRAME
        }
}


SendFrame()          // Transmits a non synchronisation frame

{
        if DMACOMPLETED
        {
                // Set up the DMA controller
                DmaLoad( BUFFER[ACTIVEFRAME] )

                DMACOMPLETED = FALSE
                ACTIVEFRAME = !ACTIVEFRAME
        }
}
```

**A0616**

5,488,610

85

86

```
/*

RxFrame

Defines the methods for receiving multiplexer frames

*/

class RxFrame : Frame          // Note inheritance

Read()              // Processed a receive multiplexer frame

{
    if DMACOMPLETED
    // If a receive frame is available
    {
        DMACOMPLETED = FALSE

        // Test header
        Read three header positions in BUFFER[ ACTIVEFRAME ]

        if exact match found store header

        switch header
        {
            case SYNC :

                FRAMETYPE = SYNC

            case V :

                FRAMETYPE = V

            case  VD :

                FRAMETYPE = VD
```

A0617

5,488,610

87

88

```
case VLD :

        FRAMETYPE = VLD

case D :

        FRAMETYPE = D

case LD :

        FRAMETYPE = LD

default :

        // Header error, get closest match
        FRAMETYPE = HammingDistance()
        Increment header error counter
}

switch FRAMETYPE
{
    case SYNC :

        // Test qualifier
        switch Qualifier
        {
            case 0x0 :

                switch SYNCSTATE
                {
                    case OUTOFSYNC :

                        If three consecutive 0x0
                          received
                        {
                            SYNCSTATE = SYNCING
                        }
```

**A0618**

5,488,610

89                                                    90

```
                              case   SYNCING :

                                  No action required

                              default :

                                      SYNCSTATE = OUTOFSYNC
                                  }

                          case 0x7 :

                              switch SYNCSTATE
                              {
                                  case OUTOFSYNC :

                                      If three consecutive 0x7
                                        received
                                      {
                                              SYNCSTATE = SYNCING
                                      }

                                  case SYNCING :

                                      SYNCSTATE = INSYNC

                                  default :

                                      No action required
                                  }
                          }

                  case V :

                      Copy V field from BUFFER[ ACTIVEFRAME ]
                      to VOICEBUFFER

                  case   VD :
```

5,488,610

**91**                                                                **92**

```
                    Copy V field from BUFFER[ ACTIVEFRAME ]
                    to VOICEBUFFER


                    Copy D field from BUFFER[ ACTIVEFRAME ]
                    to DATABUFFER


          case VLD :


                    Copy V field from BUFFER[ ACTIVEFRAME ]
                    to VOICEBUFFER


                    Copy D field ( L octets ) from BUFFER[ ACTIVEFRAME]
                    to DATABUFFER


          case   D :


                    Copy D field from BUFFER[ ACTIVEFRAME ]
                    to DATABUFFER


          case LD :


                    Copy D field ( L octets ) from BUFFER[ ACTIVEFRAME]
                    to DATABUFFER
             }


      // Set up DMA channel
      DmaLoad( BUFFER[ ACTIVEFRAME ] )


      ACTIVEFRAME = !ACTIVEFRAME
      return FRAMETYPE
      }
      // Indicate frame not received
      else return NOFRAME
  }


  HammingDistance()         // Returns FRAMETYPE that matches closest to
                            // the H field in BUFFER[ ACTIVEFRAME ]
```

**A0620**

5,488,610

93　　　　　　　　　　　　　　　　　　　　　94

// the H field in BUFFER[ ACTIVEFRAME ]

```
{
}
```

5,488,610

95                                                                                          96

```
/*

DMAInterrupt()

Executed when a DMA transfer has completed, ie when a multiplexer frame has been input
or output. Sets DMACOMPLETED flag true for the appropriate DMA channel

*/

DMAInterrupt()
{
        if input DMA completed
        {
                Inframe.DMACOMPLETED = TRUE
        }
        if output DMA completed
        {
                Outframe.DMACOMPLETED = TRUE
        }
}

/*

HostInterrupt()

Executed when the host PC writes a speech frame to the multiplexer. Calculates the
accumulated timing error and generates a COMPRESS or EXPAND flag as appropriate.

*/

HostInterrupt()
{
        read and reset timer
        calculate accumulated error
        if one octet of overspeed error

        {
```

5,488,610

97                                                                98

```
            OutFrame.COMPRESS = TRUE
        }
    if one octet of underspeed error
        {
            OutFrame.EXPAND = TRUE
        }
    }
```

5,488,610

**99**

The present invention provides a multiplexer system which combines the advantages of Time Division Multiplexing (TDM)and Statistical Multiplexing techniques ie the efficiency and low delay of the former with the flexibility of the latter. It is optimised for, though not necessarily restricted to, voice and data multiplexing on restricted bandwidth channels such as those provided by PSTN modems.

The synchronous, frame oriented, voice signal is combined with other data with very little overhead, the multiplexer is typically 92% efficient. In the implementations described, the voice dam produced by a low bit rate voice coder and it is generated in regular, fixed length frames. In many applications it is not possible to synchronise the voice coder frames to the clock of the transmission channel. This multiplexer schemes described eliminates the effect of clock error due to this problem and ensure that no voice coder frames are lost at the transmitter.

The invention allows the integration of a framed data channel, such as a voice channel, with serial data channels in a manner which does not require the clock controlling the source of framed data and the channel clock to be locked together whilst maintaining efficient use of bandwidth.

The invention further provides for the elimination of transmission errors in the framed data due to clock errors, which is a particularly significant advantage when the framed data has already undergone compression.

Some low bit rate voice coders employ silence detection. This multiplexer scheme integrates these coders easily, voice frames not containing voice need not be transmitted and all the bandwidth can be used for data. The frame type transmitted by the multiplexer can change from frame to frame thus ensuring efficient use of bandwidth.

The multiplexer scheme is inherently robust to errors on the transmission channel. All frame headers are error protected and there is support for error detection and correction on both the voice and the data components of a multiplexer frame.

It will be understood that the present invention is not limited to the implementations described here. Another implementation of the first embodiment uses the GSM transparent service. This is a mobile data service which offers 9600 bps asynchronous data at the DTE port of the GSM mobile. This multiplexer scheme therefore has applications in radio communications.

I claim:

1. A system for multiplexing framed digital data having frames of predetermined size with other data for transmission on a single physical channel, comprising:

a) means for receiving from a source of framed digital data the framed digital data at a first frame rate, wherein the source of framed digital data is controlled by a first clock;

b) means for receiving the other data;

c) means for generating multiplexer frames under the control of a second clock, the multiplexer frames being of a substantially predetermined size, wherein an individual multiplexer frame incorporates the framed digi-

**100**

tal data and/or other data according to whether the framed digital data and/or the other data is available for inclusion in that individual multiplexer frame and a header containing information about the contents of the individual multiplexer frame;

d) means for comparing clock rates of the first clock and the second clock;

e) means for calculating a cumulative error between the first clock and the second clock and for adjusting the length of an individual multiplexer frame to be transmitted from the multiplexer by a predetermined amount whenever said cumulative error reaches a predetermined threshold, said individual multiplexer frame being transmitted from the multiplexer being received by a demultiplexer as a received individual multiplexer frame; and

f) means for ensuring that no two successive individual multiplexer frames have a same length adjustment.

2. A system for multiplexing framed digital data having frames of predetermined size with other data for transmission on a single physical channel, comprising:

a) means for receiving from a source of framed digital data the framed digital data at a first frame rate, wherein the source of framed digital data is controlled by a first clock;

b) means for receiving the other data;

c) means for generating multiplexer frames under the control of a second clock, the multiplexer frames being of a substantially predetermined size, wherein an individual multiplexer frame:

(1) incorporates the framed digital data and/or other data according to whether the framed digital data and/or the other data is available for inclusion in that individual multiplexer frame and a header containing information about the contents of that individual multiplexer frame, and

(2) has a length chosen so that the multiplexer frames are transmitted at a second frame rate wihich is faster than the first frame rate.

3. A system according to claim 1 wherein said predetermined amount is one octet.

4. A system according to claim 1 wherein the means for calculating a cumulative error between the first clock and the second clock and for adjusting the length of an individual multiplexer frame to be transmitted includes means for establishing a position of a header in a received individual multiplexer frame.

5. A system according to claim 1 wherein the header in the individual multiplexer frame is used as a frame delimiter.

6. A system according to claim 1 wherein the header in the individual multiplexer frame is error protected.

7. A system according to claim 6 wherein each header selected to represent frame content information has a chosen hamming code distance from each other header.

8. A system according to claim 1 in which the framed data is voice data.

\* \* \* \* \*

UNITED STATES PATENT AND TRADEMARK OFFICE
# CERTIFICATE OF CORRECTION

PATENT NO.  : 5,488,610                    Page 1 of 2

DATED        : January 30, 1996

INVENTOR(S) :  Stephen Morley

It is certified that error appears in the above-indentified patent and that said Letters Patent is hereby corrected as shown below:

Column 4, line 26, after "state" insert --.--.

Column 5, line 4, change "dam" to--data--.

Column 5, line 11, change "Receive" to--Received--.

Column 5, line 52, delete "and".

Column 6, line 10, change "e.g." to --e.g.,--

Column 6, line 16, change "ram" to--rate--.

Column 6, line 47, after fields, add "that".

Column 7, line 53, after "it" add--is--.

Column 7, line 53, change "ie" to --i.e.,--.

Column 8, line 3, change "ie" to --i.e.,--.

Column 8, line 45, change "overspeed" to--oversped--.

Column 8, line 54, change "flames" to--frames--.

UNITED STATES PATENT AND TRADEMARK OFFICE
# CERTIFICATE OF CORRECTION

PATENT NO.  :    5,488,610                          Page 2 of 2
DATED       :    January 30, 1996
INVENTOR(S) :    Stephen Morley

It is certified that error appears in the above-indentified patent and that said Letters Patent is hereby corrected as shown below:

Column 10, line 23, change "dam" to--data--.

Column 100, line 40, change "wihich" to--which--.

Signed and Sealed this

Sixth Day of August, 1996

*Attest:*

BRUCE LEHMAN

*Attesting Officer*                     *Commissioner of Patents and Trademarks*

A0626

US005541662A

# United States Patent [19]

## Adams et al.

[11] **Patent Number:** 5,541,662

[45] **Date of Patent:** Jul. 30, 1996

[54] **CONTENT PROGRAMMER CONTROL OF VIDEO AND DATA DISPLAY USING ASSOCIATED DATA**

[75] Inventors: **Robert Adams**, Lake Oswego; **David M. Williams**; **John Richardson**, both of Portland; **Burt Perry**, Beaverton, all of Oreg.

[73] Assignee: **Intel Corporation**, Santa Clara, Calif.

[21] Appl. No.: **316,503**

[22] Filed: **Sep. 30, 1994**

[51] Int. Cl.$^6$ ............................ **H04N 5/50**

[52] U.S. Cl. .................... **348/460**; 348/13; 348/461; 348/468; 348/474; 348/478; 348/552; 348/589; 348/596; 395/155

[58] **Field of Search** .................... 348/7, 12, 13, 348/20, 460, 461, 462, 468, 473, 474, 478, 484, 552, 563, 564, 569, 589, 596, 600; 364/514; 395/155, 156, 159, 161, 152–154; H04N 5/50

[56] **References Cited**

### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,862,268 | 8/1989 | Campbell et al. ..................... | 348/463 |
| 4,977,455 | 12/1990 | Young ..................... | 348/460 |
| 5,210,611 | 5/1993 | Yee et al. ..................... | 348/569 |
| 5,260,788 | 11/1993 | Takano et al. ..................... | 348/478 |
| 5,274,753 | 12/1993 | Roskowski et al. ..................... | 348/154 |
| 5,353,121 | 10/1994 | Young et al. ..................... | 348/563 |
| 5,390,027 | 2/1995 | Henmi et al. ..................... | 358/335 |
| 5,404,393 | 4/1995 | Remillard ..................... | 348/13 |

### FOREIGN PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 05350 | 5/1990 | WIPO ..................... | G09B 5/06 |

*Primary Examiner*—Safet Metjahic
*Assistant Examiner*—Glenton B. Burgess
*Attorney, Agent, or Firm*—Blakely, Sokoloff, Taylor & Zafman

[57]    **ABSTRACT**

An interactive video system is disclosed that processes a video data stream and an associated data stream corresponding to the video data stream. The interactive video system displays a video image defined by the video data stream on a display device and performs interactive command functions specified by the associated data stream. The interactive command functions include commands that specify placement of a video display window, commands that specify parameters of graphical objects that are associated with the video image and commands that specify pixel data or graphics description for the graphical object and commands for placement of selection windows and that specify interactive functions for the selection windows.

**14 Claims, 8 Drawing Sheets**



Packetized Data Streams

A0782

BROADCOM 1006

**U.S. Patent**    Jul. 30, 1996    Sheet 1 of 8    5,541,662

*Figure 1*

A0783



*Figure 2*

**A0784**

**U.S. Patent**        Jul. 30, 1996        Sheet 3 of 8        **5,541,662**



*Figure 3*

A0785

*Figure 4*

**U.S. Patent**    Jul. 30, 1996    Sheet 5 of 8    5,541,662

*Figure 5*

**U.S. Patent**    Jul. 30, 1996    Sheet 6 of 8    5,541,662



*Figure 6*

A0788



*Figure 7*

**U.S. Patent**            Jul. 30, 1996        Sheet 8 of 8            **5,541,662**



*Figure 8*

5,541,662

# 1

## CONTENT PROGRAMMER CONTROL OF VIDEO AND DATA DISPLAY USING ASSOCIATED DATA

### BACKGROUND OF THE INVENTION

1. Field of the Invention

The present invention pertains to the field of computer systems. More particularly, this invention relates to the coordination of video and audio data streams using associated data streams to enable content programmer control of display and selection functions for a video system.

2. Background

In prior television systems, a video content programmer typically controls the entire video display screen by selecting the video programming, the presentation of the video programming, and the programming flow. Typically, such a content programmer maintains total control over the coloring, the style, and the presentation of images on the video display screen.

In contrast, the presentation of video on a computer system is typically limited by an operating system's styles and conventions. A typical operating system for a computer system imposes a particular display style that confine programs executed on the computer system. In the case of video windows on such a computer system, a content programmer is usually limited to the standard look of the particular operating system and may not vary too far from the standard look.

However, as such computer systems become more commonly used for the presentation of consumer items, content programmers may seek more control over the look and feel of computer system video. Such control would enable content programmers to select a look and feel closely identified with the products being displayed. Such control would require that the content programmer control the video information as well as other elements on the video display screen including colors, logos and selection button placement. Unfortunately, such control over the look and feel of video displays on a computer system is generally unavailable to content programmers on prior television receiving systems.

Prior television receiving systems merely provide mechanisms for including data associated with an incoming video signal. Such associated data is typically received during vertical blanking intervals of the incoming video signal. In such prior systems, the functions of the associated data in relation to the incoming video signal is usually fixed according to the design of the television receiving system.

For example, some prior television receivers include a mechanism for decoding and displaying closed caption information that corresponds to the incoming video signal. In such a system, the closed caption associated data of the incoming video signal is usually decoded and displayed with video characters superimposed over the normal incoming video scene.

Other prior video receivers decode the associated data of the incoming video stream and transfer the decoded data through an input/output port of the receiver. Typically in such systems, the function of the input/output port is fixed according to a predetermined design of the receiver. Unfortunately, such systems impose fixed and inflexible functions to video content programmers where the receiving device is a computer.

In addition, some prior video receiving systems provide rudimentary interactive video functions. In such systems, selection regions of the video display are typically encoded

# 2

into the incoming video signal. Such selection region information usually specifies areas of the video display that correspond to a predetermined selection function according to the content of the incoming video signal. The video receiver in such prior systems typically includes a pointing device that enables a user to position a pointer within a selection region and select the corresponding function.

Unfortunately, such prior interactive video systems provide only limited selection and control functions for interactive video such as specifying regions for picking underlying video objects. Typically, such prior systems do not enable video content programmers to exercise flexible control over an entire range of interactive video functions including the sizing and placement of video objects over the entire display.

### SUMMARY AND OBJECTS OF THE INVENTION

One object of the present invention is to provide flexible content programming control in an interactive video system.

Another object of the present invention is to enable a content programmer to create a video display screen from a programming studio and to flexibly control the area around the video display including the placement of text, the definition and placement of graphical objects and to provide download information to the computer system and place buttons on the video display to select the downloaded information wherein the additional display information is in sync with the video and audio information.

Another object of the present invention is to provide an interactive video system controlled by an associated data stream corresponding to a video data stream.

Another object of the present invention is to provide an interactive video system wherein the associated data stream determines placement of a video display window on a display device.

Another object of the present invention is to provide an interactive video system wherein the associated data stream determines placement and functionality of selection regions that correspond to a video image in the video display window.

A further object of the present invention is to provide an interactive video system wherein the associated data stream determines the placement and pixel content of graphical objects on the display device that correspond to the video image.

Another object of the present invention is to provide an interactive video system that employs the vertical blanking intervals of the video frames of a video signal or chrominance, sideband, or audio sub carrier signals to transfer the associated data stream.

Another object of the present invention is to provide a video system that employs packetized digital data streams to provide a video stream, an audio stream and a command and control associated data stream.

These and other objects of the invention are provided by a video system that receives a video data stream and an associated data stream corresponding to the video data stream via a broadcast receiver, a CATV link, or a packetized digital communication link. The video system displays a video image defined by the video data stream on a display device and performs command functions specified by the associated data stream.

The command functions include commands that specify parameters that determine an area on a display surface of the

5,541,662

3

display device for placement of a video display window that contains the video image. The command functions include commands that specify parameters of graphical objects that corresponds to the video image and commands that specify pixel data for the graphical objects. The command functions include commands that specify parameters for placement of selection windows that correspond to the video image and commands that specify functions performed if a user selects the selection windows.

One embodiment of the present invention is employed in a computer enhanced video shopping system. For this embodiment, a portion of a video display screen is allocated to the display of an incoming video program. The remainder of the video display screen contains information that describes items being displayed along with manufacturing logos for the items being displayed on the video display. The remainder of the video display screen includes selection regions or buttons to enable a viewer to select more detailed information regarding the items being displayed and related items for sale. In addition, the remainder of the video display contains additional text and graphics that provides information on future items for display.

Other objects, features and advantages of the present invention will be apparent from the accompanying drawings, and from the detailed description that follows below.

## BRIEF DESCRIPTION OF THE DRAWINGS

The present invention is illustrated by way of example and not limitation in the figures of the accompanying drawings in which like references indicate similar elements, and in which:

FIG. 1 illustrates an interactive video system for one embodiment that receives data streams through a satellite receiver, a cable television (CATV) receiver, or a television broadcast receiver;

FIG. 2 illustrates a computer system for one embodiment including a graphics display subsystem that drives a display device, a data modem that receives data streams, and an audio subsystem that drives a speaker;

FIG. 3 illustrates the data modem for one embodiment which comprises a data selector, a video queue, an audio queue, and an associated data queue;

FIG. 4 illustrates a digitized representation of an analog video signal received by the data selector from either the CATV receiver or the television broadcast receiver for one embodiment;

FIG. 5 illustrates a packetized digital data stream received by the data selector for one embodiment which illustrates the format of a video packet, an audio packet, and an associated data packet;

FIG. 6 illustrates the software architecture for the computer system for one embodiment which includes a data stream manager and an operating system;

FIG. 7 is a flow diagram illustrating the functions of the data stream manager for one embodiment, wherein the client runtime manager processes the video, audio, and associated data streams to perform interactive video functions.

FIG. 8 shows an example video screen that can be created with the technology described herein.

## DETAILED DESCRIPTION

FIG. 1 illustrates an interactive video system for one embodiment. The interactive video system comprises a computer system 10, along with a display device 12, a

4

keyboard 20, a mouse pointing device 22, and a speaker 24. The interactive video system further comprises a satellite receiver 14, a cable television (CATV) receiver 16, or a television broadcast receiver 18.

The satellite receiver 14 enables reception of packetized digital data streams over a satellite link. For one embodiment, the incoming packetized digital data streams received by the satellite receiver 14 conform to the motion picture engineering group (MPEG) video transport standard. The packetized digital data streams received by the satellite receiver 14 include video data packets, audio data packets, and associated data packets. The satellite receiver 14 transfers the received digital data stream packets to the computer system 10 over a communication line 30.

The CATV receiver 16 enables reception of an analog or digital video signal over a coaxial transmission line 28. The analog video signal over the coaxial transmission line 28 comprises a CATV cable television link. The CATV receiver 16 digitizes the incoming analog video signal and transfers the corresponding digitized video signal to the computer system 10 over the communication line 30. Alternatively, the CATV receiver 16 transfers the incoming analog video signal to the computer system 10 over the communication line 30.

The television broadcast receiver 18 enables reception of an analog video signal transmitted over the air through an antenna 26. The television broadcast receiver 18 receives and demodulates the incoming broadcast analog video signal, performs analog to digital conversion on the analog video signal to generate a corresponding digital video signal. The television broadcast receiver 18 transfers the incoming digital video signal to the computer system 10 over the communication line 30.

For one embodiment, the computer system 10 receives the packetized digital data stream from the satellite receiver 14 over the communication line 30. The computer system 10 extracts the video data packets from the incoming packetized digital data stream and generates a corresponding video image in a video window 40 on a display surface 50 of the display device 12. The computer system 10 also extracts audio data packets of the incoming packetized digital data stream on the communication line 30 and generates a corresponding analog audio signal to drive the speaker 24.

The computer system 10 extracts associated data packets of the incoming packetized digital data stream on the communication line 30 and decodes the associated data packets according to a predefined video command and control protocol. The associated data packets received over the communication line 30 specify a selection region 42 on the display surface 50. The incoming associated data packets specify the position of the selection region 42 on the display surface 50. The associated data packets on the communication line 30 also specify a graphical display icon 44 for the display surface 50. In addition, the associated data packets specify the graphical content of the icon 44 as well as the positioning of the icon 44 on the display surface 50.

The incoming associated data packets received over the communication line 30 specify an information display window 46 on the display surface 50. The associated data packets specify a position for the information display window 46 and the video window 40 on the display surface 50 as well as the display content of the information display window 46.

For another embodiment, the computer system 10 receives a digitized representation of the incoming analog

5,541,662

5

video signal from either the CATV receiver 16 or the television broadcast receiver 18 over the communication line 30. The incoming digitized video signal comprises a series of video frames each comprising a series of video scan intervals and a vertical blanking interval. The computer system 10 extracts the video information for the video window 40 during the video scan intervals of each received video frame over the communication line 30. The computer system 10 extracts the corresponding audio information for the speaker 24 during the video scan interval of the incoming video data frames.

In addition, the computer system 10 extracts associated data for the incoming video signal during vertical blanking intervals of the incoming video data frames. The computer system 10 decodes the extracted associated data according to the predefined video command and control protocol. The associated data specifies the parameters for the selection region 42. The associated data also specifies the position and content of the graphical display icon 44. The associated data specifies the parameters for the information display window 46 and the video window 40 as well as the display content of the information display window 46.

FIG. 2 illustrates the computer system 10 for one embodiment. The computer system 10 comprises a processor 52, a memory subsystem 54, a graphics display subsystem 56. The computer system 10 further comprises a data modem 58, a disk drive 60, an audio subsystem 62. The processor 52 communicates with the memory subsystem 54, the graphics display subsystem 56, the data modem 58, the disk drive 60, and the audio subsystem 62 via a system bus 51.

The memory subsystem 54 provides memory storage areas for an operating system, application programs, device driver programs, and associated data structures for the computer system 10. For one embodiment, the memory subsystem 54 comprises a dynamic random access memory (DRAM) subsystem. The disk drive 60 provides large scale mass storage to the computer system for programs and associated data structures.

The graphics display subsystem 56 performs graphics rendering functions and includes a frame buffer and associated circuitry to drive the display device 12. The graphics display subsystem 56 enables software executing on the processor 52 to generate display windows on the display device 12 including video display windows. The graphics display subsystem 56 also enables user selection functions from the display surface 50 the display device 12 via the mouse pointing device 22.

The audio subsystem 62 enables software executing on the processor 52 to render audio data and includes circuitry that drives the speaker 24. The audio subsystem 62 receives digitized audio data over the system bus 51 and generates a corresponding analog audio signal to drive the speaker 24.

The data modem 58 receives incoming digital data streams over the communication line 30. For one embodiment, the digital data streams received over the communication line 30 comprise packetized digital data streams from the satellite receiver 14. For another embodiment, the digital data stream received over the communication line 30 comprises a digitized representation of the analog video signal received either by the CATV receiver 16 or the television broadcast receiver 18.

The data modem 58 enables software executing on the processor 52 to extract the video data, the audio data, and the associated data from the incoming digital data on the communication line 30. The software executing on the processor 52 thereafter distributes the video data for display on the

6

display device 12 through the graphics display subsystem 56. The processor 52 distributes the incoming audio data to the audio subsystem 62 to drive the speaker 24. The processor 52 extracts the associated data through the data modem 58 and performs the interactive video functions specified by the associated data.

FIG. 3 illustrates the data modem 58 for one embodiment. The data modem 58 comprises, a data selector 76, a video queue 70, an audio queue 72, an associated data queue 74 and an address filter 75. The data selector 76 receives incoming digital data streams over the communication line 30. The data selector 76 extracts the incoming digital video data received over the communication line 30 and transfers the incoming digital video data into the video queue 70. The data selector 76 extracts the incoming digital audio data over the communication line 30 and transfers the incoming digital audio data into the audio queue 72. The data selector 76 extracts the incoming digital associated data over the communication line 30 and transfers the incoming associated data into the associated data queue 74.

For one embodiment, the data selector 76 receives packetized digital data streams over the communication line 30 from the satellite receiver 14. The data selector 76 decodes the header of each incoming packet to determine whether to transfer the incoming packet into either the video queue 70, the audio queue 72, or the associated data queue 74.

For another embodiment, the data selector 76 receives a digitized representation of an analog video signal over the communication line 30 from either the CATV receiver 16 or the television broadcast receiver 18. The data selector 76 extracts the video information from the incoming digitized video signal and assembles the video information into corresponding video packets in the video queue 70. The data selector 76 extracts the audio information from the incoming digitized video signal and assembles the audio information into corresponding audio packets in the audio queue 72. The data selector 76 extracts associated data during the vertical blanking interval of each video frame of the incoming digitized video signal on the communication line 30. The data selector 76 assembles the incoming associated data into associated data packets in the associated data queue 74.

The data selector 76 generates an interrupt to the processor 52 over an interrupt line 78 each time an incoming packet is placed in either the video queue 70, the audio queue 72, or the associated data queue 74. The interrupt to the processor 52 on the interrupt line 78 causes the processor 52 to read the incoming packets from the video queue 70, the audio queue 72, and the associated data queue 74 over the system bus 51. The processor 52 then distributes the incoming video packets from the video queue 70 to the graphics display subsystem 56 to generate a video image in the video window 40. The processor 52 distributes the incoming audio packets to the audio subsystem 62 to drive the speaker 24. The processor 52 reads the incoming associated data packets from the associated data queue 74 and then performs the video command and control functions specified in the incoming associated data packets.

The address filter 75 contains a data stream address for the computer system 10. The data selector 76 ignores incoming data streams that do not correspond to the data stream address. The data stream address may be written by the processor 52. The data stream address may specify the same address of the data stream or the destination address of the computer system 10 for the data stream.

FIG. 4 illustrates a digitized representation of an analog video signal received by the data selector 76 from either the

5,541,662

## 7

CATV receiver **16** or the television broadcast receiver **18** for one embodiment. The incoming digitized video signal on the communication line **30** comprises a series of video frames. Each video frame comprises a series of scan lines that carries both video and audio information. Each video frame further comprises a vertical blanking interval. The vertical blanking interval carries the associated data that corresponds to the video and audio information for each video frame.

FIG. **5** illustrates the packetized digital data stream received by the data selector **76** over the communication line **30** for one embodiment. The incoming packetized digital data stream on the communication line **30** includes a video packet **80**, an audio packet **82**, and an associated data packet **84**.

The video packet **80**, the audio packet **82**, and the associated data packet **84** each comprise a packet header and a packet payload. The packet header of the video packet **80**, the audio packet **82** and the associated data packet **84** each include a time stamp (TIME_STAMP) that synchronizes the video, audio and associated data carried in the packets **80-84**.

The video packet **80** includes a video payload that provides digital video data for display in the video display window **40**. The video packet **80** is identified as a packet that carries video data by the video identifier (VIDEO_ID) in the packet header.

The audio packet **82** includes an audio payload for transfer to the audio subsystem **64** to drive the speaker **24**. The audio packet **82** is identified as a packet that carries audio data by the audio identifier (AUDIO_ID) in the packet header.

The associated data packet **84** includes an associated data payload that specifies interactive video command and control functions for the computer system **10**. The associated data packet **84** is identified as a packet that carries associated data by the associated data identifier (DATA_ID) in the packet header.

For other embodiments, the associated data stream is carried via a chromanance key, a sideband transmission or an audio sub carrier. An embodiment of the command protocol contains commands that perform the following functions:

1) Specify coordinate scale

2) Video screen position and scaling

3) Screen background color

4) Screen background pattern

5) Text

6) Placement region for text (height and width box)

7) Font, size and color for text

8) Graphic/icon for display

9) Display graphic/icon at position with scale

10) Ordering of graphic/text items for layering on the screen

11) Define height and width and position of a selection region

12) Define command to be performed when selection region selected

13) Define color palette

Each command is pre-pended with an address and an identifier. The address specifies the address of the receiver (with suitable coding for "all" and sub-groups of possible receivers) and the identifier marks this as a display command (as opposed to other data that is synchronized with the video or audio).

## 8

One possible implementation of the above functions is illustrated by the following "object oriented" command set:

Define Object

Type: Text, Graphic, icon, Sound, Cursor, Video Window, Selection Region, Execution Object, Object List

| | |
|---|---|
| Content: | <appropriate to object type> |
| Attributes: | <appropriate to object type: for example, text attributes include font, size, color> |

Instantiate Object

Background: Transparent, solid color, or repeated object (pattern)
Foreground: Visible/Invisible
Location: <x,y>
Size: <x,y>
Scale: <x,y>

| | |
|---|---|
| Define coordinate scaling | (low x, high x, low y, high y) |
| Define Virtual Screen | (ID, object list) |
| Display Virtual Screen | (ID, on/off) |
| Free Object Instance | (ID list, <all>) |
| Cache Object Insurance | (ID list, <all>) |
| Define Instance Order | (ID list) (for overlapping objects) |
| Move Object Instance | (ID, x, y) |
| Copy Object Instance | ID, new x, new y) |

FIG. **6** illustrates the software architecture for the computer system **10** for one embodiment. The software for the computer system **10** includes a client runtime manager **102** and an operating system **100**. The operating system **100** comprises a set of video driver routines **108**, a set of audio driver routines **104**, a data modem driver **106**, a pointing device driver **110**, and a set of display window control routines **112**.

The client runtime manager **102** reads incoming packets from the video queue **70**, the audio queue **72**, and the associated data queue **74** using the data modem driver **106**. The data modem driver **106** manages the video queue **70**, the audio queue **72**, or the associated data queue **74** and processes the interrupts on the interrupt line **78** to the processor **52**. The client runtime manager **102** distributes the incoming video data from the video queue **70** to the graphics display subsystem **56** using the video driver routines **108**. The video driver routines **108** enable the client runtime manager **102** to display the incoming video data stream within the video window **40** on the display surface **50** of the display device **12**.

The client runtime manager **102** distributes the incoming audio data from the audio queue **72** to the audio subsystem **62** using the audio driver routines **104**. The audio driver routines **104** enable the client runtime manager **102** to drive the speaker **24** with the incoming audio information from the audio queue **72**.

The client runtime manager **102** reads the incoming associated data packets from the associated data queue **74** and executes the command and control interactive video functions specified by each associated data packet. The associated data packets are synchronized to the video and audio packets via the TIME_STAMP in each packet header. The associated data packets from the associated data queue **74** include commands that specify the placement of graphic objects on the display device **12**. The associated data packets also include commands for placement for graphical windows on the display device **12**. The associated data packets also specify graphical objects for rendering on the display device **12**.

The associated data packets also specify selection regions for the display surface **50** of the display device **12**. In addition, the associated data packets includes commands for execution upon selection of one of the specified selection

5,541,662

| 9 | 10 |

regions by the mouse pointing device 22. The associated data packets also include commands for the presentation placement and sizing of the video window 40 on the display surface 50.

The display window control routines 112 enable the client runtime manager 102 to define the video display window 40 according to the specifications provided by the associated data packets. The pointing device driver 110 enables the client runtime manager 102 to detect the selection of one of the selection regions defined by the associated data.

FIG. 7 is a flow diagram illustrating the functions of the client runtime manager 102 for one embodiment. The client runtime manager 102 is driven by interrupts from the data modem 58 over the system bus 51. At decision block 120, the client runtime manager 102 determines whether an incoming video packet is available from the video queue 70. If an incoming video packet is available at decision block 120 then control proceeds to block 122. At block 122 the client runtime manager 102 updates the content of the video display 40 using the video driver routines 108 to communicate with the graphics display subsystem 56. Thereafter, the client runtime manager 102 waits for another interrupt from the data modem 58.

At decision block 124, the client runtime manager 102 determines whether an incoming audio packet is available from the audio queue 72. If an incoming audio packet is available from the audio queue 72 then control proceeds to block 126. At block 126 the client runtime manager 102 invokes the audio driver routines 104 to play out the incoming audio packet to the audio subsystem 62. The client runtime manager 102 transfers the audio packet payload audio data to the audio subsystem 62 to drive the speaker 24. Thereafter, the client runtime manager 102 awaits another interrupt from the data modem 58.

At decision block 128, the client runtime manager 102 determines whether an incoming associated data packet is available in the associated data queue 74. If an associated data packet is not available from the associated data queue 74 then the client runtime manager 102 waits the next interrupt from the data modem 58.

If an associated data packet is available from the associated data queue 74 at decision block 128, then control proceeds to block 130. At block 130, the client runtime manager 102 reads the associated data packet from the associated data queue 74 and performs the interactive command and control functions specified by the incoming associated data packet. Thereafter, the client runtime manager 102 awaits the next interrupt from the data modem 58.

FIG. 8 illustrates an example arrangement of video and display data on the display surface 50 which is generated under content programmer control with the techniques described herein.

In the foregoing specification the invention has been described with reference to specific exemplary embodiments thereof. It will, however, be evident that various modifications and changes may be made thereto without departing from the broader spirit and scope of the invention as set forth in the appended claims. The specification and drawings are accordingly to be regarded as illustrative rather than a restrictive sense.

What is claimed is:

1. A method for providing a video display image, comprising the steps of:

receiving a video data stream and an associated data stream corresponding to the video data stream, the video data stream and the associated data stream each comprising a series of digital communication packets, each digital communication packet having an identifier that indicates the video data stream or the associated data stream, the video data stream being received during a series of scan intervals of a video frame and the associated data stream being received during a vertical blanking interval of the video frame; and

displaying a video image defined by the video data stream on a display device and performing an interactive command function specified by the associated data stream, the interactive command function comprising a command that specifies a set of parameters used for configuring a video display window that contains the video image.

2. The method of claim 1, wherein the interactive command function further comprises a command that specifies a set of parameters that determines an area on a display surface of the display device for placement of a graphical object that corresponds to the video image.

3. The method of claim 2, wherein the interactive command function further comprises a command that specifies a set of pixel data or graphical description commands that correspond to the graphical object.

4. The method of claim 1, wherein the interactive command function further comprises a command that specifies a set of parameters that determines an area on a display surface of the display device for placement of a selection window that corresponds to the video image.

5. The method of claim 4, wherein the interactive command function further comprises a command that specifies an interactive command that is performed if a user selects the selection window.

6. A method for creating a display in a computer system, comprising the steps of:

receiving a video stream and a data stream synchronized to the video stream, the data stream specifying at least one graphical command, the data stream also specifying a graphical object for display on a portion of a display screen, the video stream being coded in a series of video scan intervals of a video signal and the data stream being coded in a series of nonvideo scan intervals of the video signal;

receiving an audio stream synchronized to the video stream and playing the audio stream through an audio subsystem of the computer system;

generating a video scene defined by the graphical object specified in the data stream onto the portion of the display screen of the computer system; and

performing a graphical operation on the portion of the display screen defined by the at least one graphical command.

7. The method of claim 6, wherein the at least one graphical command specifies a color palette for the portion of the display screen.

8. The method of claim 6, wherein the at least one graphical command specifies placement of the video scene defined by the graphical object specified in the data stream onto the portion of the display screen.

9. The method of claim 6, wherein the at least one graphical command specifies a set of parameters that define selection regions on the portion of the display screen.

10. The method of claim 9, wherein the at least one graphical command specifies a selection device for picking the selection regions on the portion of the display screen.

11. The method of claim 6, wherein the at least one graphical command specifies text for display on the portion of the display screen.

A0795

5,541,662

**11**

12. The method of claim 11, wherein the at least one graphical command specifies placement and format of the text including font, color, and point size.

13. The method of claim 6, wherein the data stream comprises a series of data packets and wherein the step of receiving a video stream and a data stream synchronized to the video stream includes the step of filtering the data packets according to a destination address of each data packet.

**12**

14. The method of claim 6, wherein the data stream comprises a series of data packes and wherein the step of receiving a video stream and a data stream synchronized to the video stream includes the step of filtering the data packets according to a source address of each data packet.

\* \* \* \* \*

**A0796**

# UNITED STATES PATENT AND TRADEMARK OFFICE
## CERTIFICATE OF CORRECTION

PATENT NO.     :   5,541,662

DATED          :   July 30, 1996

INVENTOR(S)  :   Pantelakis et al.

It is certified that error appears in the above-identified patent and that said Letters Patent is hereby corrected as shown below:

In column 5 at line 11 delete "flames" and insert --frames--

In column 8 at line 4 delete "icon" and insert --Icon--

In column 8 at line 20 delete "Insurance" and insert --Instance--

In column 12 at line 2 delete "packes" and insert --packets--

In column 8 at line 23 insert --(--prior to "ID"

Signed and Sealed this

Nineteenth Day of August, 1997

*Attest:*

**BRUCE LEHMAN**

*Attesting Officer*        *Commissioner of Patents and Trademarks*

A0797

DOCKET NO: 0111168-0241

## IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

PATENT:        6,466,568

INVENTOR:      RAITH ET AL.

FILED:         September 21, 1999        ISSUED:    October 15, 2002

TITLE:       MULTI-RATE RADIOCOMMUNICATION SYSTEMS AND TERMINALS

Mail Stop PATENT BOARD
Patent Trial and Appeal Board
U.S. Patent & Trademark Office
P.O. Box 1450
Alexandria, VA 22313-1450

## DECLARATION OF HARRY BIMS, PH.D.

I, Harry Bims, declare as follows:

### General Background

1.      My name is Harry Bims.  I have been asked to offer opinions regarding whether the claims of U.S. Patent No. 6,466,568 (the '568 patent) are anticipated or would have been obvious in view of the prior art; and to review a petition requesting *Inter Partes* Review of the '568 patent ("Petition"), which I understand is being submitted at the same time as this declaration.

2.      I received my B.S. in computer and systems engineering from Rensselaer Polytechnic Institute in 1985, my M.S. in electrical engineering from

BROADCOM 1009

ActiveUS 116131815v.1

**A0857**

Stanford University in 1988, and my Ph.D. in electrical engineering from Stanford University in 1993. Since receiving my doctorate, I have worked on a number of wireless and mobile technologies, including wireless pagers, wireless home LAN protocols, cellular products including 2.5G and 3G products, wireless network infrastructures based on the 802.11 wireless specification, and wireless networks in the 4G technology known as WiMAX, an implementation of 802.16.

3.      I have been actively involved in the development of the 802.16 standards, which is a series of wireless broadband standards written by the Institute of Electrical and Electronics Engineers (IEEE), including as a vice-chair of the 802.16 working group, and chair of two task groups. Previously, I was the vice-chair and secretary of the IEEE 802.16h License Exempt Task Group.

4.      I am currently working as both a technology consultant in the industry and an expert consultant for litigation matters.

5.      I began my technical career in 1992 just before completing my Ph.D. as one of the first employees at Glenayre Technologies, where I worked until 1998. While at Glenayre, I designed and built a 4-channel wireless pager demonstration based on the ReFLEX wireless protocol developed by Motorola, which led to an award for Narrowband Personal Communications Service (PCS) development. I invented, designed, and built a two-way pager test system for the ReFLEX protocol that was deployed around the country for testing pagers. Additionally, I

- 2 -

**A0858**

a transmitter for transmitting information received from said processor including said at least one first field and said at least one second field.

### *Ground 1: Morley Anticipates Challenged Claims 1-6*

25.    I have reviewed Morley, U.S. Patent No. 5,488,610, entitled "Communication System," filed Jul. 12, 1994, which claimed priority to European Patent Application No. 93306797, filed August 26, 1993 ("Morley", Ex. 1002). I understand Morley and it is my opinion that it enables the invention it describes.

26.    In my opinion, Morley discloses the limitations of claims 1-6, and therefore anticipates claims 1-6 of the '568 patent.

27.    Morley generally relates to a system that transmits more than one type of data, such as voice and data, using a multiplexer. (Morley, Abstract, Ex. 1002). The system can be a wired telephone system (*Id.* at Fig. 2), or a wireless system, such as a cellular GSM system (*Id.* at 99:40-46). The composite voice and data signal generated by the multiplexer is organized into frames, each containing a header and one or more voice frames and/or non-voice data. (*Id.* at 5:39-59) The frames are transmitted on an RS232 link between the mux and the modem. (*Id.*) Some possible mux frames are shown in Morley's Figures 5a-5g and described at 6:4-63.

ActiveUS 116131815v.1



28.　These frames have a header that is used to identify the frame type, as shown in the table below:

| Header Type | Frame Type | Header Value |
|---|---|---|
| 0 | Sync | $0 \times 19b3$ |
| 1 | Extend | $0 \times 007f$ |
| 2 | Voice Only | $0 \times 4ce6$ |
| 3 | Not Defined | $0 \times 0000$ |
| 4 | Data 0 | $0 \times 34e9$ |
| 5 | Data 0* | $0 \times 3366$ |
| 6 | Voice + Data 0 | $0 \times 2ad5$ |
| 7 | Voice + Data 0* | $0 \times 1e3c$ |
| 8 | Data 1 | $0 \times 4b69$ |
| 9 | Data 1* | $0 \times 52da$ |
| 10 | Voice + Data 1 | $0 \times 552a$ |
| 11 | Voice + Data 1* | $0 \times 61c3$ |
| 12 | Data 2 | $0 \times 664c$ |
| 13 | Data 2* | $0 \times 7870$ |
| 14 | Voice + Data 2 | $0 \times 078f$ |
| 15 | Voice + Data 2* | $0 \times 4b16$ |

(*Id.* at 7:1-17; *see also* 6:22-23.) This header value is a service type identifier field that indicates whether the payload of the frame contains voice only, one of three different types of data (Data 0, Data 1, or Data 2), or some combination of these services. (*Id.* at 6:64-7:22) The receiving system uses this service type identifier

- 9 -

field to identify the type of payload information in the frame and to write the information to an appropriate buffer. (*Id*. at 10:19-22.)

29.    Morley discloses all the limitations of claim 1. Morley discloses a communication station, such as PC 18 in Figure 2, for handling a composite voice and data signal. (Figure 2, PC 18, 3:33-38). Morley discloses a processor (e.g., processor 19, mux/demux 22, storage 20, and voice coder/decoder 24 in Figure 2; and NEC V40 microprocessor 52, and RAM 54 in Figure 9) that arranges data for transmission by forming mux frames that include voice and/or data in a payload. (*Id*. at 6:18-63.)

30.    Morley discloses providing and transmitting "at least one first field" with a payload and "at least one second field" with the service type identifier that identifies the type of payload. The structure of possible mux frames, as shown in Figures 5a-5g, include voice only, three different types of data (Data 0, Data 1, or Data 2), or various combination of these services. (Morley, Figures 5a-5g; 6:4-7:30, Ex. 1002) Morley discloses that the mux frames include a header with a "frame type" that constitutes a service type identifier field that indicates whether the payload of the frame contains voice only, one of three different types of data (Data 0, Data 1, or Data 2), or some combination of these. (*Id*.) Voice and data are identified in the '568 patent as examples of service types.

- 10 -

ActiveUS 116131815v.1

**A0866**

31.    Further, Morley discloses a high speed modem 26 as a transmitter for transmitting the first and second fields, e.g., with a V32 or V32bis full duplex modem, or using GSM. (*Id*. at Fig. 2, 3:58-61; 99:40-46).

32.    Morley discloses that the invention described therein can have applications in radio communications, including GSM. (Morley, 99:40-46, Ex. 1002.) GSM is a well-known 2G cellular system that was implemented first in Europe and later elsewhere, including the United States. GSM inherently has a network of base stations and mobile stations that implement the GSM specifications in processors that are programmed to implement the protocols and mobile applications that reside on top of the protocols. The disclosure of GSM also inherently means transmitting at RF frequencies, e.g., at 800MHz, using a transmitter and a receiver. Thus, a mobile station would inherently include a processor and a transmitter for implementing GSM communications. *Id.*

33.    Dependent claims 2-4 of the '568 patent recite:

2. The communication station of claim 1, wherein said processor is also for changing said type of payload information from a first type to a second type during a connection involving said communication station and adjusting a value of said service type identifier to correspond to the second type of information.

ActiveUS 116131815v.1

3. The communication station of claim 2, wherein said

first type of information is one of video, voice and data

and said second type of information is different one of

video, voice and data.

4. The communication station of claim 1, wherein said

information is multimedia information.

34.    These claims thus disclose that the payload information can thus include multimedia information (claim 4); and that the packet types (and therefore the contents of the payload and the associated type identifier field) can be changed during a connection from one of voice, video, and data to another of voice, video and data (claims 2 and 3). Morley discloses that the "frame type transmitted by the multiplexer can change from frame to frame" (*Id.* at 99:32-34; see also Figures 5a-5g), and further discloses switching between voice and data frame buffers during a connection (*Id.* at 9:43-10:9), and therefore anticipates dependent claims 2-3. Morley further discloses transmitting voice and visual data, including textual input, drawings, stored images, or a mixture thereof, as claimed in dependent claims 3-4 of the '568 patent. Further, the voice and visual data can "remain in synchronization as perceived by the user" to provide a combined audio and visual experience (See *id.* at Figures 5a-5g, 1:3-8; 3:10-23, 6:4-7:17, Ex. 1002).

- 12 -

35.    Dependent claim 5 recites that the communication station is a base station. As noted above, Morley discloses that the invention has "applications in radio communications," including GSM. (*Id.* at 99:40-46.)

36.    It is inherent that GSM radio communications systems include base stations, and it is also known that base stations can receive data from mobile stations and retransmit data to other mobile stations. It is also inherent that GSM radio communications systems include mobile stations. Base stations and mobile stations in a GSM cellular system, or in other cellular systems, each have a processor for processing data to be sent, and a transmitter for sending data. That processor sends data that has been arranged in frames defined by the GSM protocol. (See, e.g., Mouly and Pautet, GSM, Ex. 1008, pp. 89-99).

37.    Dependent claim 6 recites that the communication station is a mobile station. Morley discloses implementing its claimed "communication station" using GSM, which "is a mobile data service that offers 9600 bps asynchronous data at the DTE port of the GSM mobile." (*Id.* at 99:40-45.) Morley further discloses that its multiplexing scheme has "applications in radio communications." (*Id.*) Morley thus discloses that the communication station can be a mobile station.

### Patent Owner's Prior Report Regarding Morley

38.    I have reviewed portions of a rebuttal expert report that I understood was submitted by the Patent Owner (Ericsson) in the course of a litigation

- 13 -

**A0869**

("Report", Ex. 1010). The Report was supposed to rebut the assertion that Morley anticipated claims 1-5. I understood claim 6 was not at issue. The sole point of difference I see in the Patent Owner's Report is a statement in the Report that Morley does not disclose "a service type identifier which identifies a type of payload information" because the headers in Morley "merely specify whether data should be sent to the voice or data buffer." (Report, ¶ 61, Ex. 1010) I disagree. As the Report itself states, Morley's "header identifies the 'frame type,'" which can include voice only, three different types of data (Data 0, Data 1, or Data 2), or some combination of these. Morley also describes the transmission of frames whose type alternates between voice frames and data frames. (*Id.* at 9:43-10:9) The Morley reference discloses that the header type identifies the type of payload information (e.g., voice, data, or some combination of voice and data).

39. The Report argues that Morley teaches away from the '568 patent by requiring the receiver to contain specialized subsystems for receiving voice, audio, and data. (Report at ¶ 62, Ex. 1010) The Report suggests that this is a meaningful difference, but I see nothing in claim 1 that would require that the station cannot contain specialized subsystems for receiving voice, audio, and data. For example, claim 1 recites generally a "communication station," a "processor" and a "transmitter."

- 14 -

ActiveUS 116131815v.1

**A0870**

40.    Further, I believe that the one portion of the '568 patent (Report at ¶ 62, fn.36, Ex. 1010) that is cited in the Report as teaching away from using specialized subsystems does not actually support that proposition.  It reads:

> Accordingly, it would be desirable to provide techniques for transmitting information between remote stations and the system in radiocommunication networks that provide sufficient flexibility for the anticipated variety of information communication services described above, while also providing sufficient compatibility with existing technology so that equipment used by the existing consumer base will not become obsolete.

('568 patent at 2:56-64, Ex. 1001.)

41.    In my opinion, one of ordinary skill in the art would not understand this section to exclude specialized subsystems for receiving voice, audio, and data, but would instead understand the cited language to simply address communicating different payloads at different data rates, such that when the type of payload is switched, the data rate is changed to reflect the new type of payload.

42.    The Report does not separately identify any additional differences between Morley and any of claims 2-5.  (Report at ¶ 62, Ex. 1010).

- 15 -

ActiveUS 116131815v.1

**A0871**

67.    A person of ordinary skill would also have found it obvious to include the disclosure of Menand in a mobile station as required in claim 6.  It is well known to one of skill in the art that radio communications can include the use of a mobile station.  In general, I believe it would have been obvious to implement Menand with any wireless system, not just a satellite.  The system in Menand does not require any particular form of wireless communication.  In the case of Menand, Figure 1 shows an interactive component source 10 as a (mobile) laptop and coupled to a data packet former 14, which in turn is coupled to a packet mux 16 and a channel mux 28 and to a modem (transmitter).  Menand further discloses that the data packet former 14 can be included as part of the interactive component source 10.  (Menand, 5:19-23).  Further, it would therefore have been obvious to one of skill to implement the functionality of Menand in a mobile station if it has audio and video data to send, and doing so would have been the use of a known element yielding predictable results of allowing a device to send different types of data (as disclosed by Menand) to a recipient, for the purpose of identifying to the recipient what type of data is being sent..

### Ground 7:  Adams Renders Claims 1-6 Obvious

68.    I have reviewed Adams et al., U.S. Patent No. 5,541,662, entitled "Content Programmer Control of Video and Data Display Using Associated Data,"

- 28 -

**A0884**

filed Sep. 30, 1994 ("Adams", Ex. 1005.). I understand Adams and believe it enables the invention it describes.

69.   Adams generally relates to an interactive video system that receives packetized data streams, including video data streams, audio data streams, and associated data streams corresponding to the video data stream. (Adams, Abstract, Ex. 1006.) The interactive video system includes a satellite receiver 14, a cable television (CATV) receiver 16, or a television broadcast receiver 18. (*Id.* at Figure 1, 4:2-4.) The satellite receiver 14 enables reception of packetized digital data streams over a satellite link. (*Id.* at 3:65-4:6.)

70.   The packetized digital data streams received by the satellite receiver 14 include video data packets, audio data packets, and associated data packets. (*Id.* 7:12-14.) For example, Adams' Figure 5, reproduced below, discloses a video packet 80, audio packet 82, and the associated data packet 84 each comprising a packet header and a packet payload. (*Id.* at 6:66-7:17.)

- 29 -

**A0885**



*Figure 5*

The video packet 80 includes a video payload that provides digital video data for display in the video display window 40. The video packet 80 is identified as a packet that carries video data by the video identifier (VIDEO__ID) in the packet header. The audio packet 82 includes an audio payload for transfer to the audio subsystem 64 to drive the speaker 24. The audio packet 82 is identified as a packet that carries audio data by the audio identifier (AUDIO__ID) in the packet header. The associated data packet 84 includes an associated data payload that specifies interactive video command and control functions for the computer system 10. The associated data packet 84 is identified as a packet that carries associated data by the associated data identifier (DATA__ID) in the packet header. (*Id.* at 7:22-40.)

71.    The subject matter of claim 1 would have been obvious in view of Adams. Adams is focused on a receiver, while the claims are to a transmitting

- 30 -

device. However, one of ordinary skill in the art would have understood that the Adams reference implicitly teaches a communication station for transmitting packetized digital data streams, including the three types of payload, in Adams. Therefore it would have been obvious to provide a transmitter for sending the type of data that Adams receives.

72.     Adams discloses receiving "at least one first field" in which payload information is disposed because in Adams each packet that is received includes an audio payload, a video payload, or a data payload. An object of the invention in Adams is to enable a content programmer to create a video display screen from a programming studio. (*Id.* at 2:21-23.) Because Adams discloses implementing a content programmer, it is obvious (if not inherent) that the communication station sending to Adams include a processor for arranging information for transmission. Adams also discloses receiving "at least one second field, separate from the first field" that identifies a type of payload information because Adams discloses that each video packet includes a packet header that includes an identifier that identifies whether audio, video, or data is carried in the packet payload. (*Id.* at Figures 3, 5, and 6, 6:7-58, 7:8-37). One of ordinary skill in the art would have understood the Adams reference to teach a transmitter for transmitting said at least one first field and said at least one second field on said radio channel.

- 31 -

ActiveUS 116131815v.1

**A0887**

73.    Dependent claims 2-3 recite that the payload information can include video, voice, and data, and that the packet types (and therefore the contents of the payload and the associated type identifier field) can be changed during a connection.  Adams discloses these elements.  Adams discloses receiving audio, video, or other data in the packet payload, and determining which type of payload is being received.  (Adams, .4:34-64; Figures 3, 5, 6, and 7; 7:9-37; Ex. 1006) Adams also discloses utilizing a different identifier depending on the type of payload – video, audio or data.  (*Id.*)  The different types of packets are all sent during one communication, and therefore they must switch from one type of packet to another, and therefore the service type identifier changes to reflect the type of payload information during transmission.  These packets and their service type identifiers can change from one of voice, video, and data, to another of voice, video, and data.

74.    If one contends that Adams does not satisfy the claim limitation of "wherein said processor is also for changing said type of payload information from a first type to a second type during a connection involving said communication station" and "adjusting a value of said service type identifier to correspond to the second type of information" (claim 2), a person of ordinary skill would have found it obvious to modify Adams to include a processor for changing the payload type during a transmission, and adjusting the identifier to reflect the changed payload

ActiveUS 116131815v.1

**A0888**

type. Using a processor to change the payload and associated identifier during transmission is well-known. For example, an object of Adams is to provide a video system that employs packetized digital data streams to provide a video stream, an audio stream and a command and control associated data stream.

75. Dependent claim 4 recites that the information is multimedia information. As indicated above, the data that is received includes audio, video, and other data, and is provided in such a manner to create a display with audio. (Adams, Figures 3, 5, 6, and 7; 2:21-39; 4:34-64; 7:9-37; Ex. 1006).

76. Dependent claim 5 recites that the communication station is a base station. Adams discloses transmission of packetized digital data streams over a satellite link, and thus the transmitter would typically be a base station. (*Id.* at Figure 1, 3:65-5:22). It is well-known in the art that such satellite communications devices include base stations. Adams also discloses communication of an analog or digital video signal over a coaxial transmission line. Transmission over a coaxial transmission line is typically by a head-end, or base station. Further, I believe it would have been obvious to provide Adams over almost any wireless system. Adams does not require any particular type of system, and thus could use systems like cellular systems with base stations. This would be the use of a known technique (of providing payloads and identifiers) applied to a known type of device

- 33 -

A0889

(base station) to yield the predictable result of allowing the base station to send content and identify the packets that make up the content.

77. Dependent claim 6 recites that the station is a mobile station. It would have been obvious to provide a protocol for sending voice, video, and data to a mobile station, as a mobile station (e.g., like the laptop in Menand) could create multiple types of content to be sent, and therefore it would have been obvious to provide the ability to identify what type of data was included in a packet to allow the packet to be processed appropriately. This would be the use of a known technique (of providing payloads and identifiers) applied to a known type of device (mobile) to yield the predictable result of allowing the mobile to send content and identify the packets that make up the content.

### Patent Owner's Prior Report Regarding Adams

78. In the Patent Owner's Report (Ex. 1010), the Patent Owner did not raise the issue that Adams is directed to a receiver as opposed to a transmitter. (Report at ¶¶ 61-69, Ex. 1010). From this I would assume the Patent Owner accepted that the receiver in Adams would inherently work with a corresponding transmitter as stated above. The Report disputes whether Adams discloses the requirement of "a service type identifier which identifies a type of payload information" of claim 1. (Report at ¶ 64, Ex. 1010). As explained above, it does. The Report admits that "[w]hen a device in [Adams's] system receives a packet of

- 34 -

ActiveUS 116131815v.1

**A0890**

information, it checks an ID tag in the packet to determine which subsystem should receive the packet." (Report at ¶ 61, Ex. 1010) Moreover, the Report admits that Robert Adams, a named inventor of the Adams patent, explained that "the ID tags disclosed in this reference is a 'trivial technique' which has been known in the prior art." (*Id.*) This is not surprising, since sending different types of data and telling a recipient what type of data it is would seem to be a matter of common sense, as is suggested by the multiple references that disclose payloads and identifiers. Therefore, the Report admits that Adams disclosed using ID tags to identify the type of payload, and suggests that using such identifiers, like the service type identifier claimed in the '568 patent, was well known in the art.

79.    The Report asserts that Adams teaches away from the '568 patent by requiring the receiver to contain specialized subsystems for receiving voice, audio, and data is incorrect. (Report at ¶ 65, Ex. 1010) As noted above, the single portion of the '568 patent that the Report cites for excluding specialized subsystems at 2:56-64 does not actually support the proposition, as explained above with reference to Morley and Menand. Moreover, Adams provides "a video system that employs packetized digital data streams to provide a video stream, an audio stream and a command and control associated data stream."

80.    The Report did not argue that Adams does not satisfy the claim limitation of "a processor for arranging information for transmission including

- 35 -

providing at least one first field in which payload information is disposed" or "a transmitter for transmitting information received from said processor including said at least one first field and said at least one second field" (claim 1).

81.    Even if Adams does not disclose either of these limitations inherently, a person of ordinary skill would have found it obvious to include a processor for arranging the packetized digital data stream and a transmitter for transmitting the packetized digital data stream to the computer system.  Using a processor to generate packetized digital data stream is well-known, and is further made obvious by Adams' disclosure of a content programmer that provides control over receivers.  (Adams, 1:14-2:15, Ex. 1006)  Further, Adams discloses that an object of the invention in Adams is to provide flexible content programming control in an interactive video system.

82.    The Report does not make additional arguments for patentability of the dependent claims 2-5 (claim 6 was not at issue).  (Report at ¶¶ 67-69, Ex. 1010)

**Ground 8:  Padovani Anticipates Claims 1-6**

83.    I have reviewed Padovani et al., U.S. Patent No. 6,659,569, entitled "Data Burst Randomizer," filed February 14, 1994 ("Padovani", Ex. 1007), which is a continuation of an application filed March 5, 1992.  I understand Padovani and believe it enables the invention it describes.

- 36 -

**A0892**

to imply that the two fields must be distanced from one another along the radio channel. This Court

rejects Defendants' construction and determines that no construction is necessary.

        b.     **"a service type identifier which identifies a type of payload information" (claim 19 of the '019, claim 1 of the '568)**

| Plaintiffs' Proposed Construction | Defendants' Proposed Construction |
| --- | --- |
| an identifier which identifies transmission characteristics of payload information | an identifier that identifies the type of information (e.g. video, voice, or data) conveyed in the payload. |

Plaintiffs contend that their proposal recognizes that the inventors anticipated many more

types of payload information than the few examples discussed in the patent and the patentee, instead

of attempting to predict all of the various types of information that may be used in future radio

communications, flexibly accounted for future developments. They contend that the service type

identifier must inform the receiver about the transmission characteristics of the payload it is receiving

so that it may handle the transmission correctly rather than merely knowing if the payload is a video

or audio.

Defendants argue that there is a distinct difference between the type of service and how it is

sent and that Plaintiffs disavowed "transmission characteristics" to distinguish the '019 over the

Raith reference, which disclosed channel coding. They contend that Plaintiffs' attempt to inject the

phrase "transmission characteristics" into the claim doesn't broaden the claim, but is an attempt to

rewrite it. They argue that the service type identifier merely identifies the type of data conveyed in

the payload and not the transmission characteristics of that data.

The language of the claim is clear in that the service type identifier identifies the type of

payload information, not the transmission characteristics of that information. The specification also

**A1201**

makes it clear that "the service type identifier informs the mobile or base station of the type of information (e.g., voice, video, or data) being conveyed in the payload. This information can be used by the receiving equipment to aid in processing the information conveyed in the payload, e.g., by knowing the channel coding rate." '019 patent at 3:9-19. In another embodiment involving a multimedia connection where the transmission may rapidly between voice, data and video, "a change in the FOC can inform the mobile station of the type of information being transmitted, so that the mobile station will know how to process the information, e.g., how to decode the received bits." '019 patent at 9:32-38.

In addition, claim 22, which is dependent on claim 19, claims an additional step of changing the type of information from a first type to a second type. Claim 23, which is dependent on Claim 22, claims the method of claim 22 "wherein said first type of information is one of video, voice and data and said second type of information is different one of video, voice and data."

Further, it appears that Plaintiffs previously acknowledged that in some cases "it may not be possible to identify the type of payload information based upon an indication of channel coding since the type of channel coding identified may be employed for different types of information." '568 file history, May 10, 2002 Amendment, page 6 (Ericsson's Response to Examiner's Second Raith Rejection).

Therefore, this Court finds that the proper construction for this term is **"an identifier that identifies the type of information conveyed in the payload. Examples of types of information include, but are not limited to, video, voice, data, and multimedia."**

19

**A1202**

Application/Control Number: 09/399,771                                      Page 3

Art Unit: 2664

> The specification shall conclude with one or more claims particularly pointing out and distinctly
> claiming the subject matter which the applicant regards as his invention.

5.    Claims 45-51 are rejected under 35 U.S.C. 112, second paragraph, as being

indefinite for failing to particularly point out and distinctly claim the subject matter which

applicant regards as the invention.

As per claim 45, line 5, "the type" lacks of antecedent basis.

As per claim 46, line 2, "said type of information" lacks of antecedent basis.

Moreover, it is unclear whether "said type of information" recited thereat is the same as

"type of payload information" previously recited in the parent claim.

Claims 47-51 variously depends from their indefinite parent claim.


### Claim Rejections - 35 USC § 102

The following is a quotation of the appropriate paragraphs of 35 U.S.C. 102 that

form the basis for the rejections under this section made in this Office action:

> A person shall be entitled to a patent unless --
>
> (e) the invention was described in a patent granted on an application for patent by another filed in the
> United States before the invention thereof by the applicant for patent, or on an international application
> by another who has fulfilled the requirements of paragraphs (1), (2), and (4) of section 371(c) of this
> title before the invention thereof by the applicant for patent.

6.    Claims 45-51 are rejected under 35 U.S.C. 102(e) as being anticipated by Raith

(USP 5,757,813).

Regarding claim 1, while the specification discloses providing out of band

information regarding the type of service which the associated payload is currently

supporting, the channel coding and/or interleaving associated therewith, the claim calls

for a communication station comprising:  a processor for arranging information for

**A1256**

Application/Control Number: 09/399,771                                    Page 4
Art Unit: 2664

transmission including providing at least one first field in which payload information is

disposed and providing at least one second field, separate from said first field, which

includes a service type identifier which identifies a type of payload information provided

in said at least one first field; and a transmitter for transmitting information received from

said processor including said at least one first field and said at least one second field.

Raith, in according to FIGS. 4, 8 and the disclosure at col. 12, lines 6-30

discloses just that as clearly corresponding below:

The claim calls a communication station (corresponding to FIG. 4, 110 or 120)

comprising: a processor (130 or 180) for arranging information (FIG. 8) for transmission

including providing at least one first field (DATA) in which payload information is

disposed and providing at least one second field (PCF or CSFP/PCF), separate from

said first field, which includes a service type identifier which identifies a type of payload

information provided in said at least one first field (col. 12, lines 16-30); and a

transmitter (150 or 170) for transmitting information received from said processor

including said at least one first field and said at least one second field. Thus, the Raith

reference reads on the claimed limitations in a manner set forth as claimed.

Regarding claim 46, in according to the recitation at col. 12, lines 31-57, Raith

also discloses that the system can assign the mobile station a new modulation symbol

alphabet by sending the indicator (corresponding to "service type identifier") to the

mobile station which indicates the modulation symbol alphabet to be used in order to

increase change the type of modulations. Thus, the recitation thereat reads on the

claimed limitations set forth as claimed.

**A1257**

Application No. 09/399,771
Attorney's Docket No. 040010-490
Page 4

antecedent basis. Claims 45 and 46 have been amended, accordingly, withdrawal of this ground of rejection is respectfully requested.

In the sixth paragraph of the Office Action, claims 45-51 are rejected under 35 U.S.C. § 102(e) as allegedly being anticipated by U.S. Patent No. 5,757,813 to *Raith* ("*Raith*"). This ground of rejection is respectfully traversed.

*Raith* does not anticipate Applicants' claim 45 because *Raith* does not disclose all of the elements of Applicants' claim 45. For example, *Raith* does not disclose a processor providing at least one second field, separate from said first field, which includes a service type identifier which identifies a type of payload information provided in said at least one first field.

*Raith* discloses a method for achieving optimal channel coding in a communication system. Specifically, *Raith* discloses a method in which the reserved field or the CSFP/PCF field can be provided with an indication bit for indicating the type of channel coding being used in the data field. However, *Raith* does not disclose a service type identifier which *identifies a type of payload information*. Accordingly, *Raith* cannot disclose a processor providing at least one second field, separate from said first field, which includes a service type identifier which identifies a type of payload information provided in said at least one first field as recited in Applicants' claim 45.

Nevertheless, the Office Action asserts that the indication of coding provided in the PCF or the CSFP/PCF field anticipates the service type identifier of Applicants' claim 45. However, the indication which *Raith* discloses is placed in the PCF field or the CSFP/PCF field is *an indication of the type of channel coding*. However, *Raith* does not disclose that

**A1263**

Application No. 09/399.771
Attorney's Docket No. 040010-490
Page 5

this indication *identifies a type of payload information* as recited in Applicants' claim 45.

Since *Raith* does not disclose a service type identifier which identifies a type of payload

information provided in said at least one field, *Raith* does not anticipate Applicants' claim

45.

Claims 46-51 depend from claim 45, and hence, these claims are patentably

distinguishable over *Raith* for at least those reasons stated above with regards to

Applicants' claim 45. For at least those reasons stated above, it is respectfully requested

that the rejection of claims 45-51 as allegedly being anticipated by *Raith* be withdrawn.

All outstanding objections and rejections having been addressed is respectfully

submitted that the present application is in condition for allowance. Notice to this affect is

respectfully requested. If there are any questions regarding this response or the application

in general, the Examiner's is encouraged to contact the undersigned at 703-838-6578.

Respectfully submitted,

BURNS, DOANE, SWECKER & MATHIS, L.L.P.

By: _____

Stephen W. Patan
Registration No. 43,420

P.O. Box 1404
Alexandria, Virginia 22313-1404
(703) 836-6620

Date: November 21, 2001

5

**A1264**

Application/Control Number: 09/399,771                                    Page 3

Art Unit: 2664

(e) the invention was described in a patent granted on an application for patent by another filed in the United States before the invention thereof by the applicant for patent, or on an international application by another who has fulfilled the requirements of paragraphs (1), (2), and (4) of section 371(c) of this title before the invention thereof by the applicant for patent.

5.   Claims 45-51 are rejected under 35 U.S.C. 102(e) as being anticipated by Raith (USP 5,757,813).

Regarding claim 45, while the specification discloses providing out of band information regarding the type of service which the associated payload is currently supporting, the channel coding and/or interleaving associated therewith, the claim calls for a communication station comprising: a processor for arranging information for transmission including providing at least one first field in which payload information is disposed and providing at least one second field, separate from said first field, which includes a service type identifier which identifies a type of payload information provided in said at least one first field; and a transmitter for transmitting information received from said processor including said at least one first field and said at least one second field.

Raith, in according to FIGS. 4, 8 and the disclosure at col. 12, lines 6-30 discloses just that as clearly corresponding below:

The claim calls a communication station (corresponding to FIG. 4, 110 or 120) comprising: a processor (130 or 180) for arranging information (FIG. 8) for transmission including providing at least one first field (DATA) in which payload information is disposed and providing at least one second field (PCF or CSFP/PCF), separate from said first field, which includes a service type identifier which identifies a type of payload information provided in said at least one first field (col. 12, lines 16-30); and a transmitter (150 or 170) for transmitting information received from said processor

**A1270**

Application/Control Number: 09/399,771                                                Page 4
Art Unit: 2664

including said at least one first field and said at least one second field. Thus, the Raith

reference reads on the claimed limitations in a manner set forth as claimed.

Regarding claim 46, in according to the recitation at col. 12, lines 31-57, Raith

also discloses that the system can assign the mobile station a new modulation symbol

alphabet by sending the indicator (corresponding to "service type identifier") to the

mobile station which indicates the modulation symbol alphabet to be used in order to

increase change the type of modulations. Thus, the recitation thereat reads on the

claimed limitations set forth as claimed.

Regarding claims 47-48, because Raith's system (FIG. 4) supports various

wireless communication systems to include IS-136 that supports multimedia. Therefore,

it is inherent that the changing of coding type and modulation type disclosed at col. 12,

lines 6-30 by Raith reads on the claimed limitations of "wherein said first type of

information is one of video, voice and data and said second type of information is

different one of video, voice and data".

Regarding claims 49-50, see FIG. 4, elements 110 and 120.

Regarding claim 51, in according to FIG. 5 and col. 11, lines 21-53, Raith shows

on possible mapping sequence performed by the processor (130 or 140). Thus, Raith

discloses the claimed limitation set forth as claimed.

**A1271**

Application/Control Number: 09/399,771                                    Page 5
Art Unit: 2664

### *Response to Arguments*

6. Applicants' arguments filed 11/21/2001 have been fully considered but they are not persuasive. Applicant's arguments will be addressed hereinbelow in the order in which they appear in the response dated 11/21/2001.

In the Remarks of the outstanding response, on page 4, fourth paragraph and thereinafter, Applicants state that "*Raith discloses a method in which the reserved field or the CSFP/PCF field can be provided with an indication bit for indicating the type of channel coding being used in the data field*" and argue that "*However, Raith does not disclose a service type identifier which identifies a type of payload information. Accordingly, Raith cannot disclose a processor providing at least one second field, separate from said first field, which includes a service type identifier which identifies a type of payload information provided in said at least one first field as recited in Applicants' claim 45*".

In response Examiner respectfully disagrees and asserts that the interpretation of Raith reference, as clearly pointed out in the Office Action, against the claimed invention is proper because the original specification, on page 15, last paragraph, clearly defined that "*the FOC fields may also serve the purpose of service type identifier*" and "*the FOC can provide information regarding*", among other things, "*the channel coding*". Thus, CSFP/PCF field in Raith reference clearly reads on the claimed limitation of "a service type identifier which identifies a type of payload information" in a manner set forth as claimed. Unless the Applicants amend the claim to better distinguish the claimed

# A1272

Application/Control Number: 09/399,771                                    Page 6
Art Unit: 2664

invention over the Raith reference, the rejection from the last Office Action is

maintained.

Examiner believes an earnest attempt has been made in addressing all of the

applicants' arguments.

*Conclusion*

7. **THIS ACTION IS MADE FINAL.** Applicant is reminded of the extension of time

policy as set forth in 37 CFR 1.136(a).

A shortened statutory period for reply to this final action is set to expire THREE

MONTHS from the mailing date of this action.  In the event a first reply is filed within

TWO MONTHS of the mailing date of this final action and the advisory action is not

mailed until after the end of the THREE-MONTH shortened statutory period, then the

shortened statutory period will expire on the date the advisory action is mailed, and any

extension fee pursuant to 37 CFR 1.136(a) will be calculated from the mailing date of

the advisory action.  In no event, however, will the statutory period for reply expire later

than SIX MONTHS from the mailing date of this final action.

8.  Any inquiry concerning this communication or earlier communications from the

examiner should be directed to Frank  Duong whose telephone number is (703) 308-

5428.  The examiner can normally be reached on 7:00AM-3:30PM.

If attempts to reach the examiner by telephone are unsuccessful, the examiner's

supervisor, Wellington  Chin can be reached on (703) 305-4366.  The fax phone

numbers for the organization where this application or proceeding is assigned are (703)

**A1273**

Application No. 09/399,771
Attorney's Docket No. 040010-490
Page 3

Prior to addressing this ground of rejection in detail, a brief description of the present invention is presented to highlight advantageous characteristics thereof.

The present invention is directed to radiocommunications systems, and more particularly to methods and apparatus for identifying the type of payload information in a transmission payload. As commercial radiocommunications continues to grow, many other types of information in addition to voice information are being transmitted using radiocommunications systems. For example, in addition to voice information, video and data communications are being implemented in radiocommunications systems. Each of these types of information has different transmission characteristics, for example, the amount of channel coding required and the ability to tolerate delay. Accordingly, it would be desirable to provide sufficient flexibility in radiocommunications systems for the variety of information.

Due to the different transmission characteristics associated with the different types of information, it would be desirable to provide an ability for a transmitter to be able to inform a receiver of the type of information in a transmission payload. One conventional technique for identifying the type of information in a transmission payload is to employ call control signaling over the Fast Associated Control Channel (FACCH) to identify which type of instantaneous service is to be supported over the channel. One technique for discriminating between different types of information in a transmission payload on a slot by slot basis requires a mobile station to discriminate based upon the differences in channel coding. Although discrimination based upon channel coding may be sufficient in systems in which there are two different types of information possible in a transmission payload, as

3

**A1277**

the number of different types of information expands beyond two, the complexity of discriminating between different types of information in this manner becomes excessive.

Accordingly, the present invention overcomes the above-identified and other deficiencies of the prior art by employing a field which identifies the type of payload information in another field. In accordance with one embodiment of the present invention, the fast out-of-band channel (FOC) can be employed to include a service type identifier to identify the type of payload information in another field. By providing the service type identifier, the present invention overcomes the complexity required of discrimination based upon channel coding when more then two different types of information are employed in a radiocommunications system.

Raith does not anticipate Applicants' claim 1 because Raith does not disclose or suggest all of the elements of Applicants' claim 45. For example, Raith does not disclose or suggest a processor for "providing at least one second field, separate from said first field, which includes a service type identifier which identifies the type of payload information provided in said at least one first field" as recited in Applicants' claim 45.

Raith discloses a method for achieving optimal channel coding in a communication system. Specifically, Raith discloses a method in which the reserved field or the CSFP/PCF field can be provided with an indication bit for indicating the type of channel coding being used in the data field. However, Raith does not disclose a service type identifier which *identifies a type of payload information*. Moreover, there is nothing in Raith which explicitly or inherently discloses that the type of channel coding being used in the data field *identifies a type of payload information*. Accordingly, Raith cannot disclose

4

**A1278**

Application No. 09/399,771
Attorney's Docket No. 040010-490
Page 5

a processor "providing at least one second field, separate from said first field, which includes a service type identifier which identifies a type of payload information provided in said at least one first field" as recited in Applicants' claim 45.

In the Response to Arguments section of the Office Action it is asserted that since the last paragraph on page 15 of the present application describes that the FOC field can provide information regarding channel coding, that Raith's disclosure of identifying a type of channel coding anticipates the "service type identifier which identifies the type of payload information provided in said at least one first field" recited in Applicants' claim 45. However, as discussed during the personal interview, this section of Applicants' specification states that "the FOC can provide information regarding the type of service which the associated payload is currently supporting, the channel coding *and/or* interleaving associated therewith." (emphasis added). Accordingly, it is clear that the FOC field can provide information regarding three different aspects of the transmission, namely, 1) type of service, 2) channel coding, and 3) interleaving. These different aspects can be alternatives or they can all be indicated by the FOC field. However, Applicants' claim 45 recites that "at least one second field...identifies the type of payload information." Accordingly, the plain language of this claim makes clear that Applicants are claiming the use of a field to identify the type of payload information and not the type of channel coding. Therefore, it is respectfully submitted that a disclosure of the identification of the type of channel coding does not anticipate the "at least one second field" which "identifies the type of payload information" as recited in Applicants' claim 45.

5

**A1279**

Application No. 09/399,771
Attorney's Docket No. 040010-490
Page 6

During the personal interview, the Examiner discussed that Applicants' specification, at page 15, lines 11-20, describes a prior system which employs discrimination of channel coding to identify a type of transmission payload information, and in view of Raith's disclosure of employing a field to identify the type of channel coding, that the identification of channel coding would necessarily identify the type of transmission payload information. However, Raith does not disclose, expressly or inherently, that channel coding can be employed to identify a type of transmission payload information. Accordingly, reliance upon the disclosure of prior systems in Applicants' specification in combination with Raith is not proper as an anticipation rejection under 35 U.S.C. § 102 since the rejection requires a modification of the disclosure of Raith to allegedly meet the elements of Applicants' claim 45.

Nevertheless, as discussed during the personal interview, the type of channel coding may not necessarily identify the type of payload information. In other words, each different type of payload information may have more than one type of coding, and the types of coding between these different types of payload information may overlap. Accordingly, it may not be possible identify the type of payload information based upon an indication of channel coding since the type of channel coding identified may be employed for different types of information. This argument is intended to illustrate that the identification of the type of channel coding in Raith does not inherently identify the type of payload information because the identification of channel coding does not *necessarily* identify the type of payload information as would be required for a rejection based upon inherency.

6

**A1280**

Application No. <u>09/399,771</u>
Attorney's Docket No. <u>040010-490</u>
Page 7

Since there is nothing in Raith which expressly or inherently discloses a processor "providing at least one second field, separate from said first field, which includes a service type identifier which identifies a type of payload information provided in said at least one first field" as recited in Applicants' claim 45, Raith cannot anticipate Applicants' claim 45.

Claims 46-51 depend from claim 45, and hence, these claims are patentably distinguishable over *Raith* for at least those reasons stated above with regards to Applicants' claim 45. For at least those reasons stated above, it is respectfully requested that the rejection of claims 45-51 as allegedly being anticipated by *Raith* be withdrawn.

All outstanding objections and rejections having been addressed is respectfully submitted that the present application is in condition for allowance. Notice to this affect is respectfully requested. If there are any questions regarding this response or the application in general, the Examiner's is encouraged to contact the undersigned at 703-838-6578.

Respectfully submitted,

BURNS, DOANE, SWECKER & MATHIS, L.L.P.

By: _____

Stephen W. Palan
Registration No. 43,420

P.O. Box 1404
Alexandria, Virginia 22313-1404
(703) 836-6620

Date: May 10, 2002

7

**A1281**

UNITED STATES PATENT AND TRADEMARK OFFICE

---

BEFORE THE PATENT TRIAL AND APPEAL BOARD

---

BROADCOM CORPORATION

Petitioner

v.

TELEFONAKTIEBOLAGET L.M. ERICSSON

Patent Owner

---

Case IPR2013-00602
U.S. Patent No. 6,466,568

---

**DECLARATION OF DAVID DJAVAHERIAN**

Broadcom v. Ericsson
IPR2013-00602
Broadcom 1018

ActiveUS 119704228v.1

**A1297**

**CONFIDENTIAL PAGES REMOVED**

**A1298-A1299**

**Morley Anticipates Claims 1-6 of the '568 Patent**

3.      In my original Declaration I explained why Morley anticipated claims 1-6 of the '568 patent.  Below I provide an additional discussion of Morley in reply to Patent Owner's Response.

4.      Morley discloses using a header to determine how to process the received data.  Morley describes that the voice coder and data modem can operate at different rates.  For example, Morley describes that the modem data rate is 14400 bps and the voice coder operates at 6800 bps.  (Morley at 52:45-47; Ex. 1002.)  Morley discloses that the receiver uses the header to process data (voice or non-voice) at the proper rate.  For example, Figure 8 of Morley shows receiving data and sending it to a separate voice or data buffers.  (*Id*. at Figure 8; Ex. 1002.) Morley explains that "Frames of voice [data] are supplied to the voice decoder from the receive voice buffer 70.  These can be read at a rate derived from the voice decoder clock."  (*Id.* at 10:23-25; Ex. 1002).  Therefore Morley discloses that identifying the type of payload information also identifies the data rate, which would be considered a transmission characteristic.

5.      Morley also discloses that the "format of the mux frame may need to change according to the particular characteristics of a call" (Morley at 7:27-29; Ex. 1002), and that the structure of the multiplexer frames can be optimized "according to 'long term' requirements of the application and protocol layers," such as voice

2

**A1516**

coder data rate and frame rate, and data bandwidth requirements. (*Id.* at 5:60-64; Ex. 1002.) For example, in addition to the various voice and data frames, Morley includes a "Not Defined" frame type 3 that is "reserved for future expansion where more frame types may be required." (*Id.* at 7:23-25; Ex. 1002.) Therefore, Morley discloses that a receiver can use the header to determine the associated voice and/or data channels and the rate at which to process the received data, all of which would be transmission characteristics.

### Adams Renders Claims 1-6 of the '568 Patent Obvious

6. In my original Declaration I explained why Adams renders claims 1-6 of the '568 patent obvious. Below I provide an additional discussion of Adams in reply to Patent Owner's Response.

7. Adams discloses the type of information conveyed in the payload and a transmission characteristic of the service, because Adams discloses using the header to determine the proper driver to process the received data, and this driver indicates transmission characteristics.

8. If Adams receives a data packet, it reads the associated data and performs certain functions. (Adams at FIG. 7 and 9:41-48; Ex. 1006.) As shown in Figure 7, if Adams receives a video packet, it uses the video driver routines 108 to update the video display window. (*Id.* at FIG. 7 and 9:18-21; Ex. 1006.) This includes using MPEG decoding. (*Id.* at 4:6-9; Ex. 1006.) If Adams receives an

3

**A1517**

audio packet, it uses the audio driver routines 104 to play the audio packet using the audio subsystem. (*Id.* at FIG. 7 and 9:24-32; Ex. 1006.) Even though Adams discloses MPEG, it does not follow that all data types would use MPEG. MPEG (i.e., *Motion Picture* Experts Group) is a video standard for encoding video data. Audio data can be encoded using any of a number of audio codec standards. A person of ordinary skill would understand that different encodings would be used for audio data, and that different transmission characteristics are required to transmit video data, audio data, and other types of data. Other types of data typically require transmission characteristics different from audio; e.g., they could require a higher data rate and more robust channel coding if they are delay-tolerant, such as e-mail data. Because there is often a one-to-one correspondence between the type of data and the requirements on its transmission, Adams implicitly discloses a service type identifier that identifies a type of data and also transmission characteristics.

9.      Regarding Adams rendering obvious a transmitter for sending data, Adams specifically discloses a satellite receiver, and Adams discloses the format of the data received. Therefore it would have been obvious that there would be a transmitter to send the data in the format that Adams discloses receiving it, and the formatted data would need to be generated by some processor that provides it to the transmitter.

4

**A1518**

EXHIBIT 2001

Filed on behalf of:   Telefonaktiebolaget L. M. Ericsson

UNITED STATES PATENT AND TRADEMARK OFFICE

———————————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

———————————

BROADCOM CORPORATION

Petitioner

v.

TELEFONAKTIEBOLAGET L.M. ERICSSON

Patent Owner

———————————

Case IPR2013-00601, -602, and -636
Patent Nos. 6,772,215, 6,466,568, and 6,424,625

———————————

**Patent Owner's Requests For Production**

A1568

## PATENT OWNER'S REQUESTS FOR PRODUCTION

Pursuant to 37 C.F.R.§ 42.51(b), Patent Owner Ericsson Telefonaktiebolaget L.M. Ericsson ("Ericsson") hereby requests that Petitioner Broadcom, Inc. ("Broadcom") produce for inspection and copying the documents requested below, within 20 days of the Board's Order, service thereof at the offices of Lee & Hayes, 13809 Research Blvd., Suite 405, Austin, TX 78750. Due to the timing and scheduling order, Ericsson requests that Broadcom produce its responses on a rolling basis, with any contracts or agreements in Request Nos. 1-3 being produced as early as possible.

## INSTRUCTIONS

1.    If any of the following requests cannot be answered in full after exercising due diligence to secure the information, please so state and answer to the extent possible, specifying your inability to answer the remainder and stating whatever information you have concerning the unanswered portions.

2.    You must produce all documents responsive to these requests which are in your actual or constructive possession, custody or control, including all documents within the actual or constructive possession, custody or control of any representative, agent, employee, attorney, accountant, investigator or any person acting for you or on your behalf.

3.    All documents are to be produced as they are kept in the usual course of business, in the files in which such documents have been maintained, and in the order within each file in which such documents have been maintained; or all documents shall be organized and labeled to correspond with the requests below.

4.    If you withhold any document(s) from production on the basis of a claim of attorney-client or any other privilege, or on the basis of the attorney work-product doctrine, you must set

### A1569

forth with specificity the privilege or work product claim and furnish a list identifying each document for which the privilege or work product doctrine is claimed and a description thereof.

5.    If, in responding to the requests, you claim that there is any ambiguity in either a particular request or in a definition or an instruction applicable to the request, that claim shall not be used by you as a basis for refusing to respond, but you shall set forth as part of the response the language deemed to be ambiguous and the interpretation chosen or used in responding to the particular request.

6.    Electronic records and computerized information are to be produced in an intelligible format together with a description of the system from which it is derived sufficient to permit rendering the material intelligible.

7.    The requests are to be regarded as continuing, and you are requested to provide any additional information or documents by way of supplemental responses as specified in Federal Rule of Civil Procedure 26(e).

## DEFINITIONS

1.    The terms "you," "your," "Broadcom," and "Petition" refer to Broadcom Corporation and each of its directors, officers, employees, agents, representatives, affiliates, predecessors, successors, assigns, or licensees, privies, and any other person or entity acting or purporting to act on its behalf, and, unless privileged, its attorneys.

2.    The term "the D-Link Litigation" refers to *Ericsson Inc. et al. v. D-Link Corp., et al.*, Civil Action No. 6:10-CV-473 (LED/KGF) in the United States District Court for the Eastern District of Texas.

3.    The term "the D-Link Defendants" refers to the Defendants in *Ericsson Inc. et al. v. D-Link Corp., et al.*, Civil Action No. 6:10-CV-473 (LED/KGF), collectively, including D-Link

**A1570**

Corporation, D-Link Systems, Inc., Netgear, Inc., Acer Inc., Acer America Corporation,

Gateway Inc., Dell, Inc., Toshiba Corporation, Toshiba America, Inc., Toshiba America

Information Systems, Inc., Toshiba America Consumer Products, LLC, Belkin International,

Inc., and Intel Corporation.

4.      The term "the '568 Patent" refers to U.S. Patent No. 6,466,568.

5.      The term "the '625 Patent" refers to U.S. Patent No. 6,424,625.

6.      The term "the '215 Patent" refers to U.S. Patent No. 6, 772,215.

### REQUESTS FOR PRODUCTION OF DOCUMENTS AND THINGS

**REQUEST FOR PRODUCTION NO. 1:**   All executed contracts or agreements between Broadcom and any of the D-Link Defendants relating to Wi-Fi compliant products, such as the BCM4313 and BCM4321, that are used in any of the D-Link Defendants' products accused of infringement in the D-Link Litigation.

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 2:**   All executed contracts or agreements between Broadcom and any of the D-Link Defendants that include any indemnity or duty to defend provisions.

**RESPONSE**:

**REQUEST FOR PRODUCTION NO. 3**:   All joint defense agreements, or other agreements addressing cooperation on the defense of the D-Link Litigation, between Broadcom and any of the D-Link Defendants relating to the D-Link Litigation.

**RESPONSE**:

**REQUEST FOR PRODUCTION NO. 4:** All invoices provided to or received from any of the D-Link Defendants, or their counsel, seeking reimbursement for any fees or expenses incurred in the D-Link Litigation.

**RESPONSE**:

**REQUEST FOR PRODUCTION NO. 5:** Records of any payments made by Broadcom to any of the D-Link Defendants, or their counsel, or to Ericsson, pursuant to any actual or alleged contractual duty to defend or indemnify any the D-Link Defendants for any fees or expenses incurred in the D-Link Litigation.

**RESPONSE**:

**REQUEST FOR PRODUCTION NO. 6:** All emails and written correspondence between any of the D-Link Defendants, or their counsel, and Broadcom, or its counsel, relating to any claimed duty of Broadcom to defend or indemnify any of the D-Link Defendants in the D-Link Litigation from January 1, 2010 to the present.

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 7:** All emails and written correspondence between Broadcom, or its counsel, and any of the D-Link Defendants, or their counsel, from January 1, 2010 to the present relating to:

A.  The filing of IPR2013-00601, IPR2013-00602, and IPR2013-00636;

**A1572**

B.  Intervention by Broadcom in the D-Link Litigation;

C.  The claim construction or interpretation of any of the patents at issue in the D-Link Litigation, including, but not limited to, the '568 Patent, the '625 Patent, or the '215 Patent; and

D.  The validity or alleged invalidity of any of the patents at issue in the D-Link Litigation, including, but not limit to, the '568 Patent, the '625 Patent, or the '215 Patent.

**RESPONSE:**

Dated: December 11, 2013.

    /Peter J. Ayers/

PETER AYERS, Reg. No. 38,374
Lee & Hayes, PLLC
13809 Research Blvd., Suite 405
Austin, TX 78750
Telephone: 512.505.8162
Fax: 509.944.4693
Attorney for Patent Owner Telefonaktiebolaget
   L.M. Ericsson

**A1573**

CERTIFICATE OF SERVICE

The undersigned certifies that on December 3, 2013 the foregoing PATENT OWNER'S REQUESTS FOR PRODUCTION was served on Lead and Back-up Counsel for Broadcom Corporation by sending the same via Federal Express to the service address provided in Broadcom's Mandatory Notices:

Dominic E. Massa, Lead Counsel
Michael A. Diener, Back-up Counsel
Wilmer Cutler Pickering Hale and Dorr, LLP
60 State Street
Boston, MA 02109

/Peter J. Ayers/
Peter J. Ayers, Reg. No. 38,374

**A1574**

Table of Contents

Due to the nature of our compensation programs, most of our executive officers sell shares of our common stock each quarter or otherwise periodically, often pursuant to trading plans established under Rule 10b5-1 of the Securities Exchange Act of 1934, as amended, or the Exchange Act. As a result, sales of shares by our executive officers may not be indicative of their respective opinions of Broadcom's performance at the time of sale or of our potential future performance. Nonetheless, the market price of our stock may be affected by sales of shares by our executive officers.

**We may be required to defend against alleged infringement of intellectual property rights of others and/or may be unable to adequately protect or enforce our own intellectual property rights.**

Companies in the semiconductor industry and the wired and wireless communications markets aggressively protect and pursue their intellectual property rights. From time to time, we receive notices that claim we have infringed upon, misappropriated or misused other parties' proprietary rights. Additionally, we receive notices that challenge the validity of our patents. Some of these notices involve "non-practicing entities," or NPEs, asserting claims addressing certain of our products. Intellectual property litigation can be expensive, time consuming and distracting to management. An adverse determination in any of these types of disputes could prevent us from manufacturing or selling some of our products or could prevent us from enforcing our intellectual property rights. Further, settlements can involve royalty or other payments that could reduce our profit margins and adversely affect our financial results.

We may also be required to indemnify some customers and strategic partners under our agreements if a third party alleges or if a court finds that our products or activities have infringed upon, misappropriated or misused another party's proprietary rights. We have received requests from certain customers and strategic partners to include increasingly broad indemnification provisions in our agreements with them. These indemnification provisions may, in some circumstances, extend our liability beyond the products we provide to include liability for combinations of components or system level designs and for consequential damages and/or lost profits. Even if claims or litigation against us are not valid or successfully asserted, these claims could result in significant costs and diversion of the attention of management and other key employees to defend.

Our products may contain technology provided to us by other parties such as contractors, suppliers or customers. We may have little or no ability to determine in advance whether such technology infringes the intellectual property rights of a third party. Our contractors, suppliers and licensors may not be required to indemnify us in the event that a claim of infringement is asserted against us, or they may be required to indemnify us only up to a maximum amount, above which we would be responsible for any further costs or damages. Any of these claims or litigation may materially and adversely affect our business, financial condition and results of operations.

Furthermore, our success and future revenue growth will depend, in part, on our ability to protect our intellectual property. It is possible that competitors or other unauthorized third parties may obtain, copy, use or disclose our technologies and processes, or confidential employee, customer or supplier data. Any of our existing or future patents may be challenged, invalidated or circumvented. We engage in litigation to enforce or defend our intellectual property rights, protect our trade secrets, or determine the validity and scope of the proprietary rights of others, including our customers. We also enter into confidentiality agreements with our employees, consultants and strategic partners and control access to and distribution of our technologies, documentation and other proprietary information. Despite these efforts, internal or external parties may attempt to copy, disclose, obtain or use our products, services or technology without our authorization. If we cannot adequately protect our technology, our competitors may be able to offer products similar to ours.

Our software may be derived from "open source" software, which is generally made available to the public by its authors and/or other third parties. Open source software is often made available under licenses, which impose certain obligations in the event we distribute derivative works of the open source software. These obligations may require us to make source code for the derivative works available to the public, and/or license such derivative works on different terms than those customarily used to protect our intellectual property. With respect to our proprietary software, we generally license such software under terms that prohibit combining it with open source software. Despite these restrictions, parties may combine our proprietary software with open source software without our authorization, in which case we might nonetheless be required to release the source code of our proprietary software.

We cannot assure you that our efforts to prevent the misappropriation or infringement of our intellectual property or the intellectual property of our customers will succeed. Identifying unauthorized use of our products and technologies is difficult and time consuming. The initiation of litigation may adversely affect our relationships and agreements with certain customers that have a stake in the outcome of the litigation proceedings. Litigation is very expensive and may divert the attention of management and other key employees from the operation of the business, which could negatively impact our business and results of operations.

46

**Brad Caldwell**

---

**Subject:** FW: (Acer): Ericsson GPLA(PC/End-User-Terminal) - following steps

---

**From:** Kate_Ci_Shang@acer.com.tw [mailto:Kate_Ci_Shang@acer.com.tw]
**Sent:** Friday, June 04, 2010 11:02 AM
**To:** ROGER TU
**Subject:** RE: (Acer): Ericsson GPLA(PC/End-User-Terminal) - following steps

Dear Roger, for Wilan patents, we've been gathering vendors' inputs, and would need to discuss further. Is it possible to arrange another meeting before meeting in Sweden?

**Main purpose is to discuss comments from Acer's vendors, including Intel, Broadcom and Atheros. Orrick will lead the discussion so I don't mind if we meet in US with your counsels there.**

Kate

| | |
|---|---|
| ROGER TU <roger.tu@ericsson.com> | To "Kate_Ci_Shang@acer.com.tw" <Kate_Ci_Shang@acer.com.tw> |
| 2010/06/04 上午 10:54 | cc |
| | Subject RE: (Acer): Ericsson GPLA(PC/End-User-Terminal) - following steps |

Dear Kate,

We don't expect any technical discussion for the meeting in Sweden. Both parties should aim to conclude the commercial discussion then.

BR/Roger

---

**From:** Kate_Ci_Shang@acer.com.tw [mailto:Kate_Ci_Shang@acer.com.tw]
**Sent:** Friday, June 04, 2010 10:47 AM
**To:** ROGER TU
**Subject:** Re: (Acer): Ericsson GPLA(PC/End-User-Terminal) - following steps

Dear Roger, regarding the technical discussion about Wlan patents, do you expect that we do it the same

day when we visit Sweden?

Kate

**A1809**

6/30/2010

**ROGER TU**
**<roger.tu@ericsson.com>**

To "lydiawu@acer.com.tw" <lydiawu@acer.com.tw>

2010/06/01 上午 11:29

cc Kasim Alfalahi <kasim.alfalahi@ericsson.com>, Andreas Iwerb鉄k <andreas.iwerback@ericsson.com>, Martin Karlsson <martin.karlsson@ericsson.com>, "bj_lin@acer.com.tw" <bj_lin@acer.com.tw>, "Kate_Ci_Shang@acer.com.tw" <Kate_Ci_Shang@acer.com.tw>

Subject (Acer): Ericsson GPLA(PC/End-User-Terminal) - following steps

Dear Lydia,

Thanks for the meeting dated May 19th. Both parties have reached certain consensus regarding the issue of Ericsson patent license(PC/End-User-Terminal). I hereby summarize the action points for your reference:

**PC (WLAN/WiMAX patent license)**
Acer requested to have more technical discussion with the chipset suppliers. To facilitate the technical discussion, Ericsson agreed with that Acer can disclose the Chipworks documents(reverse-engineering, Acer PC vs. Ericsson WLAN patent) to Acer's suppliers. Since Ericsson has provided all the necessary technical information, we don't expect a long technical discussion in this case. Acer should make the decision and conclude the commercial discussion as soon as possible.

As both parties agreed, the next meeting will be held in Sweden. The tentative schedule is below:

Date: June 29th, 2010

Time: 09:30AM~12:00PM

Place: Ericsson office

Torshamnsgatan 21-23, Stockholm, Sweden

6/30/2010

**A1810**

I would need Acer's confirmation in order to arrange the meeting. If any questions, please don't hesitate to call me.

Best Regards

**ROGER TU**
**IPR Director, Licensing & Patent Development**

Ericsson (China) Communications Co. Ltd.
No.5 Lize East Street, Chaoyang District
Beijing, China
Phone +86-10-84769600
Fax +86-10-84767765
Mobile +86-13581626085
roger.tu@ericsson.com
www.ericsson.com



This Communication is Confidential. We only send and receive email on the basis of the terms set out at www.ericsson.com/email_disclaimer

**A1811**

6/30/2010

EXHIBIT 2009

**CONFIDENTIAL PAGES REMOVED**

**A1820-1855**

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## TYLER DIVISION

|  |  |  |
|---|---|---|
| **ERICSSON INC., et al.,** | § § § § § | |
| **Plaintiffs,** | § § | |
| **vs.** | § § | **CASE NO. 6:10-CV-473** |
| **D-LINK CORPORATION, et al.,** | § § § | |
| **Defendants.** | § § § | |

## ORDER

Before the Court are Plaintiff Ericsson Inc.'s Emergency Motion for Relief from the Protective Order (Docket No. 662) and Ericsson's Emergency Motion for Expedited Briefing (Docket No. 664). For the following motions, the motions are **DENIED**.

## BACKGROUND

On August 8, 2013, the Court entered final judgment against Defendants Toshiba Corporation and Toshiba America Information Systems, Inc., (collectively, "Toshiba") and Dell, Inc. ("Dell") in favor of Plaintiffs Ericsson Inc. and Telefonakiebolaget LM Ericsson (collectively, "Ericsson"). During the course of the litigation, Ericsson discovered (1) an indemnity agreement between Toshiba and non-party Broadcom Corporation ("Broadcom"), (2) an indemnity agreement between Dell and Broadcom, and (3) an email between Dell and Broadcom discussing indemnification (collectively "Indemnity Documents"). Dell and Toshiba disclosed the Indemnity Documents pursuant to the Court's Protective Order, originally issued on October 18, 2011. Docket No. 148.

**A1985**

In the Motion for Relief from the Protective Order, Ericsson requests to disclose the Indemnity Documents in an inter partes review proceeding ("IPR") at the Patent Trial and Appeal Board ("PTAB"), which was initiated by Broadcom on September 20, 2013. According to Ericsson, the Indemnity Documents show Broadcom is in privity with Dell and Toshiba, or at least show additional discovery is warranted on the issue. Docket No. 662 at 1. If Broadcom is in privity with Dell or Toshiba, Broadcom would be ineligible to petition for an IPR pursuant to the one-year bar of 35 U.S.C. § 315(b) ("An inter partes review may not be instituted if the petition requesting the proceeding is filed more than 1 year after the date on which the petitioner, real party in interest, or privy of the petitioner is served with a complaint alleging infringement of the patent."). In opposition, Dell and Toshiba argue the potential benefit to Ericsson for modifying the Protective Order will be outweighed by the potential harm they will suffer. Specifically, Dell and Toshiba argue indemnification agreements do not show privity under the PTAB's recent rulings, and that as non-parties to the IPR, they will no longer in control of their confidential materials. Docket Nos. 668 at 5, 669 at 2–3.

In the Motion for Expedited Briefing, Ericsson requests the Court to order Toshiba and Dell to file redacted, non-confidential versions of their briefs in response to the Motion for Relief from the Protective Order. Docket No. 664 at 2. Ericsson intends to use these briefs to "update the PTAB on the status" of Ericsson's Motion for Relief from the Protective Order and to show the PTAB the Defendants' "stated basis for opposing the motion." *Id.* Dell has agreed to this request and Toshiba opposes. Docket Nos. 666, 667.

2

**A1986**

## ANALYSIS

*Motion for Relief from Protective Order*

Compared to district courts, the PTAB has an intentionally narrower scope of discovery. *See* 35 U.S.C. § 316(a)(5)(B) (limiting discovery to what is "necessary for the interest of justice"). Additionally, the PTAB has a corresponding narrower protection for the confidentiality of discoverable materials. *See* "Office Patent Trial Practice Guide," 77 Fed. Reg. 48761 ("Confidential information that is subject to a protective order ordinarily would become public 45 days after denial of a petition to institute a trial or 45 days after final judgment in a trial."). Granting Ericsson's request for relief from the Protective Order would allow Ericsson to circumvent this balance between IPR discovery and confidentiality. In essence, Ericsson would be able to use the Court's broader Rule 26 "relevancy" standard for discovery, yet subject Dell and Toshiba to the PTAB's narrower protections of confidentiality. *Id.* Relatedly, Ericsson only is aware of the Indemnity Documents as a matter of coincidence because of its former litigation and the broad scope of discovery pursuant to Rule 26.

Moreover, granting Ericsson relief from the Protective Order in this case would undermine the negotiations which produced the Protective Order. Ericsson, as the plaintiff in the district court litigation and the patent owner in any potential IPR, was in the best position to negotiate whether it may disclose documents discovered during litigation in an IPR.[1] Accordingly, Ericsson's Emergency Motion for Relief from the Protective Order is **DENIED**.

---

[1] For example, the parties considered proceedings at the PTAB when they negotiated the protective order, and agreed that anyone who viewed confidential information "may not participate, directly or indirectly, in the drafting preparation, or amending of any patent claim [and] may not reveal the content of [confidential] materials to reexamination counsel or agents." Docket No. 148 at 10–11. Ericsson has failed to show why this protection should not apply to the IPR.

**A1987**

*Motion for Expedited Briefing*

Ericsson requests an expedited briefing schedule and for Dell and Toshiba to provide redacted, non-confidential briefs in response to Ericsson's Motion for Relief from Protective Order.  The Court has ordered an expedited briefing schedule.  Docket No. 665.  Accordingly, Ericsson's requests concerning the briefing schedule are **DENIED AS MOOT**.  Additionally, Dell has agreed to provide a redacted response brief.  Docket No. 667.  Furthermore, the Court has denied Ericsson's underlying request for relief from the Protective Order.  Consequently, there is little, if any, benefit in ordering Toshiba to supply a redacted response brief.  Accordingly, Ericsson's request to require Toshiba to file a redacted brief is **DENIED**.

**So ORDERED and SIGNED this 20th day of December, 2013.**

**LEONARD DAVIS**
**UNITED STATES DISTRICT JUDGE**

4

**A1988**

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TYLER DIVISION

| | | |
|---|---|---|
| ERICSSON. INC., ET AL., | § | |
| | § | |
| **Plaintiffs,** | § | |
| | § | |
| vs. | § | **CASE NO. 6:10-CV-473** |
| | § | |
| D-LINK CORPORATION. ET AL., | § | |
| | § | |
| **Defendants.** | § | |
| | § | |

## FINAL JUDGMENT PURSUANT TO FED. R. CIV. P. 54(b)

On September 14, 2010, Ericsson Inc. and Telefonaktiebolaget LM Ericsson ("Ericsson") filed this action against D-Link Corporation[1] and D-Link Systems, Inc. ("D-Link"), Netgear, Inc. ("Netgear"), Acer, Inc. and Acer America Corporation ("Acer") and Gateway, Inc. ("Gateway"). Ericsson filed an amended complaint on June 8, 2011. The amended complaint added the following defendants: Dell, Inc. ("Dell"); Toshiba Corporation, Toshiba America, Inc.,[2] Toshiba America Information Systems, Inc., and Toshiba America Consumer Products, LLC ("Toshiba"); and Belkin International, Inc. ("Belkin"). Intel Corporation ("Intel") intervened in this action on June 22, 2012, and Ericsson brought a counterclaim against Intel on July 3, 2012. The Court conducted an eight day trial beginning June 3, 2013. Final judgment is now appropriate because all issues between Ericsson and the Defendants have been finally resolved by either the jury or the Court's Memorandum Opinion and Order (Docket No. 615).

---

[1] The Court dismissed D-Link Corporation on January 31, 2011. Docket No. 54.

[2] The Court dismissed Toshiba America, Inc. and Toshiba America Consumer Products, LLC on August 16, 2011. Docket No. 120.

Broadcom v. Ericsson
IPR2013-00602
Ericsson Ex. 2018

**A1998**

Therefore, pursuant to Rule 54(b) of the Federal Rules of Civil Procedure, consistent with the Court's Memorandum Opinion and Order, and the Court having expressly determined that there is no just cause for delay, the Court **ORDERS AND ENTERS FINAL JUDGMENT** as follows:

- Defendants D-Link, Netgear, and Belkin are found to infringe Claims 1 and 5 of U.S. Patent No. 6,466,568. Defendants Acer/Gateway, Dell, Toshiba, and Intel are found to infringe Claim 1 of U.S. Patent No. 6,466,568.

- Defendants D-Link, Netgear, Belkin, Acer/Gateway, Dell, Toshiba, and Intel are found to infringe Claim 1 of U.S. Patent No. 6,424,625.

- Defendants D-Link, Netgear, Belkin, Acer/Gateway, Dell, Toshiba, and Intel are found to not infringe Claims 1 and 2 of U.S. Patent No. 6,330,435.

- Defendants D-Link, Netgear, Belkin, Acer/Gateway, Dell, Toshiba, and Intel are found to infringe Claims 1 and 2 of U.S. Patent No. 6,772,215.

- Defendants Acer/Gateway, Dell, Toshiba, and Intel are found to not infringe Claim 11 of U.S. Patent No. 6,519,223.

- The Asserted Claims are valid.

- Defendants' infringement was not willful.

- The Court awards the following in damages to Ericsson for Defendants' infringement of the claims found infringed: $435,000 for D-Link; $3,555,000 for Netgear; $1,170,000 for Acer/Gateway; $1,920,000 for Dell; $2,445,000 for Toshiba; and $600,000 for Belkin.

- Ericsson is further awarded pre-judgment interest, post-judgment interest, and an ongoing royalty as detailed in the Court's Memorandum Opinion and Order.

2

**A1999**

Case: 15-1945   Document: 40   Page: 388   Filed: 03/10/2016

All relief not specifically granted herein is **DENIED**. All pending motions not previously resolved are **DENIED.**

**So ORDERED and SIGNED this 8th day of August, 2013.**

_____
**LEONARD DAVIS**
**UNITED STATES DISTRICT JUDGE**

**A2000**

UNITED STATES PATENT AND TRADEMARK OFFICE

———————————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

———————————

BROADCOM CORPORATION
Petitioner

v.

TELEFONAKTIEBOLAGET LM ERICSSON (PUBL)
Patent Owner

———————————

Case IPR2013-00602
Patent 6,466,568
Title: Multi-Rate Radiocommunication System and Terminals

———————————

**DECLARATION OF ROBERT AKL, D.Sc.,
IN SUPPORT OF PATENT OWNER'S RESPONSE**

Broadcom v. Ericsson
IPR2013-00602
Ericsson Ex. 2020

**A2002**

Case IPR2013-00602
Patent 6,466,568

relating to the same connection as the payload or data field in that time slot, e.g., a service type identifier which informs the mobile or base station of the type of information (*e.g.*, voice, video or data) being conveyed in the payload." *Id.* at 3:11-16. This information "is used by the receiving equipment to aid in processing the information conveyed in the payload, *e.g.*, by knowing the channel coding rate." *Id.* at 3:16-19.

17. Fig. 6 of the '568 Patent illustrates one approach for implementing a service type identifier in a FOC field. Here, the FOC field can be populated with "information regarding the type of service which the associated payload is currently supporting, the channel coding and/or interleaving associated therewith." *Id.* at 9:29-32. In each case, the FOC field provides transmission characteristics for the communication of the information between the base and mobile stations. For example, information regarding the type of service necessarily reduces to transmission characteristics. So too do channel coding and interleaving. The '568 Patent therefore consistently uses the service type identifier to identify the type of service, including transmission characteristics.

11

**A2012**

Case IPR2013-00602
Patent 6,466,568

## FIG. 6

| SLOT 1 | SYNC | SACCH | DATA | CDVCC | DATA | CDL |
| SLOT 2 | SYNC | FOC | DATA | FOC | DATA | FOC |
| SLOT 3 | SYNC | FOC | DATA | FOC | DATA | FOC |

18.    Different types of information can be efficiently communicated by exploiting the communication characteristics of the service type. But if a receiver is unable to determine the service type(s) of the payload(s) of each data packet, the receiver would not know how to efficiently process the data streams. For example, efficient communication of various types of data may involve different channel coding, different interleaving, or error correction. *Id*. at 2:28-50; 9:27-32. Moreover, different data types may have different tolerances for delay. *Id*. at 2:50-55. The service type identifier of the '586 patent identifies the type of information communication, and in some cases, the type of data in the payload so that different types of information can be efficiently communicated.

19.    The '568 Patent recognized that advancement and evolution of radio communication systems would also allow new types of information with different transmission characteristics to be exchanged. Rather than attempt to predict all these future changes, the '568 Patent proposes using a service type identifier to describe, among others, the transmission characteristics of a data payload. *Id*. at

12

**A2013**

Case IPR2013-00602
Patent 6,466,568

24.    The phrase "service type" is central to the recited claims.  The '568 Patent is not merely directed toward only identifying the type of information in a payload.  Rather, it establishes a system protocol whereby the "information can be used by the receiving equipment to aid in processing the information conveyed in the payload."  '568 Pat. at 3:16-19.  The '568 Patent is directed toward supporting various types of information communication—services—having differing optimal transmission characteristics.  *Id*. at 2:28-30.  These claimed systems and methods can be applied to "multimedia communications where the type of payload may vary rapidly, e.g., on a slot-by-slot basis, or even within each slot."  *Id*. at 3:20-22.  Merely knowing a type of data conveyed in a payload in such a system is insufficient for a receiver to properly process the received data.  Rather the receiver must also know about "a transmission characteristic" of the payload information.  When properly construed, the "service type identifier" does both.

25.    The '568 Patent makes clear that the invention was designed for use in systems where many service types may be used in the transmission of many different types of payloads.  *Id*. at 2:56-60.  The inventors realized that many more types of payloads and service types for use in transmitting those payloads were possible in addition to those discussed in the patents.  See *Id*. at 2:26-28 ("video or hybrid voice, data, and video to support Internet connections[] will likely be supported in the future").  To accommodate different services, the '568 Patent

15

**A2016**

Case IPR2013-00602
Patent 6,466,568

statements made during prosecution than does the Board.  In my opinion, the district court placed undue weight on a statement made by the inventor during the prosecution history to reach its conclusion.  Ex. 1011, p. 19, 13-17.  Accordingly, in my opinion, Broadcom's reliance on the district court's construction is misplaced.  Pet. at 7.  When put in context, none of the statements made by Ericsson during prosecution in the file history undermine Ericsson's proposed construction under the broadest reasonable construction.

28.    The patent distinguishes between "information" and "services," and nowhere does the '568 Patent refer to services as merely information.  "Services" refer to the "various types of information transmission."  '568 Pat. at 2:28-29.  The type of information transmission (including the characteristics of transmitting that information)—and not merely the information itself—is central to a "service."

29.    I understand that both Broadcom and the Board relied, in part, on statements made by the patentee during the prosecution history of the '568 Patent to support their construction.  In particular, both rely on the statement made by the applicantthat "it may not be possible to identify the type of payload information upon an indication of channel coding since the type of channel coding identified may be employed for different types of information" (Ex. 1016 ('568 Prosecution History, Amendment of May 10, 2002)).  In my opinion, the applicant meant that the prior art only identified the type of coding; it did not identify both (1) the type

17

**A2018**

Case IPR2013-00602
Patent 6,466,568

of service, and (2) the information conveyed in the payload. And since channel coding does not necessarily uniquely identify a service type, channel coding by itself cannot be a service type identifier. Instead, the service type identifier must also identify the information conveyed in the payload just as recited by claim 1 of the '568 Patent. Accordingly, in my opinion, this statement supports Ericsson proposed construction for this term.

30.    In my opinion, the statements made during the prosecution simply recognized that the disclosure of a "type of channel coding" was not sufficient to teach or suggest the recitation of "identif[ying] a type of payload information." Ex. 1016, p. 5, lines 14-20. This statement says nothing about whether the "service type" identifies "transmission characteristics" of the service.

31.    In my opinion, Broadcom's proposed construction for this term is not the broadest reasonable construction because it ignores the purpose and plain meaning of the "service type identifier" by replacing it with one thing identified by the "service type identifier." Such an interpretation would rewrite the claim to recite "a payload type identifier" or just "an identifier" and is not supported by the specification and prosecution history. In my opinion, the broadest reasonable interpretation for "a service type identifier which identifies a type of payload information provided in said at least one first field" consistent with the totality of the written description is "an identifier that identifies a transmission characteristic

18

Case IPR2013-00602
Patent 6,466,568



FIG.2

34.    Users of Morley communicate with each other using the telephone handsets 16 and exchange visual data from a graphics tablet 12. *Id*. at 3:11-15. A voice coder/decoder 24 digitizes voice signals into outgoing voice frames. *Id*. at 43-49. Via a multiplexer, a voice frame is combined with any available data from the tablet to "form mux frames including both voice and image data." *Id*. at 4:38-41. The multiplex frame is then converted into an analog signal by a modem 26 and sent to the other user through the telephone connection. *Id*. at 4:42-44.

35.    The purpose of Morley is to ensure synchronization of the combined voice frame, thereby eliminating transmission errors caused by clock errors. "Morley provides a multiplexer enabling voice frames, or other framed data, to be

20

**A2021**

Case IPR2013-00602
Patent 6,466,568

transmitted without degradation due to timing errors whilst maintaining efficient use of bandwidth." *Id*. at 1:52-55. Morley recognized that using separate clocks for voice and data information during transmission introduces errors that may propagate and produce a loss of synchronization. *Id*. at 1:28-34. To address this issue, Morley embedded a signal in the header for use as a clock for both the transmitted voice frame and data. *Id*. at 5:39-44, 7:34-35.

36. The header of the mux frame serves two purposes. First, the header identifies the "frame type." The receiver sorts received information to the appropriate voice or data hardware based on the frame type: "the header of a received frame is checked and status, voice and non voice fields are written to the voice and data buffers 70 and 72 as appropriate." *Id*. at 10:19-22. Second, the receiver compares the header value to one of the 16 unique header values shown in the table below for error determination purposes:

21

**A2022**

Case IPR2013-00602
Patent 6,466,568

header does not match a predetermined header value, the receiver checks the frame for errors, which if present, causes the transmitter and receiver to resynchronize. *Id*. at 7:64-8:10.

## 2. Morley does not disclose a service type identifier

39.     Broadcom cites the header value of Morley shown in the table reproduced above as disclosing, teaching or suggesting the claimed "service type identifier" because the header value can be used to indicate which of a voice channel, one of three different data channels, or a combination of these channels is included in the multiplex frame. *Id*. at 7:1-17; Figs. 5a-5g.  I disagree.  To reach its erroneous conclusion, Broadcom mischaracterizes Morley in two important respects.

40.     First, the header is not a "service type identifier" because Morley only communicates a composite frame of voice and data.  Morley is concerned with a system that combines "at least two types of data and send[s] a composite signal over a single physical channel." *Id*. at 1:57-59.  The multiplex frame in Morley can include voice only, data only, or a combination of a voice frame and data. *Id*. at 5:52-53; 6:33-53; 7:1-17.  But just because a mux frame may take one of various forms does not deem the communication of each type of mux frame a separate service.  Separate voice and data services for the mux frame require that the voice frame and data each be independently communicated, rather than communicated as

23

**A2024**

Case IPR2013-00602
Patent 6,466,568

a single composite unit.  In other words, the '568 Patent requires a separate service type identifier for each service, rather than redundant service type identifiers for one service.

41.　　Morley treats each mux frame as a composite unit, rather than as an independent communication of each type of information in the composite frame. Although a mux frame consists of a voice frame (if any) and a data frame (if any), communication of the mux frame is not optimized for separate communication of the voice and data.  Rather, a received mux frame is deconstructed into its constituent parts (voice, if any, and data, if any) after transmission.  Because Morley describes only one type of information communication, it cannot disclose a service type identifier.  In my opinion such an identifier would be meaningless in the context of communicating only one type of information.

42.　　Second, the header is not a service type identifier because, when properly construed, a "service type identifier" identifies transmission characteristics of the service, but the header in Morley does not identify any transmission characteristics of the composite mux frame.  The header provides synchronization information, not transmission characteristics:  "Synchronization between two multiplexers is achieved and maintained by searching for the mux frame headers."  *Id*. at 7:34-35.  The header values do not allow devices in the system to account for different transmission characteristics of different service

24

**A2025**

Case IPR2013-00602
Patent 6,466,568

types, let alone identify any transmission characteristics of the information conveyed in the payload.

43.   Indeed, the transmission characteristics of the voice frame and data cannot be part of the header value.  To the extent that they exist, the transmission characteristics are separately embedded into the voice frames and data by the codec and processor, respectively.  "Error correction may be added to the data channels by the multiplexer."  *Id.* at 5:15-16.  Specifically, the "multiplexer may perform error correction on data channels, thus ensuring error free data to the protocol and application layers."  *Id.*  at 8:34-36.  Moreover, the voice codec may provide error correction information to the receiver.  *Id.* at 8:24-28 ("Some voice coders incorporate forward error correction (FEC) and some send a checksum.  Both schemes increase the bandwidth required by the voice channel, the additional information is used for error correction/detection at the voice decoder.")

44.   The multiplexer and the voice coder, not the header, add error correction to the voice frames and data.  *Id.* at 5:15-16; 8:22-33.  A single header type could relate to the same type of voice frame or data with entirely different error correction characteristics.  Merely adding error correction to the voice frames or data before creating a composite mux frame does not create a new service. Because one header type can refer to different types of data, each having a unique error correction procedure, the header type cannot be a service type.  In reality, one

25

**A2026**

Case IPR2013-00602
Patent 6,466,568

service type exists in Morley, and that service is the communication of composite voice and data information. In my opinion, the header value does not identify transmission characteristics to the receiver for proper decoding of the received information, as required by the claimed "service type identifier."

### 3. Morley does not disclose an identifier identifying a type of information conveyed in the payload

45. Morley does not anticipate the '568 claims for another reason. The header does not identify a type of payload information. The structure of the mux frames is optimized "according to 'long term' requirements of the application and protocol layers." *Id*. at 5:60-62. The organization of the frames is determined by the transmitter and reflected in the header. The header is merely a shorthand notation for the optimal structure or framework of a multiplex frame.

46. Morley discloses 13 types of composite frames that transport data:

- 1 composite frame that includes voice frames (Header Type 1)

- 6 composite frames that each include data from each of the three different data channels (Data 0, Data 1, Data 2) and zero-padded versions of these data channels (Data 0*, Data 1*, Data 2*)

- 6 composite frames that each include a voice frame combined one of the data channels (which may be zero-padded)

*Id.* at 7:1-25.

26

**A2027**

Case IPR2013-00602
Patent 6,466,568

47.    Morley is premised on transporting data using pre-determined mux frame types, depending on the data that is currently available for transport. Rather than identifying (1) the type of information conveyed in the payload, and (2) the service type for the information conveyed in the payload, as does the '568 Patent, Morley transmits the data using only one service type, and selects the frame format (using the header) to transport the available data.

48.    The header in Morley defines the format (or structure) of the information transmitted, rather than identify the payload data itself. A composite mux frame can include a voice frame and varying amount of data; therefore Morley provides a header for use with a demultiplexer to select and route the received voice and data information to the appropriate processor (codec or system processor). The header value merely specifies which portions of the payload data are to be sent to the voice buffers and which portions are sent to the data buffers. "Received data is demultiplexed into voice and data components according to the synchronization information." *Id*. at 5:11-13. At the receiver, "[t]he analog signal received is converted back into frames of digital data by the modem 26a and sent to the mux 22a where they are demultiplexed into frames of voice data and a stream of data." *Id*. at 4:45-48. Morley would have no need for a demultiplexer had the header provided a service type identifier which identifies the type of information conveyed in the payload. But since it did not, the codec and the mux

27

**A2028**

Case IPR2013-00602
Patent 6,466,568

need to be aware of the transmission characteristics of the data.

49.    Because the header identifies only the structure of the mux frame for proper decoding, in my opinion, the header value of Morley and Morley as a whole fail to disclose, teach or suggest "a service type identifier which identifies a type of payload information provided in said at least one first field" as recited by claim 1. In my opinion, Morley does not anticipate claim 1 of the '568 Patent.

**4.  Morley does not anticipate claims 2-6 of the '568 Patent**

50.    Claims 2-6 of the '568 Patent depend from claim 1.  Because Morley does not disclose, teach or suggest "a service type identifier which identifies a type of payload information provided in said at least one first field" as recited by claim 1, in my opinion, claims 2-6 are not anticipated by Morley.

**D.    The Challenged Claims Are Not Rendered Obvious by Adams**

51.    In my opinion, Adams does not render obvious claims 1-6 of the '568 Patent for two reasons.  First, Adams does not disclose a "service type identifier." Second, Adams does not disclose an "identifier which identifies a type of payload information" as required by the Board's proposed construction.  Adams discloses a system for receiving only three types of data (video, audio, and associated data) for content programmer control of a satellite television display.  Because Adams is concerned with only the transmission of a data stream as three different known and invariant packet types, and ignores identification of any transmission

28

**A2029**

Case IPR2013-00602
Patent 6,466,568

characteristics of such information communication, Adams discloses only one type

of service, and thus does not disclose service type identifiers.

### 1. Overview of Adams

52.     Adams relates to a satellite television receiver system that uses video

and audio data streams in conjunction with associated data streams for "content

programmer control of display and selection functions for a video system." *Id*. at

1:9-11.   Adams discloses a "video system that employs packetized digital data

streams to provide a video stream, an audio stream and a command and control

associated data stream." *Id.* at 2:53-56.  The system relies on devices that receive a

data stream having separate audio, video, and data packets.   Adams is not

concerned with efficiently using bandwidth of the wireless media.  Rather, Adams

is directed toward programmer control of a television screen based on transmitted

satellite television data consisting of labeled video, audio, and associated data

packets.

53.     The Adams system includes separate subsystems for processing each

of three different types of information by checking an ID tag in the header of a

received packet to determine the proper routing for the packet.  In particular, the

ID tag may contain one of a video identifier (VIDEO_ID), an audio identifier

(AUDIO_ID) and a data identifier (DATA_ID) as shown in FIG. 5 below to cause

the receiver to route the packet to the video, audio, and data subsystems,

29

Case IPR2013-00602
Patent 6,466,568

respectively:



*Figure 5*

54.    The system processes the incoming data using a data selector to route the incoming data to the appropriate data queue.  The system does not process the incoming data based on transmission characteristics.  Rather, it merely diverts the incoming packets to an appropriate processor based on the label of each packet as shown in Fig. 3 below:

30

**A2031**

Case IPR2013-00602
Patent 6,466,568



*Figure 3*

55.    The data selector 76 decodes the header of each incoming packet to determine whether to transfer the incoming packet into either the video queue 70, the audio queue 72, or the associated data queue 74." *Id*. at 6:23-26.

### 2.  Adams Does Not Disclose a "service type identifier"

56.    Broadcom contends the ID tag of Adams shown in Fig. 5 discloses, teaches or suggests the claimed "service type identifier" because the ID tag can be used to indicate which of a video, audio, or data is included in the packet.  Adams at 7:9-37.  I disagree.  Labeling a packet is distinct from identifying a service or even transmission characteristics of a service.  Labeling a packet in Adams as audio, voice, or associated data packets confirms that those data packets are merely transmitted separately, but processed together.    No such transmission characteristics are gleaned from such a packet label.

31

**A2032**

Case IPR2013-00602
Patent 6,466,568

57.    Adams is essentially silent as to the transmission characteristics relating to the alleged data types.    Other than disclosing that the "incoming packetized digital data streams received by the satellite receiver 14 conform to the motion picture engineering group (MPEG) video transport standard, *id*. at 4:7-9, Adams does not address whether the incoming packets are otherwise compressed or processed.    A person of ordinary skill in the art would understand that the voice and audio packets in Adams could be compressed using the MPEG standard, but would not glean any information regarding transmission characteristics of the services.    Accordingly, Adams discloses only one type of encoded information, namely the MPEG encoding.    As such, Adams does not teach or disclose "service type identifier" because always relying on MPEG encoding negates the need for a "service type identifier."

58.    The disclosed ID tags are not service type identifiers.    As discussed above, there is only one type of information communication—the transmission of separate and individual audio, voice, and data packets "to provide flexible content programming control in an interactive video system."    *Id*. at 2:19-20.    Because each type of information is associated with only one type of data packet, Adams does not teach or disclose a service type identifier for each packet.    Instead, since each packet includes only one type of data, the receiver need only interpret a label identifying the type of received packet to properly process the packet.    Adams

32

**A2033**

Case IPR2013-00602
Patent 6,466,568

discloses nothing more than sorting data packets based on a label field, which is distinct from a service type identifier.

59.    Further, Adams does not disclose the use of a data slot that can, depending on the service, store or carry various types of information to thereby save bandwidth.  Adams discloses an invariant data structure, namely packets that are always one of three types:  video, audio, or associated data.  Adams did so because he directed his solution to a much simpler problem, namely efficiently receiving and processing discrete audio, video, and other types of data.  As a result, the ID tag does not allow devices in the system to account for different transmission characteristics of different service types, and therefore cannot be a "service type identifier."

**3. Adams Does Not Disclose an "identifier which identifies a type of payload information provided in said at least one first field"**

60.    Even assuming that the ID tags of Adams are "service type identifiers" under the Board's construction of this term, those identifiers, nonetheless do not identify the type of information conveyed in the payload. Instead, the receiver in Adams merely transfers the incoming packet to an appropriate queue based on the ID tag.  "The data selector 76 decodes the header of each incoming packet to determine whether to transfer the incoming packet into either the video queue 70, the audio queue 72 or the associated data queue 74." *Id.*

33

**A2034**

Case IPR2013-00602
Patent 6,466,568

at 6:23-26.    Merely classifying received data packets as a video, audio, or associated data packet says nothing about the transmission characteristics of the received data packet.    As such, the ID tags of Adams and Adams as a whole fail to disclose, teach or suggest "a service type identifier which identifies a type of payload information provided in said at least one first field" as recited by claim 1.

### 4. Adams Does Not Teach or Suggest a transmitter for transmitting information."

61.    After admitting that Adams does not disclose a transmitter, Broadcom contends that "it would have been obvious to provide a transmitter for sending the type of data that Adams receives." Pet. at 47.  I disagree.  Adams discloses an interactive system for controlling the display and selection content in a satellite TV-based system. *Id*. at 1:10-11.  Unlike cellular communication devices, which contain transceivers for the transmission and reception of data, the satellite receivers in Adams only receive data.  The satellite receivers have no transmitter functionality.   Furthermore, Adams does not address whether satellite service providers create content or merely rebroadcast content.    Nonetheless, in my opinion, Adams does not disclose how data is transmitted.  For example, the satellite broadcasting station may simply retransmit the audio, video, and/or associated data.  And if so, its transmitter may not transmit the information recited by the claims.  Without knowing the transmission characteristics of the video,

34

**A2035**

# United States Court of Appeals
# for the Federal Circuit

*WiFi One, LLC v. Broadcom Corporation*, No. 2015-1945

## CERTIFICATE OF SERVICE

I, Robyn Cocho, being duly sworn according to law and being over the age of 18, upon my oath depose and say that:

Counsel Press was retained by NELSON BUMGARDNER PC, attorneys for Appellant to print this document.  I am an employee of Counsel Press.

On **March 10, 2016** counsel has authorized me to electronically file the foregoing **JOINT APPENDIX (confidential and non-confidential versions)**, with the Clerk of Court using the CM/ECF System, which will serve via e-mail notice of such filing to any of the following counsel registered as CM/ECF users:

DOMINIC E. MASSA, ESQ.
KEVIN GOLDMAN, ESQ.
ZACHARY PICCOLOMINI, ESQ.
KATIE SAXTON, ESQ.
WILMER CUTLER PICKERING HALE AND DORR LLP
60 State Street
Boston, MA 02109
617-526-6000
dominic.massa@wilmerhale.com
kevin.goldman@wilmerhale.com
zachary.piccolomini@wilmerhale.com
kate.saxton@wilmerhale.com
*Attorneys for Appellee*

Additionally on this date, the confidential version will be emailed to the above counsel and paper confidential copies will also be mailed to the above principal counsel.

Upon acceptance by the Court of the e-filed document, six confidential paper copies will be filed with the Court within the time provided in the Court's rules.

March 10, 2016                                    /s/ Robyn Cocho
                                                 Counsel Press